1  MARTIN L. FINEMAN, State Bar No. 104413
   SUZANNE TOLLER, State Bar No. 129903
2  DAVIS WRIGHT TREMAINE LLP
   505 Montgomery St., Suite 800
3  San Francisco, California 94111-6533
   Telephone: (415) 276-6500
4  Facsimile: (415) 276-6599

5  T. SCOTT THOMPSON, *pro hac vice application pending*
   JOHN R. EASTBURG, State Bar No. 247380
6  DAVIS WRIGHT TREMAINE LLP
   1919 Pennsylvania Avenue, N.W., Suite 200
7  Washington, D.C. 20006
   Telephone 202-973-4200
8  Facsimile: 202-973-4499

9  ROBERT L. DELSMAN, State Bar No. 142376
   NEXTG NETWORKS, INC.
10 2216 O'Toole Avenue
   San José, California 95131
11
   Attorneys for Plaintiff
12 NextG Networks of California, Inc.

13             IN THE UNITED STATES DISTRICT COURT

14          FOR THE NORTHERN DISTRICT OF CALIFORNIA

15                 SAN FRANCISCO DIVISION

16

17

18 NEXTG NETWORKS OF CALIFORNIA, INC., )  No. _____
   a Delaware corporation,            )
19                                     )  **COMPLAINT FOR DECLARATORY**
                    Plaintiff,        )  **JUDGMENT, INJUNCTIVE RELIEF AND**
20                                     )  **PETITION FOR WRIT OF MANDAMUS**
         v.                           )
21                                     )
   THE CITY AND COUNTY OF SAN         )
22 FRANCISCO and THE DEPARTMENT OF    )
   PUBLIC WORKS OF THE CITY OF SAN    )
23 FRANCISCO,                         )
                                       )
24               Defendants.          )

25

26

27

28

1    Plaintiff NextG Networks of California, Inc. ("NextG") hereby complains against Defendants

2  The City and County of San Francisco (the "City") and The Department of Public Works of the City of

3  San Francisco ("DPW") and for its Complaint and Petition alleges as follows:

4                                    **NATURE OF THE CASE**

5    1.    Recently, this Court reiterated what the Ninth Circuit repeatedly has made clear:

6  California municipalities are prohibited by Section 253 of the federal Communications Act (47 U.S.C.

7  § 253) from imposing complex, discretionary, and burdensome zoning or other obligations on

8  telecommunications providers as a precondition for deploying facilities for the provision of

9  telecommunications services. *NextG Networks of Calif., Inc. v. City of San Francisco* ("*San*

10 *Francisco*"), 2006 U.S. Dist. LEXIS 36101 at *11-12 (Patel, J.) (N.D. Cal. June 2, 2006); *see also*

11 *NextG Networks of Calif., Inc. v. County of Los Angeles* ("*Los Angeles*"), 2007 U.S. Dist. LEXIS 82776

12 at *17 (C.D. Cal. June 20, 2007); *Sprint Telephony PCS, L.P. v. County of San Diego* ("*San Diego*"),

13 490 F.3d 700 (9th Cir. 2007).

14    2.    The City has chosen to ignore state and federal laws, and has attempted to circumvent

15 this Court's ruling interpreting them. After the Court enjoined enforcement of its previous regulatory

16 regime, the City has now adopted a "Wireless Permit Ordinance" (or the "new Ordinance") that again

17 imposes burdensome and wholly discretionary administrative procedures that NextG – a provider of

18 telecommunications service under federal law and a telephone corporation under California law – must

19 endure as a condition of constructing its network in the public rights-of-way. If subjected to the City's

20 new requirements, NextG would once again face an uncertain, indefinite, and continued delay for each

21 of its installations. The City's requirements and the City's actions imposing them have the effect of

22 prohibiting NextG from providing telecommunications services, in violation of 47 U.S.C. § 253.

23 Moreover, the City's requirements are prohibiting NextG from immediately deploying to fulfill

24 customer contracts for service.

25    3.    This case presents facts and municipal requirements strikingly similar to the City

26 regulations already enjoined by this Court and to those requirements which have been squarely

27 addressed under binding legal precedent. The City's new Ordinance violates Section 253 and conflicts

28 with the Court's Judgment in *San Francisco* and the established precedent of the Ninth Circuit upon

2

1  which the Court relied in reaching its Judgment. The new Ordinance imposes a subjective, multi-

2  layered, vague, and standardless process that ultimately vests the City with unfettered discretion to deny

3  applications for telecommunications facilities.

4        4.      Moreover, the City's new Ordinance continues to discriminate against NextG and other

5  telecommunications providers whose networks and/or services involve wireless technologies by

6  imposing the additional, discretionary layer of permitting only on certain wireless facilities. Thus, the

7  City's requirements give an inherent regulatory advantage to competitors that use one technology over

8  another. As such, the City's new Ordinance, on its face, violates Section 253 and the well-established

9  precedents of the Ninth Circuit and this Court.

10       5.      Application of the clear precedents to the facts of this case leads inexorably to the

11 conclusion that the City's requirements are unlawful and are preempted and must be enjoined. By this

12 action, Plaintiff NextG seeks to set aside the requirements, procedures, decisions, and actions of the

13 City, acting through its DPW, and to compel the City and DPW to take actions required by law.

14       6.      Given the City's renewed attempt to stifle, prohibit and effectively prohibit NextG's

15 activities, NextG again seeks a declaration of its rights to install, operate and maintain its

16 Telecommunications Networks in public rights-of-way within the city for the provision of

17 telecommunications services, an order enjoining the City from imposing its new Ordinance on NextG,

18 and an order compelling the City and DPW to issue any necessary and legitimate permits for such

19 activities forthwith. The City's new Ordinance, like its previous regulatory regime, violates the

20 Telecommunications Act of 1996, which seeks to promote the expansion of telecommunications

21 services, because it prohibits or has the effect of prohibiting the provision of telecommunications

22 services. In addition, the City's new ordinance violates Section 7901 of the California Public Utilities

23 Code, which grants telephone corporations such as NextG the right to install lines, necessary fixtures of

24 lines, wires, cables, instruments, appliances, fixtures and personal property along or upon public rights-

25 of-way throughout the State of California, without the need for any discretionary permits or separate

26 franchises issued by localities. The City also has failed to apply its limited control over public rights-of-

27 way to telephone corporations in an equivalent manner, as required by Section 7901.1 of the Public

28 Utilities Code. The City's requirements, procedures, actions and decisions violate the rights, privileges

1  and immunities of NextG, a violation of the Civil Rights Act.  As a result, NextG is entitled to the

2  declaratory judgment, injunctive relief, damages and attorneys fees, and mandamus relief requested

3  herein.

4  ## JURISDICTION AND VENUE

5       7.    This action arises under the laws of the United States and the State of California,

6  including the federal Supremacy Clause, U.S. Const. art. VI, cl. 2; the federal Communications Act of

7  1934, as amended by the Telecommunications Act of 1996 (the "Communications Act"), 47 U.S.C.

8  §§ 151, et seq., 47 U.S.C. § 253; and Sections 7901 and 7901.1 of the California Public Utilities Code.

9  The Court has jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331, 1367 and 47 U.S.C. § 401.

10  The Court's authority to grant declaratory judgments is based upon 28 U.S.C. § 2201.  Venue is proper

11  in this Court pursuant to 28 U.S.C. § 1391 because the Defendants reside and transact business within

12  this district and the events and omissions giving rise to the claims arose in this judicial district.

13  ## INTRADISTRICT ASSIGNMENT

14       8.    Pursuant to Local Rule 3-2(c) and (d), this action is appropriate for the San Francisco

15  division of the Court in that it involves policies and procedures being implemented by the City and

16  County of San Francisco and the Department of Public Works of the City of San Francisco in the city of

17  San Francisco, and because a related case is pending in that division. *See NextG Networks of Calif., Inc.*

18  *v. City of San Francisco*, No. C 05-00658 MHP.

19  ## THE PARTIES

20       9.    Plaintiff NextG is a Delaware corporation with its principal place of business in San José,

21  California, operating its facilities in California.  NextG is and was at all times mentioned herein

22  qualified to do business in California.  Among other things, NextG is a "telephone corporation" which

23  provides service over "telephone lines," as those terms are defined and commonly used in the California

24  Public Utilities Code and the rules, regulations and orders promulgated by the California Public Utilities

25  Commission (the "CPUC") and pursuant to the state statutory scheme governing the provision of

26  telecommunications services.

27       10.    On January 30, 2003, in Decision 03-01-061, the CPUC issued NextG a certificate of

28  public convenience and necessity ("CPCN") to provide limited facilities-based and resold local

4

1    exchange, access and interexchange telecommunications services in California as a telephone

2    corporation. A true and correct copy of NextG's CPCN is attached hereto as Exhibit A and incorporated

3    by reference herein. By order dated January 12, 2006, over the City's challenge, the CPUC affirmed the

4    scope of NextG's CPCN. A true and correct copy of the CPUC's January 12, 2006 Order is attached

5    hereto as Exhibit B and incorporated by reference herein. On July 20, 2006, the CPUC modified its

6    January 12, 2006 Order and denied the City's request for rehearing of the decision as modified. A true

7    and correct copy of the CPUC's July 20, 2006 Order is attached hereto as Exhibit C and incorporated by

8    reference herein.

9        11.    On April 12, 2007, in Decision 07-04-045, the CPUC granted NextG's application for

10    expanded full facilities-based authority and modified its CPCN to permit construction of facilities that

11    are exempt from the California Environmental Quality Act ("CEQA"). This authority was granted to

12    NextG subject to the requirement that the CPUC's Energy Division staff confirm that the construction is

13    exempt from CEQA and issue a "Notice to Proceed" before NextG may commence construction

14    requiring full facilities-based authority. A true and correct copy of this decision is attached hereto as

15    Exhibit D and incorporated by reference herein.

16        12.    NextG also is a "telecommunications carrier" that provides "telecommunications

17    service," as those terms are defined and used in the federal Communications Act, 47 U.S.C. § 153 (44)

18    & (46), and the rules, regulations and orders promulgated by the Federal Communications Commission

19    (the "FCC") and pursuant to the overall federal statutory and regulatory scheme.

20        13.    NextG has standing to bring this claim, among other reasons, because the City's

21    burdensome regulations constitute an infringement of its federal rights under the federal

22    Communications Act and state rights under the California Public Utilities Code. *Los Angeles*, 2007 U.S.

23    Dist. LEXIS 82776 at *13.

24        14.    Defendant City and County of San Francisco is a municipal corporation duly constituted

25    under the Constitution and laws of the State of California. Defendant DPW is a subdivision of the City,

26    empowered by law to take certain actions on behalf of the City. In taking the actions complained of

27    herein, the City acted through DPW, the City Attorney and certain staff, employees and agents

28    responsible to those bodies.

COMPLAINT AND PETITION
SFO 403372v1 0058588-000003

1                                    <u>FACTS</u>

2   **I.     NEXTG'S TELECOMMUNICATIONS SERVICE AND RIGHT TO OCCUPY PUBLIC**

3   **RIGHTS-OF-WAY**

4           15.     NextG provides telecommunications service, as that term is defined by the federal

5   Communications Act, 47 U.S.C. § 153(46).

6           16.     NextG's telecommunications service consists of providing transport, over fiber optic

7   lines, of NextG's customers' communications (both voice and data) between points designated by the

8   customer without alteration of the content of the communications.

9           17.     NextG's customers typically are providers of retail wireless telecommunications services

10  (also known as Commercial Mobile Radio Services ["CMRS"] providers, cellular, or Personal

11  Communications Services ["PCS"] providers); however, NextG's services are not limited to serving any

12  specific type of wireless customer.

13          18.     NextG's typical telecommunications service offering involves a communication signal

14  handed off from NextG's customer to NextG that NextG then transports over its fiber optic facilities.

15  This handoff and transport takes place at and through equipment configurations called "Nodes" that are

16  located on utility or streetlight poles located in the public rights-of-way or in private utility easements.

17          19.     The typical "Node" in NextG's network consists of electronic equipment that converts

18  Radio Frequency (i.e., "RF" or wireless) format communications to light signals carried over NextG's

19  fiber optic lines.  The equipment comprising a typical Node in NextG's network includes a small, low-

20  power antenna, laser and amplifier equipment for the conversion of RF signals to optical signals (and

21  vice versa, *i.e.*, from optical to RF), that is connected to the antenna, fiber optic lines, and associated

22  equipment such as power supplies, all of which are owned, operated, controlled, managed, or maintained

23  by NextG.

24          20.     Upon handoff from its customer at a Node, NextG transports communications through

25  NextG's fiber optic network to a distant point that is typically, but not always, an aggregation point for

26  NextG's communications called a "Base Station."  The Base Station is typically a facility of NextG's

27  customer that is a central location that contains such equipment as routers, switches, and signal

28  conversion equipment.  The Base Station is typically installed in a building located on private property.

                                              6

1  NextG hands the communication signal back to its customer at the Base Station, where the

2  communications signal may be interconnected with the public telephone network.

3       21.    All wireless transmissions are performed by NextG's customers, who control and are

4  responsible for their licensed, proprietary radio frequency spectrum.

5       22.    Although NextG's service and network incorporate wireless reception devices, NextG is

6  not a wireless, cellular, or commercial mobile radio service ("CMRS") provider.

7       23.    NextG does not hold or control any wireless spectrum licenses from the FCC.

8       24.    NextG's fiber optic transmission lines are a fundamental component of its network.

9       25.    The certification and regulation of telecommunication services and facilities, such as

10  those of NextG, are governed by state and federal statute, as well as rules and regulations promulgated

11  by the CPUC and FCC.  Under the federal Communications Act and the California Public Utilities

12  Code, the FCC and CPUC are responsible for the certification and regulation of telecommunication

13  services and facilities.  Local governments, such as the City and its DPW, are prohibited from regulating

14  the terms and conditions of service offered by telephone corporations such as NextG.  In addition, local

15  agencies are prohibited from erecting barriers to the entry of any entity providing telecommunications

16  services or from taking actions or imposing requirements which have such an effect.

17  **II.    THE FEDERAL COMMUNICATIONS ACT**

18       26.    Congress amended the Communications Act of 1934 by enacting the

19  Telecommunications Act of 1996.  The Telecommunications Act was expansive legislation intended to

20  increase and improve competition in the telecommunications industry.  An important purpose of the

21  Telecommunications Act was to "accelerate rapidly private sector deployment of advanced

22  telecommunications and information technologies and services to all Americans by opening all

23  telecommunications markets to competition . . . ."  H.R. Conf. Rep. No. 458, 104th Cong., 2d Sess. 1

24  (1996).

25       27.    In enacting the Telecommunications Act, Congress gave due consideration to the

26  potential conflict between state and local government regulation of the public rights-of-way, on the one

27  hand, and the national need for deployment of advanced telecommunications and information

28  technologies, on the other.  Accordingly, 47 U.S.C. § 253 prohibits local authorities from imposing

7

1  requirements that may prohibit or may have the effect of prohibiting the ability of any entity to provide

2  telecommunications services. 47 U.S.C. § 253(a). Section 253(c) limits local authorities' power to

3  "manage" providers' use of public rights-of-way on a competitively neutral and non-discriminatory

4  basis, such as through the imposition of time, place and manner restrictions.

5  **III.    THE CALIFORNIA PUBLIC UTILITIES CODE**

6      28.    Section 7901 of the California Public Utilities Code grants telephone corporations the

7  right to install lines and associated equipment along public rights-of-way. Section 7901 provides that

8  "[t]elegraph or telephone corporations may construct lines of telegraph or telephone lines along and

9  upon any public road or highway, along or across any of the waters or lands within this State, and may

10  erect poles, posts, piers, or abutment for supporting the insulators, wires, and other necessary fixtures of

11  their lines, in such manner and at such points as not to incommode the public use of the road or highway

12  or interrupt the navigation of the waters." Cal. Pub. Util. Code § 7901. A "telephone corporation"

13  "includes every corporation or person owning, controlling, operating, or managing any telephone line

14  for compensation within the state." Cal. Pub. Util. Code § 234(a). A "telephone line" is defined broadly

15  to include "all conduits, ducts, poles, wires, cables, instruments, and appliances, and all other real estate,

16  fixtures, and personal property owned, controlled, operated, or managed in connection with or to

17  facilitate communication by telephone, whether such communication is had with or without the use of

18  transmission wire." Cal. Pub. Util. Code § 233.

19      29.    Because NextG directly owns, controls, operates and manages its own instruments and

20  appliances used to facilitate communications by telephone for compensation within California, it is a

21  telephone corporation and may install telephone lines in public rights-of-way pursuant to Section 7901.

22  NextG also is a telephone corporation entitled to install telephone lines in public rights-of-way pursuant

23  to Section 7901 based upon its operation and management of instruments and appliances owned and

24  controlled by its wireless carrier customers that are used to facilitate communications by telephone for

25  compensation within California. The equipment at issue in this Complaint and Petition comes within the

26  statutory definition of telephone line.

27      30.    Section 7901.1 of the Public Utilities Code allows municipalities to impose certain

28  limited restrictions regarding the time, place and manner in which telephone corporations access public

COMPLAINT AND PETITION
SFO 403372v1 0058588-000003

1 | rights-of-way pursuant to Section 7901, provided, among other things, that such restrictions are applied

2 | in an equivalent manner.

3 | **IV.    NEXTG'S EFFORTS TO OBTAIN ACCESS TO THE PUBLIC RIGHTS-OF-WAY**

4 |     31.    After NextG initiated discussions with the City in November 2002, the City was unable

5 | to determine and communicate to NextG the appropriate procedure by which NextG could secure

6 | appropriate permits or other authorization to install, operate and maintain certain facilities for the

7 | provision of telecommunications services ("Telecommunications Networks") in public rights-of-way

8 | within the city.  Therefore, on December 23, 2002, NextG submitted a letter application to the City's

9 | Department of Telecommunications and Information Services seeking a permit or other appropriate

10 | authorization for the installation of NextG's Telecommunications Networks along or upon public rights-

11 | of-way within the city.

12 |     32.    NextG submitted an application on February 4, 2003, to DPW for a Utility Conditions

13 | Permit ("UCP") or other appropriate authorization for the installation, operation, and maintenance of

14 | NextG's Telecommunications Networks along or upon public rights-of-way within the city.  On June 27,

15 | 2003, after the foregoing application and other communications failed to generate a response reflecting

16 | the requirements of law, NextG submitted a letter to DPW requesting a determination from DPW

17 | recognizing NextG's authority to install, operate and maintain its Telecommunications Networks in

18 | public rights-of-way within the city.

19 |     33.    On August 11, 2003, the City Attorney, acting for DPW, denied NextG's UCP

20 | application, failed to issue the requested determination from DPW, and informed NextG that DPW and

21 | the City would require NextG to obtain a discretionary major encroachment permit for the installation,

22 | operation, and maintenance of NextG's Telecommunications Networks along or upon public rights-of-

23 | way within the city.

24 |     34.    NextG's status as a telephone corporation under state law and its status as a

25 | telecommunications carrier under federal law provide it with legal authority to install, operate and

26 | maintain its Telecommunications Networks along or upon the rights-of-way without a discretionary

27 | permit or other requirements not imposed a non-discriminatory basis on other telecommunications

28 | providers and telephone corporations operating in the City's public ways.

1      35.    NextG is informed and believes that the City and DPW have allowed AT&T Corp.

2 ("AT&T") (fka SBC Communications, Inc.) and other telephone corporations to install telephone lines

3 and associated equipment similar to NextG's telephone lines and associated equipment along or upon

4 public rights-of-way without demanding that they obtain a discretionary major encroachment permit or

5 planning approval from the City. NextG competes or will compete with AT&T and those other

6 telephone corporations.

7 **V.    PRIOR LITIGATION AND THIS COURT'S INJUNCTION**

8      36.    In response to the City's actions, NextG filed suit against the City in this Court on

9 February 11, 2005 (No. C 05-00658 MHP). NextG asserted that the City denied NextG its rights to

10 install facilities in the public way and thereby prohibited NextG from providing service in violation of

11 Section 253 of the federal Communications Act (47 U.S.C. § 253) and California Public Utilities Code

12 §§ 7901, 7901.1. NextG sought a declaration of its rights to access the public way and an order

13 compelling the City to issue NextG a UCP and any other necessary and legitimate permits for such

14 access.

15      37.    After the filing of NextG's complaint, the City filed a complaint against NextG at the

16 CPUC. The City asked the CPUC to resolve the following issues: (1) whether NextG holds a valid

17 CPCN to operate in California; (2) whether the services NextG provides are within the scope of its

18 CPCN; and (3) whether the CPUC has authorized NextG to install its facilities on existing utility poles.

19      38.    In requesting a stay of NextG's federal case pending the CPUC's decision on the City's

20 complaint, the City told this Court that the CPUC's decision would be dispositive of the issues before

21 the Court in NextG's federal action.

22      39.    The CPUC issued a decision on the City's complaint in which it resolved each and every

23 issue in favor of NextG. Exhibit B. In rejecting the City's arguments and claims entirely, the CPUC

24 "reaffirm[ed] that the authority granted [to NextG] in D.03-01-061 includes the provision of

25 radiofrequency transport services." The CPUC ruled that "limited facilities-based authority for carriers

26 [such as NextG] providing radiofrequency transport services includes installation in or on existing utility

27 poles" of equipment such as NextG's microcells and antennae.

28      40.    NextG then filed a motion for partial summary judgment with respect to its federal claims

COMPLAINT AND PETITION
SFO 403372v1 0058588-000003

1  under Section 253(a) as well as its state law claims. This Court ruled in favor of NextG and against the

2  City and DPW. The Court held that imposition of the City's discretionary and discriminatory permitting

3  regime on NextG violated Section 253(a) and that the City's actions exceeded the limited statutory safe

4  harbors of Section 253(c). Having concluded that Section 253(a) preempts the City's actions, this Court

5  found it unnecessary to consider NextG's claims under Sections 7901 and 7901.1 of the California

6  Public Utilities Code.

7       41.    In its decision in favor of NextG ("*San Francisco*"), this Court held that the City's

8  requirement that NextG obtain a major encroachment permit violated Section 253(a) because it "'may

9  prohibit or have the effect of prohibiting' NextG from providing telecommunications services." The

10  Court based its holding on the fact that the encroachment permit process is "very involved" in that it

11  requires "an explanation of the purpose of the facilities," "maps . . . pictures . . . drawings and

12  specifications for the equipment to be installed," "notice to all other city agencies entitled to notice," a

13  "public hearing," and then referral to the Board of Supervisors which has "absolute discretion" and

14  "plenary power to accept or reject" the recommendation of DPW with regard to the application. The

15  Court also found that this process is "time-consuming and expensive." *San Francisco*, 2006 U.S. Dist.

16  LEXIS 36101 at *14-16.

17       42.    This Court entered judgment in the form proposed by NextG. The Court issued a

18  declaratory judgment that the City's refusal to issue NextG a UCP as well as the City's other

19  requirements, "including but not limited to the requirement that NextG obtain a major encroachment

20  permit," violate and are preempted by Section 253(a) and exceed the statutory safe harbors.  The Court

21  issued a writ of mandamus and an injunction requiring the City to "promptly grant NextG access to the

22  public rights-of-way . . . by issuing NextG such lawful permits as NextG may require, and to issue

23  NextG a Utility Conditions Permit in the form attached [to the judgment], as well as any other necessary

24  and legitimate permits" that the City "may require of *all other telecommunications providers under a*

25  *Utility Conditions Permit*." *See* Declaratory Judgment, Injunction, and Writ of Mandamus ("Judgment")

26  at 2 (emphasis added). The City appealed the Court's judgment.

27  **VI.**    **THE CITY'S NEW WIRELESS ORDINANCE**

28       43.    On September 11, 2007, the City adopted Ordinance No. 214-07 (the "new Ordinance" or

1    "Wireless Permit Ordinance"). A true and correct copy of the new Ordinance is attached hereto as

2    Exhibit E. On January 7, 2008, the City sent NextG a letter informing NextG of the new Ordinance and

3    ordering NextG to refrain from "installing any new Wireless Facilities in the public rights-of-way

4    without first obtaining Wireless Permits." A true and correct copy of this letter is attached hereto as

5    Exhibit F.

6        44.    On October 22, 2007, the City moved for clarification of the scope of the injunctive relief

7    granted to plaintiff or in the alternative to modify the judgment, requesting that the Court "clarify" that

8    the City could enforce its new Wireless Permit Ordinance against NextG consistent with the Court's

9    judgment and injunction. After a hearing on December 17, 2007, the Court denied the City's motion to

10    clarify.

11        45.    The new Ordinance imposes yet another multi-layered, burdensome process. Under the

12    new Ordinance, NextG is required to obtain not only a UCP, but then also a Wireless Permit. Ordinance

13    No. 214-07 §§ 11.9(a) & (b). Moreover, in the vast majority of the City, in order to receive a Wireless

14    Permit, NextG would also be subject to additional (as yet undefined) processes and review before the

15    Planning Department, the Recreation and Park Department, the Department of Public Health, and in

16    some cases, all of them. Ord. No. 214-07 § 11.9(b)(2).

17        46.    For the vast majority of installations, the City still retains absolute discretion over

18    whether NextG will be able to install its network. For example, as amended by Ordinance No. 214-07,

19    Section 11.9(b)(2)(A) requires that any Wireless Permit application proposing to install facilities "(i) on

20    historic, historically or architecturally significant, decorative, or specially designed utility poles; (ii) in a

21    historic or locally significant district; (iii) adjacent to a historic, architecturally significant or locally

22    significant building; or (iv) on a street where the City and County of San Francisco General Plan has

23    identified the presence of valued scenic resources that should be protected and conserved" must be

24    submitted to the Planning Department.

25        47.    This provision leaves the City open-ended discretion even to define what will trigger

26    referral to the Planning Department. There is no objective standard defining what constitutes a "locally

27    significant" or "architecturally significant" district or building, or what is a "valued scenic resource."

28    NextG and other carriers that submitted comments on the Ordinance repeatedly have requested that the

COMPLAINT AND PETITION
SFO 403372v1 0058588-000003

1  City put objective standards and clear rules in place, and the City consistently has rejected such an

2  approach in a bid to maintain absolute control exercised in a manner that cannot be questioned.

3      48.    Similarly, Section 11.9(b)(2)(B) requires review by the Recreation and Park Department

4  for any Wireless Permit application to install a Wireless Service Facility "adjacent to a City park or open

5  space."

6      49.    Based on the maps and information made available by the City, at least 90% percent of

7  NextG's anticipated new facility installations will be subject to review by the Planning Department

8  and/or Recreation and Park Department.

9      50.    The issue of whether an application will be referred to the Planning Department or

10  Recreation and Park Department is fraught with discretion.  The maps identifying the streets that are

11  subject to the scenic view trigger are nearly illegible and will require interpretation by DPW.  Moreover,

12  there are no maps identifying the areas that constitute, for example, "historic, historically or

13  architecturally significant, decorative, or specially designed utility poles" or "historic, architecturally

14  significant or locally significant building[s]."  Ord. No. 214-07, § 11.9(b)(2)(A).  Thus, whether a

15  particular application will require discretionary approval by the Planning Department or Recreation and

16  Park Department will lie in the discretion of DPW.

17      51.    For those applications that trigger Planning Department and/or Recreation and Park

18  Department review, the City once again has broad discretion to deny applications.  Under the Ordinance,

19  if an application is referred to the Planning Department and/or the Recreation and Park Department,

20  DPW is prohibited from granting the application unless the relevant Department(s) recommends

21  approval.  Ord. No. 214-07 §§ 11.9(b)(2)(A) & (B).

22      52.    The face of the Ordinance reveals that the "standards" are wholly subjective and

23  discretionary.  For example, in the case of applications referred to the Planning Department, the

24  Planning Department "shall not recommend approval . . . unless [it] determines that a Personal Wireless

25  Service Facility in the proposed location *is consistent with the public health, safety, convenience and*

26  *general welfare and will not unreasonably affect, intrude upon or diminish any of the identified City*

27  *resources.*"  (Ord. No. 214-07 § 11.9(b)(2)(A) (emphasis added)).  Similarly, if referred to the

28  Recreation and Park Department, the Department "shall not recommend approval . . . unless [it]

13

1    determines that a Personal Wireless Service Facility in the proposed location *will not unreasonably*

2    *affect, intrude upon or diminish a City park or open space*." (Ord. No. 214-07 § 11.9(b)(2)(B)

3    (emphasis added)). Notably, there is no apparent process for how the applications will be treated by

4    either Department. Hearings and additional submissions of information are possible. Moreover, there is

5    apparently no appeal of a Department decision not to recommend approval.

6        53.    These are precisely the type of open-ended, arbitrary, subjective, discretionary standards

7    that were preempted by this Court in the previous case as well as other cases in the Ninth Circuit. *San*

8    *Francisco*, 2006 U.S. Dist. LEXIS 36101 at *11-21; *Sprint*, 490 F.3d at 706 (challenged ordinance

9    provisions required the County to find that "the location, size, design, and operating characteristics of

10   the proposed use will *be compatible with* adjacent uses, residences, or structures" and that the proposed

11   facility is appropriately "camouflaged," "consistent with community character," and designed to have

12   minimum "visual impact").

13       54.    Under Ordinance No. 214-07, NextG will never have certainty regarding what process

14   will apply to its proposed installations, and there are no objective standards that NextG can satisfy to

15   ensure its applications will be granted. Just as under the City's prior process which this Court enjoined,

16   NextG's applications will be subject to the City's unfettered, subjective discretion.

17       55.    In addition, the new Ordinance discriminates against NextG, and companies like it, based

18   on the fact that they provide telecommunications service that involves wireless technologies and the use

19   of wireless equipment. *See San Francisco*, 2006 U.S. Dist. LEXIS 36101 at *25-26 (forbidding such

20   discrimination).

21       56.    Under Section 11.9(a) of the City's new Ordinance, all providers of

22   "Telecommunications Service" or "Personal Wireless Service" must obtain a Utilities Conditions Permit

23   ("UCP") from DPW. Indeed, the new Ordinance makes no meaningful change to the standards for the

24   issuance of UCPs. Still, the City's law provides that DPW "shall include in a UCP such conditions, in

25   addition to those already set forth in Applicable Law, as may be required to … protect and benefit the

26   public health, safety and welfare." Ord. No. 214-07 § 11.9(a)(1). Just as in the past, there is no limit to

27   DPW's discretion to determine what will benefit the public welfare. *See, e.g., TCG New York, Inc. v.*

28   *City of White Plains*, 305 F.3d 67, 76 (2d Cir. 2002) (ability to deny based on "public interest factors"

1    violates Section 253(a)), *cert. denied*, 538 U.S. 923 (2003)).

2        57.    In addition to a UCP, entities that need to use "Personal Wireless Service Facilities" to

3    provide their telecommunications service must also now obtain a "Personal Wireless Service Facilities

4    Site Permit" ("Wireless Permit"). The Wireless Permit process is burdensome and subjects the provider

5    to a standardless, undefined, and discretionary review process before various City agencies.

6        58.    Telecommunications providers that provide service using technology other than wireless

7    are given a regulatory advantage, as they are not subject to the burden, uncertainty, and delay inherent in

8    the Wireless Permit requirement. Furthermore, by its own definitions and scope, the new Ordinance

9    does not impose a Wireless Permit requirement on all antennas (*i.e.*, wireless facilities) but, rather, only

10    those that fall within the definitions set forth therein, namely "commercial mobile services provided

11    under a license issued by the FCC." Ord. No. 214-07 § 11.1(aa)-(bb), 11.9(b)(1). Thus, the Ordinance

12    does not impose the same obligations on other types of wireless telecommunications services or

13    unlicensed wireless services, for example "WiFi" wireless broadband service facilities or those used by

14    other utilities or the City itself to monitor their networks.

15        59.    The City's Ordinance, on its face, does not comply with legal authority that is squarely

16    on point, including this Court's ruling in *San Francisco*, 2006 U.S. Dist. LEXIS 36101. The Judgment

17    in *San Francisco* clearly stated that on a going-forward basis, the City may require NextG to obtain, and

18    must issue to NextG, only "lawful" permits that the City "require[s] of *all other telecommunications*

19    *providers under a Utility Conditions Permit*." Judgment at 2 (emphasis added). Moreover, the

20    Judgment enjoined the City and DPW "from imposing on NextG permit or other access requirements

21    not also imposed on all other telecommunications services providers." *Id*. Yet, Ordinance No. 214-07

22    requires all telecommunications providers, including NextG, to obtain a UCP, but then only certain

23    providers, that use certain wireless devices, are required to also obtain a Wireless Permit. All

24    telecommunications providers that are subject to UCP requirements are not subject to the Wireless

25    Permit requirement, or even its rough equivalent, and thus, the City cannot require it of NextG

26    consistent with the Judgment.

27

28

COMPLAINT AND PETITION
SFO 403372v1 0058588-000003

### FIRST CLAIM FOR RELIEF

### (The Federal Telecommunications Act – Facial and

### As Applied Challenge of City Requirements)

60.     NextG incorporates herein by reference the allegations of paragraphs 1 through 59 above.

61.     Section 253(a) of the federal Communications Act prohibits state and local authorities from enacting rules, regulations, or requirements that "may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." 47 U.S.C. § 253(a).

62.     Article VI, Clause 2 of the Unites States Constitution provides, in pertinent part, that "the Laws of the United States … shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

63.     Section 253 of the federal Communications Act "preempts any state or local law that is contrary to its provisions and the only question for the court is whether the ordinances interfere with, or are contrary to the Act." *Qwest Communications Corp. v. City of Berkeley*, 146 F. Supp. 2d 1081, 1089 (N.D. Cal. 2001) (internal citations omitted), *aff'd*, 433 F.3d 1253 (9th Cir. 2006).

64.     On their face, the rules, regulations, and requirements imposed by the City in the Wireless Permit Ordinance, including but not limited to those provisions identified in this Complaint, individually and collectively, may prohibit or have the effect of prohibiting the ability of entities, including NextG, to provide telecommunications services in violation of 47 U.S.C. § 253(a).

65.     On their face, the rules, regulations, and requirements imposed in the City's Wireless Permit Ordinance, including but not limited to those provisions identified in this Complaint, individually and collectively, are unlawful and preempted by 47 U.S.C. § 253(a).

66.     The City's enforcement of its Wireless Permit Ordinance and related rules, regulations, and requirements and other actions by the City with respect to NextG, individually and collectively, prohibit or have the effect of prohibiting the ability of NextG to provide telecommunications services in violation of 47 U.S.C. § 253(a).

67.     Section 253(c) of the Act provides:

(c)    State and Local Government Authority – Nothing in this section affects the authority of a State or local government to manage the public rights-

COMPLAINT AND PETITION
SFO 403372v1 0058588-000003

of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

47 U.S.C. § 253(c).

68.    The requirements that the City imposes in the Wireless Permit Ordinance, including but not limited to those identified in this Complaint, are not directly related to the City's management of the public rights-of-way, are not competitively neutral and nondiscriminatory, and do not impose fair and reasonable compensation for use of the public rights-of-way or publicly disclose the amount of the required compensation.

69.    The requirements that the City imposes in the Wireless Permit Ordinance, including but not limited to those identified in this Complaint, exceed the scope of and are preempted by 47 U.S.C. § 253(c) on their face and as applied to NextG and to NextG's deployment of its facilities in the City rights of way.

70.    As a direct and proximate cause of the requirements that the City imposes in the Wireless Permit Ordinance, including but not limited to those identified in this Complaint, NextG will suffer immediate, substantial and irreparable injury in an amount and of a kind that cannot be adequately compensated through monetary damages and/or for which there is no adequate remedy at law.

WHEREFORE, NextG prays for judgment as set forth below.

**SECOND CLAIM FOR RELIEF**

**(California Public Utility Code §§ 7901 & 7901.1)**

71.    NextG incorporates herein by reference the allegations of paragraphs 1 through 70 above.

72.    NextG is a telephone corporation under California Public Utilities Code § 234.

73.    NextG is constructing, maintaining and operating telephone lines as defined in California Public Utilities Code § 233.

74.    NextG has a CPCN granted by the California Public Utilities Commission.

75.    NextG has been granted a state-wide franchise to construct, maintain and operate its telecommunications facilities in California, as authorized by the CPUC, pursuant to California Public Utilities Code § 7901.

76.    Section 7901 constitutes "a continuing offer extended to telephone and telegraph

17

1  companies ... which offer when accepted by the construction and maintenance of lines" [citation

2  omitted] gives a franchise from the state to use, without compensation, the public highways for the

3  prescribed purposes without the necessity for any grant by a subordinate legislative body. *Pacific Tel. &*

4  *Tel. Co. v. City & County of San Francisco*, 51 Cal. 2d 766, 771 (1959) ("*Pac. Tel. I*"); *City of Salinas v.*

5  *Pacific Tel. & Tel. Co.*, 72 Cal. App. 2d 494, 497 (1946).

6       77.    California Public Utilities Code Sections 7901 and 7901.1 expressly limit municipal

7  authority over telephone lines, as that term is defined by applicable state law, to the reasonable control

8  of the time, place and manner in which roads, highways, and waterways may be accessed.

9       78.    "[T]he right and obligation to construct and maintain telephone lines has become a matter

10  of state concern." *Pac. Tel. I*, 51 Cal. 2d at 774.

11       79.    A local law that "duplicates, contradicts, or enters an area fully occupied by general law,

12  either expressly or by legislative implication" is preempted by state law. *Fireman's Fund Ins. Co. v.*

13  *City of Lodi*, 302 F.3d 928, 941 (9th Cir. 2002) (internal quotations omitted); *Tily B., Inc. v. City of*

14  *Newport Beach*, 69 Cal. App. 4th 1, 19 (1998).

15       80.    The requirements that the City imposes in the Wireless Permit Ordinance, including but

16  not limited to those identified in this Complaint, on their face, and as applied to NextG and NextG's

17  deployment of its facilities in the public rights of way, exceed the scope of the City's authority under

18  and are preempted by Pub. Util. Code § Section 7901.

19       81.    The requirements that the City imposes in the Wireless Permit Ordinance, including but

20  not limited to those identified in this Complaint, on their face, and as applied to NextG and NextG's

21  deployment of its facilities in the public rights of way, exceed the scope of the City's authority under

22  and are preempted by Pub. Util. Code § Section 7901.1.

23       82.    NextG has and will suffer immediate, substantial and irreparable injury in an amount and

24  of a kind that cannot be adequately compensated through monetary damages and/or for which there is no

25  adequate remedy at law as a direct and proximate cause of the requirements that the City imposes in the

26  Wireless Permit Ordinance, including but not limited to those identified in this Complaint.

27       WHEREFORE, NextG prays for judgment as set forth below.

28

18

### THIRD CLAIM FOR RELIEF

### (Contracts Clause of the United States Constitution)

83.    NextG incorporates herein by reference the allegations of paragraphs 1 through 82 above.

84.    NextG has a state-wide franchise to operate as a telephone corporation. NextG therefore has contractual rights with the State of California to access the public rights-of-way.

85.    NextG also has a contract with the Northern California Joint Pole Association ("JPA") under which NextG has the right and option as a joint owner to access and attach to poles owned by other members of the JPA located throughout Northern California, including the City of San Francisco.

86.    The Contracts Clause of the United States Constitution prohibits the government from promulgating any law that impairs the obligations of contracts.

87.    The City's imposition of the multiple requirements set forth in the Wireless Ordinance and identified in this Complaint on NextG substantially impair NextG's contractual rights under its state franchise to access the public rights-of-way. The City's requirements also substantially impair NextG's contract with the JPA to access its members' poles located in the City.

88.    The City's substantial impairment of NextG's contractual rights threatens NextG's ability to maintain and grow its business of deploying telephone networks. Consequently, NextG has suffered and will continue to suffer irreparable harm as a result of the City's unlawful actions.

WHEREFORE, NextG prays for judgment as set forth below.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for the following relief:

1.    For a declaration and judgment that the requirements that the City, including DPW, imposes in the Wireless Permit Ordinance, including but not limited to those identified in this Complaint, on their face, violate and are preempted by Section 253 of the federal Communications Act and are therefore void, invalid, and unenforceable;

2.    For a declaration and judgment that the requirements that the City, including DPW, imposes in the Wireless Permit Ordinance, including but not limited to those identified in this Complaint, as applied to NextG and NextG's deployment of its facilities in the public rights of way, violate and are preempted by Section 253 of the federal Communications Act, and are therefore void,

1    invalid, and unenforceable;

2         3.    For a declaration and judgment that the requirements that the City, including DPW,

3    imposes in the Wireless Permit Ordinance, including but not limited to those identified in this

4    Complaint, on their face, exceed the scope of the City's authority under and are preempted by Sections

5    7901 and 7901.1 of the Public Utilities Code and therefore are void, invalid, and unenforceable;

6         4.    For a declaration and judgment that the requirements that the City, including DPW,

7    imposes in the Wireless Permit Ordinance, including but not limited to those identified in this

8    Complaint, as applied to NextG and NextG's deployment of its facilities in the public rights of way,

9    exceed the scope of the City's authority under and are preempted by Sections 7901 and 7901.1 of the

10   Public Utilities Code and therefore are void, invalid, and unenforceable;

11        5.    For a declaration and judgment that the requirements that the City, including DPW,

12   imposes in the Wireless Permit Ordinance, including but not limited to those identified in this

13   Complaint, violate the Contracts Clause of the United States Constitution and therefore are void and

14   invalid;

15        6.    For a declaration of the respective rights and obligations of the parties as to the actions of

16   NextG and the City, including DPW, based on the federal Constitutional and statutory rights and duties

17   and state statutory rights and duties, at issue herein;

18        7.    For an order temporarily, preliminarily and permanently enjoining the City, including

19   DPW and all others acting in connection therewith, from applying the City's Wireless Permit Ordinance

20   and any similar future ordinance or requirements to NextG;

21        8.    For an order temporarily, preliminarily and permanently enjoining the City, including

22   DPW and all others acting in connection therewith, from further delaying NextG's installation of its

23   telecommunications facilities in the public rights-of-way;

24        9.    For an order mandating or an injunction temporarily, preliminarily and permanently

25   requiring that the City, including DPW and all others acting in connection therewith, immediately

26   provide NextG with the authority to place its telephone lines and equipment, including but not limited to

27   its Nodes, on existing utility poles in the public right of way subject only to reasonable time, place and

28   manner restrictions and payment of the City's reasonable costs of administrating NextG's access to the

1 | rights of way;

2 |       10.    For such other and further relief as the Court may deem just and proper.

3 |

4 | Dated:  February 15, 2008.

5 |                                 **DAVIS WRIGHT TREMAINE LLP**

6 |                                 By: _____

7 |                                     Martin L. Fineman

8 |                                     Attorneys for Plaintiff
                                    NextG Networks of California, Inc.

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COMPLAINT AND PETITION
SFO 403372v1 0058588-000003

# Exhibit A

ALJ/KJB/avs                                                          **Mailed 1/31/2003**

Decision 03-01-061  January 30, 2003

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

<table>
<tr>
<td>In the Matter of the Application of NextG Networks of California, Inc. for a Certificate of Public Convenience and Necessity to Provide Limited Facilities-Based and Resold Competitive Local Exchange, Access and Interexchange Service.</td>
<td>Application 02-09-019<br>(Filed September 18, 2002)</td>
</tr>
</table>

## O P I N I O N

### I.  Summary

NextG Networks of California, Inc. (Applicant) seeks a certificate of public convenience and necessity (CPCN) under Pub. Util. Code § 1001 for authority to provide limited facilities-based and resold local exchange, access and interexchange telecommunications services.  By this decision, we grant the requested authority subject to the terms and conditions set forth below.

### II.  Background

In prior decisions we authorized the provision of competitive interexchange services by carriers meeting specified criteria.  In addition, we authorized the provision of competitive local exchange service, by carriers meeting specified criteria, within the service territories of Pacific Bell Telephone Company (Pacific), Verizon California Inc. (Verizon), Roseville Telephone Company (RTC), and Citizens Telecommunications Company of California, Inc. (CTC).

Applicant, a Delaware corporation, seeks authority to provide limited facilities-based and resold interexchange services throughout the State of California as a nondominant interexchange carrier (NDIEC), and limited facilities-based and resold local exchange services as a competitive local carrier (CLC) throughout Pacific, Verizon, RTC and CTC's service territories.

Applicant's principal place of business is located at 2033 Gateway Place, Suite 500, San Jose, CA 95110.

### III.  Financial Qualifications

To be granted a CPCN, an applicant for authority to provide facilities-based and resold local exchange and/or interexchange services must demonstrate that it has a minimum of

139714                                    - 1 -

A.02-09-019 ALJ/KJB/avs

$100,000 of cash or cash equivalent to meet the firm's start-up expenses.[1] An applicant must also demonstrate that it has sufficient additional resources to cover all deposits required by local exchange carriers (LECs) and/or interexchange carriers (IECs) in order to provide the proposed service.[2] Applicant represented that it will not be required to make deposits to other telecommunications carriers in order to provide the proposed service. Applicant provided bank statements that demonstrate that it has sufficient cash to satisfy the financial requirement.

## IV. Technical Qualifications

Applicants for NDIEC and CLC authority are required to make a reasonable showing of technical expertise in telecommunications or a related business. Applicant submitted biographical information on its officers that demonstrates that it possesses sufficient experience and knowledge to operate as a telecommunications provider.

Applicant represents that no one associated with or employed by Applicant as an affiliate, officer, director, partner, or owner of more than 10% of Applicant was previously associated with any telecommunications carrier that filed for bankruptcy or went out of business, or was sanctioned by the Federal Communications Commission or any state regulatory agency for failure to comply with any regulatory statute, rule, or order.

## V. Tariffs

Commission staff reviewed Applicant's draft tariffs for compliance with Commission rules and regulations. The deficiencies are noted in Attachment A to this decision. Applicant shall correct these deficiencies in its tariff compliance filing as a condition of our approval of its tariffs.

## VI. Request to File Under Seal

Applicant requests that the financial information filed with the application be filed under seal. The financial information consists of Applicant's most recent bank statements. Applicant

---

[1] The financial requirement for CLCs is contained in D.95-12-056, Appendix C. The financial requirement for NDIECs is contained in D.91-10-041.

[2] The requirement for CLC applicants to demonstrate that they have additional financial resources to meet any deposits required by underlying LECs and/or IECs is set forth in D.95-12-056, Appendix C. For NDIECs, the requirement is found in D.93-05-010.

A.02-09-019  ALJ/KJB/avs

represents that the information is proprietary and sensitive. The information, if revealed, would place Applicant at an unfair business disadvantage. We have granted similar requests in the past and will do so here.

## VII. California Environmental Quality Act

CEQA requires the Commission as the designated lead agency to assess the potential environmental impact of a project in order that adverse effects are avoided, alternatives are investigated, and environmental quality is restored or enhanced to the fullest extent possible. Applicant represents that it will not be constructing any facilities other than equipment to be installed in or on existing buildings or structures, for the purpose of providing interexchange or local exchange services. Therefore, it can be seen with certainty that there is no possibility that granting this application will have an adverse effect upon the environment. Applicant must file for additional authority, and submit to any required CEQA review, before it can construct facilities other than equipment to be installed in existing buildings or structures.

## VIII.    Categorization and Need for Hearings

In Resolution ALJ 176-3096 dated October 3, 2002, the Commission preliminarily categorized this application as ratesetting, and preliminarily determined that hearings were not necessary. No protests have been received. There is no apparent reason why the application should not be granted. Given these developments, a public hearing is not necessary, and it is not necessary to disturb the preliminary determinations.

## IX. Comments on Draft Decision

This is an uncontested matter, in which the decision grants the relief requested. Accordingly, pursuant to Pub. Util. Code Section 311(g)(2), the otherwise applicable 30-day period for public review and comment is being waived.

## X.  Conclusion

We conclude that the application conforms to our rules for authority to provide competitive local exchange and interexchange telecommunications services. Accordingly, we shall approve the application subject to the terms and conditions set forth herein.

- 3 -

A.02-09-019  ALJ/KJB/avs

## XI.  Assignment of Proceeding

Geoffrey Brown is the Assigned Commissioner and Karl Bemesderfer is the assigned Administrative Law Judge in this proceeding.

## Findings of Fact

1.  Notice of the application appeared in the Daily Calendar on September 20, 2002.

2.  No protests have been filed.

3.  A hearing is not required.

4.  In prior decisions the Commission authorized competition in providing interexchange services for carriers meeting specified criteria.

5.  In prior decisions the Commission authorized competition, by carriers meeting specified criteria, in providing local exchange telecommunications services within the service territories of Pacific, Verizon, RTC and CTC.

6.  Applicant has a minimum of $100,000 of cash or cash equivalent that is reasonably liquid and readily available to meet its start-up expenses.

7.  Applicant has sufficient additional cash or cash equivalent to cover any deposits that may be required by other telecommunications carriers in order to provide the proposed service.

8.  Applicant possesses sufficient experience and knowledge to provide telecommunications services.

9.  As part of its application, Applicant submitted a draft of its initial tariff that contained the deficiencies identified in Attachment A to this decision.  Except for those deficiencies, its draft tariffs complied with the Commission's requirements.

10.  Applicant will not be constructing facilities, other than equipment to be installed in existing buildings or structures.

11.  Public disclosure of the financial information filed under seal would place Applicant at an unfair business disadvantage.

## Conclusions of Law

1.  Applicant has the financial ability to provide the proposed service.

2.  Applicant has sufficient technical expertise to operate as a telecommunications carrier.

3.  Public convenience and necessity require that Applicant's competitive local exchange and interexchange services be subject to the terms and conditions set forth herein.

A.02-09-019 ALJ/KJB/avs

4. Since Applicant will not be constructing any facilities, other than equipment to be installed in existing buildings or structures, it can be seen with certainty that there will be no significant effect on the environment.

5. The application should be granted to the extent set forth below.

6. Applicant, once granted a CPCN, should be subject to the applicable Commission rules, decisions, General Orders, and statutes that pertain to California public utilities.

7. Applicant's initial tariff filing should correct the deficiencies in its draft tariffs as indicated in Attachment A to this decision.

8. Applicant's request to file its financial information under seal should be granted for two years.

9. Because of the public interest in competitive local exchange and interexchange services, the following order should be effective immediately.

## O R D E R

**IT IS ORDERED** that:

1. A certificate of public convenience and necessity (CPCN) is granted to NextG Networks of California, Inc. (Applicant) to operate as a limited facilities-based and resale provider of competitive local exchange services, and interexchange services, subject to the terms and conditions set forth below.

2. Applicant is authorized to provide local exchange service in the service territories of Pacific Bell Telephone Company, Verizon California Inc., Roseville Telephone Company, and Citizens Telecommunications Company of California, Inc.

3. Applicant is authorized to file tariff schedules for the provision of competitive local exchange and interexchange services with the deficiencies noted in Attachment A corrected. Applicant may not offer services until tariffs are on file. Applicant's initial filing shall be made in accordance with General Order (GO) 96-A, excluding Sections IV, V, and VI. The tariff shall be effective not less than 1 day after tariff approval by the Commission's Telecommunications Division. Applicant shall comply with its tariffs.

A.02-09-019  ALJ/KJB/avs

4. The certificate granted, and the authority to render service under the rates, charges, and rules authorized, will expire if not exercised within 12 months after the effective date of this order.

5. The corporate identification number assigned to Applicant, U-6745-C, shall be included in the caption of all original filings with this Commission, and in the titles of other pleadings filed in existing cases.

6. Applicant shall comply with all applicable rules adopted in the Local Exchange Competition proceeding (Rulemaking 95-04-043/Investigation 95-04-044), the Commission's rules and regulations for NDIECs set forth in Decision (D.) 93-05-010 and D.90-08-032, as well as all other applicable Commission rules, decisions, GOs, and statutes that pertain to California public utilities, subject to the exemptions granted in this decision.

7. Applicant shall comply with the requirements applicable to competitive local exchange carriers and non-dominant interexchange carriers included in Attachment B to this decision.

8. Applicant is not authorized to construct facilities, other than equipment to be installed in existing buildings or structures.

9. Applicant's request to have the financial information filed with the application kept under seal is granted for two years from the effective date of this decision. During that period the information shall not be made accessible or disclosed to anyone other than the Commission staff except on the further order or ruling of the Commission, the Assigned Commissioner, the assigned Administrative Law Judge (ALJ), or the ALJ then designated as Law and Motion Judge.

10. If Applicant believes that further protection of the information kept under seal is needed, it may file a motion stating the justification for further withholding of the information from public inspection, or for such other relief as the Commission rules may then provide. This motion shall be filed no later than one month before the expiration date.

11. This application is closed.

This order is effective today.

Dated January 30, 2003, at San Francisco, California.

> MICHAEL R. PEEVEY
> President
> CARL W. WOOD
> LORETTA M. LYNCH

A.02-09-019  ALJ/KJB/avs

GEOFFREY F. BROWN
SUSAN P. KENNEDY
        Commissioners

A.02-09-019  ALJ/KJB/avs

## ATTACHMENT A
### Page 1

List of deficiencies in tariffs filed by NextG Networks of California, Inc. in A.02-09-019 to be corrected in its tariff compliance filing.

1. Sheet 14: Include the fees and surcharges shown in Attachment B to this decision.

2. Sheet 17, Rule 3: Incomplete rule on Application for Service.  Include Rule 2 of Appendix B of D.95-07-054 in the CLC tariff.

3. Sheet 18, Rule 5: In the 3rd paragraph, state the following: "In the event a customer requests services in addition to basic service, the average bill will reflect the aggregate services requested by the customer." Refer to Rule 5 of Appendix B of D.95-07-054.

4. Sheet 20, Rule 8: Include Rule 8B from Appendix B of D.95-07-054 in the CLC tariff.

5. Sheet 21, Rule 9: Include Rule 10C from Appendix B of D.95-07-054 in the CLC tariff. State in the tariff that Basic Service will not be disconnected for non-payment of anything other than residential and single line business, Flat Rate and/or Measured Rate Service as defined in D. 96-10-066, Appendix B, page 5.  Refer to D. 00-03-020.

6. Sheet 26, Rule 12A: State in the tariff that credit cannot be denied for failure to provide social security number.  Refer to Rule 4 of Appendix B of D.95-07-054.

7. Sheet 27, Rule 14: Include Rule 11 of Appendix B of D.95-07-054 in the CLC tariff.

8. Sheet 27, Rule 16: Include Rule 15 of Appendix B of D.95-07-054 in the CLC tariff.

9. Sheet 28, Rule 18: State in the tariff that the CLC concurs with Pacific or Verizon's Limitation of Liability tariffs regarding credit for service interruptions.  Refer to D.95-12-057.

10. Sheet 30, Rule 26: The CLC must have a demarcation tariff or concur in another company's tariff.

11. Include rule on how telephone directories will be provided to residential and business customers.

12. Include sample forms in the CLC tariff.

A.02-09-019  ALJ/KJB/avs

## ATTACHMENT B

REQUIREMENTS APPLICABLE TO COMPETITIVE LOCAL EXCHANGE CARRIERS
AND NON-DOMINANT INTEREXCHANGE CARRIERS

1.  Applicant shall file a written acceptance with the Director of the Telecommunications

Division of the certificate granted in this proceeding.

2.  Applicant is subject to the following fees and surcharges; per the instructions in Appendix E

to Decision (D.) 00-10-028, the Combined California PUC Telephone Surcharge Transmittal

Form must be submitted even if the amount due is zero.

    a.  The current 0.00% surcharge applicable to all intrastate services except
        for those excluded by D.94-09-065, as modified by D.95-02-050, to
        fund the Universal Lifeline Telephone Service Trust Administrative
        Committee Fund (Pub. Util. Code § 879; Resolution T-16688,
        December 5, 2002);

    b.  The current 0.300% surcharge applicable to all intrastate services
        except for those excluded by D.94-09-065, as modified by
        D.95-02-050, to fund the California Relay Service and
        Communications Devices Fund (Pub. Util. Code § 2881; D.98-12-073
        and Resolution T-16663, August 22, 2002);

    c.  The user fee provided in Pub. Util. Code §§ 431-435, which is 0.11%
        of gross intrastate revenue (Resolution M-4800);

    d.  The current surcharge applicable to all intrastate services except for
        those excluded by D.94-09-065, as modified by D.95-02-050, to fund
        the California High Cost Fund-A (Pub. Util. Code § 739.3;
        D.96-10-066, pp. 3-4, App. B, Rule 1.C; set by Resolution T-16550 at
        0.360%, October 10, 2001);

    e.  The current 1.42% surcharge applicable to all intrastate services except
        for those excluded by D.94-09-065, as modified by D.95-02-050, to
        fund the California High Cost Fund-B (D.96-10-066, p. 191, App. B,
        Rule 6.F., Resolution T-16554, October 25, 2001); and

    f. The current 0.00% surcharge applicable to all intrastate services except
        for those excluded by D.94-09-065, as modified by D.95-02-050, to
        fund the California Teleconnect Fund (D.96-10-066, p. 88, App. B,
        Rule 8.G, Resolution T-16686, December 5, 2002).

3.  Applicant is a competitive local exchange carrier (CLC).  The effectiveness of its future

tariffs is subject to the schedules set forth in Appendix C, Section 4.E of Decision (D.) 95-12-

056:

    "E.  CLCs shall be subject to the following tariff and contract filing,
        revision and service pricing standards:

A.02-09-019  ALJ/KJB/avs

"(1)  Uniform rate reductions for existing tariff services shall become effective on five (5) working days' notice. Customer notification is not required for rate decreases.

"(2)  Uniform major rate increases for existing tariff services shall become effective on thirty (30) days' notice to the Commission, and shall require bill inserts, or first class mail notice to customers at least 30 days in advance of the pending rate increase.

"(3)  Uniform minor rate increases, as defined in D.90-11-029, shall become effective on not less than (5) working days' notice to the Commission. Customer notification is not required for such minor rate increases.

"(4)  Advice letter filings for new services and for all other types of tariff revisions, except changes in text not affecting rates or relocations of text in the tariff schedules, shall become effective on forty (40) days' notice.

"(5)  Advice letter filings revising the text or location of text material which do not result in an increase in any rate or charge shall become effective on not less than five (5) days' notice to the Commission."

"(6)  Contracts shall be subject to GO 96-A rules for NDIECS, except interconnection contracts.

"(7)  CLCs shall file tariffs in accordance with PU Code § 876."

4.  Applicant is a nondominant interexchange carrier (NDIEC). The effectiveness of its future NDIEC tariffs is subject to the schedules set forth in Ordering Paragraph 5 of D.90-08-032 (37 CPUC2d 130 at 158), as modified by D.91-12-013 (42 CPUC2d 220 at 231) and D.92-06-034 (44 CPUC2d 617 at 618):

"5.  All NDIECs are hereby placed on notice that their California tariff filings will be processed in accordance with the following effectiveness schedule:

"a.  Inclusion of FCC-approved rates for interstate services in California public utilities tariff schedules shall become effective on one (1) day's notice.

"b.  Uniform rate reductions for existing services shall become effective on five (5) days' notice.

"c.  Uniform rate increases, except for minor rate increases, for existing services shall become effective on thirty (30) days' notice, and shall require bill inserts, a message on the bill itself, or first class mail notice to customers of the pending increased rates.

- 2 -

A.02-09-019 ALJ/KJB/avs

> "d.    Uniform minor rate increases, as defined in D.90-11-029, for existing services shall become effective on not less than five (5) working days' notice. Customer notification is not required for such minor rate increases. "

> e.    Advice letter filings for new services and for all other types of tariff revisions, except changes in text not affecting rates or relocations of text in the tariff schedules, shall become effective on forty (40) days' notice.

> f.    Advice letter filings merely revising the text or location of text material which do not cause an increase in any rate or charge shall become effective on not less than five (5) days' notice.

5.    Applicant may deviate from the following provisions of GO 96-A: (a) paragraph II.C.(1)(b), which requires consecutive sheet numbering and prohibits the reuse of sheet numbers; and (b) paragraph II.C.(4), which requires that "a separate sheet or series of sheets should be used for each rule." Tariff filings incorporating these deviations shall be subject to the approval of the Commission's Telecommunications Division. Tariff filings shall reflect all fees and surcharges to which Applicant is subject, as reflected in 2 above.

6.    Applicant shall file a service area map as part of its initial tariff.

7.    Prior to initiating service, Applicant shall provide the Manager of the Consumer Affairs Branch with the name and phone number of its designated contact person(s) for purposes of resolving consumer complaints. This information shall be updated if the name or telephone number changes, or at least annually.

8.    Applicant shall notify the Director of the Telecommunications Division in writing of the date that local exchange service is first rendered to the public, no later than five days after service first begins.

9.    Applicant shall notify the Director of the Telecommunications Division in writing of the date interLATA service is first rendered to the public within five days after service begins, and again within five days after intraLATA service begins.[3]

---

[3] California is divided into ten Local Access and Transport Areas (LATAs), each containing numerous local telephone exchanges. InterLATA describes services, revenues and functions relating to telecommunications originating within one LATA and terminating in another LATA. IntraLATA describes services, revenues and functions relating to telecommunications originating within a single LATA.

A.02-09-019 ALJ/KJB/avs

10.    Applicant shall keep its books and records in accordance with the Generally Accepted Accounting Principles.

11.    In the event Applicant's books and records are required for inspection by the Commission or its staff, it shall either produce such records at the Commission's offices or reimburse the Commission for the reasonable costs incurred in having Commission staff travel to its office.

12.    Applicant shall file an annual report with the Director of the Telecommunications Division, in compliance with GO 104-A, on a calendar-year basis with the information contained in Attachment C to this decision.

13.    Applicant shall file an affiliate transaction report with the Director of the Telecommunications Division, in compliance with Decision (D.) 93-02-019, on a calendar year basis using the form developed by Commission Staff and contained in Attachment D.

14.    Applicant shall ensure that its employees comply with the provisions of Public Utilities (Pub. Util.) Code § 2889.5 regarding solicitation of customers.

15.    Within 60 days of the effective date of this order, Applicant shall comply with Pub. Util. Code § 708, Employee Identification Cards, and notify the Director of the Telecommunications Division in writing of its compliance.

16.    If Applicant is 90 days or more late in filing an annual report, or in remitting the surcharges and fee listed in 2 above, the Commission's Telecommunications Division shall prepare for Commission consideration a resolution that revokes Applicant's CPCN unless it has received written permission from the Telecommunications Division to file or remit late.

17.    Applicant is exempt from General Order 96-A, subsections III.G(1) and (2), and Commission Rule of Practice and Procedure 18(b).

18.    Applicant is exempt from Pub. Util. Code §§ 816-830.

19.    Applicant is exempt from the requirements of Pub. Util. Code § 851 for the transfer or encumbrance of property whenever such transfer or encumbrance serves to secure debt.

20.    Applicant shall send a copy of this decision to concerned local permitting agencies not later than 30 days from the date of this order.

**(END OF ATTACHMENT B)**

A.02-09-019 ALJ/KJB/avs

## ATTACHMENT C
## ANNUAL REPORT

An original and two copies shall be filed with the California Public Utilities Commission, 505 Van Ness Avenue, Room 3107, San Francisco, CA 94102-3298, no later than March 31st of the year following the calendar year for which the annual report is submitted.

Failure to file this information on time may result in a penalty as provided for in §§ 2107 and 2108 of the Public Utilities Code.

Required information:

1.  Exact legal name and U # of reporting utility.

2.  Address.

3.  Name, title, address, and telephone number of the person to be contacted concerning the reported information.

4.  Name and title of the officer having custody of the general books of account and the address of the office where such books are kept.

5.  Type of organization (e.g., corporation, partnership, sole proprietorship, etc.).

If incorporated, specify:

   a.    Date of filing articles of incorporation with the Secretary of State.
   b.    State in which incorporated.

6.  The number and date of the Commission decision granting the Utility's CPCN.

7.  Date operations were begun.

8.  Description of other business activities in which the utility is engaged.

9.  A list of all affiliated companies and their relationship to the utility. State if affiliate is:

   a.    Regulated public utility.
   b.    Publicly held corporation.

10. Balance sheet as of December 31st of the year for which information is submitted.

11. Income statement for California operations for the calendar year for which information is submitted.

For answers to any questions concerning this report, call (415) 703-1961.
## (END OF ATTACHMENT C)

- 1 -

A.02-09-019  ALJ/KJB/avs

## ATTACHMENT D
## 2002 CALENDAR YEAR AFFILIATE TRANSACTION REPORT

1.  Each utility shall list and provide the following information for each affiliated entity and regulated subsidiary that the utility had during the period covered by the annual Affiliate Transaction report.

- Form of organization (e.g., corporation, partnership, joint venture, strategic alliance, etc.);
- Brief description of business activities engaged in;
- Relationship to the utility (e.g., controlling corporation, subsidiary, regulated subsidiary, affiliate);
- Ownership of the utility (including type and percent ownership)'
- Voting rights held by the utility and percent;
- Corporate officers.

2.  The utility shall prepare and submit a corporate organization chart showing any and all corporate relationships between the utility and its affiliated entities and regulated subsidiaries in #1 above.  The chart should have the controlling corporation (if any) at the top of the chart; the utility and any subsidiaries and/or affiliates of the controlling corporation in the middle levels of the chart and all secondary subsidiaries and affiliates (*e.g.* a subsidiary that in turn is owned by another subsidiary and/or affiliate) in the lower levels.  Any regulated subsidiary should be clearly noted.

3.  For a utility that has individuals who are classified as "controlling corporations" of the competitive utility, the utility must only report under the requirements of #1 and #1 above any affiliated entity that either a) is a public utility or b) transacts any business with the utility filing the annual report excluding the provision of tariffed services.

4.  Each annual report must be signed by a corporate officer of the utility stating under penalty of perjury under the laws of the State of California (CCP 2015.5) that the annual report is complete and accurate with no material omissions.

5.  Any required material that a utility is unable to provide must be reasonably described and the reasons the data cannot be obtained, as well as the efforts expended to obtain the information,

A.02-09-019  ALJ/KJB/avs

must be set forth in the utility's annual Affiliate Transaction Report and verified in accordance with Section I-F of Decision 93-02-019.

   6.  Utilities that do no have affiliated entities must file, in lieu of the annual transaction report, an annual statement to the commission stating that the utility had no affiliated entities during the report period.  This statement must be signed by a corporate officer of the utility, stating under penalty of perjury under the laws of the State of California (CCP 2015.5) that the annual report is complete and accurate with no material omissions.

**(END OF ATTACHMENT D)**

# Exhibit B

ALJ/JLG/sid

**Mailed 1/13/2006**

Decision 06-01-006  January 12, 2006

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

City and County of San Francisco,

                    Complainant,

          vs.

NextG Networks of California,
Inc. (U6754 C),

                    Defendant.

Case 05-03-010
(Filed March 9, 2005)

**OPINION RESOLVING COMPLAINT**

## 1. Summary

In Decision (D.) 03-01-061, we authorized NextG Networks of California, Inc. (NextG) to provide competitive local exchange services as a limited facilities-based provider.  NextG provides wireless carriers certain radiofrequency transport services, which augment those carriers' geographic wireless coverage and improve system capacity.  NextG sought to provide those services in San Francisco, but the City and County of San Francisco (CCSF) claimed those services were outside the authority granted by us.  In today's decision, we find NextG did not violate its certificate of public convenience and necessity (CPCN), did not fail to timely exercise the authority granted in D.03-01-061, and did not misrepresent the scope of that authority.

218886

C.05-03-010 ALJ/JLG/sid

We reaffirm that the authority granted in D.03-01-061 includes the provision of radiofrequency transport services. Our standard limited facilities-based CPCN does not mention the type of service provided by the telephone corporation. However, we have granted authority to carriers providing similar services.

In providing radiofrequency transport services, NextG installs microcells and antennas on existing utility poles. Allowing placement of microcells and antennas on existing utility poles is consistent with limited facilities-based authority, because no construction is involved. We find limited facilities-based authority for carriers providing radiofrequency transport services includes installation in or on existing utility poles.

NextG informed CCSF and other localities about the authority it was granted and the services it provides. CCSF did not rely on this information; it did not permit NextG to operate in San Francisco. Without reliance on a material fact, there is no actionable misrepresentation. NextG followed our procedures for accepting its CPCN, including requesting an extension of time. Because we reaffirm our grant of authority to NextG, we find NextG timely exercised that authority.

## 2. Procedural Background

CCSF claims that NextG is violating the terms of the CPCN granted in D.03-01-061, because NextG: (1) has failed to timely exercise its authority to offer competitive local exchange or interexchange services, and (2) is representing to CCSF that it is authorized to provide radiofrequency transport services, a service the Commission has not authorized it to provide. CCSF further claims that NextG is violating the terms and conditions of its CPCN because the Commission has not authorized NextG to install either (1) microcell and antenna

- 2 -

C.05-03-010 ALJ/JLG/sid

facilities in public rights-of-way, or (2) any equipment or facilities on existing utility poles.

On March 30, 2005, NextG moved to dismiss the complaint and to receive expedited consideration of its motion to dismiss. On April 14, 2005, CCSF filed its opposition to the motion to dismiss, its partial opposition to the motion for expedited consideration, and a motion to strike evidence submitted in support of the motion to dismiss. On April 19, 2005, NextG filed its reply. On May 20, 2005, the assigned Administrative Law Judge's (ALJ) ruling requested further briefing on the motion to dismiss. The parties submitted responses on May 27, 2005, and replies on June 9, 2005. A prehearing conference was held on June 13, 2005.

An Assigned Commissioner's ruling and scoping memo (ACR) issued on July 6, 2005. The ACR denied NextG's motion to dismiss; it was premature to find CCSF's complaint alleged no violation of law or order upon which the Commission could grant relief. The parties filed a stipulation of material facts on July 12, 2005. That stipulation is attached to this decision as an attachment. On July 13, 2005, NextG filed in this proceeding the proponent's environmental assessment it filed with its application for a CPCN. The parties filed opening and reply briefs on August 1 and 12, 2005, respectively. CCSF filed a motion to strike NextG's declarations in support of its brief that described NextG's discussions with our staff prior to filing its application. In the interest of expediting resolution of this complaint, NextG withdrew the declarations.

## 3. Parties' Contentions

The dispute between the parties centers on four issues:

1. Whether the Commission granted NextG the authority to place antennas and microcells on utility poles and in public rights-of-way in D.03-01-061.

C.05-03-010 ALJ/JLG/sid

2. Whether NextG misrepresented the authority granted it by the Commission in requesting to place microcells and antennas on utility poles in San Francisco and other localities.

3. Whether NextG timely exercised its authority.

4. Whether the placement of microcells and antennas on utility poles by a telephone corporation such as NextG is exempt from the California Environmental Quality Act (CEQA).

If we find NextG has violated state law or our orders or rules, CCSF requests that we revoke NextG's CPCN or order NextG to comply with the terms and conditions of its CPCN. NextG states we should deny each of CCSF's claims. We discuss each of the four issues in the following section.

## 4. Discussion

To resolve this complaint, we first must determine whether we granted NextG the authority to provide radiofrequency transport services as competitive local exchange services. After resolving concerns regarding the scope of the authority we granted to NextG, we then must decide whether the installation of wireless microcells and antennas on public utility poles has an adverse environmental impact under CEQA. Finally, we must resolve whether NextG timely exercised the authority we granted and/or misrepresented the scope of that authority.

### 4.1. Authority to Provide Radiofrequency Transport Services

In D.03-01-061, we granted NextG the authority to provide competitive local exchange and nondominant interexchange services. CCSF claims NextG has violated our rules and orders by failing to provide competitive local exchange services. CCSF asserts the radiofrequency transport services provided

C.05-03-010 ALJ/JLG/sid

by NextG are not competitive local exchange services, primarily because NextG provides those services to wireless carriers who are uncertificated. To ascertain whether NextG's provision of radiofrequency services violates the authority granted in D.03-01-061, we must reexamine that decision, including the authority requested and granted, in the context of our decisions authorizing local exchange competition.

In its application, NextG stated it would provide radiofrequency transport services. Radiofrequency transport services augment geographic wireless coverage and improve system capacity. NextG provides these services to wireless telecommunications service providers. (*See* Material Facts 1 and 2.) NextG does not provide residential or business exchange services to end users. (*See* Material Fact 3.) D.03-01-061 granted NextG a CPCN to "operate as a limited facilities-based and resale provider of competitive local exchange services." (D.03-01-061, Ordering Paragraph 1.)

We initially authorized carriers to provide facilities-based competitive local exchange telecommunications services to residential or business customers. (*See* D.95-12-056.) In establishing facilities-based local exchange services, we stated carriers providing such services must "directly own, control, operate, or manage conduits, ducts, pokes, wires, cables, instruments, switches, appurtenances, or appliances in connection with or to facilitate communications within the local exchange portion of the public switched network." (D.95-07-054, 60 CPUC 2d 611, 642, Appendix A, p. 3.)

Since authorizing facilities-based competitive local exchange services, we have extended competitive local exchange carrier (CLC) authority to other types of carriers. We have found wholesale services to be competitive local exchange services. For example, we granted Southern California Edison a CPCN as a CLC

C.05-03-010 ALJ/JLG/sid

to provide wholesale services to other CLCs and to other telecommunications providers, including wireless carriers, as a facilitator of local communications services, rather than as a competitor. (D.98-12-053, 84 CPUC 2d 468, 472-473.)

We have made no distinction between carriers providing wholesale services to wireline or wireless carriers or certificated or uncertificated providers. We have stated our rules concerning competitive services necessarily apply to all CLCs, whether they use wireline, wireless or both. (D.95-07-054, 60 CPUC 2d at 629.) Many telecommunications providers are not traditionally regulated, yet they purchase regulated telecommunications services from regulated carriers. We must focus on what we are authorizing, the authority to provide a type of telecommunications service, and not on the technology used or the customers for that service. Nonetheless, wireless carriers do register with the Commission. We also regulate the terms and conditions of wireless service.

We have granted CLC authority to carriers providing services similar to NextG's. For example, we reaffirmed Teligent Inc.'s authority to install microwave antennas as part of its limited facilities-based authority in D.01-06-019, 2001 Cal. PUC LEXIS 334, *1. We also granted a limited facilities-based CLC CPCN to Crown Castle Solutions Corp., a provider, NextG asserts is operating a distributed antenna network system almost identical to NextG's, in D.05-01-021, 2005 Cal. PUC LEXIS 21. CCSF is correct that our standard limited facilities-based CLC CPCN decision does not mention the specific service the telephone corporation is providing. (See, *e.g.*, Application of Global Internetworking, Inc., D.05-01-013, 2005 Cal. PUC LEXIX 5, *2.) Again, our focus is on the authority we are granting, limiting facilities-based CLC authority.

We further note that the CLC authority we have granted to NextG is consistent with other states' characterization of NextG's services. (*See, e.g.,* Order

- 6 -

C.05-03-010 ALJ/JLG/sid

No. 05-189, *In the Matter of NextG Networks of California, Inc. dba NextG Networks West*, 2005 Ore. PUC LEXIS 158, *5; *Application of NextG Networks of Illinois, Inc., d/b/a NextG Networks Central for Certification as a Competitive Local Exchange Carrier and Alternative Telecommunications Utility*, 4142-NC-100, 2005 Wisc. PUC LEXIS 282, mailed April 25, 2005; and *Application of NextG Networks Atlantic, Inc. for certificates of public convenience and necessity to provide local exchange and interexchange telecommunications services*, Case No. PUC-2004-00009, 2004 Va. PUC LEXIS 241.)

When examining whether a carrier is providing service that exceeds the authority granted by its CPCN, we have looked for any limitations to that authority. (*See, e.g.,* D.03-12-064, 2002 Cal. PUC LEXIS 1060, *10.) The underlying decision here, D.03-01-016, does not limit the authority granted to NextG.

Because we have granted other carriers similar operating authority and did not limit the authority granted to NextG in D.03-01-061, we conclude our decision grants the authority requested and authorizes NextG to provide radiofrequency transport services. Thus, NextG has not violated D.03-01-061 by providing radiofrequency transport services.

## 4.2. CEQA

In D.03-01-061, we stated NextG's authority was limited to installation of facilities in existing buildings or structures. (D.03-01-061, Ordering Paragraph 8.) We must determine whether that authority permits NextG to place microcells and antennas on utility poles.

The limitation to installation of facilities in existing buildings or structures is standard in our grant of limited facilities-based CLC authority. In D.99-10-025 we found no material adverse environmental impacts would result from

C.05-03-010 ALJ/JLG/sid

limited-facilities based service, utilizing equipment installed in previously existing structures, since no external construction would occur. (D.99-10-025, 2 CPUC 3rd 700, 703.) As NextG notes, in the past we have granted limited facilities-based CPCNs that approve "equipment installed solely within or on existing buildings and structures." (*See* D.00-12-009, Ordering Paragraph 1.) However, we no longer do so. A blanket extension allowing installation on existing buildings and structures without limit is too broad for a finding of no material adverse environmental impact. Although NextG's application clearly signaled its intent to install facilities on existing structures, we did not address that issue in D.03-01-061. Thus, we now must consider whether NextG's placement of equipment on existing utility poles is within the scope of its limited facilities-based authority.

NextG constructs microcellular networks that in part transport wireless carriers' voice and data traffic. NextG's network comprises a "hub," which operates like a traditional central switch in the wireline network and a system of fiber optic cables, remote nodes and small antennas attached to poles and other structures. (*See* Material Facts 9 and 10.) Fiber optic cables are strung on existing utility poles or installed in existing underground conduit. (*See* Material Fact 10.) NextG's brief includes pictures and diagrams of the remote nodes and antennas it uses. On distribution poles, directional antennas are approximately 25" long and remotes are approximately 29" long.

Allowing placement of microcells and antennas on existing utility poles is consistent with limited facilities-based authority, because no construction is involved. It is also consistent with our prior decision that installation of fiber

- 8 -

C.05-03-010 ALJ/JLG/sid

optic equipment on existing utility structures is categorically exempt from CEQA.[1]

CCSF's Planning Department concluded that the installation of antennas, repeaters, wiring, and equipment cabinets on existing utility poles by NextG would have no effect on land use, traffic and circulation, geology/seismicity, water, hazardous materials, biology, archeological resources or public services after ensuring no installation would impact scenic resources. (*See* NextG's Brief, p. 19, n.58.) Our review of the information provided by NextG is in accord. Thus, it can be seen with certainty that there is no possibility that the installation of antennas and microcells will have an adverse effect upon the environment. Having determined the installation of microcells and antennas on existing utility poles will not have an adverse effect, we find that their installation is permissible under limited facilities-based authority. This construction activity is within the scope of the authority granted in D.03-01-016. We conclude that a grant of limited facilities-based authority for carriers providing radiofrequency transport services includes installation in or on existing utility poles.[2]

NextG must file for additional authority, and submit to any required CEQA review, before it can construct facilities other than equipment to be

---

[1] In our Metropolitan Fiber Network Services, Inc. proceeding, we found the "installation of optical fiber and related telecommunications equipment on existing utility structures by third-party telecommunications providers . . . is categorically exempt from environmental review under the California Environmental Quality Act (CEQA)." (D.04-04-014, 2004 Cal PUC LEXIS 142, *1.)

[2] This determination does not preclude local jurisdiction from safeguarding scenic resources and from adopting conditions on installations such as those found in permits and rights-of-way agreements. (*See* Declaration of Theresa L. Mueller, Exhibits E and F.)

C.05-03-010 ALJ/JLG/sid

installed in or on existing buildings or structures. NextG recognized it would need to expand its requested authority if it needed to construct new facilities. (Proponent's Environmental Assessment, n.1.) NextG's request for additional authority should conform to authority granted to carriers with distributed antenna systems networks. NextG should contact our Energy Division in advance of filing a request for expanded authority.

### 4.3. Misrepresentation

CCSF asserts NextG negligently misrepresented the scope of its authority. The information NextG provided to CCSF and other localities basically derives from D.03-01-061. NextG made the following representations to CCSF: (1) NextG is a facilities-based provider of protocol-agnostic, fiber-aggregated optical-to-radio frequency conversion and microcellular repeater services; (2) NextG will make its radiofrequency transport services available to wireless carriers; (3) the Commission granted NextG a CPCN to operate as a telephone corporation; and (4) NextG will attach microcells and antennas to utility and other poles located in rights-of-way. NextG provided CCSF with a copy of its CPCN. NextG made similar representations to representatives of 67 other localities in California. (*See* Material Facts 13 and 14.) None of these representations is inaccurate. Having reaffirmed that D.03-01-061 authorized NextG to provide radiofrequency transport services, NextG's representation concerning the authority we granted also is not inaccurate.

Further, one element of actionable negligent misrepresentation is reliance on a material fact. (*See* Hydro-Mill Co., Inc., v. Hayward, Tilton, Rolapp Ins. Associates, Inc., 115 Cal. App. 4th 1145, 1154.) All of the representations NextG made to CCSF are material; however, CCSF has not proved it relied on that

C.05-03-010 ALJ/JLG/sid

information. Instead, CCSF disagreed with NextG's claims. CCSF further has challenged the veracity of that information in this complaint.

NextG also gave localities more specific information concerning its plans. NextG stated it would install fiber optic cable either underground or on existing utility poles and antennas and associated equipment on utility poles and/or streetlight poles. Finally, NextG stated if the locality did not permit NextG to attach to its streetlight or traffic poles, NextG might need to install its own utility poles. (Declaration of Theresa L. Mueller, Exhibit D.) The limited facilities-based authority we granted in D.03-06-016 does not permit NextG to install its own utility poles. Again, although this information is material and some of it is inaccurate, CCSF has not shown it relied on it. CCSF did not permit NextG to engage in any construction.

NextG clarifies that it recognizes it would be necessary to modify its CPCN in order to install poles and that it did not intend to suggest otherwise. NextG agrees to revise the relevant section, contained in its Local Official's Guide, to reflect this understanding. We accept NextG's proposal to revise its Guide.

CCSF has not shown that it relied on any information concerning the scope of authority or business plans provided by NextG. Thus, there is no actionable misrepresentation.

### 4.4.  NextG Timely Exercised Its Authority

We next consider whether NextG timely exercised the authority granted in D.03-01-061. NextG filed a written acceptance of the CPCN on February 25, 2003. On January 23, 2004, NextG requested an extension of time to commence service under its CPCN. The Commission granted the requested extension until July 30, 2004. On July 21, 2004, NextG notified the Commission that it had commenced

C.05-03-010 ALJ/JLG/sid

providing telecommunications service under its CPCN in California. (Material Facts 7 and 8.) NextG has constructed or is constructing networks in numerous localities in California. (Material Fact 12.)

Having reaffirmed that D.03-01-061 authorized NextG to provide radiofrequency transport services as competitive local exchange services and finding that NextG has provided and continues to provide those services in California, we find that NextG timely exercised the authority granted in D.03-01-061.

## 5. Assignment of Proceeding

Geoffrey F. Brown is the Assigned Commissioner and Janice Grau is the assigned ALJ in this proceeding.

## 6. Comments on Draft Decision

We initially categorized this proceeding as an adjudication that would go to hearing. We confirm that the proceeding is adjudicatory but find, with the agreement of the parties, that a hearing is not needed.

The draft decision of the ALJ in this matter was mailed to the parties in accordance with Pub. Util. Code § 311(g)(1) and Rule 77.7 of the Rules of Practice and Procedure. Comments were filed on January 5, 2006 and reply comments were filed on January 10, 2006.

## Findings of Fact

1. On July 13, 2005, the parties filed a stipulation of material facts.

2. By D.03-01-061, Ordering Paragraph 1, the Commission granted NextG a CPCN to "operate as a limited facilities-based and resale provider of competitive local exchange services."

C.05-03-010 ALJ/JLG/sid

3. NextG provides radiofrequency transport services, which augment geographic wireless coverage and improve system capacity, to wireless telecommunications service providers.

4. NextG's network comprises a "hub," which operates like a traditional central switch in the wireline network and a system of fiber optic cables, remote nodes, and small antennas attached to poles and other structures.

5. The Commission has granted competitive local exchange carrier CPCNs to carriers providing services similar to NextG's. In D.01-06-019, the Commission reaffirmed Teligent Inc.'s authority to install microwave antennas as part of its limited facilities-based authority. In D.05-01-021, the Commission granted a limited facilities-based CPCN to Crown Castle Solutions Corp., a provider operating a system similar to NextG's.

6. The Commission's standard limited facilities-based CLC CPCN decisions do not mention the specific service the telephone corporation is providing.

7. D.03-01-061 limited NextG's authority to installation in existing buildings and structures.

8. CCSF's Planning Department concluded that the installation of antennas, repeaters, wiring, and equipment cabinets on existing utility poles by NextG would have no effect on land use, traffic and circulation, geology, seismicity, water, hazardous materials, biology, archeological resources or public services.

9. NextG made representations to CCSF and other localities concerning the nature of its services, the authority it had obtained, and its planned construction.

10. CCSF did not permit NextG to operate in San Francisco.

11. NextG filed a written acceptance of its CPCN on February 25, 2003. On January 23, 2004, NextG requested an extension of time to commence service under its CPCN. The Commission granted the requested extension until July 30,

C.05-03-010 ALJ/JLG/sid

2004. On July 21, 2004, NextG notified the Commission that it had commenced providing telecommunications service under its CPCN in California.

**Conclusions of Law**

1. NextG is currently providing telephone service in accordance with the limited facilities-based authority granted in D.03-01-061.

2. It can be seen with certainty that there is no possibility that the installation of antennas and microcells on existing utility poles will have an adverse effect upon the environment.

3. NextG timely exercised the authority granted in D.03-01-061.

4. It is reasonable to conclude CCSF did not rely on any material representation NextG made to CCSF.

5. It is reasonable to make this order effective today in order to resolve this complaint without further delay.

# O R D E R

**IT IS ORDERED** that:

1. The complaint of the City and County of San Francisco is denied as set forth herein.

2. Case 05-03-010 is closed.

This order is effective today.

Dated January 12, 2006, at San Francisco, California.

MICHAEL R. PEEVEY
President
GEOFFREY F. BROWN
DIAN M. GRUENEICH

- 14 -

C.05-03-010 ALJ/JLG/sid

JOHN A. BOHN
RACHELLE B. CHONG
Commissioners

# Exhibit C

L/cdl

**MAIL DATE**
**7/25/06**

Decision 06-07-036          July 20, 2006

BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA

| | |
|---|---|
| City and County of San Francisco,<br>Complainant,<br><br>vs.<br><br>NextG Networks of California,<br>Inc. (U6754 C),<br><br>Defendant. | Case 05-03-010<br>(Filed March 9, 2005) |

## ORDER MODIFYING AND DENYING REHEARING OF DECISION 06-01-006, AND DENYING MOTION FOR EXPEDITED CONSIDERATION

In September 2002, NextG Networks of California, Inc. (NextG), filed an application for a certificate of public convenience and necessity (CPCN) to provide radio frequency (RF) transport services as competitive local exchange (CLEC or CLC) and interexchange (IEC) telecommunications services. (A.02-09-019.) By D.03-01-061, we found that NextG was a non-dominant inter-exchange carrier (NDIEC) and a CLC. D.03-01-061 approved NextG's application and granted it a CPCN. In its 2002 application, NextG described its construction as "a system of fiber optic cables and small antennas and conversion equipment attached to poles and other structures."

CCSF filed a complaint (C.05-03-010) alleging that NextG failed to timely accept the CPCN authority granted to it by D.03-01-016, misrepresented the scope of its authority, and was installing facilities in non-authorized public rights-of-way. CCSF prayed the Commission either revoke NextG's CPCN or order it to fully comply with the terms of it.

236214

C.05-03-010                          L/cdl

NextG filed a motion to dismiss CCSF's complaint, on the grounds that it failed to state a cause of action under Public Utilities Code section 1702 and was an improper attempt by CCSF to use the Commission's procedures to obstruct a federal proceeding, currently stayed, brought by NextG against CCSF (*NextG Networks of California v. City of San Francisco*, Case No. 05-0658 (N.D. Cal.)).[1] That motion was denied by ruling of the Assigned Commissioner (AC) on July 6, 2005.

Because an allegation involved the California Environmental Quality Act (CEQA), to assist us in determining what, if any, environmental review was necessary, NextG was ordered to re-file the proposed environmental assessment (PEA) it had originally submitted in A.02-09-019.

On July 13, 2005, the parties filed a stipulation of material facts, which is attached to D.06-01-006. D.06-01-006 finds, among other things, that by D.03-01-061, the Commission authorized NextG to operate as a limited facilities-based and resale provider of competitive local exchange services and that in so doing the Commission understood that NextG would provide RF transport services. D.06-01-006 discusses the CPCN authorization provided to other CLCs providing services similar to NextG, finding that, as in the case of D.03-01-061, commonly "standard limited facilities-based CLC CPCN decisions do not mention the specific service the telephone corporation is providing." (D.06-01-006, at p. 13, Finding of Fact No. 6.) D.06-01-006 determines that NextG's "construction activity is within the scope of authority granted in D.03-01-061." (*Id.*, at p. 9.) D.06-01-006 concludes that "NextG is currently providing telephone service in accordance with the limited facilities-based authority granted in D.03-01-061." (*Id.*, at p. 14, Conclusion of Law No. 1.) D.06-01-006 also concludes that NextG timely exercised the authority granted in D.03-01-061. In addition, D.06-01-006 concludes that CCSF did not rely on any material representation NextG made to it, and denies the complaint.

CCSF timely filed an application for rehearing of D.06-01-006. CCSF's application for rehearing of D.06-01-006 alleges the Commission erred in finding that

---

[1] All statutory references are to the Public Utilities Code unless otherwise indicated.

C.05-03-010                          L/cdl

NextG was authorized under its CPCN to provide RF transport services, and that its construction of facilities on existing utility poles and structures is categorically exempt from the California Environmental Quality Act (CEQA). CCSF also contends that D.06-01-006 unlawfully modifies D.03-01-061 without adequate notice and opportunity to be heard and in violation of section 1705; and makes a new CEQA finding without evidence to support it and without notice such finding would be made in an adjudicatory docket. NextG filed a timely response opposing CCSF's application for rehearing. NextG also filed a motion for expedited consideration which we deny by this order.

I.    **DISCUSSION**

    A.    **Scope of authority granted to NextG by D.03-01-061.**

        CCSF argues that there was no discussion in D.03-01-061 that NextG intended to offer only RF transport services or that such services constitute LEC or IEC service.[2] That is correct; D.03-01-061 is very general and provides no specifics regarding what specific type of services NextG will provide, apart from CLC and IEC services. It does, however, reference and approve NextG's application for a CPCN. In its application, NextG stated: "… NextG will provide radiofrequency … transport and backhaul services…. Using a system of fiber optic cables, small antennas and conversion equipment attached to poles and other structures." (A.02-09-019 at p. 3.) CCSF acknowledges that in its 2002 application for a CPCN, NextG specifically stated that it would be providing RF transport services and described how it would do so. CCSF contends that D.03-01-061 did not authorize NextG to offer RF transport services, implying that RF transport services are not included within CLC (or CLE) or IEC service. CCSF also argues that D.03-01-061 "limits" NextG's authority to CLC or IEC service. (CCSF application for rehearing at pp. 2-3.)

---

[2] The parties agreed by stipulation, D.03-01-061 authorized NextG "to operate as a limited facilities-based and resale provider of competitive local exchange services, and interexchange services…." (D.03-01-061 at p. 7, Ordering Paragraph No. 1.) D.03-01-061 also authorizes NextG "to provide local exchange service in the service territories of Pacific Bell Telephone Company, Verizon California Inc., Roseville Telephone Company, and Citizens Telecommunications Company of California, Inc." (*Id.*, Ordering Paragraph No. 2.) Consequently, NextG was required to file tariff schedules for CLC and IEC services.

C.05-03-010                     L/cdl

CCSF contends that since D.03-01-061 did not specifically state that NextG would offer only RF transport services, or that its RF transport services constitute CLC or IEC service, or that NextG is authorized by its CPCN to offer its RF transport services, that NextG did not receive such authority. This is inaccurate for reasons discussed herein and is a re-argument of the issues addressed by D.06-01-006. D.06-01-006 states that the authority granted to NextG by D.03-01-061 to act as a CLC and/or IEC encompasses a variety of telecommunications services. (D.06-01-006 at p. 6.) Addressing CCSF's concern, D.06-01-006 provides:

> CCSF is correct that our standard limited facilities-based CLC CPCN decision does not mention the specific service the telephone corporation is providing. [Citation omitted.] ... [O]ur focus is on the authority we are granting, limit[ed] facilities-based CLC authority. (*Id.*, at p. 6.)

As discussed in D.06-01-006, the language used by D.03-01-061 was standard "boilerplate" language used for various services that constitute CLC and/or IEC service. It has been the Commission's policy in such cases, as it did in D.03-01-061, to reference the application in the authorizing decision, rather than actually provide a separate description of the actual service(s) being authorized.

In addition, use of more general terminology to describe existing buildings and structures in D.03-01-061 rather than specific terms such as "public rights-of-way," "streetlight," or "utility poles," does not establish that we did not authorize NextG to construct its facilities on such existing buildings and structures. As noted above, D.03-01-061 did not reject NextG's request for authority to install its equipment "in and on" existing structures. Nothing in D.03-01-061 establishes that we rejected any part of NextG's application.

CCSF contends that D.06-01-006 errs by making findings on issues concerning NextG's RF transport services because, it contends, there is no factual support for the findings in violation of section 1705.[3] Yet, as noted above, CCSF readily admits that NextG's application for a CPCN specified that it would be offering RF transport services.

---

[3] Section 1705 requires the Commission to issue a decision that contains "separately stated, findings of fact and conclusions of law ... on all issues material to the order or decision."

4

C.05-03-010                    L/cdl

By raising the issue in its complaint of whether NextG's RF transport services and construction were authorized within the CPCN granted by D.03-01-061, the Commission necessarily was required to make a finding on whether RF services are contemplated by the authority granted by D.03-01-061 and that is what we did. Further, CCSF's complaint made necessary a finding on whether the authority to install antennas and microcells in or on existing buildings and structures, such as utility poles and/or public rights-of-way, was within the scope of NextG's CPCN. CCSF has not shown the decision errs in its determination of whether RF transport services were within the scope of authority conferred on NextG by D.03-01-061.

**B.    CEQA and installation on existing structures.**

CCSF also asserts that in NextG's CPCN decision, D.03-01-061, "[t]he Commission rejected NextG's request for a determination that its construction of its facilities *on* existing streetlights and poles was categorically exempt from CEQA." (CCSF application for rehearing at p. 3, emphasis retained.)[4] CCSF therefore argues that D.06-01-006 errs in finding that NextG's installation of microcells and antenna on existing utility poles is exempt from CEQA, contending D.06-01-006 "is both internally inconsistent and confusing…," citing to pages 8 and 9. (CCSF application for rehearing at p. 6.) CCSF maintains that NextG is only authorized to place its facilities "in" existing structures.

Despite language in D.06-01-006 suggesting that the Commission had not granted NextG authority to place antennas and microcells on existing utility poles, upon reflection we conclude that D.03-01-061 authorized these placements. We acknowledge that the language we originally used in D.03-01-061 authorizing NextG's proposal is ambiguous. As CCSF points out, in some places we discussed authorizing construction "in" existing structures. At the same time, however, we stated that: "Applicant represents

---

[4] CCSF is mistaken in its contention that we concluded that NextG's project was "categorically exempt" from CEQA (CCSF application for rehearing at pages 6-9) at any time. Categorical exemptions are a term of art pursuant to CEQA and the Commission never determined that NextG's placement and construction fit within any CEQA categorical exemption. Rather, the Commission concluded it could be seen with certainty that the particular proposals in NextG's application would not result in a significant environmental impact.

C.05-03-010                       L/cdl

that it will not be constructing any facilities other than equipment to be installed in or on existing buildings or structures, for the purpose of providing interexchange or local exchange services. Therefore, it can be seen with certainty that there is no possibility that granting this application will have an adverse effect upon the environment." (D.03-01-061 at p. 4.)

Moreover, as noted in the discussion of CEQA in D.03-01-061, we clearly understood from NextG's application that NextG would be constructing facilities "attached to" or "in or on" existing buildings or structures. NextG described its construction as attaching its equipment to existing utility poles and other existing structures. (A.02-09-019 at pp. 3-4.) We note that D.03-01-061 specifically declares: "This … decision grants the relief requested." (D.03-01-061 at p. 4.)

Accordingly, we reject CCSF's restrictive interpretation of NextG's CPCN language. Although D.03-01-061 reflects concern about granting unlimited authority to place indefinite items "on" existing structures, we concluded in that decision that NextG's specific proposal, regarding antenna and microcells, should be authorized and would not have a significant impact on the environment. We find that it is a reasonable interpretation of D.03-01-061 that NextG is only required to return for additional authorization for construction or placement on structures *beyond* what was described in NextG's CPCN application.

For these reasons, upon reconsideration of our language in D.03-01-061, we will alter our conclusions in D.06-01-006 regarding the correct interpretation of the earlier decision. We find that NextG's interpretation of D.03-01-061, that we authorized it to place antennas and microcells on utility poles and in public rights-of-way, is reasonable. Because we find that we authorized NextG's proposal in 2003, and at that time concluded there was no need for environmental review of the limited actions NextG planned, we will delete the portions of D.06-01-006 purporting to provide this authority and evaluating the need for environmental review. Moreover, since we concluded there was no potential for environmental impact from NextG's proposed facilities in our 2003 decision, we decline to

C.05-03-010                          L/cdl

further discuss CCSF's contentions regarding the possible environmental harm of NextG's equipment placement at this time.[5]

We further note that we have a proceeding that is currently pending concerning our CEQA policies for telecommunications utilities. (*Rulemaking on Application of CEQA to Telecommunication Utilities*, R.00-02-003, "rulemaking.") The issue of the regulatory treatment of utilities' placement of equipment "in or on" existing structures is being considered in that proceeding on a broader scale. Both NextG and CCSF should be aware that the final order we issue in the rulemaking may supersede the terms of NextG's CPCN as we have interpreted them in today's decision.

Finally, CCSF also argues that D.06-01-006 modifies D.03-01-061 without adequate notice and opportunity to be heard and made a CEQA finding without evidence to support it and without notice such finding would be made in an adjudicatory docket. As discussed above, as modified by our decision today, D.06-01-006 does not make any new CEQA finding. We clarify, but do not modify, D.03-01-061, and CCSF's allegations of error are unsupported and without merit.

## II.    CONCLUSION

We believe that modification of D.06-01-006 is warranted as discussed herein. In view of the modifications we now order, upon reviewing each and every allegation of error raised by CCSF and for all of the foregoing reasons, we find there is no merit supporting the application for rehearing of D.06-01-006, as modified. In addition, we find that there is no good cause shown for granting NextG's motion to expedite this decision and we deny the motion.

Therefore **IT IS ORDERED** that:

1.    The following modifications are made to Decision 06-01-006:

---

[5] We note that CCSF has identified no new circumstances or particular environmental impact that was mistakenly overlooked. Rather CCSF is solely challenging the conclusions in D.03-01-061, as we interpret that decision. The time for contributing to, or challenging that decision is long past. In the event CCSF had information regarding changed circumstances, or a specific environmental concern, it would be able to bring that to our attention as a complaint pursuant to section 762, et al. This complaint route should be reserved for exceptional circumstances, however.

C.05-03-010                         L/cdl

      a.     The third full sentence of the second full paragraph on page 2: "We find limited facilities-based authority for carriers providing radiofrequency transport services includes installation in or on existing utility poles," is deleted and the following added in its place:

> The authority granted to NextG by D.03-01-061 to provide limited facilities-based CLC services includes the authority to provide radiofrequency transport services involving construction in or on existing utility poles and other existing structures.

      b.     The second full sentence in the paragraph entitled "4. Discussion" on page 4: "After resolving concerns regarding the scope of the authority we granted to NextG, we then must decide whether the installation of wireless microcells and antennas on public utility poles has an adverse environmental impact under CEQA," is deleted in its entirety.

      c.     The second sentence in the second full paragraph on page 5 is modified to delete the word "pokes," and add the word "poles" in its place as follows:

> In establishing facilities-based local exchange services, we stated carriers providing such services must "directly own, control, operate, or manage conduits, ducts, poles, wires, cables, instruments, switches, appurtenances, or appliances in connection with or to facilitate communications within the local exchange portion of the public switched network."

      d.     The last sentence of the second full paragraph on page 6, stating: "Again our focus is on the authority we are granting, limiting facilities-based CLC authority" is modified to delete the word "limiting" and add in its place the word "limited," as follows:

> Again our focus is on the authority we are granting, limited facilities-based CLC authority.

      e.     Section 4.2, entitled "CEQA," beginning on page 7 and ending on page 9 is deleted.

      f.     Finding of Fact No. 7 is deleted and the following added in its place:

C.05-03-010                          L/cdl

    7.    D.03-01-061 grants NextG a CPCN to provide radio frequency transport services as described in its application.

    g.    Conclusion of Law No. 2 on page 14 is deleted and the following added in its place:

    2.    The determination already made in D.03-01-061 that it can be seen with certainty that there is no possibility that granting NextG's application to install its equipment in or on existing buildings or structures for the purpose of providing interexchange or local exchange service will have an adverse effect upon the environment, includes installation by NextG of small antennas and microcells on existing utility poles.

    2.    The application for rehearing of Decision 06-01-006 as modified herein, filed by the City and County of San Francisco, is denied.

    3.    The motion of NextG Networks for expedited consideration of complainant's application for rehearing is denied.

    4.    This proceeding is closed.

    This order is effective today.

    Dated July 20, 2006, at San Francisco, California.

                         MICHAEL R. PEEVEY
                               President
                         GEOFFREY F. BROWN
                         DIAN M. GRUENEICH
                         JOHN A. BOHN
                         RACHELLE B. CHONG
                            Commissioners

# Exhibit D

ALJ/JLG/sid

**Mailed 4/16/2007**

Decision 07-04-045  April 12, 2007

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| Application of NextG Networks of California, Inc. ( U 6745 C) to expand its existing Certificate of Public Convenience and Necessity [A.02-09-019, D.03-01-061] to include full Facilities-based Telecommunications Services. | Application 06-05-031 (Filed May 19, 2006) |

**OPINION GRANTING REQUEST FOR EXPANDED AUTHORITY AND EXPEDITED ENVIRONMENTAL REVIEW AND ORDERING FURTHER ENFORCEMENT PROCEEDINGS**

We grant NextG Networks of California, Inc.'s (NextG) request for full facilities-based local exchange services authority and expedited environmental review, subject to the requirements and conditions stated below. Granting this authority is consistent with prior decisions and follows no issuance in this proceeding of a stop work order. Although we grant NextG's application, we order that a separate investigation be opened to consider whether NextG violated its limited facilities-based Certificate of Public Convenience and Necessity (CPCN) issued in Decision (D.) 03-01-061, when NextG engaged in ground-disturbing activity. The investigation also should consider whether NextG violated Rule 1.1 of the Commission's Rules of Practice and Procedure in failing to disclose to the Commission that it engaged in ground-disturbing activity. Further, NextG should be ordered to show cause why a penalty should not be imposed for any violations.

A.06-05-031 ALJ/JLG/sid

## 1.  Background

In this application, NextG seeks approval of a process for expedited environmental review of facilities construction, consistent with the authority granted to ClearLinx Network Corporation (ClearLinx), now known as ExteNet Systems, Inc. (ExteNet), in D.06-04-063 and to CA-CLEC LLC in D.06-04-067, and expansion of its CPCN to full facilities-based authority.  NextG provides radiofrequency transport services for wireless carriers and constructs transport networks consisting of a central switch-like hub and a system of fiber optic cables, remote nodes, and small antennae attached to poles and other structures. ExteNet and the League of California Cities and the City and County of San Francisco (Cities) protested the application.  ExteNet alleges NextG has violated its limited facilities-based authority in constructing its distributed antenna system (DAS) networks and requests a stop work order.  ExteNet's request for a stop work order was referred to the Commission's Energy Division by the Administrative Law Judge (ALJ).  The Cities object to allowing the expedited review process to include the construction of new utility poles in underground utility districts.  NextG replied to the protests, and the ALJ granted leave to ExteNet and NextG to file additional responsive pleadings, which they did on July 28 and August 8, 2006, respectively.

A prehearing conference (PHC) was held on September 13, 2006.  On September 29, 2006, an assigned Commissioner's ruling and scoping memo issued.  The scoping memo stated this proceeding would address whether the Commission should (1) grant NextG's request for authority as a facilities-based telecommunications carrier and for expedited review of facilities construction, and (2) initiate an enforcement investigation to address NextG's alleged violations of its limited facilities-based authority.  The scoping memo confirmed

A.06-05-031 ALJ/JLG/sid

the ratesetting categorization and that hearings were necessary on the issue of alleged violations. Hearings were held on November 6 and 8, 2006 on the enforcement issue. Opening and reply briefs were filed on December 4 and 11, 2006, respectively.

The Energy Division's stop work order investigation was limited to environmental violations. The Energy Division monitored the discovery produced, the hearings, and the filed briefs as part of its stop work order investigation.

## 2.    Stop Work Order

The Energy Division did not request that a stop work order be issued in this proceeding. Thus, the request for a stop work order is moot, and we may proceed with NextG's request for expanded authority and expedited environmental review. The procedural schedule contemplated issuance of an interim decision on the request for expanded authority after the Energy Division's investigation of the stop work order request and a final decision on whether enforcement proceedings were necessary. No interim decision issued, and this decision will resolve both issues. We first address NextG's request for expanded authority and expedited environmental review and then address whether enforcement proceedings are necessary to resolve the alleged violations of NextG's CPCN.

## 3.    Facilities-Based CPCN

The requirements for the expanded CPCN authority requested by NextG here are the same as those previously met by NextG for its existing CPCN (U-6754 C), except for California Environmental Quality Act (CEQA)

- 3 -

A.06-05-031 ALJ/JLG/sid

requirements.[1] We have previously granted the expedited review process requested by NextG to two competitors, ExteNet and CA-CLEC LLC in D.06-04-063 and D.06-04-067. Therefore, we must determine whether NextG's proposed construction and process for requesting determinations of exemption from CEQA by Commission staff meet the requirements of CEQA and similarly should be approved.

NextG seeks authority in this application to modify its existing CPCN to include full facilities-based competitive local exchange service. NextG states that the location of its projects is not known at this time but that they will be geographically dispersed. NextG states that the proposed construction activities include: (1) new pole installations, (2) small-scale trenching and underground conduit installation, and (3) micro-trenching and installation of laterals. NextG states these activities are projects which are categorically exempt from CEQA.

Both in its application and in the record in this proceeding, NextG has demonstrated that its proposed projects take place in existing rights-of-way and in utility easements. NextG will install a limited number of new poles, will engage in small-scale trenching and underground conduit installation of up to five miles, and will do micro-trenching and installation of laterals of up to 25 feet. NextG states these activities fall within the extensions, minor alternations and infill exemptions to CEQA, so neither an environmental impact report nor a Negative Declaration is required.

---

[1] NextG also filed financial documentation. NextG relies on managerial biographical information filed with its original application. This information demonstrates that NextG otherwise meets the requirements for a full facilities-based CPCN.

A.06-05-031  ALJ/JLG/sid

NextG proposes the following procedure for obtaining Commission approval of its claimed CEQA exemptions for proposed construction projects and for comparable activities where a CEQA exemption is likely:

- NextG will provide the Commission's CEQA staff in the Energy Division with:

  o A description of the proposed project, including the environmental setting

  o A description of the proposed construction plan

  o A list of applicable CEQA exemptions

  o Documentation and factual support necessary to support a finding of categorical exemption.

- Within 21 days from the date of the submission, the Commission's Energy Division will issue either:

  o A Notice to Proceed (NTP) and file a Notice of Exemption with the State Clearinghouse, Office of Planning and Research, or

  o A letter of denial stating the specific reasons why the claimed exemption(s) are not applicable to the proposed project.

The procedure NextG proposes conforms to the procedure adopted in D.06-04-063 and D.06-04-067. We will apply that procedure here. If the Energy Division disapproves NextG's claimed CEQA exemption(s), and issues a letter of denial to NextG, NextG shall either re-design the specific project and facilities and then reapply for a finding of exemption from CEQA, or file a formal application with the Commission seeking the requisite approval and full CEQA review, before commencing any construction activities.

NextG shall not perform any full facilities-based construction activities without first obtaining an NTP from the Energy Division or authorization by the

A.06-05-031 ALJ/JLG/sid

Commission after the requisite environmental review. This procedure shall remain in place unless we adopt different requirements in Rulemaking (R.) 06-10-006.

The Cities are concerned that the expedited review process might include the installation of utility poles in underground districts. NextG states local ordinances often grant exceptions for construction in those districts by utilities for communications services. Thus, the procedure we adopt here will apply to installing utility poles in underground districts where local jurisdictions grant such exceptions.

We conclude that the application conforms to our rules for authority to provide full facilities-based local exchange services. Accordingly, we shall approve the application subject to the terms and conditions set forth herein.

## 4.  Enforcement Proceedings

NextG's limited facilities-based CPCN permits NextG to provide radiofrequency transport services involving construction in or on existing utility poles and other existing structures. (*See* D.03-01-061, D.06-01-006, D.06-07-036.) That authority does not include ground-disturbing activity. NextG admits it has engaged in ground-disturbing activity in the construction of DAS networks, including the installation of new underground conduit in existing public rights-of-way to either pull fiber or make lateral connections between equipment on a pole and fiber or bring power to nodes. However, NextG states it engaged in these ground-disturbing activities in reliance on the authority of its wireless carrier partners, for whom it is building the networks. Wireless carriers have

A.06-05-031 ALJ/JLG/sid

that authority, and NextG states that authority is sufficient for it to engage in new underground construction on behalf of those carriers.[2]

NextG originally applied for limited facilities-based authority in 2002, because it intended to install DAS networks and did not intend to engage in ground-disturbing activity. NextG's Proponent's Environmental Assessment (PEA), filed with Application 02-02-019, and refiled in Case (C.) 05-03-010, stated that NextG would install equipment exclusively in or on existing structures and facilities and would, if new construction of facilities was necessary to provision its services, comply with applicable rules and regulations in securing any expanded authority necessary for such construction. This application requests that authority while clarifying that NextG has operated within the confines of its current authority in constructing DAS networks. Specifically, NextG states:

> [t]o date, NextG has been able to establish its network through the installation of its fiber on existing poles and in existing underground conduit in public rights-of-way and the installation of its microcells and antennas on existing poles in the public way. [footnote omitted] However, NextG now is facing difficulty in certain limited areas where existing poles and conduit in rights-of-way are not available or available only at a prohibitive cost. . . . As a result, NextG will have to engage in limited installation of new poles and underground conduit (through which it will pull fiber) in existing public rights-of-way and existing private utility easements. The installation of new poles and underground conduit is beyond the scope of NextG's existing limited facilities-based authority.

---

[2] NextG installs some networks using existing conduit. These networks are within NextG's existing limited facilities-based authority.

A.06-05-031 ALJ/JLG/sid

In this application, NextG's PEA details the new construction activity, which consists of installation of poles, small-scale trenching and micro-trenching. After ExteNet filed its protest, NextG admitted it engaged in ground-disturbing activity for a number of DAS projects between issuance of D.03-01-061 and the filing of its application. The amount of ground-disturbing activity between those periods was approximately one mile. During that timeframe, NextG did not affirmatively disclose to the Energy Division environmental staff that it was trenching, as NextG's Vice President of Government Relations, Robert Delsman, testified at the hearing.

NextG maintains that the ground-disturbing activity, with a few exceptions due to failure to follow its procedures, was done under the authority of its wireless carrier partners. Applications for permits authorizing trenching submitted to local jurisdictions were filed in NextG's and the wireless carriers' names.

NextG's application is silent on the wireless carrier partner arrangement. Instead, NextG states:

> In certain instances, it may be the case that the wireless carrier to whom NextG will provide service will undertake certain of the new construction activities described herein pursuant to the wireless carrier's existing commercial mobile service (CMRS) authority and subject to the terms and conditions of General Order ("GO") 159-A.

This statement that some construction activities would be undertaken by the wireless carrier differs from NextG's current position that it engaged in ground-disturbing activity under the wireless carrier's authority. There are internal NextG e-mails that discuss the arrangement, but no agreement with the

A.06-05-031 ALJ/JLG/sid

wireless carriers formally discusses the terms under which such construction would occur.

Although an informal agreement may be sufficient to establish that NextG was using the authority of the wireless carriers to engage in ground-disturbing activities, the wireless carriers did not comply with our requirements for wireless carrier construction. NextG, on behalf of the wireless carriers and in its own name on several occasions, applied for and received necessary excavation permits from local jurisdictions. Although NextG understands our notification letter requirements under GO 159-A, before the protest to this application was filed, neither the wireless carriers for which NextG engaged in ground-disturbing activity nor NextG on their behalf submitted the GO 159-A notification letters necessary when land use approvals are required for cell siting and related construction activity. The one wireless carrier who complied with GO 159-A notification did so at a later date. The wireless carriers' failure to comply with our notification requirements belies NextG's claim that its arrangement with them was consistent with our rules and regulations.

Our earlier consideration of a proposed partnership arrangement for a CLEC does not support NextG's position that it could engage in new underground construction under the authority of the wireless carrriers. That decision declined to authorize a limited facilities-based CLEC, Cmetric, authority to engage in construction activities through a partnership arrangement with other certificated carriers. (D.99-11-025, 1999 Cal. PUC LEXIS 746.) NextG states that decision is distinguishable, because it did not consider the partnership arrangement presented here, that of a CLEC partnering with a wireless carrier that has the required authority to trench.

A.06-05-031  ALJ/JLG/sid

NextG's arguments in favor of its partnership arrangement permitting ground-disturbing activity are not persuasive.  Cmetric presented the Commission with a proposal to enter into a partnership arrangement with certificated carriers and we rejected the proposal, because we needed to study and appropriately mitigate the impacts of any construction.  NextG did not present its proposed partnership arrangement to us for our consideration, so there was no opportunity for us to fulfill our role under CEQA to review the environmental impacts of the proposed construction.  Further, since no GO 159-A notification letter was submitted for any construction prior to the filing of this application, we could not have ascertained whether local land use approvals had been received.

NextG also did not act as the agent of the wireless carriers while constructing transport networks.  NextG admits it has an ownership interest in components of the DAS network it installs on behalf of wireless carriers.  Although the arrangements between NextG and the wireless partners are detailed, no provision in the agreements NextG entered into with the wireless carriers places ownership of new underground construction completed by NextG in the wireless carriers' names.  At a minimum, NextG continues to own most of the network it constructed under contracts entered into with the wireless carrier partners.

NextG has failed to persuade us that it engaged in new underground construction under the authority of its wireless carrier partners consistent with our regulations.  NextG's ground-disturbing activities are extensive; NextG had trenched approximately 64 miles before this proceeding was submitted.  Therefore, a separate investigation should be opened to consider NextG's

A.06-05-031  ALJ/JLG/sid

violation of its limited facilities-based authority, and NextG should be ordered to show cause why a penalty should not be assessed.

NextG was not forthright with us in discussing its ground-disturbing activities. Neither in the complaint case concerning the extent of its CLEC authority in constructing DAS networks (C.05-03-010) nor in its application did NextG disclose it was engaged in ground-disturbing activity. Only after ExteNet protested the application, did NextG admit its activities. Thus, the investigation we order should consider whether NextG violated Rule 1.1.

Although we find that an investigation should be opened to consider NextG's past behavior, NextG could have applied for and been granted full facilities-based authority, as we are doing in this decision, at the same time as ExteNet and CA-CLEC LLC. No environmental violations have been found for the new underground construction examined in this proceeding. To the contrary, NextG has demonstrated it complied with land use requirements of local jurisdictions and disturbed the ground to the minimal extent possible with small scale and micro-trenching. There also have been no complaints alleging environmental impacts. These factors should be considered in the investigation.

## 5. Request to File Under Seal

NextG requests that the financial information filed as Attachment B to this application be filed under seal. The financial information consists of NextG's financial statements. We have granted similar requests in the past, and we grant NextG's request here.

## 6. Comments on the Proposed Decision

The proposed decision of the ALJ in this matter was mailed to the parties in accordance with Section 311 of the Public Utilities Code and Rule 14.2(a).

A.06-05-031  ALJ/JLG/sid

Comments were filed on March 13, 2007, and reply comments were filed on March 19, 2007.

## 7.  Assignment of Proceeding

Rachelle B. Chong is the assigned Commissioner and Janice Grau is the assigned ALJ in this proceeding.

### Findings of Fact

1. In D.03-01-061, NextG was granted authority to provide limited facilities-based local exchange services.  NextG provides radiofrequency transport services for wireless carriers and constructs transport networks consisting of a central switch-like hub and a system of fiber optic cables, remote nodes, and small antennae attached to poles and other structures.

2. NextG seeks expansion of its existing CPCN to obtain authorization to provide full facilities-based local exchange services by installing and operating DAS facilities.  NextG seeks expedited environmental review of its proposed construction activities and comparable activities that likely will be categorically exempt from CEQA.

3. ExteNet protested the application because it alleged NextG had violated its limited facilities-based authority in constructing its DAS networks.

4. The Cities filed a protest to object to allowing the expedited environmental review to include the construction of new utility poles in underground utility districts.

5. In D.06-04-063 and D.06-04-067, ExteNet and CA-CLEC LLC, respectively were granted full facilities-based authority and an expedited environmental review procedure.  NextG did not seek comparable authority until after the issuance of those decisions.

- 12 -

A.06-05-031 ALJ/JLG/sid

6.  The proposed construction activities, including installation of poles, small-scale trenching and micro-trenching, are projects which potentially are categorically exempt from CEQA.

7.  The procedure proposed by NextG, in which NextG would notify Commission Energy Division staff of the claimed CEQA exemptions and Commission Energy Division staff would review and act upon Applicant's claimed CEQA exemptions, has been adopted for other DAS carriers in D.06-04-063 and D.06-04-067.

8.  NextG has met the requirements for issuance of a CPCN authorizing the provision of full facilities-based local exchange services.

9.  NextG has engaged in ground-breaking activities in the construction of DAS networks.  Between the issuance of D.03-01-061 and the filing of this application, NextG trenched a total of approximately one mile.

10.  Most applications for permits for the DAS networks, including new underground construction, were submitted to local jurisdictions in NextG's and the wireless carriers' names.  Some applications were submitted in NextG's name only.

11.  GO 159-A requires notification letters when land use approvals are required for cell siting and related construction activity.  Prior to the filing of this application, no GO 159-A letters were submitted by the wireless carriers for the DAS networks subject to land use approvals or NextG on their behalf.

12.  In D.99-11-025, the Commission declined to authorize a limited facilities-based CLEC to engage in construction activities through a partnership arrangement with other certificated carriers.

13.  NextG did not seek Commission authorization of a proposed partnership arrangement with wireless carriers to construct DAS networks.

A.06-05-031 ALJ/JLG/sid

14. NextG received no complaints about environmental concerns for construction of its DAS networks.

**Conclusions of Law**

1. Except for the requirement for additional environmental (CEQA) review, the requirements for a full facilities-based CPCN are generally the same as for a limited facilities-based CPCN.

2. NextG's description of its future construction projects and proposed process for Commission review of claimed CEQA exemptions for these projects, as described above, meet the requirements of CEQA, based on the specific facts of this case.

3. If the Commission subsequently adopts different requirements for review of claimed CEQA exemptions for telecommunications carriers generally in R.06-10-006, NextG should be subject to those requirements, as applicable.

4. Public convenience and necessity require NextG's full facilities-based local exchange services to be offered to the public subject to the terms and conditions set forth herein.

5. The application should be approved.

6. Upon approval of the application, NextG should be subject to the applicable Commission rules, decisions, GOs, and statutes that pertain to California public utilities.

7. NextG should remain subject to the requirement of D.03-01-061, its licensing decision.

8. It is reasonable to apply D.99-11-025's prohibition against CLEC partnerships with other certificated carriers to NextG's arrangement with wireless carriers to engage in ground-disturbing activities.

A.06-05-031 ALJ/JLG/sid

9. It is reasonable to open an investigation to consider whether NextG violated its limited facilities-based CPCN issued in D.03-01-061. NextG should be ordered to show cause why a penalty should not be imposed for any violations.

10. NextG's request to file its financial information under seal should be granted, to the extent set forth below.

11. Because of the public interest in competitive local exchange services, the following order should be effective immediately.

## O R D E R

**IT IS ORDERED** that:

1. A certificate of public convenience and necessity (CPCN) is granted to NextG Networks of California, Inc. (NextG) to operate as a full facilities-based provider of local exchange services in the service territories of Pacific Bell Telephone Company, Verizon California Inc., SureWest Telephone, and Citizens Telephone Company, subject to the terms and conditions set forth below. This authorization expands NextG's existing authority to provide limited facilities-based local exchange services in this state.

2. NextG is authorized to construct the facilities addressed in this decision only upon receiving prior Commission approval.

3. The staff of the Commission Energy Division is authorized to review, process, and act upon NextG's requests for a determination that its full facilities-based construction activities are exempt from the requirements of the California Environmental Quality Act (CEQA).

4. If NextG wishes to engage in full facilities-based construction activities and believes that these activities are exempt from CEQA, NextG shall first apply to

- 15 -

A.06-05-031 ALJ/JLG/sid

the Commission Energy Division staff for a determination of exemption from
CEQA using the following procedure:

   A.  NextG will provide the Commission Energy Division with:

     1.  A detailed description of the proposed project, including:

       a.  Customer(s) to be served;

       b.  The precise location of the proposed construction project; and

       c.  Regional and local site maps.

     2.  A description of the environmental setting, including at a minimum:

       a.  Cultural, historical, and paleontologic resources;

       b.  Biological resources; and

       c.  Current land use and zoning.

     3.  A construction workplan, including:

       a.  Commission Preconstruction Survey Checklist—Archaeological Resources;

       b.  Commission Preconstruction Survey Checklist—Biological Resources;

       c.  A detailed schedule of construction activities, including site restoration activities;

       d.  A description of construction/installation techniques;

       e.  A list of other agencies contacted with respect to siting, land use planning, and environmental resource issues, including contact information; and

       f.  A list of permits required for the proposed project.

     4.  A statement of the CEQA exemption(s) claimed to apply to the proposed project; and

     5.  Documentation supporting the finding of exemption from CEQA.

A.06-05-031 ALJ/JLG/sid

B. The Commission Energy Division will then review the submittal and notify NextG of either its approval or its denial of NextG's claim for exemption from CEQA review within 21 days from the time that NextG's submittal is complete.

C. If the Commission Energy Division approves NextG's claimed CEQA exemption(s), the staff will prepare a Notice to Proceed (NTP) and file a Notice of Exemption with the State Clearinghouse, Office of Planning and Research.

D. If the Commission Energy Division disapproves NextG's claimed CEQA exemptions, the staff will issue to NextG a letter which states the specific reasons that the claimed CEQA exemptions do not apply to the proposed project.

E. If the Commission Energy Division disapproves NextG's claimed CEQA exemption(s), NextG shall either re-design the specific project and facilities and then reapply for a finding of exemption from CEQA, or file a formal application with the Commission seeking the requisite approval and full CEQA review, before commencing any full facilities-based construction activities.

5.  NextG shall not engage in any construction activity relating to a pending CEQA exemption request before receiving an NTP from Commission Energy Division staff.

6.  If the Commission adopts different requirements for obtaining Commission review of proposed CEQA exemptions applicable to NextG in Rulemaking 06-10-006, NextG shall be subject to those requirements.

7.  NextG remains subject to the requirements of Decision (D.) 03-01-061, which granted NextG a CPCN authorizing the provision of limited facilities-based local exchange services.

8.  NextG will operate under its current tariffs. NextG shall comply with those tariffs.

A.06-05-031 ALJ/JLG/sid

9. The certificate granted and the authority to render service under the rates, charges, and rules authorized herein will expire if not exercised within 12 months after the effective date of this order.

10. The corporate identification number assigned to NextG, U 6745 C, shall be included in the caption of all original filings with this Commission, and in the titles of other pleadings filed in existing cases.

11. NextG shall comply with all applicable rules adopted in the Local Exchange Competition proceeding (Rulemaking 95-04-043/ Investigation 95-04-044), as well as all other applicable Commission rules, decisions, General Orders, and statutes that pertain to California public utilities, subject to the exemptions granted in this decision.

12. NextG shall comply with the requirements applicable to competitive local exchange carriers included in Attachments A, B, and C to this decision.

13. NextG's financial statements and information filed as Attachment B to the application shall be filed under seal and shall remain under seal for a period of two years after the date of this order. During this two-year period, the information filed as Attachment B to the application shall remain under seal and shall not be viewed by any person other than the assigned Commissioner, the assigned Administrative Law Judge (ALJ), the Assistant Chief ALJ, or the Chief ALJ, except as agreed to in writing by Applicant or as ordered by a court of competent jurisdiction. If NextG believes that it is necessary for this information to remain under seal for longer than two years, NextG shall file a new motion at least 30 days before the expiration of this limited protective order.

14. An investigation and order to show cause shall be opened to consider whether NextG violated the authority granted it in D.03-01-061 and Rule 1.1 of the Commission's Rules of Practice and Procedure.

A.06-05-031  ALJ/JLG/sid

15. Hearings were necessary in this proceeding.

16. Application 06-05-031 is closed.

This order is effective today.

Dated April 12, 2007, at San Francisco, California.

> MICHAEL R. PEEVEY
> President
> DIAN M. GRUENEICH
> JOHN A. BOHN
> RACHELLE B. CHONG
> TIMOTHY ALAN SIMON
> Commissioners

A.06-05-031  ALJ/JLG/sid

## ATTACHMENT A

REQUIREMENTS APPLICABLE TO COMPETITIVE LOCAL EXCHANGE
CARRIERS

   1. Applicant shall file, in this docket, a written acceptance of the certificate
granted in this proceeding within 30 days of the effective date of this order.

   2. Applicant is subject to the following fee and surcharges that must be
regularly remitted per the instructions in Appendix E to Decision (D.) 00-10-028.
The Combined California PUC Telephone Surcharge Transmittal Form must be
submitted even if the amount due is zero.

     a. The current 1.15% surcharge applicable to all intrastate
       services except or those excluded by D.94-09-065, as
       modified by D.95-02-050, to fund the Universal Lifeline
       Telephone Service Trust Administrative Committee Fund
       (Pub. Util. Code § 879; Resolution T-17071), dated March 1,
       2007, effective April 1, 2007);

     b. The current 0.37% surcharge applicable to all intrastate
       services except for those excluded by D.94-09-065, as
       modified by D.95-02-050, to fund the California Relay
       Service and Communications Devices Fund (Pub. Util. Code
       § 2881; D.98-12-073 and Resolution T-17072, dated March 1,
       2007, effective April 1, 2007);

     c. The user fee provided in Pub. Util. Code §§ 431-435, which is
       0.11% of gross intrastate revenue (Resolution M-4816), dated
       March 15, 2006, effective April 1, 2006;

     d. The current 0.21% surcharge applicable to all intrastate
       services except for those excluded by D.94-09-065, as
       modified by D.95-02-050, to fund the California High Cost
       Fund-A (Pub. Util. Code § 739.3; D.96-10-066, pp. 3-4,
       App. B, Rule 1.C; Resolution T-16963, dated December 1,
       2005, effective January 1, 2006);

A.06-05-031  ALJ/JLG/sid

A.06-05-031  ALJ/JLG/sid

      e.  The current 1.30% surcharge applicable to all intrastate services except for those excluded by D.94-09-065, as modified by D.95-02-050, to fund the California High Cost Fund-B (D.96-10-066, p. 191, App. B, Rule 6.F., Resolution T-17078, dated March 1, 2007, effective April 1, 2007); and

      f.  The current 0.13% surcharge applicable to all intrastate services except for those excluded by D.94-09-065, as modified by D.95-02-050, to fund the California Teleconnect Fund (D.96-10-066, p. 88, App. B, Rule 8.G, Resolution T-16888, dated December 1, 2005, effective January 1, 2006).

Note:  These fees change periodically.  In compliance with Resolution T-16901, December 2, 2004, Applicant should check the joint tariff for surcharges and fees filed by Pacific Bell (dba SBC California) and apply the current surcharge and fee amounts in that joint tariff on end-user bills until further revised.

    3.  Applicant is a competitive local exchange carrier (CLC).  The effectiveness of its future tariffs is subject to the schedules set forth in Appendix C, Section 4.E of D.95-12-056:

"E.  CLCs shall be subject to the following tariff and contract filing, revision and service pricing standards:

"(1)  Uniform rate reductions for existing tariff services shall become effective on five (5) working days' notice to the Commission.  Customer notification is not required for rate decreases.

"(2)  Uniform major rate increases for existing tariff services shall become effective on thirty (30) days' notice to the Commission, and shall require bill inserts, or a message on the bill itself, or first class mail notice to customers at least 30 days in advance of the pending rate increase.

A.06-05-031 ALJ/JLG/sid

"(3)  Uniform minor rate increases, as defined in
D.90-11-029, shall become effective on not less than
five (5) working days' notice to the Commission.
Customer notification is not required for such minor
rate increases.

"(4)  Advice letter filings for new services and for all other
types of tariff revisions, except changes in text not
affecting rates or relocations of text in the tariff
schedules, shall become effective on forty (40) days'
notice to the Commission.

"(5)  Advice letter filings revising the text or location of text
material which do not result in an increase in any rate
or charge shall become effective on not less than five
(5) days' notice to the Commission.

"(6)  Contracts shall be subject to GO 96-A rules for
NDIECs, except interconnection contracts.

"(7)  CLCs shall file tariffs in accordance with PU Code
Section 876."

4.  Applicant may deviate from the following provisions of GO 96-A:

(a) paragraph II.C.(1)(b), which requires consecutive sheet numbering and

prohibits the reuse of sheet numbers; and (b) paragraph II.C.(4), which requires

that "a separate sheet or series of sheets should be used for each rule."  Tariff

filings incorporating these deviations shall be subject to the approval of the

Commission's Communications Division.  Tariff filings shall reflect all fees and

surcharges to which Applicant is subject, as reflected in 2 above.

5.  Applicant shall file a service area map as part of its initial tariff.

6.  Prior to initiating service, Applicant shall provide the Commission's

Consumer Affairs Branch with the name and address of its designated contact

A.06-05-031 ALJ/JLG/sid

person(s) for purposes of resolving consumer complaints. This information shall be updated if the name or telephone number changes, or at least annually.

7. Applicant shall notify the Director of the Communications Division in writing of the date that local exchange service is first rendered to the public, no later than five days after service first begins.

8. Applicant shall notify the Director of the Communications Division in writing of the date interLATA service is first rendered to the public within five days after service begins, and again within five days after intraLATA service begins.[1]

9. Applicant shall keep its books and records in accordance with the Generally Accepted Accounting Principles.

10. In the event Applicant's books and records are required for inspection by the Commission or its staff, it shall either produce such records at the Commission's offices or reimburse the Commission for the reasonable costs incurred in having Commission staff travel to its office.

11. Applicant shall file an annual report with the Director of the Communications Division, in compliance with GO 104-A, on a calendar-year basis with the information contained in Attachment C to this decision.

12. Applicant shall file an affiliate transaction report with the Director of the Communications Division, in compliance with D.93-02-019, on a calendar-year basis using the form contained in Attachment D.

---

[1] California is divided into ten Local Access and Transport Areas (LATAs), each containing numerous local telephone exchanges. InterLATA describes services, revenues and functions relating to telecommunications originating within one LATA and terminating in another LATA. IntraLATA describes services, revenues and functions relating to telecommunications originating within a single LATA.

A.06-05-031  ALJ/JLG/sid

13.  Applicant shall ensure that its employees comply with the provisions of Pub. Util. Code § 2889.5 regarding solicitation of customers.

14.  Within 60 days of the effective date of this order, Applicant shall comply with Pub. Util. Code § 708, Employee Identification Cards, and notify the Director of the Communications Division in writing of its compliance.

15.  If Applicant is 90 days or more late in filing an annual report, or in remitting the surcharges and fee listed in 2 above, the Communications Division shall prepare for Commission consideration a resolution that revokes Applicant's CPCN unless it has received written permission from the Telecommunications Division to file or remit late.

16.  Applicant is exempt from General Order 96-A, subsections III.G(1) and (2), and Rule 18(b) of the Commission's Rules of Practice and Procedure.

17.  Applicant is exempt from Pub. Util. Code §§ 816-830.

18.  Applicant is exempt from the requirements of Pub. Util. Code § 851 for the transfer or encumbrance of property whenever such transfer or encumbrance serves to secure debt.

19.  If Applicant decides to discontinue service or file for bankruptcy, it shall immediately notify the Communications Division's Bankruptcy Coordinator.

20.  Applicant shall send a copy of this decision to concerned local permitting agencies not later than 30 days from the date of this order.

**(END OF ATTACHMENT A)**

A.06-05-031 ALJ/JLG/sid

A.06-05-031 ALJ/JLG/sid

## ATTACHMENT B

## ANNUAL REPORT

An original and a machine readable, copy using Microsoft Word or compatible format shall be filed with the California Public Utilities Commission, 505 Van Ness Avenue, Room 3107, San Francisco, CA 94102-3298, no later than March 31st of the year following the calendar year for which the annual report is submitted.

Failure to file this information on time may result in a penalty as provided for in Sections 2107 and 2108 of the Public Utilities Code.

Required information:

1. Exact legal name and U # of the reporting utility.

2. Address.

3. Name, title, address, and telephone number of the person to be contacted concerning the reported information.

4. Name and title of the officer having custody of the general books of account and the address of the office where such books are kept.

5. Type of organization (e.g., corporation, partnership, sole proprietorship, etc.).

   If incorporated, specify:

   a. Date of filing articles of incorporation with the Secretary of State.
   b. State in which incorporated.

6. Number and date of the Commission decision granting the Certificate of Public Convenience and Necessity.

7. Date operations were begun.

8. Description of other business activities in which the utility is engaged.

9. List of all affiliated companies and their relationship to the utility. State if affiliate is a:

   a. Regulated public utility.
   b. Publicly held corporation.

10. Balance sheet as of December 31st of the year for which information is submitted.

11. Income statement for California operations for the calendar year for which information is submitted.

For answers to any questions concerning this report, call (415) 703-2883.

### (END OF ATTACHMENT B)

A.06-05-031 ALJ/JLG/sid

## ATTACHMENT C
### CALENDAR YEAR AFFILIATE TRANSACTION REPORT

1. Each utility shall list and provide the following information for each affiliated entity and regulated subsidiary that the utility had during the period covered by the annual Affiliate Transaction Report.

- Form of organization (e.g., corporation, partnership, joint venture, strategic alliance, etc.);
- Brief description of business activities engaged in;
- Relationship to the utility (e.g., controlling corporation, subsidiary, regulated subsidiary, affiliate);
- Ownership of the utility (including type and percent ownership);
- Voting rights held by the utility and percent; and
- Corporate officers.

2. The utility shall prepare and submit a corporate organization chart showing any and all corporate relationships between the utility and its affiliated entities and regulated subsidiaries in #1 above. The chart should have the controlling corporation (if any) at the top of the chart; the utility and any subsidiaries and/or affiliates of the controlling corporation in the middle levels of the chart and all secondary subsidiaries and affiliates (e.g., a subsidiary that in turn is owned by another subsidiary and/or affiliate) in the lower levels. Any regulated subsidiary should be clearly noted.

3. For a utility that has individuals who are classified as "controlling corporations" of the competitive utility, the utility must only report under the requirements of #1 and #2 above any affiliated entity that either (a) is a public utility or (b) transacts any business with the utility filing the annual report excluding the provision of tariff services.

- 1 -

A.06-05-031  ALJ/JLG/sid

4. Each annual report must be signed by a corporate officer of the utility stating under penalty of perjury under the laws of the State of California (CCP 2015.5) that the annual report is complete and accurate with no material omissions.

5. Any required material that a utility is unable to provide must be reasonably described and the reasons the data cannot be obtained, as well as the efforts expended to obtain the information, must be set forth in the utility's annual Affiliate Transaction Report and verified in accordance with Sections I-F of Decision 93-02-019.

6. Utilities that do not have affiliated entities must file, in lieu of the annual transaction report, an annual statement to the Commission stating that the utility had no affiliated entities during the report period.  This statement must be signed by a corporate officer of the utility, stating under penalty of perjury under the laws of the State of California (CCP 2015.5) that the annual report is complete and accurate with no material omissions.

**(END OF ATTACHMENT C)**

# Exhibit E

FILE NO. ___070904___                    ORDINANCE NO. _214-07_

1    [Permits for communications companies and equipment.]

2
     Ordinance amending Chapter 11, Article 1 of the San Francisco Administrative Code by
3
     amending sections 11.1 and 11.9 to authorize state video franchise holders and
4
     personal wireless service carriers to obtain utility conditions permits, requiring
5
     persons installing personal wireless service facilities in the public rights-of-way to
6
     obtain personal wireless service facilities site permits, imposing fees for personal
7
     wireless service facilities site permits, and making environmental findings.

8
                Note:        Additions are *single-underline italics Times New Roman*;
9                            deletions are *strikethrough italics Times New Roman*.
                             Board amendment additions are <u>double underlined</u>.
10                           Board amendment deletions are strikethrough normal.

11
          Be it ordained by the People of the City and County of San Francisco:
12
          Section 1.  Findings.
13
          (a)      The City and County of San Francisco ("City") has various means of authorizing
14
     the use of the public rights-of-way to provide communications services.  The City will issue a
15
     utility conditions permit ("UCP") to a landline telecommunications carrier and a franchise to a
16
     video services provider.  No City law expressly authorizes a personal wireless services carrier
17
     to use the public rights-of-way, allows for use of the public rights-of-way for the construction of
18
     personal wireless service facilities, or regulates that construction in any way.  In the past, the
19
     City had required entities seeking to construct personal wireless services in the public rights-
20
     of-way to obtain major encroachment permits.
21
          (b)      Changes in federal and state law and litigation against the City now require the
22
     City to amend its permitting processes for video service providers and entities seeking to
23
     construct personal wireless services facilities.
24

25

1          (c)     Due to changes in State law, the City will no longer issue franchises to video

2    services providers.  In 2006, the State of California enacted the Digital Infrastructure and

3    Video Competition Act ("DIVCA") (Public Utilities Code § 5800, et seq.).  Under DIVCA, the

4    California Public Utilities Commission is now the sole franchising authority for video service

5    providers.  Nevertheless, the City retains the authority to regulate construction by state video

6    franchise holders.  Consistent with DIVCA, the proposed ordinance requires state video

7    franchise holders to obtain UCPs prior to constructing facilities in the public rights-of-way that

8    would be used to provide video service.

9          (d)     In two separate lawsuits, the plaintiffs successfully challenged the City's

10   authority to require telecommunications carriers to obtain encroachment permits to construct

11   personal wireless services facilities in the public rights-of-way.  The courts in those cases held

12   that federal law (47 U.S.C. § 253) preempted the City's authority to regulate the provision of

13   telecommunications services in this manner.  In ruling against the City, the courts found that

14   federal law preempted the City's major encroachment permit process because that process

15   "may have the effect of prohibiting" the provision of telecommunications services.

16         (e)     The proposed ordinance requires all entities seeking to construct such facilities

17   to obtain UCPs and personal wireless services facilities site permits ("Wireless Permits").  The

18   proposed ordinance would allow the City to regulate the location and design of personal

19   wireless services facilities in the public rights-of-way through a permitting process that does

20   not contain any of the features the courts had found were preempted.

21         (f)     The proposed ordinance would also: (i) authorize the Department of Public

22   Works to establish a procedure for obtaining Wireless Permits; (ii) establish certain

23   requirements for Wireless Permits; and (ii) authorize the Department of Public Works and

24   other City departments to impose fees to recover their costs related to issuing Wireless

25   Permits and inspecting facilities constructed under Wireless Permits.

1    Section 2.  The San Francisco Administrative Code is hereby amended by amending

2    Sections 11.1, to read as follows:

3    SEC. 11.1.  DEFINITIONS.

4    For purposes of Articles I through VIII of this Chapter, and of any Franchise granted

5    pursuant to this Chapter, the following terms, phrases, words, abbreviations, their derivations,

6    and other similar terms, when capitalized, shall have the meanings given herein.  When not

7    inconsistent with the context, words used in the present tense include the future tense; words

8    in the plural number include the singular number; and words in the singular number include

9    the plural number. The words "shall" and "will" are mandatory.  "May" is permissive.  However,

10    as applied to official action, the words "shall" and "will" shall be directory in effect.  Unless

11    otherwise expressly stated, words not defined herein shall be given their common and

12    ordinary meaning. References to governmental entities (whether persons or entities) refer to

13    those entities or their successors in authority. Unless otherwise expressly stated, if specific

14    provisions of law referred to herein are renumbered or amended, then the reference shall be

15    read to refer to the renumbered or amended provision.

16    (a)    "Affiliate," when used in relation to any Person means another Person who owns

17    or Controls is owned or Controlled by, or is under common ownership or Control with, such

18    Person.

19    (b)    "Applicable law" means all applicable federal, state, and City laws, ordinances,

20    codes, rules, regulations and orders, as the same may be amended or adopted from time to

21    time.

22    (c)    "Applicant" means any Person submitting a Proposal pursuant to this Chapter.

23    (d)    "Board" means the City's Board of Supervisors.

24    (e)    "Bona Fide Institutional Lender" means any one or more of the following:  (1) a

25    savings bank, a savings and loan association, a commercial bank or trust company, an

1   insurance company, a real estate investment trust, or any other Person which at the time a

2   pledge in trust or mortgage is recorded in favor of such Person or Persons, has assets of at

3   least $500 million in the aggregate (or the equivalent in foreign currency, and is regularly

4   engaged in the financial services business; or (2) any special account, managed fund,

5   department, agency or Affiliate of any of the foregoing.  For purposes hereof:  (1) acting in a

6   "fiduciary capacity" shall be deemed to include acting as a trustee, agent, or in a similar

7   capacity under a mortgage, loan agreement, indenture or other loan document; and (2) a

8   lender, even if not a Bona Fide Institutional Lender, shall be deemed to be a Bona Fide

9   Institutional Lender if, no more than thirty (30) City business days after such loan is

10  consummated, the notes or other evidence of indebtedness or the collateral securing the

11  same are assigned to a Person then qualifying as a Bona Fide Institutional Lender.

12      (f)    "Cable Service" means the one way transmission to Subscribers of video

13  programming or other programming service and subscriber interaction, if any, required to

14  select or use such video programming or other programming service.

15      (g)    "Cable System" means a Facility that consists of a set of closed transmission

16  paths and associated signal generation, reception, and control equipment designed to provide

17  Cable Service to multiple Subscribers.  Except where expressly stated otherwise, Cable

18  System includes an Open Video System.  Cable System does not include: (1) a Facility that

19  serves only to retransmit the television signals of one or more television broadcast stations,

20  (2) a Facility of a common carrier which is subject, in whole or in part, to the provisions of Title

21  II of the Communications Act of 1934 (47 U.S.C. Sections 201—276) except that such Facility

22  shall be considered a Cable System to the extent such Facility is used to provide Cable

23  Services; and (3) any Facilities of a gas or electric utility necessary or proper and used solely

24  for: (i) the transmission, distribution, or supply of gas or electricity; or (ii) the transmission or

25

1   collection of gas and electric usage and pricing information incidental thereto; or (iii) to provide

2   services required by the City.

3        (h)    "Cable System Franchise" means a Franchise authorizing construction,

4   installation, or operation of a Cable System or the provision of Cable Service over a Cable

5   System. "Cable System Franchise" includes an OVS Franchise, unless expressly excluded

6   hereunder.

7        (i)    "CPUC" means the California Public Utilities Commission.

8        (j)    "City" means the City and County of San Francisco, a municipal corporation of

9   the State of California.

10        (k)    "Control" means the power to control the affairs and key decisions of another

11   Person, in whatever manner exercised, whether directly or indirectly.

12        (l)    "Department," in reference to a Cable System Franchise or any other

13   communications-related Franchise, means the Department of Telecommunications and

14   Information Services.  In reference to any gas, electric, or steam Franchise, "Department"

15   means the San Francisco Public Utilities Commission.  In reference to any other type of

16   Franchise, "Department" means the City department assigned by the Board to Pprocess the

17   Proposal or administer the Franchise.

18        (m)   "Facilities" includes any physical element used in connection with, or designed

19   to be used in connection with, the provision of Services, whether or not located in the Public

20   Rights-of-Way, including, without limitation, pedestals, cabinets, ducts and conduits (whether

21   empty or occupied), transformers, equipment, drains, handholds, lines, line extensions,

22   service drops, manholes, poles, power supplies and generators, splice boxes, surface location

23   markers, vaults, tunnels, amplifiers, power guards, nodes, cables, and fiber optics (whether

24   active or dark).

25        (n)    "FCC" means the Federal Communications Commission.

1          (o)      "Final Report" means a report submitted to the Board by the Department making

2     a final recommendation upon a Proposal.

3          (p)      "Franchise" means an authorization granted by ordinance of the Board to a

4     Person to construct, install, or operate Facilities in the Public Rights-of-Way or to provide

5     Services using Facilities installed in the Public Rights-of-Way. "Franchise" shall not mean or

6     include any license or permit required for the privilege of transacting and carrying on a

7     business within the City as required by other ordinances or laws of the City, including, without

8     limitation:

9          (1)      Any permit, agreement or authorization required in connection with operations

10    on public streets or property such as permits and agreements for placing devices on or in

11    poles, conduits or other structures, whether owned by the City or a private entity, or for

12    excavating or performing other work in or along Public Rights-of-Way; and

13         (2)      Express or implicit authorization to provide Service to, or install Facilities on,

14    private property without owner consent.

15         (q)      "Franchise Area" means the geographic area of the City in which a Franchise

16    authorizes a Grantee to construct, install, or operate Facilities or to provide Services.

17         (r)      "Franchise Fee" means a payment made to the City in accordance with Section

18    11.21 below.  In the case of a UVPP, "Franchise Fee" shall mean a fee in lieu of a franchise

19    fee, pursuant to 47 U.S.C. Section 573(c)(2)(B).

20         (s)      "Grantee" means a Person granted a Franchise by the City, and any lawful

21    permitted successor or assign.

22         (t)      "Gross Revenues" means any and all income, receipts and other revenue of any

23    kind or nature arising from or in connection with the operation of, or provision of Service using,

24    Facilities in the Franchise Area and as may be more specifically defined in a Franchise.

25

1    (u)    "Material Breach" means a breach of the Franchise that has a substantial and
2    significant effect on the rights or benefits either party to the Franchise has secured pursuant to
3    the Franchise.  "Material Breach" shall include, but not be limited to, those breaches
4    designated as such in the Franchise and this Chapter.

5    (v)    "Open Video System" or "OVS" means a Cable System owned, operated, or
6    Controlled by a Person certified by the FCC pursuant to 47 U.S.C. Section 573 and holding an
7    OVS Franchise pursuant to this Article.

8    (w)    "Operator" means any Person who: (1) provides Service over Facilities and
9    either directly or indirectly owns, or has an Affiliate that owns, a significant interest in the
10    Facilities; or (2) otherwise Controls, or is responsible for, through any arrangement, the
11    operation or management of Facilities.

12    (x)    "OVS Franchise" means a Franchise authorizing construction, installation, or
13    operation of an Open Video System or the provision of Cable Service over an Open Video
14    System.

15    *(y)    "Permittee" means a person granted a UCP.*

16    (y̶z̶)    "Person" means any individual, group, company, partnership, association, joint
17    stock company, trust, corporation, society, syndicate, club, business, or governmental entity.
18    "Person" shall not include the City.

19    *(aa)    "Personal Wireless Service" means commercial mobile services provided under a*
20    *license issued by the FCC.*

21    *(bb)    "Personal Wireless Service Facilities" means antennas and related Facilities used to*
22    *provide or facilitate the provision of Personal Wireless Service.*

23    *(cc)    "Personal Wireless Service Facilities Site Permit" means a permit issued by the*
24    *Department of Public Works authorizing a Person to construct Personal Wireless Service Facilities.*

25

1    (=dd)  "Proposal" means any application proposal submission or request filed pursuant

2    to the requirements of this Chapter to: (1) obtain a new Franchise; (2) Transfer a Franchise;

3    (3) extend a Franchise; or otherwise modify a Franchise.  A Proposal includes an Applicant's

4    initial proposal, submission or request, as well as any and all amendments or supplements to

5    the Proposal and relevant correspondence.

6    (aaee)  "Proposal Fee" means a charge to recover the City's actual costs of processing

7    Proposals hereunder.

8    (bbff)  "Public Rights-of-Way" means the area in, on, upon, above, beneath, within,

9    along, across, under, and over the public streets, sidewalks, roads, lanes, courts, ways,

10    alleys, spaces, and boulevards within the geographic area of the City in which the City now or

11    hereafter holds any property interest, which is dedicated to Public use and which, consistent

12    with the purposes for which it was dedicated, may be used for the purpose of installing and

13    maintaining Facilities to provide Service to customers.

14    (eegg)  "Required Service Area" means the geographic area of the City a Grantee must

15    construct, install or operate Facilities in or provide Service in, pursuant to its Franchise.

16    (ddhh)  "Revocation" means the City's affirmative act of Terminating a Franchise.

17    (eeii)  "Service" means any service provided on a Commercial or for hire basis using

18    Facilities installed in the Public Rights-of-Way.  "Service" includes without limitation: (1)

19    leasing or, through any other arrangement, offering the use of a Facility installed in the Public

20    Rights-of-Way (except for the mandatory provision of Facilities pursuant to 47 U.S.C. Section

21    224 or California Public Utility Commission orders) and (2) the transmission of electronic

22    signals through Facilities installed in the Public Rights-of-Way, whether or not owned by

23    Person providing service to Subscribers.  "Service" shall not include Telecommunications

24    Service, *State Video Service or Personal Wireless Service unless and until Applicable Law permits*

25    *local governments to require telephone corporations in California to obtain a local Franchise or pay*

1    ~~fair and reasonable compensation for the use of the Public Rights-of-Way in connection with the~~

2    ~~provision of Telecommunications Service.~~

3        *(jj)    "State Video Service" means video programming services, Cable Service, or OVS*

4    *Service authorized under a State Video Service Franchise that is provided through Facilities located at*

5    *least in part in Public Rights-of-Way without regard to delivery technology, including Internet protocol*

6    *or other technology.*

7        *(kk)    "State Video Service Franchise" means a franchise issued by the CPUC pursuant to*

8    *California Public Utilities Code Section 5800, et. seq.*

9        (~~ff~~ll)    "Subscriber" means the City or any Person who legally receives any Service.

10       (~~gg~~mm)    "Telecommunications Service" means any service ~~regulated~~ _subject to regulation_

11   by the CPUC or the FCC as a telecommunications service and provided to customers by a

12   telephone corporation regulated by the CPUC.

13       (~~hh~~nn)    "Termination" means the conclusion of a Franchise by any means, including, but

14   not limited to, by expiration of its term, abandonment, or Revocation.

15       (~~ii~~oo)    "Transfer" means any transaction in which: (1) all or a portion of any Facilities or

16   any rights to use or operate Facilities located in the Public Rights-of-Way are sold, conveyed,

17   transferred, assigned, encumbered (except as set forth herein) or leased, in whole or in part,

18   directly or indirectly, by one or more transactions to another Person, whether voluntarily or by

19   operation of law or otherwise; or (2) there is any change, acquisition, or transfer in the identity

20   of the Person in Control of the Grantee, or any Person that controls Grantee, including,

21   without limitation, forced or voluntary sale, merger, consolidation, or receivership; or (3) the

22   rights or obligations under the Franchise are sold, conveyed, transferred, assigned,

23   encumbered (except as set forth herein) or leased, in whole or in part, directly or indirectly, by

24   one or more transactions to another Person, whether voluntarily or by operation of law or

25   otherwise.  It will be presumed, for purposes of clause (2) above, that any transfer or

1   cumulative transfer of a voting interest by a Person or group of Persons acting in concert of

2   twenty five percent (25%) or more of Grantee, or Person that Controls Grantee, or any change

3   in the managing general partners of a Grantee is a change of Control.  "Transfer" does not

4   include: (1) a lease to a UVPP pursuant to 47 U.S.C. Sections 532 or 573; (2) the

5   transmission of a commodity or electronic signal using Facilities on a common carrier basis;

6   (3) a lease or other right to use Facilities mandated pursuant to 47 U.S.C. Section 224,

7   California Public Utilities Code Section 767.5, or by an order of the CPUC; or (4) a pledge in

8   trust, mortgage or other encumbrance against the Facilities, or any portion thereof, given to a

9   Bona Fide Institutional Lender in connection with a loan or other financing required to secure

10  the construction, operation, or repair of the Facilities ("Loan") provided that such Loan is

11  subject to the rights and powers of the City pursuant to the Franchise and Applicable Law,

12  including, without limitation, the right of the City to approve any Transfer pursuant to Section

13  11.14 below upon foreclosure.  "Transferring" and "Transferee" shall have correlative

14  meanings.

15      (*ii*pp) "Unaffiliated Video Programming Provider" or "UVPP" means any Person who

16  uses capacity on a franchised Cable System to deliver Cable Service or other

17  communications service (as that term is used in 47 U.S.C. Section 542(h)) to Subscribers and

18  who is not an Affiliate of the Grantee.

19      (*kk*qq) "Utility Conditions Permit" or "UCP" means a permit issued by the Department of

20  Public Works authorizing a Person to construct, install, _and maintain_ ~~operate~~ specific Facilities

21  in the Public Rights-of-Way.

22      Section 3.  The San Francisco Administrative Code is hereby amended by amending

23  Sections 11.9, to read as follows:

24

25

1    SEC. 11.9.  UTILITY CONDITIONS PERMIT, *PERSONAL WIRELESS SERVICE*

2    *FACILITIES SITE PERMIT*.

3    *(a)    Utility Conditions Permit*.

4    *(1)    ~~Telephone Corporations~~Required for Providers of Telecommunications Service, State*

5    *Video Service and Personal Wireless Service*.  The Department of Public Works ~~may~~ *shall* require

6    a Person, ~~including a Grantee of an existing Franchise,~~ to obtain a Utility Conditions Permit prior

7    to the~~ir~~ construction, installation, or maintenance of *Facilities in the Public Rights-of-Way that*

8    *will be used to provide Telecommunications Service, State Video Service* ~~Telephone Lines (as defined~~

9    ~~in the California Public Utilities Code)~~ *or Personal Wireless Service* ~~in the Public Rights-of-Way~~.

10   UCPs shall be issued by the Department of Public Works in a manner consistent with

11   Applicable Law to Persons who *are willing to comply with the City's requirements regarding the*

12   *physical use and occupation of the Public Rights-of-Way and who* have: *(A)* authority ~~as a Telephone~~

13   ~~Corporation (as defined in the California Public Utilities Code)~~ to occupy the Public Rights-of-Way

14   pursuant to California Public Utilities Code Section 7901*; (B) authority to occupy the Public*

15   *Rights-of-Way pursuant to California Public Utilities Code Section 5885; or (C) a license to provide*

16   *Personal Wireless Service issued under federal law*~~, and who are willing to comply with the City's~~

17   ~~requirements regarding the physical use and occupation of the Public Rights-of-Way~~.  Persons

18   intending to construct, install, or maintain *Facilities* ~~Telephone Lines~~ to provide

19   Telecommunications Services, *State Video Service or Personal Wireless Service* shall prove their

20   legal right to occupy and use the Public Rights-of-Way by providing the Department of Public

21   Works a ~~current~~ copy of their *current: (a)* certificate of public convenience and necessity issued

22   by the CPUC *(which shall expressly state the Person's authority to provide facilities-based*

23   *Telecommunications Service); (b) State Video Service Franchise issued by the CPUC; or (c) license to*

24   *provide Personal Wireless Service issued by the FCC*~~, or otherwise demonstrate that they have been~~

25   ~~authorized to occupy the Public Rights-of-Way by the CPUC ("CPCN"). Such "CPCN" shall~~

1  ~~expressly state the Person's authority to provide facilities-based Telecommunications Service.~~  The

2  _Department of Public Works shall include in a_ UCP ~~shall set forth~~ such conditions, in addition to

3  those already set forth in Applicable Law, as may be required to govern the _Permittee's_

4  construction, installation, or _maintenance of Facilities_ ~~occupancy~~ in the Public Rights-of-Way to

5  protect and benefit the public health, safety and welfare.  The terms and conditions of a UCP

6  shall be limited to those areas consistent with the City's authority under Applicable Law.  A

7  UCP ~~shall expressly limit the services which may be offered using the Telephone Lines to those~~

8  ~~services that do not require a Franchise and~~ shall have a term of no longer than two (2) years _and_

9  _may be renewed in accordance with requirements established by the Department in the UCP.  A UCP_

10  _shall provide that the Permittee is not entitled to construct, install, or maintain Personal Wireless_

11  _Service Facilities in the Public Rights-of-Way without obtaining a Personal Wireless Service Facilities_

12  _Site Permit under Section 11.9(b) below._

13  ~~(b)      Persons Subject To Franchise Requirements.  Where a Person seeks to construct or~~

14  ~~install Facilities that will be used to provide both Telecommunications Service and Service requiring a~~

15  ~~Franchise pursuant to Section 11.3 above, a UCP may be issued only if: (1) the Person has obtained or~~

16  ~~has submitted a Proposal to obtain any required Franchise; and (2) the Person agrees not to provide~~

17  ~~Service requiring a Franchise until a Franchise has been granted by the Board.  Where a Person has~~

18  ~~not already obtained any required Franchise, the term of its UCP shall be limited to six (6) months and~~

19  ~~shall not be extended more than twice.  A UCP shall not be issued to a Person seeking to construct or~~

20  ~~install Facilities to provide only Service requiring a Franchise.~~

21  ~~(c)~~_(2)_   ~~CPU~~ _UCP_ fee.  Any ~~p~~_Person_ required to obtain or renew a UCP shall pay to the

22  Department of Public Works a _non-refundable application_ fee of _two thousand dollars_ ($2,000) to

23  compensate the City for _all costs (including_ the City Attorney's costs) related to~~:~~ _(1A)_

24  establishing the _Person's_ ~~applicants'~~ authority to occupy the _Public Rights-of-Way_ ~~public right-of-~~

25  ~~way~~; _(2B)_ establishing the terms on which _Persons_ ~~applicants~~ may occupy the _Public Rights-of-_

1     *Way public right-of-way;* and *(3C)* granting, monitoring, enforcing, renewing, revising or

2     revoking UCPs.  These fees shall be deposited in the Public Works Excavation Fund

3     established by Section 10.100-230 of the San Francisco Administrative Code.

4          *(b)*     *Personal Wireless Service Facilities Site Permit.*

5          *(1)*     *Required for Personal Wireless Service Facilities.  The Department of Public Works*

6     *shall require a Permittee to obtain a Personal Wireless Service Facilities Site Permit to install,*

7     *construct, and maintain Personal Wireless Service Facilities in the Public Rights-of-Way.  The*

8     *Department of Public Works shall include in a Personal Wireless Service Facilities Site Permit such*

9     *conditions, in addition to those already set forth in Applicable Law, as may be required to govern the*

10    *construction, installation, or maintenance of Personal Wireless Service Facilities in the Public Rights-*

11    *of-Way to protect and benefit the public health, safety and welfare.  The terms and conditions of a*

12    *Personal Wireless Service Facilities Site Permit shall be limited to those areas consistent with the*

13    *City's authority under Applicable Law.  A Personal Wireless Service Facilities Permit shall have a*

14    *term of no longer than two (2) years and may be renewed in accordance with requirements established*

15    *by the Department in the Personal Wireless Service Facilities Site Permit.*

16         *(2)*     *Procedure for Personal Wireless Service Facilities Site Permits.  The Department of*

17    *Public Works shall implement a procedure for issuing Personal Wireless Service Facilities Site Permits*

18    *that is consistent with Applicable Law and the requirements of this Section.*

19         *(A)*     *Review by the Planning Department.  The Department of Public Works shall submit to*

20    *the Planning Department for review any application for a Personal Wireless Service Facilities Site*

21    *Permit allowing for the construction, installation, or maintenance of Personal Wireless Service*

22    *Facilities: (i) on historic, historically or architecturally significant, decorative, or specially designed*

23    *utility poles; (ii) in a historic or locally significant district; (iii) adjacent to a historic, architecturally*

24    *significant or locally significant building; or (iv) on a street where the City and County of San*

25    *Francisco General Plan has identified the presence of valued scenic resources that should be protected*

1    and conserved. The Planning Department shall not recommend approval of a Personal Wireless

2    Service Facilities Site Permit unless the Planning Department determines that a Personal Wireless

3    Service Facility in the proposed location is consistent with the public health, safety, convenience and

4    general welfare and will not unreasonably affect, intrude upon or diminish any of the identified City

5    resources. Where review by the Planning Department is required, the Department of Public Works

6    shall not issue a Wireless Services Facilities Site Permit unless the Planning Department has

7    recommended approval.

8        (B)    Review by the Recreation and Park Department. The Department of Public Works shall

9    submit to the Recreation and Park Department for review any application for a Personal Wireless

10   Service Facilities Site Permit allowing for the construction, installation, or maintenance of a Personal

11   Wireless Service Facility adjacent to a City park or open space. The Recreation and Park Department

12   shall not recommend approval of a Personal Wireless Service Facilities Site Permit unless the

13   Recreation and Park Department determines that a Personal Wireless Service Facility in the proposed

14   location will not unreasonably affect, intrude upon or diminish a City park or open space. Where

15   review by the Recreation and Park Department is required, the Department of Public Works shall not

16   issue a Wireless Services Facilities Site Permit unless the Recreation and Park Department has

17   recommended approval.

18       (C)    Review by the Department of Public Health. The Department of Public Works shall

19   submit to the Department of Public Health for review any application for a Personal Wireless Service

20   Facilities Site Permit allowing for the construction, installation, or maintenance of a Personal Wireless

21   Service Facility. The Department of Public Health shall not recommend approval of a Personal

22   Wireless Service Facilities Site Permit unless the Department of Public Health determines that any

23   human exposure to radio frequency emissions from the proposed Personal Wireless Service Facility is

24   within limits established by the FCC. The Department of Public Works shall not issue a Wireless

25   Services Facilities Site Permit unless the Department of Public Health has recommended approval.

1

2     (3)    *Personal Wireless Service Facilities Site Permit Fees.*

3     *(A)*    *Fees of the Department of Public Works. An applicant for a Personal Wireless Service*

4 *Facilities Site Permit shall pay to the Department of Public Works: (i) a non-refundable application fee*

5 *of seventy-five dollars ($75.00) for each Personal Wireless Service Facility contained in the*

6 *application to compensate the Department of Public Works for all costs related to reviewing the*

7 *application and; (ii) a non-refundable time and materials inspection fee not to exceed one hundred and*

8 *fifty dollars ($150.00) for each Personal Wireless Service Facility contained in the application to*

9 *compensate the Department of Public Works for all costs related to inspecting any Personal Wireless*

10 *Service Facility constructed under a Personal Wireless Service Facilities Site Permit to ensure*

11 *compliance with all of the terms and conditions of contained therein, including any costs incurred by*

12 *the Department of Public Health to confirm that human exposure to radio frequency emissions from the*

13 *Personal Wireless Services Facility is within FCC limits.*

14     *(B)*    *Fees of Other City Departments. Where as required under this Section the Department*

15 *of Public Works has referred an application for a Personal Wireless Service Facilities Site Permit to*

16 *the Planning Department, the Recreation and Park Department or the Department of Public Health,*

17 *the applicant shall pay the following additional fees for each Personal Wireless Service Facility*

18 *contained in an application for a Personal Wireless Service Facilities Site Permit: (i) a Planning*

19 *Department non-refundable fee of one hundred and five dollars ($105.00) plus time and materials;*

20 *(ii) a Recreation and Park Department non-refundable fee of one hundred and twenty-five dollars*

21 *($125.00) and (iii) a Department of Public Health non-refundable fee of one hundred and thirty-five*

22 *dollars ($135.00) plus time and materials for any review that takes more than thirty (30) minutes. The*

23 *purpose of these fees is to compensate the applicable City department for all costs related to reviewing*

24 *an application for a Personal Wireless Service Facilities Site Permit.*

25

1      *(C)    Adjustment of Fees for CPI. Beginning with fiscal year 2008-2009, the fees established*

2 *herein may be adjusted each year, without further action by the Board of Supervisors, to reflect*

3 *changes in the relevant Consumer Price Index ("CPI") ( as determined by the Controller). No later*

4 *than April 15th of each year, the Director of Public Works shall submit the current fee schedule to the*

5 *Controller, who shall apply the CPI adjustment to produce a new fee schedule for the following year.*

6 *No later than May 15th of each year, the Controller shall file a report with the Board of Supervisors*

7 *reporting the new fee and certifying that: (i) the fees produce sufficient revenue to support the costs of*

8 *providing the services for which the fee is charged; and (ii) the fees do not produce revenue that*

9 *exceeds the costs of providing the services for which each permit fee is charged.*

10      *(D)    Discretion to Require Additional Fees. In instances where the review of an application*

11 *for a Personal Wireless Service Facilities Site Permit is or will be unusually costly to the Department*

12 *of Public Works or to other City agencies, the Director of Public Works, in his or her discretion, may*

13 *require a Person filing an application for a Personal Wireless Service Facilities Site Permit to pay a*

14 *sum in excess of the amount charged pursuant to this section. This additional sum shall be sufficient to*

15 *recover actual costs incurred by the Department of Public Works and/or other agencies, boards,*

16 *commissions, or departments of the City in connection with an application for approval of a Personal*

17 *Wireless Service Facilities Permit and shall be charged on a time and materials basis. Whenever*

18 *additional fees are charged, the Director of Public Works, upon request, shall provide in writing the*

19 *basis for the additional fees and an estimate of the additional fees.*

20      *(E)    Deposit of Fees. All fees paid to the Department of Public Works for Personal Wireless*

21 *Service Facilities Site Permits shall be deposited in the Public Works Excavation Fund established by*

22 *Section 10.100-230 of the San Francisco Administrative Code. All other fees shall go directly to the*

23 *appropriate City department.*

24      Section 2. Environmental Findings. The Planning Department has reviewed the

25 ordinance in accordance with the California Environmental Quality Act (California Public

1   Resources Code Section 21000 *et seq.*).  The Board hereby affirms the determination of the

2   Planning Department, which is on file with the Clerk of the Board of Supervisors in File No.

3   _____ and which is hereby declared to be a part of this ordinance as if set forth fully

4   herein.

5

6   APPROVED AS TO FORM:
    DENNIS J. HERRERA, City Attorney

7

8   By:

9       WILLIAM K. SANDERS
        Deputy City Attorney

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



### City and County of San Francisco

#### Tails

#### Ordinance

City Hall
1 Dr. Carlton B. Goodlett Place
San Francisco, CA 94102-4689

---

**File Number:**    070904                          **Date Passed:**

Ordinance amending Chapter 11, Article 1 of the San Francisco Administrative Code by amending Sections 11.1 and 11.9 to authorize state video franchise holders and personal wireless service carriers to obtain utility conditions permits, requiring persons installing personal wireless service facilities in the public rights-of-way to obtain personal wireless service facilities site permits, imposing fees for personal wireless service facilities site permits, and making environmental findings.

---

August 14, 2007  Board of Supervisors — PASSED ON FIRST READING

Ayes: 11 - Alioto-Pier, Ammiano, Daly, Dufty, Elsbernd, Jew, Maxwell, McGoldrick, Mirkarimi, Peskin, Sandoval

September 11, 2007  Board of Supervisors — FINALLY PASSED

Ayes: 10 - Alioto-Pier, Ammiano, Daly, Dufty, Elsbernd, Jew, Maxwell, McGoldrick, Mirkarimi, Peskin
Excused: 1 - Sandoval

File No. 070904

I hereby certify that the foregoing Ordinance was FINALLY PASSED on September 11, 2007 by the Board of Supervisors of the City and County of San Francisco.

_____
Signature Clerk

9/21/07
_____
Date Approved

_____
Mayor Gavin Newsom

File No. 070904

# Exhibit F

**City and County of San Francisco**





(415) 554-5800
FAX (415) 554-5843
http://www.sfdpw.org

**Department of Public Works**
**Bureau of Street-Use and Mapping**
875 Stevenson Street, Room 460
San Francisco, CA 94103-0942

Gavin Newsom, Mayor
Fred V. Abadi, Ph.D., Director

Barbara L. Moy, Bureau Manager

January 7, 2008

<u>Via U.S. Mail and Facsimile</u>: (408) 383-5397

Todd K. Schultz
Vice President – Operations
NextG Networks, Inc.
2216 O'Toole Avenue
San Jose, CA 95131

        Re:    Personal Wireless Services Facilities Site Permits

Dear Mr. Schultz:

This is to advise you that on September 11, 2007 the City and County of San Francisco Board of Supervisors ("Board") enacted Ordinance No. 214-07. In Ordinance No. 214-07, the Board amended the City and County of San Francisco Administrative Code to require any person that has been granted a Utility Conditions Permit ("UCP") to obtain personal wireless services facilities site permits ("Wireless Permit") from the Department of Public Works ("Department") before installing personal wireless services facilities ("Wireless Facilities") in the public rights-of-way.

On July 7, 2006, the Department issued a UCP to NextG Networks, Inc. ("NextG"). As a result, NextG is prohibited from installing any new Wireless Facilities in the public rights-of-way without first obtaining Wireless Permits.

Sincerely,

Dan McKenna
Deputy Bureau Manager

c:     Bill Sanders
       John Kwong
       Cliff Wong