DENNIS J. HERRERA, State Bar #139669
City Attorney
THERESA L. MUELLER, State Bar #172681
Chief Energy and Telecommunications Deputy
WILLIAM K. SANDERS, State Bar #154156
THOMAS J. LONG, State Bar #124776
Deputy City Attorneys
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4682
Telephone:     (415) 554-6548
Facsimile:     (415) 554-4757
E-Mail:        thomas.long@sfgov.org

Attorneys for Defendants
THE CITY AND COUNTY OF SAN FRANCISCO and
THE DEPARTMENT OF PUBLIC WORKS OF THE
CITY AND COUNTY OF SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NEXTG NETWORKS OF CALIFORNIA, INC., a Delaware corporation, | Case No. CV-08-0985-MHP |
| Plaintiff, | **DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ON THE FIRST AND SECOND CLAIMS OF THE COMPLAINT** |
| vs. | |
| THE CITY AND COUNTY OF SAN FRANCISCO and THE DEPARTMENT OF PUBLIC WORKS OF THE CITY OF SAN FRANCISCO, | Hearing Date:  June 9, 2008<br>Time:          2:00 p.m.<br>Place:         Courtroom 15 |
| Defendants. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iii

NOTICE OF MOTION............................................................................................. vii

MEMORANDUM OF POINTS AND AUTHORITIES .............................................1

I.     INTRODUCTION AND SUMMARY OF ARGUMENT ......................1

II.    STATEMENT OF FACTS .......................................................................2

    A.    *NextG I* ......................................................................................2

    B.    ExteNet Systems Litigation ......................................................3

    C.    The City's New Ordinance and Implementing Regulations .......3

        1.    Overview................................................................3

        2.    The Department Maps Are Easy to Use and Involve No DPW Discretion.....................................................5

        3.    The Wireless Permit Review Process .............................6

            a.    The Regulations Create a New, Streamlined Process for Approving Applications in Unprotected Locations .............6

            b.    The Process for Reviewing Applications in Protected Areas Is Neither Time Consuming nor Cumbersome and Is Tailored to the City's Legitimate Need to Protect Its Identified Historic and Scenic Resources ...........................7

        4.    Types of Equipment Constituting Wireless Facilities ....................9

III.   APPLICABLE LEGAL STANDARDS ................................................9

    A.    NextG Must Overcome a Strong Presumption In Order to Preempt the City's Traditional Authority Over Land Use Matters.................................9

    B.    NextG Must Overcome a Heavy Burden in Its Facial Challenge of the City's Wireless Permit Regulations. .........................................................10

    C.    Summary Judgment Standard ..................................................10

IV.   ARGUMENT ..........................................................................................11

    A.    The Court Should Grant Summary Judgment for the City on NextG's Claim that § 253(a) Preempts the City's Wireless Permit Regulations .....11

        1.    Section 253(a) Does Not Preempt the Wireless Permit Regulations ...............................................................11

        2.    The Regulations Are Saved by the § 253 (b) and § 253(c) Safe Harbors.......................................................13

            a.    The Regulations Properly Exercise the City's Authority to Manage the Public Rights of Way in a Non-Discriminatory Manner......................................13

b.     The Regulations Exercise the City's State-Conferred Authority to Protect the Public Safety and Welfare...........16

3.     Section 332(c)(7) Shows That Congress Did Not Intend to Preempt Local Authority to Manage the Placement of Wireless Facilities...................................................................................17

a.     Section 253 Must Be Interpreted to Harmonize with § 332(c)(7) ...........................................................................17

b.     Congress Expressly Preserved Local Government Discretion to Deny Wireless Permits in Protected Locations....................................................................................18

B.     This Court Should Grant Summary Judgment for the City on NextG's State Law Claim....................................................................................21

1.     The Court Should Decline Supplemental Jurisdiction...................21

2.     Public Utilities Code § 7901 Does Not Preempt the City's Regulations ...................................................................................22

V.     CONCLUSION.....................................................................................25

APPENDIX OF STATUTORY AUTHORITIES ...................................................................App.

# TABLE OF AUTHORITIES

**Federal Cases**

*American Bankers Assoc. v. Gould*
    412 F.3d 1081 (9th Cir. 2005) ................................................................9

*Auburn Housing Auth. v. Martinez*
    277 F.3d 138 (2d Cir. 2002) .................................................................19

*Boise Cascade Corp. v. EPA*
    942 F.2d 1432 (9th Cir. 1991) .............................................................18

*Cablevision of Boston, Inc. v. Public Improvement Commission*
    184 F.3d 88 (1st Cir. 1999)..................................................................15

*Celotex Corp. v. Cattrett*
    477 U.S. 317 (1986).............................................................................11

*City of Auburn v. Qwest Corp.,*
    260 F.3d 1160, 1175-76 (9th Cir. 2001) ....................................12, 13, 14

*Communications Telesystems International v. California Pub. Util. Comm (CTI)*
    196 F.3d 1011 (9th Cir. 1999) ..........................................................9, 13

*Cox Communications v. City of San Marcos*
    204 F. Supp. 2d 1260 (S.D. Cal. 2002) ............................................16, 20

*Cox Communications v. City of San Marcos*
    204 F. Supp. 2d 1272 (S.D. Cal. 2002) .................................................22

*Cox v. State of Louisiana*
    379 U.S. 536 (1965).............................................................................10

*GTE Mobilnet of California v.San Francisco* 2007
    U.S. Dist LEXIS 8801 *13-14 (N.D. Cal. 2007)..................................12

*MetroPCS v. San Francisco*
    400 F.3d  715 (9th Cir. 2005) ..............................................................10

*NextG Networks of California, Inc. v. City of San Francisco*
    2006 U.S. Dist. LEXIS 36101 (N.D. Cal. 2006) ............................ passim

*Pacific Bell Tel. Co. v. City of Walnut Creek*
    428 F. Supp. 2d 1037 (2006) ...............................................................22

*Qwest Communications Corp. v. City of Berkeley*
    146 F. Supp. 2d 1081 (N.D. Cal. 2001)................................................22

*Qwest Communications Inc. v. City of Berkeley*
    433 F.3d 1253 (9th Cir. 2006) ........................................................12, 14

*Qwest Corp. v. City of Portland*
    385 F.3d 1236 (9th Cir. 2004) .................................................................................11

*Salerno v. United States*
    481 U.S. 739 (1987).................................................................................................10

*Southwestern Bell Mobile Systems, Inc. v. Todd*
    244 F.3d 51 (1st Cir. 2001) ....................................................................................17

*Sprint PCS Assets, L.L.C. v. City of La Cañada  Flintridge*
    435 F.3d 993 *opinion amended and superseded on denial of rehearing by*,
    448 F.3d 1067 (9th Cir. 2006)................................................................................21

*Sprint PCS Assets, L.L.C. v. City of Palos Verdes*
    487 F.3d 694 (9th Cir. 2007) .................................................................................21

*Sprint Telephony PCS v. County of San Diego*
    44 Cal. Rptr. 3d 754 *review granted and opinion superseded by*,
    49 Cal. Rptr. 3d 653 (2006) *review dismissed by* 71 Cal. Rptr. 3d 251 (2008)..................21, 14

*Sprint Telephony PCS v. County of San Diego*
    490 F.3d 700 (9th Cir. 2007) .......................................................................... passim

*TCG Detroit v. City of Dearborn*
    16 F. Supp. 2d 785 (E.D. Mich. 1998).................................................................16

*TCG New York, Inc. v. City of White Plains*
    305 F.3d 67 (2d Cir. 2002) ....................................................................................15


**State Cases**

*Big Creek Lumber Co. v. County of Santa Cruz*
    38 Cal. 4th 1139 (2006) .........................................................................................22

*Pacific Tel. & Tel. Co. v. City & County of San Francisco*
    51 Cal. 2d 766 (1959) ............................................................................................24

*Pacific Tel. & Tel. Co. v. City and County of San Francisco*
    51 Cal. 2d 766 (1959) ............................................................................................23

*Pacific Tel. & Tel. v. City and County of San Francisco*
    197 Cal. App. 2d 133 (1961) .................................................................................24

*Pacific Tel. & Tel. v. City of Los Angeles*
    44 Cal. 2d 272 (1955) ............................................................................................23

*Sherwin-Williams Co. v. City of Los Angeles*
    4 Cal. 4th 893 (1993).............................................................................................22

*Tahoe Regional Planning Agency v. King*
    233 Cal. App. 3d 1365 (1991) ...............................................................................17

*Western Union Tel. Co. v. City of Visalia*
  149 Cal. 744 (1906) ...........................................................................................24

*Western Union Tel. Co. v. Hopkins*
  160 Cal. 106 (1911) ...........................................................................................23

**State Statutes & Codes**

California Civil Code
  Section 536 ...............................................................................................22, 23, 24
  Section 7091 .......................................................................................................24

California Government Code
  Section 50030 ....................................................................................................25

California Public Resources Code
  Section 21000 ......................................................................................................6

Public Utilities Code
  Section 2902 .................................................................................................16, 25
  Section 7901 ............................................................................................... passim
  Section 7901.1 ............................................................................................ passim

**Federal Statutes**

28 United States Code
  Section 1367(c)(1) ..............................................................................................21

47 United States Code
  Section 151 .........................................................................................................18
  Section 253 ................................................................................................ passim
  Section 253 (a) ..........................................................................2, 11, 12, 13
  Section 253 (b) ..........................................................................2, 11, 13,16
  Section 253(c) ...........................................................................2, 11, 13, 14
  Section 332(c)(7) ...................................................................................... passim
  Section 332(c)(7)(A) .........................................................................................18
  Section 332(c)(7)(B) .........................................................................................18
  Section 332(c)(7)(B)(i) .....................................................................................19
  Section 615b .......................................................................................................18

Federal Rule of Civil Procedure
  Section 56 .............................................................................................................5
  Section 56(c) .......................................................................................................10

**San Francisco Statutes, Codes & Ordinances**

San Francisco Administrative Code
  Section 11.1(bb)..................................................................................................15
  Section 11.9 ..........................................................................................................3
  Section 11.9 (a ) ..................................................................................................4

Section 11.9 (a)(2) .................................................................................4
Section 11.9(b)(1) ..................................................................................4
Section 11.9(b)(2)(A) ......................................................................4, 5, 8
Section 11.9(b)(2)(B) ...............................................................4, 5, 8, 13
Section 11.9(b)(2)(C) .............................................................................6
Section 11.9(b)(3) ..................................................................................4
Section 11.9(b)(3)(B) .............................................................................4

San Francisco Charter
Section 4.106(b) .....................................................................................5

**Other Authorities**

California Constitution Article XI
Section 7 ...............................................................................................22

California Rule of Court
Section 8.1115 ......................................................................................24

1

**NOTICE OF MOTION**

2

TO PLAINTIFF AND ITS ATTORNEYS OF RECORD:

3          PLEASE TAKE NOTICE that, at 2:00 p.m. on June 9, 2008, or as soon thereafter as counsel

4    may be heard, in the courtroom of the Honorable Marilyn Hall Patel, defendants the City and County

5    of San Francisco and the Department of Public Works of the City of San Francisco (collectively "the

6    City") will move for an order, pursuant to Federal Rule of Civil Procedure 56, granting summary

7    judgment to defendants on the First (Federal Telecommunications Act) and Second (California Public

8    Utilities Code §§ 7901 and 7901.1) Claims for Relief in the complaint of plaintiff NextG Networks of

9    California, Inc. ("NextG"). The grounds for the City's motion is that the City is entitled to judgment

10   as a matter of law as to those claims because there are no genuine issues as to any material fact.

11          This motion is based on this notice of motion and the accompanying memorandum of points

12   and authorities, the declarations of Daniel McKenna, William K. Sanders, Amit K. Ghosh, Mark

13   Luellen, and Daniel LaFonte, and upon such matters as may be presented to the Court at the time of

14   hearing.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

3

4

5

6

7

8

9

In response to this Court's decision in *NextG Networks of California, Inc. v. City of San Francisco*, 2006 U.S. Dist. LEXIS 36101 (N.D. Cal. 2006) ("*NextG I*"), defendants the City and County of San Francisco and the San Francisco Department of Public Works (collectively "the City") have adopted new regulations for granting permits to construct wireless antennas on utility poles in the City's rights-of-way.  This motion will show by indisputable facts – primarily the regulations themselves – that the new regulations are nothing like the major encroachment permit ("MEP") process that this Court in *NextG I* found to be preempted by 47 U.S.C. § 253.[1]

10

11

12

13

14

15

16

17

18

19

20

In summary, the regulations establish two alternative processes for obtaining wireless permits, depending on where the applicant wishes to construct its facilities.  If the proposed site is not in a location that the City has identified as having an important scenic, historic or architectural resource (an "unprotected location"), the regulations provide a quick, easy and inexpensive path to obtain a permit.  In the usual case, applicants will be able to obtain a permit to construct facilities in unprotected locations within seven business days of submitting a complete application.  If the proposed site is in a location where important scenic, historic or architectural resources are present (a "protected location"), the application will undergo review by expert City staff.  Unlike the MEP process, this review will be free of any hearings, will not involve the City's Board of Supervisors, and is targeted to be completed within fifteen business days.  The purpose of the review will be to allow City experts to protect San Francisco's celebrated views, architecture, history and open spaces.

21

22

23

24

25

Under the mistaken belief that the City's new regulations are fundamentally the same as the MEP process, NextG has filed a Complaint claiming that the regulations are preempted under § 253 of the 1996 Telecommunications Act (the "TCA") (47 U.S.C. § 253) and California Public Utilities Code §§ 7901 and 7901.1.  Because NextG has not submitted a single application under the new regulations, it is restricted to pressing these claims through a difficult facial challenge.

26

27

28

---

[1] Relevant portions of federal and state statutes discussed in this memorandum are reproduced in the attached Appendix of Statutory Authorities.

1      The City will show as a matter of law that, under the new regulations, San Francisco is

2  exercising local authority in precisely the manner that Congress and the California legislature

3  intended to safeguard from preemption.  NextG cannot sustain its burden of proving preemption

4  under § 253 for three reasons, any one of which defeats NextG's federal claim:  (1) the City's

5  regulations lack the combination of features that the Ninth Circuit has found to justify preemption

6  under § 253(a); (2) the regulations carry out the City's legally protected authority under § 47 U.S.C.

7  253(b) and § 253(c) to protect the public safety and welfare and to manage the public rights-of-way;

8  and (3) 47 U.S.C. § 332(c)(7) expressly forbids preemption of the particular means by which the City

9  manages the placement of wireless facilities in its streets.  The Court should not even reach the merits

10  of NextG's § 7901 and § 7901.1 claim because the very issue raised by NextG is a novel and

11  unresolved issue of state law.  Should the Court decide to hear this claim, it should find that the City's

12  regulations exercise authority that is fully consistent with state law.

13      The City has completely revamped its regulations and NextG has not even given them a try.

14  The Court should deny NextG's unsupported facial challenge and grant summary judgment to the

15  City on NextG's first and second claims.

16  **II.    STATEMENT OF FACTS**

17      **A.    *NextG I***

18      In *NextG I*, this Court found that § 253(a) preempted the City's MEP ordinance, *id*. at *11-21,

19  and rejected the City's defenses that the safe harbor provisions (§ 253(b), § 253(c)) saved the MEP

20  ordinance from preemption by § 253(a), *id*. at *21-27.  This Court determined that the process for

21  obtaining major encroachment permits, which involved multiple public hearings: (i) is "time-

22  consuming and expensive;" and (ii) affords the City's Board of Supervisors "unfettered discretion" to

23  reject a permit "for whatever reasons they choose."  *Id*.  at *16, *22.

24      While finding for NextG, this Court acknowledged the City's legitimate "concern that *absent*

25  *regulation*, wireless antennas will proliferate without regard for public convenience, the negative

26  views of residents, or *aesthetic guidelines*."  *Id*.  at *27 (emphasis added).  This Court noted that §

27  253 did "not foreclose[ ] [the City] from regulating wireless carriers through neutral, explicit

28

conditions for access which permit carriers to install their antennas and are limited to what is necessary to promote effective management of the City's rights-of-way." *Id*.

**B.    ExteNet Systems Litigation**

On October 18, 2006, one of NextG's competitors, ExteNet Systems Inc. ("ExteNet") filed a complaint against the City, asserting claims similar to NextG's. (*See* Declaration of William K. Sanders in Support of Defendants' Motion for Summary Judgment ("Sanders Dec."), ¶ 5.) Following *NextG I,* the City had stopped using MEPs for siting wireless facilities and instead offered ExteNet a utility conditions permit ("UCP") that required review by the City's Planning or Recreation and Park Departments for applications to construct wireless facilities in certain protected locations. (*Id.*, ¶ 6.) At a November 9, 2006 hearing on ExteNet's motion for a temporary restraining order, this Court stated to ExteNet: "There are going to be times when you are not going to be able to put the equipment on certain poles and certain locations, just because there are issues that the city has to be concerned about." (*Id.*, ¶ 7 and Ex. C, p. 35, lines 22-25). This Court also stated that, for the locations for which Planning or Recreation and Park Department approval would be required, the City should develop a process by which "not a whole series of appeal after appeal after appeal is going to be required, but a timely response can be made." (*Id.*, Ex. C, p.35, lines 16-18.)

**C.    The City's New Ordinance and Implementing Regulations**

**1.    Overview**

The City has enacted a new ordinance and developed and implemented new regulations (collectively "the Wireless Permit Regulations" or "Regulations") to address the problems and concerns identified by this Court in *NextG I* and the ExteNet litigation. The Regulations consist of three parts: (1) Ordinance 214-07 ("the Ordinance") (Complaint, Ex. E), which is now codified at San Francisco Administrative Code § 11.9 (Declaration of Daniel McKenna in Support of Defendants' Motion for Summary Judgment ("McKenna Dec."), ¶ 3 and Ex. A); (2) Department of Public Works ("Department" or "DPW") Order No. 177,163 ("the Order") (McKenna Dec., ¶ 4 and Ex. B;  and  (3) certain maps prepared by the City referred to in the Order (the "Department Maps") (McKenna Dec., ¶¶ 12-23 and Exhs.C, D).

1       Under the San Francisco Administrative Code, all telecommunications services carriers are

2  required to obtain UCPs in order to use the public rights-of-way.  S.F. Admin. Code § 11.9 (a).  The

3  Ordinance amends the Administrative Code to require any entity that is entitled to a UCP and that

4  seeks to install personal wireless services facilities ("Wireless Facilities") in the public rights-of-way

5  to obtain a personal wireless services facilities site permit ("Wireless Permit").  S.F. Admin. Code §

6  11.9 (a), (b)(1).  NextG does not dispute that its antennas and related equipment are subject to the

7  Ordinance.  *See* NextG's Motion for Judgment on the Pleadings ("NextG Motion"), p. 1.  The Order

8  implements the Ordinance by establishing a procedure for DPW to issue Wireless Permits.  The

9  Department Maps facilitate the application and DPW review process.

10       A key feature of the Regulations is that they establish two alternative processes for obtaining

11  Wireless Permits, depending on where the applicant wishes to locate its wireless facilities.  If an

12  applicant seeks to place facilities in one of the enumerated locations in the City in which there are

13  protected historic, architectural, locally significant, or scenic resources, the Regulations require the

14  Planning Department to review the application; if the applicant wishes to locate facilities adjacent to a

15  public park, the Recreation and Parks ("Rec/Park") Department must review the application.  S.F.

16  Admin.Code § 11.9(b)(2)(A), (B); Order, § III.D.4, 5.  For any location outside of these protected

17  locations, DPW may issue the Wireless Permit without any review related to protected City

18  resources.  Order, § III.D.

19       The Regulations sharply reduce the fees that the City had required under the MEP process at

20  issue in *NextG I.*  All fees are based on the costs of processing and reviewing applications.  S.F.

21  Admin. Code § 11.9(b)(3).  Fees to cover DPW costs will not exceed $225 per application.  *Id.,* §

22  11.9(b)(3)(A).  If review by other departments is required, additional fees apply, ranging from $105

23  to $135, plus time and materials.  *Id.,* §11.9(b)(3)(B).  The new fee structure is dramatically less than

24  the $4,800 in MEP fees identified in *NextG I*, 2006 U.S. Dist. LEXIS, *15.[2]

25

26          [2]  To obtain a UCP, which generally authorizes telecommunications carriers to use the public

27  rights-of-way, carriers must pay DPW a one-time fee of $2,000 to cover the City's costs.  S.F.
Admin. Code § 11.9(a)(2).

28

1    DPW's approval or denial of a Wireless Permit may be appealed under San Francisco Charter

2    § 4.106(b) to the City's Board of Permit Appeals.  Order, § VI.

3                    **2.**    **The Department Maps Are Easy to Use and Involve No DPW Discretion.**

4            There are two types of Department Maps.  *See* Order, § II.L.  The Planning Department Maps

5    show the locations that would require the approval of the Planning Department before DPW could

6    issue a Wireless Permit.  S.F. Admin. Code § 11.9(b)(2)(A); Order § III.D.4.  The Rec/Park

7    Department Map shows the City parks and open spaces that require Rec/Park Department approval

8    before DPW may issue a Permit for an adjacent location.  S.F. Admin. Code § 11.9(b)(2)(B).

9    (McKenna Dec., Ex. D (Planning Department Map) and Ex. C (Rec/Park Department Map).)

10           The Planning Department Maps are available in two formats, PDF and MapView.  (McKenna

11   Dec., ¶¶ 17-21.)  In either format, a user may enlarge the Map on a computer screen so that individual

12   street segments or buildings can be easily viewed.  (*Id.*, ¶¶ 20, 23.)  Examples of  enlargements of a

13   segment of the Maps, in both formats, are attached to the McKenna Declaration.  (*Id.,* Exhs. E, F.)

14   The MapView format is linked to a searchable database that can be used to determine if a particular

15   pole location is a protected location requiring additional review.  (*Id.*, ¶ 12.)  This is the same Map

16   and database that DPW will consult when it makes its completely non-discretionary determination of

17   the applicable process.  (*Id.*, ¶ 22.)  The Rec/Park Department Map is in PDF format and may also be

18   enlarged to show individual street segments.  (*Id.,* ¶ 12.)[3]

19           The Department Maps reflect the protected resources identified by the Planning and Rec/Park

20   Department and do not involve any discretion by DPW.[4]   The historic, architectural, and locally

21   significant resources shown on the Planning Department Map reflect determinations – based on

22   rigorous evaluations by national, state, or local experts – of the historic, architecturally and locally

23   significant districts and buildings that merit special consideration before they or their surroundings

24

25           [3]  This paragraph refutes NextG's unsupported assertion that the Department Maps are
26   illegible.  NextG Motion, p. 8.  In making that assertion, NextG ignores the fact DPW is no longer
     using or relying on the maps to which NextG refers.

27           [4]  This paragraph refutes NextG's unsupported assertion that the protected locations identified
     on the Maps are "based entirely on DPW's discretionary, subjective notions."  NextG Motion, p. 8.

28

1   could be altered by new construction.  (Declaration of Mark Luellen in Support of Defendants'

2   Motion for Summary Judgment ("Luellen Dec."), ¶¶ 3-17.)  Among other reasons, the Planning

3   Department must identify historic resources in order to meet its obligations under the California

4   Environmental Quality Act ("CEQA").  Calif. Pub. Resources Code § 21000, *et seq.*  (Luellen Dec.,

5   ¶¶ 4-8).  Similarly, the categories of scenic streets enumerated in the Regulations and the streets that

6   fall within those categories have been determined by expert City planners in fulfillment of the

7   principles and requirements of the City's state-mandated General Plan.  (Declaration of Amit K.

8   Ghosh in Support of Defendants' Motion for Summary Judgment ("Ghosh Dec."), ¶¶ 6-17. )

9                    **3.    The Wireless Permit Review Process**

10                        **a.    The Regulations Create a New, Streamlined Process for Approving**
                               **Applications in Unprotected Locations**

12          For applications to construct Wireless Facilities in unprotected locations, the Regulations

13   create a new process that is streamlined both in the amount of required information and the time for

14   approval of the Permit.  Applicants need only provide the following information:  a description of the

15   facilities to be installed; a drawing of the location of the proposed pole and existing and proposed

16   facilities on the pole; applicant contact information; proof that the applicant has permission of the

17   pole owner to install facilities; a statement that requirements under CEQA have been or will be

18   satisfied; and a verified statement of compliance with the Federal Communications Commission's

19   (FCC) regulations regarding exposure to radio frequency ("RF") emissions.  Order, § III.C.1-5.  The

20   verified RF statement need only be furnished to the City once for each particular type of RF

21   transmission equipment.  Order, § III.C.4.

22          Upon receipt of a completed application, DPW will refer the verified RF statement (if one is

23   required) to the Department of Public Health ("DPH") for confirmation of compliance with FCC

24   requirements.  S.F. Admin. Code § 11.9(b)(2)(C); Order, § III.C.8.  DPW will request that DPH make

25   this determination within ten days of the referral and will make good faith efforts to ensure

26   compliance with this request.  Order, § III.C.8.  DPW will approve the application within five

27   business days of receipt of DPH's determination of FCC compliance.  Order, § III.C.7.  In the more

28   common situation in which the applicant has already obtained a DPH finding of FCC compliance for

its equipment, the Department shall approve the application within seven business days of receipt of the completed application. *Id.*. The Department will not hold any hearing on the application. (McKenna Dec., ¶ 28.)   In sum, applications to install equipment in unprotected locations require minimal information and will, in most instances, be approved within seven business days.

In the Complaint, NextG attempts to minimize the importance of this new, streamlined process by alleging that "at least 90% of NextG's anticipated new facility installations will be subject to review by the Planning Department and/or Recreation and Park Department." Complaint, ¶ 49. Similarly, in its Motion, NextG claims that, "[i]n the vast majority of the City," NextG would be subject to review by these departments and/or DPH.[5]  NextG Motion, pp. 6-7.

NextG's own experience refutes its claims.  After the judgment in *NextG I*, NextG could install equipment on poles anywhere in the City without any City review; thus, NextG had no reason to locate its facilities in unprotected locations.  Nevertheless, 20 of the 30 locations that the Department could locate on the Department Map were in unprotected locations and would have been subject to the new streamlined process.  (McKenna Dec., ¶¶ 24 - 26.)  Similarly, Verizon Wireless recently located all 14 of its proposed sites in unprotected areas (*id.*, ¶ 27, Ex. G).

**b.    The Process for Reviewing Applications in Protected Areas Is Neither Time Consuming nor Cumbersome and Is Tailored to the City's Legitimate Need to Protect Its Identified Historic and Scenic Resources**

For applications to construct Wireless Facilities in protected locations, the Regulations require the minimum amount of information and review necessary to prevent harm to the City's identified historic and scenic resources.  The only additional information that applicants must furnish for protected locations is a photo-simulation of the Wireless Facilities at the proposed location and a photo and site drawing showing any Wireless Facilities within a 150-foot radius of the proposed location. Order, § III.C.6.   DPW will request that the Planning or Rec/Park Departments complete its review within fifteen business days of the referral from DPW, and DPW will make good faith efforts to ensure compliance with this request.  Order, § III. D.9. DPW must issue an approval or denial of

---

[5]  As shown above, DPH review is not triggered by the proposed location, but rather by whether the equipment has previously been reviewed for conformity with FCC regulations.

1  the Wireless Permit within five business days of receiving the determination from the Planning or

2  Rec/Park Departments.  *Id*., § III.D.10.  Neither the Ordinance nor the Order allow for the Planning

3  or Rec/Park Departments to hold any hearings, and therefore no hearings will be held before granting

4  or denying the Permit.  (*See* Ghosh Dec., ¶ 25; Declaration of Daniel LaForte in Support of

5  Defendants' Motion for Summary Judgment, ¶ 3).

6      The Ordinance specifies the standards that the Planning and Rec/Park Departments are to

7  apply to their review of proposed facilities in protected locations.  The Planning Department must

8  determine that the proposal is "consistent with the public health, safety, convenience and general

9  welfare and will not unreasonably affect, intrude upon or diminish any of the identified City

10  resources."  S.F. Admin. Code § 11.9(b)(2)(A).[6]  Similar standards guide the Planning Department's

11  responsibilities in many areas.  (Ghosh Dec., ¶¶ 20-24.)  The standards are necessarily flexible

12  because of the diversity of historic and scenic locations that trigger Planning Department review, and

13  the resulting diversity of factors that will need to be considered.  (*Id*., ¶ 18.)   Some of the many

14  potential factors include the extent of other "visual clutter" in the area, the compatibility of the

15  proposed facilities with neighboring structures, the quality and importance of any view or historic

16  resource that may be affected,  the extent to which vegetation may mask the facilities, and the size,

17  shape, color, and location on the pole of the proposed equipment.  (*Id*.**,** ¶ 19**.**)  For example, review of

18  facilities proposed to be located on a street with a "good" view could involve different considerations

19  from those that would apply to facilities proposed to be placed in front of City Hall.  (*Id.*, ¶ 18.)

20      For these reasons, the process for reviewing applications to construct Wireless Facilities in

21  protected locations is nothing like the MEP process this Court invalidated in *NextG I*.  It is not

22  burdensome, time-consuming, or expensive to obtain a Wireless Permit.  Among the many critical

23  differences from the process that this Court reviewed in *NextG I*, 2006 U.S. Dist. LEXIS, *14-16, are

24  the following: (1) no explanation of the purpose of the facilities is required; (2) photo-simulations are

25  only required for protected locations; (3) permit fees are much lower and cost-based; (4) applicants

---

26  [6] For proposed locations adjacent to a City park or open space, the Rec/Park Department must
27  find that the proposal "will not unreasonably affect, intrude upon or diminish a City park or open space."  *Id*., § 11.9(b)(2)(B).

28

1  are not required to provide notice to numerous other City agencies; (5) reports from other City

2  agencies are not required; (6) DPW will not hold a public hearing; (7) DPW will not submit a

3  recommendation to the Board of Supervisors ("Board"); (8) the Department, not the Board, will

4  decide whether to grant or deny the Permit; and (9) where discretion is exercised with respect to

5  protected locations, it is guided by explicit standards and vested in City experts.

6  ### 4.    Types of Equipment Constituting Wireless Facilities

7        There is a variety of equipment and equipment configurations that providers such as NextG

8  may wish to install on poles.  The most visually prominent piece of equipment is the wireless antenna

9  and the supporting crossarm.  The California Public Utilities Commission ("CPUC") requires that

10 wireless antennas on utility poles extend out at least two feet from the center of the pole, which

11 requires the use of crossarms and brackets to support the antennas.  See CPUC General Order (GO)

12 95, Rule 94.4.C ; (Sanders Dec., Ex.B).  Despite these requirements, not all antennas look the same.

13 Some of NextG's installations in the City have included an antenna comprised of two gray box-

14 shaped elements.  (*See* Sanders Dec., ¶¶ 2-3, Ex. A.)  Next G also has used canister-shaped antennas.[7]

15 Some of NextG's installations have included the following additional above-ground equipment: (1) a

16 repeater; (2) a box containing battery back-up equipment; and (3) an electric meter.  (*See id*.)

17 ## III.    APPLICABLE LEGAL STANDARDS

18 ### A.    NextG Must Overcome a Strong Presumption In Order to Preempt the City's Traditional Authority Over Land Use Matters

19        It is presumed that the historic police powers of state and local governments are not

20 superseded by federal law, unless it is the "clear and manifest purpose of Congress" to do so.

21 *American Bankers Assoc. v. Gould*, 412 F.3d 1081, 1086 (9th Cir. 2005).  State and local regulation

22 over the provision of telecommunications services is one of those areas.  *Communications*

23 *Telesystems International v. California Pub. Util. Comm. ("CTI")*, 196 F.3d 1011, 1017 (9th Cir.

24 1999) ("federal preemption of state regulation in the area of telecommunications must be clear and

25

26        [7]    See Supplemental Declaration of Nicole Mason in Support of Plaintiff's Opposition to

27 Defendants' Motion to Clarify the Scope of the Injunctive Relief Granted to Plaintiff and/or to Modify the Judgment, No. CV 05-0658 (MHP), Document 83, Filed 12/12/07, Ex. C.

28

occurs only in limited circumstances"). Land use and management of the public rights of way are also areas traditionally reserved to local government. *Cox v. State of Louisiana*, 379 U.S. 536, 554 (1965). Indeed, Congress recognized this fact when it enacted the TCA. *See* H.R. Conf. Rep. No. 104-458, at 207-08 (1996) (expressing Congress' intent to "preserve" authority of state and local governments over zoning and land use matters, except in the "limited circumstances" set forth in the TCA). Accordingly, the TCA should be presumed not to preempt the City's Wireless Permit Ordinance unless there is strong evidence to support Congressional intent to do so.

**B.    NextG Must Overcome a Heavy Burden in Its Facial Challenge of the City's Wireless Permit Regulations.**

To prevail on its facial challenge to the Regulations, NextG must show that there is no set of circumstances under which the Regulations would be valid. *Salerno v. United States,* 481 U.S. 739, 745 (1987). The Ninth Circuit has made it clear that this burden applies to challenges under 47 U.S.C. § 253. *Sprint Telephony PCS v. County of San Diego*, 490 F.3d 700, 713-714 and fn. 5 (9th Cir. 2007) (explaining that the difficulty of mounting a facial challenge under § 253 would prevent plaintiffs from using § 253 to circumvent § 332(c)(7)). Because this case concerns Wireless Facilities, the logic in *MetroPCS, Inc. v. City and County of San Francisco*, 400 F.3d 715 (9th Cir. 2005) (addressing claims under 47 U.S.C. § 332(c)(7)), is equally applicable to this case:

> Zoning rules – such as those that allow local authorities to reject an application based on 'necessity' – may not suggest on their face that they will  . . . have the effect of prohibiting wireless services. Thus, in most cases, only when a locality applies the regulation to a particular permit application and reaches a decision . . . can a court determine the TCA has been violated.

*Id*. at 724. Likewise, because the City's Wireless Permit Regulations on their face afford ample opportunity for NextG and others to provide telecommunications services in neighborhoods throughout the City, NextG's facial challenge offers no basis for the Court to find preemption.

**C.    Summary Judgment Standard**

Summary judgment is proper when the pleadings and any affidavits show that there is "no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." Fed.R. Civ. P. 56(c). As shown above, plaintiff NextG has the burden of demonstrating that federal law preempts the City's exercise of its traditional land use authority. Accordingly, to meet its summary

judgment burden, the City need only point out "that there is an absence of evidence to support [NextG's] case." *Celotex Corp. v. Cattrett*, 477 U.S. 317, 325 (1986).

## IV.    ARGUMENT

### A.    The Court Should Grant Summary Judgment for the City on NextG's Claim that § 253(a) Preempts the City's Wireless Permit Regulations

The first claim of NextG's Complaint – that 47 U.S.C § 253 preempts the City's Wireless Permit Regulations – must fail for each of three reasons:  (1) the City's Regulations do not fall under the scope of regulations preempted by § 253(a); (2) the City's Regulations are saved by § 253(b) and § 253(c); and (3) § 332(c)(7) shows that Congress did not intend for any provision of the TCA, including § 253(a), to preempt local regulations like the City's that manage the placement of wireless facilities based on impact on protected resources.  The City needs to prevail on only one of these arguments for NextG's § 253 claim to fail.

#### 1.    Section 253(a) Does Not Preempt the Wireless Permit Regulations

NextG cannot sustain its burden under § 253(a) of showing that the City's Wireless Permit Regulations may effectively deny it the opportunity to provide telecommunications services in San Francisco.[8]  Unlike the MEP process this Court found was preempted in *NextG I,* the City has created a new, streamlined process – with minimal information and fee requirements – that freely allows applicants to place Wireless Facilities on utility poles in unprotected locations.  *See* II.C.3.a, *supra.* The information required for such applications constitutes the bare minimum necessary to address health, safety, and legal concerns and to be able to respond to public inquiries about equipment on poles.  The Regulations offer ample opportunity to take advantage of this streamlined process.  The Department Maps and associated databases are fully available to applicants and clearly show the protected and unprotected locations.   See II.C.2, supra.  Visual inspection of the Maps shows that there are many parts of the City where there are no protected locations and other parts of San Francisco where unprotected locations are closely interspersed with protected locations.

---

[8]  The Ninth Circuit has interpreted § 253(a) to apply to regulations that may have the effect of  prohibiting telecommunications services.  *Qwest Corp. v. City of Portland*, 385 F.3d 1236, 1239 (9th Cir. 2004).

1    This opportunity to readily obtain a Permit in unprotected locations readily distinguishes this

2    case from *NextG I* and the Ninth Circuit decisions finding preemption under § 253(a).  *See, e.g.*,

3    *Sprint*, 490 F.3d at 706, 715-16; *Qwest Communications Inc. v. City of Berkeley*, 433 F.3d 1253,

4    1256-68 (9th Cir. 2006) ("*Berkeley*"); *City of Auburn v. Qwest Corp.*, 260 F.3d 1160, 1175-76 (9th

5    Cir. 2001) ("*Auburn*").  None of the factors justifying preemption in those cases (most of which

6    required franchises for the privilege of providing telecommunications services) are present for

7    applications to install Wireless Facilities in unprotected locations.  Instead, for the Wireless Permit

8    Regulations:  (1) the submission requirements are minimal; (2) the fees are minimal and cost-based**;**

9    (3) there are no criminal penalties for violations; (4) no hearings are required to obtain the Permit:

10   and (5) no open-ended discretion is exercised.

11        NextG also cannot meet its burden of showing that the Permit process for *protected* locations

12   may have the effect of prohibiting telecommunications.  First, NextG has not yet submitted any

13   applications for Wireless Permits and thus is only able to make a facial challenge.  As a result, there

14   is no evidence that NextG will need to include equipment in many, or even any, protected locations.

15        Second, when the Ninth Circuit has found preemption under § 253(a), it has done so based on

16   a combination of features.  *Sprint*, 490 F.3d at 715-16 ("voluminous" submission requirements, open-

17   ended discretion, threat of criminal penalties); *Berkeley*, 433 F.3d at 1257-58 (non cost-based fees,

18   "very exhaustive" submission requirements, significant discretion, civil and criminal penalties);

19   *Auburn*, 260 F.3d at 1176 ("lengthy and detailed application form", public hearings, discretion

20   unrelated to right of way management, non cost-based fees, civil and criminal penalties).  The Permit

21   process with respect to protected locations presents only one of the features the Ninth Circuit has

22   found to justify preemption – that the Wireless Permits in protected areas are discretionary.

23   However, this discretion under the new Regulations is not "unfettered discretion to reject a permit

24   application altogether, for whatever reasons [the Board of Supervisors and DPW] choose."  *NextG I*,

25   2006 U.S. Dist. LEXIS at *22; *see also GTE Mobilnet of California v. San Francisco*, 2007 U.S. Dist

26   LEXIS 8801, *13-14 (N.D. Cal. 2007) ("*GTE I*") (criticizing the City's MEP process for allowing the

27   Board of Supervisors to make decisions without "any governing or limiting standards").  Instead, the

28   Ordinance prescribes standards that could serve as the basis for a review on appeal:  the Planning

1   Department must determine that the proposed siting is consistent with the health, safety, convenience

2   and general welfare and will not unreasonably affect, intrude upon or diminish any of the identified

3   City resources.[9]  Furthermore, expert City planners, not members of the Board of Supervisors, will

4   exercise this discretion.  The aesthetic judgments the City planners will make will be akin to the types

5   of judgments they are called upon to make regularly under a variety of City ordinances in order to

6   implement the City's land use policies.  (*See* Ghosh Dec., ¶¶ 20-24.)  In addition, the discretion is not

7   exercised after a hearing in which members of the public will express their views on these issues.

8        In sum, the mere possibility (but not a certainty) that NextG may submit applications to site

9   equipment in protected locations, with the consequence that City experts may occasionally be

10  required to exercise reviewable discretion under explicit standards, is not sufficient to justify

11  preemption under § 253(a) based on a facial challenge.[10]  For this reason, this Court should grant the

12  City's motion for summary judgment as to NextG's § 253 claim.

13            **2.        The Regulations Are Saved by the § 253 (b) and § 253(c) Safe Harbors**

14       Even if the City's Regulations fall within the preemptive language of § 253(a), they are not

15  preempted if they meet the safe harbor requirements of either § 253(b) or § 253(c).  *Berkeley*, 433

16  F.3d  at 1258; *CTI,* 196 F.3d at 1016-17 (upholding state regulatory actions under subsection (b)).

17  Both safe harbors apply.

18            **a.        The Regulations Properly Exercise the City's Authority to Manage**
19                        **the Public Rights of Way in a Non-Discriminatory Manner**

20       Section 253(c) preserves local authority to "manage the public rights-of-way . . . on a

21  competitively neutral and nondiscriminatory basis."  The phrase  "manage the public rights-of-way"

22  means "control over the right-of-way itself, not control over companies with facilities in the right-of-

23  way."  *Auburn*, 260 F. 3d at 1177.  Examples of regulations that attempt to control companies, rather

24

25  [9]  Similarly, the Rec/Park Department must determine whether a proposed site adjacent to a
    park or open space would unreasonably affect, intrude upon or diminish a City park or open space.
    S.F. Administrative Code § 11.9(b)(2)(B).

26

27  [10]  While in its Complaint NextG asserts an "as applied" challenge, there are no facts alleged
    therein to support such a challenge, nor can there be because NextG has not applied for any Wireless
    Permits.

28

than manage the rights-of-way, are ones that: (1) go to an applicant's technical and legal qualifications to provide telecommunications services, *Berkeley*, 433 F.3d at 1259; (2) require a description of telecommunications services to be provided, *Auburn*, 260 F.3d at 1178; (3) regulate ownership of the franchise telecommunications carriers, *id.*; (4) require applicants to offer best available rates and terms of service, *id*; or (5) require applicants to offer excess capacity for city use, *id*.  Unlike the ordinances in those case that the courts found were not saved by § 253(c), the Regulations do not impose such requirements or any others that can be construed as attempting to control the companies providing telecommunications services in San Francisco.  For this reason alone, they are saved by § 253(c).

The legislative history of the TCA shows that Congress intended local governments to retain authority to regulate where facilities are placed in the public rights-of-way in accordance with local land use policies.   For assistance in interpreting the phrase "manage the public rights-of-way," the Ninth Circuit has looked to examples of right-of-way management offered by Senator Dianne Feinstein during the floor debate on § 253(c).  *Id.* at 1177-78.  Senator Feinstein's nonexclusive list included "requir[ing] a company to place its facilities underground, rather than overhead, consistent with the requirements imposed on other utility companies" and "enforc[ing] local zoning regulations."  *Id.* at 1177 (internal quotation marks omitted).  Under the Regulations, the City exercises authority of the type identified by Senator Feinstein to regulate the placement of telecommunications facilities.  In locations where there are no protected resources, applicants will find an easy path to construction of their Wireless Facilities.  If and when applicants propose to site those facilities in protected locations, City experts will review the proposals to determine whether the Wireless Facilities will adversely affect the City's protected resources.  Implicit in the Planning and Rec/Park Department review processes is the opportunity for the City and the applicant to work together to reduce the impact on a protected resource by either avoiding installing Wireless Facilities in those areas in the first place or, where feasible, by using a less intrusive style of antenna or by locating some equipment underground.

Management of the public rights-of-way must include the discretion to deny a permit in certain locations.  Just as one example, no reasonable person would dispute that allowing a Wireless

Facility on a pole in front of San Francisco's famous Victorian "Painted Ladies" would do violence to an internationally famous view.[11] Not all protected resources are as prized as those buildings and view, but the Regulations reasonably allow the City to regulate the placement of potentially obtrusive Wireless Facilities based on informed judgments about the impact the installation of such facilities would have on the historic and scenic resources that are central to San Francisco's celebrated character. In sum, the Regulations address the City's reasonable concern, as aptly described by this Court, that "wireless antennas will proliferate without regard for public convenience, the negative views of residents, or aesthetic guidelines." *NextG I*, 2006 U.S. Dist. LEXIS 36101 at *27.

Nor do the Regulations discriminate amongst telecommunications carriers. Instead, they treat all telecommunications carriers the same by requiring *all* carriers that have UCPs to obtain Wireless Permits if they seek to install Wireless Facilities in the public rights-of-way. The Ordinance defines Wireless Facilities as "antennas and related Facilities used to provide or facilitate the provision of Personal Wireless Service." S.F. Admin. Code § 11.1(bb). As a result, the Ordinance applies both to personal wireless service carriers (like AT&T, Verizon and Sprint) and to entities like NextG that install facilities to be used by personal wireless service carriers to service their customers. The fact that the City does not require similar permits for other types of telecommunications equipment does not constitute discrimination among carriers. In fact, NextG is a beneficiary of that policy. Like AT&T and other carriers, NextG does not need a permit, other than a UCP, to install its wireline facilities on utility poles.

Even it this Court finds that the City is somehow subjecting NextG to differential treatment, it is well settled that the City may take into account the differences between providers in regulating telecommunications providers. *See TCG New York, Inc. v. City of White Plains*, 305 F.3d 67, 80 (2d Cir. 2002) ("The statute does not require precise parity of treatment."); *Cablevision of Boston, Inc. v. Public Improvement Commission*, 184 F.3d 88, 103 (1st Cir. 1999) (as long as the City "makes distinctions on valid considerations, it cannot be said to have discriminated" against a

[11] This view can be seen at http://members.virtualtourist.com/m/p/m/328068/.

telecommunications services provider); *TCG Detroit v. City of Dearborn*, 16 F. Supp. 2d 785, 792 (E.D. Mich. 1998), *affirmed*, 206 F.3d 618 (6th Cir. 2000) ("the explicit language of the statute does not require . . . strict equality"). The City has a reasonable basis for treating Wireless Facilities differently. Carriers like NextG install large and obtrusive equipment on utility poles. (*See* Sanders Dec. at ¶¶ 2-3 and Ex. A.) Furthermore, unlike their wireline counterparts, wireless carriers have been able to provide wireless services for years without using the public rights-of-way. See *GTE I*, 2007 WL 420089, at *1.

### b. The Regulations Exercise the City's State-Conferred Authority to Protect the Public Safety and Welfare

Section 253(b) also provides a safe harbor for "State" regulations that "protect the public safety and welfare." This provision applies to local governments, to the extent that the State has delegated certain authority to local government. *Cox Communications v. City of San Marcos*, 204 F. Supp. 2d 1260, 1268 (S.D. Cal. 2002). Two provisions of the California Public Utilities Code demonstrate that the State of California has delegated such authority to cities. First, in enacting the Public Utilities Code in 1951, the Legislature stated its intention to vest in "municipal corporations" the authority to regulate public utilities with respect to "matters affecting the health, convenience, and safety of the general public, including matters such as the use and repair of public streets by a public utility [and] the location of poles, wires, mains, or conduits of any public utility, on, under, or above any public streets." Cal. Pub. Util. Code § 2902. Second, as the court noted in *City of San Marcos*, in enacting California Public Utilities Code § 7901.1 in 1995, "the state delegated its authority over public safety and welfare to municipalities." *Id.*

The Regulations properly exercise the City's § 253(b) authority to protect the public health and safety in two respects. First, the Regulations ensure compliance with the FCC's RF emission requirements that are designed to protect the public health and safety.[12] Second, the City exercises its state-conferred health and safety authority when it acts to keep the public rights-of-way from being

---

[12] *See* FCC, *OET Bulletin 65: Evaluating Compliance with FCC Guidelines for Human Exposure to Radiofrequency Electromagnetic Fields*, Aug. 1997, p. 1 (available at http://www.fcc.gov/Bureaus/Engineering_Technology/Documents/bulletins/oet65/oet65.pdf)

unduly cluttered with utility facilities.  See *Southwestern Bell Mobile Systems, Inc. v. Todd*, 244 F.3d 51, 61 (1st Cir. 2001) (§ 332(c)(7) does not "prevent municipalities from exercising their traditional prerogative to restrict and control development based upon aesthetic considerations"); *Tahoe Regional Planning Agency v. King*, 233 Cal. App. 3d 1365, 1395 (1991) (state may exercise its police powers to "advance aesthetic values").

As shown above, the City's Regulations only assert the City's authority as necessary to protect both the public health and San Francisco's protected scenic and historic resources.  The City needs to require Wireless Permits in order to ensure that human exposure to RF emissions do not exceed FCC regulations.  And, by requiring approval from the Planning and Rec/Park Departments for Wireless Permits in protected areas, the City is ensuring that these vital City resources are protected and conserved.

### 3.     Section 332(c)(7) Shows That Congress Did Not Intend to Preempt Local Authority to Manage the Placement of Wireless Facilities

The same act of Congress that enacted § 253 also added § 332(c)(7),[13] which speaks directly to the issue in this case – the extent of local governmental authority over the placement of wireless facilities.  While *Sprint*, 490 F.3d at 712-15, makes clear that NextG may challenge the City's Regulations under § 253, the City will show that:  (1) Congress and the Ninth Circuit intended for § 253 to be read in harmony with § 332(c)(7); and (2) Congress could not have been clearer that it intended to preserve precisely the authority to regulate the placement of Wireless Facilities that the City asserts in the Wireless Permit Regulations.

### a.     Section 253 Must Be Interpreted to Harmonize with § 332(c)(7)

Section 332(c)(7) is an overriding safe harbor provision for the exercise of local land use authority over wireless facilities.  It applies to the entire Communications Act, including § 253.  Section 332(c)(7)(A) states that "nothing in this chapter [*i.e*, the entire Communications Act[14]] shall limit or affect the authority" of local governments "over decisions regarding the placement,

---

[13]  Section 704 of the TCA added 47 U.S.C. § 332(c)(7) to the Communications Act.

[14]  47 U.S.C. Chapter 5 comprises 47 U.S.C. § 151 through § 615b and thus includes §253.

construction, and modification of personal wireless service facilities," subject only to the limitations in subsection (B). Section 332(c)(7) clearly applies to the City's Wireless Permit Regulations because the Regulations govern City decisions regarding the placement and construction of Wireless Facilities in the city landscape. Section 332(c)(7) explicitly forbids the courts from preempting under § 253 regulation of Wireless Facilities that is permissible under § 332(c)(7).

The Ninth Circuit agrees that § 253 may not undermine § 332(c)(7). In finding in *Sprint* that facial challenges to ordinances regulating wireless facilities could be brought under § 253, the Ninth Circuit explained that it was not "negat[ing] the substantive and procedural elements of § 332(c)(7)." 490 F.3d at 713. In so stating, the court cited longstanding Ninth Circuit precedent that courts must make "every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous." *Id*. (citing *Boise Cascade Corp. v. EPA*, 942 F.2d 1432 (9th Cir. 1991)). Likewise, the court in *City of San Marcos,* "[r]eading the [TCA] as a whole," held that, because § 332(c)(7)(B) contemplates public hearings regarding placement of wireless facilities, construing § 253 to preempt public hearings would "frustrate the purposes of [§] 332(c)(7)(B)." 204 F. Supp. 2d at 1267-68. Thus, as a matter of express statutory language and basic rules of statutory construction, regulatory activities that are permissible under § 332(c)(7) may not be the basis for preemption under § 253.

### b. Congress Expressly Preserved Local Government Discretion to Deny Wireless Permits in Protected Locations

The unusually clear legislative history of the TCA shows that Congress intended to safeguard precisely the type of regulation exercised in the Wireless Permit Regulations. As the Ninth Circuit recognized in *Sprint*, the addition of § 332(c)(7) to the TCA represented "a conscious choice" by Congress to maintain a measure of state and local control over the placement of wireless facilities. *Sprint*, 490 F.3d at 705. The rejected House version of the legislation would have displaced local land use authority and required the FCC to regulate the placement of wireless facilities. *Id.*

However, the Conference Report[15] shows that the adopted legislation, § 332(c)(7), "*prevents Commission preemption of local and State land use decisions and preserves the authority of State and local governments over zoning and land use matters* except in the limited circumstances set forth in the conference agreement." H.R. Conf. Rep. No. 104-458, at 207-08 (1996) (emphasis added).

The two "limited circumstances" that are exceptions to the preservation of local authority are found in § 332(c)(7)(B)(i). First, local governments may not "unreasonably discriminate among providers of functionally equivalent services." The Conference Report's explanation of this restriction only underscores the validity of the City's Regulations:

> The intent of the conferees is to ensure that a State or local government does not . . . unreasonably favor one competitor over another. The conferees also intend that the phrase 'unreasonably discriminate among providers of functionally equivalent services' will provide localities with the flexibility to treat facilities that create different *visual, aesthetic, or safety concerns* differently to the extent permitted under generally applicable zoning requirements even if those facilities provide functionally equivalent services. For example, *the conferees do not intend that if a State or local government grants a permit in a commercial district, it must also grant a permit for a competitor's 50-foot tower in a residential district.*

*Id.* at 208 (1996) (emphasis added). Notably, Congress expressly stated that local governments retain the discretion to deny permits in certain areas based on "visual, aesthetic or safety concerns."

The second limitation is that local regulations may not "prohibit or have the effect of prohibiting personal wireless services." Again, the Conference Report speaks directly in support of the Regulations: "[i]t is the intent of this section that bans or policies that have the effect of banning personal wireless services or facilities not be allowed *and that decisions be made on a case-by-case basis*." *Id.* at 208 (1996) (emphasis added).

The Regulations mirror Congress' example of permissible regulatory discretion. For proposed installations outside of protected locations – equivalent to the "commercial district" in Congress' example – the Ordinance allows virtually unrestricted access to the City's public rights of way. However, in the protected locations – akin to the "residential district" cited by Congress – the

---

[15]  The conference report is considered the most reliable evidence of legislative intent because it represents the final statement of the terms agreed to by both houses. *Auburn Housing Auth. v. Martinez*, 277 F.3d 138, 147 (2d Cir. 2002).

City will make case-by-case decisions about where the facilities may be located in order to avoid unreasonable intrusions on the City's historic or scenic resources.  Because the Regulations impose requirements that Congress consciously and explicitly reserved for local governments in § 332(c)(7), it would impermissibly "frustrate the purpose" of § 332(c)(7) to preempt the Regulations under § 253.  *City of San Marcos*, 204 F. Supp. 2d at 1268.

The determination in *Sprint* to preempt San Diego County's "four-tier system for the granting of wireless facility permits" is consistent with the foregoing analysis.  *Sprint*, 490 F.3d at 705-06.  In its brief one-paragraph explanation of its preemption finding,[16] the court found troubling *the combination of* burdensome submission requirements, "open-ended discretion" and threat of criminal penalties. *Id.* at  716.  Examination of the County's ordinance elucidates the court's concerns.  The San Diego County ordinance required extensive submissions for all proposed installations in all areas, including: (1) an explanation of why the site is necessary to the applicant's network; (2) simulated photographs; (3) an analysis describing maximum silhouette, viewshed analysis, color and finish palette, and proposed screening; and (4) a list of all persons having an interest in the application as well as the names of all persons having any ownership interest in the property involved.  *Id*. at 706.  In contrast, the City's Regulations require none of this information, except simulated photographs, and these only for proposed sites in the protected locations.  In addition, the County ordinance allowed "seemingly open-ended public hearings" before an initial decision on any proposed site, *id.*, a process not required for any proposed site under the City's Regulations.  The County ordinance includes criminal penalties for violation of a permit condition, *id*., a threat not present under the City's Regulations.  In sum, the Ninth Circuit apparently viewed the combination of above-described San Diego County requirements – all of which applied regardless of the location of the proposed site – to exceed the authority preserved by Congress in § 332(c)(7) and to "have the effect of prohibiting the provision of personal wireless services," as that term is used both in § 253 and in  §

---

[16]  In contrast, the opinion in *Sprint* extensively discusses the relationship between Sections 253 and 332(c)(7) including the need, discussed above, to harmonize the two provisions.  *Id*. at 709-715.

332(c)(7)(B)(i)(II). S*ee Sprint,* 490 F.3d at 715.  A similar holding would not be warranted here because of the restraint evident in the City's Regulations.

> **B.    This Court Should Grant Summary Judgment for the City on NextG's State Law Claim**
>
> > **1.    The Court Should Decline Supplemental Jurisdiction**

NextG's second claim for relief is based on California law.  This Court should decline supplemental jurisdiction over NextG's state law claim under 28 U.S.C. § 1367(c)(1) because it concerns a novel and complex issue of state law – whether California Public Utilities Code § 7901 permits local governments to regulate the placement of telephone equipment in public rights-of-way on aesthetic grounds.  As discussed below, this issue is fraught with uncertainty.

The very issue that NextG is asking this Court to decide is unsettled under state law.  In an "unpublished, non-precedential, memorandum disposition" the Ninth Circuit held that California Public Utilities Code §§ 7901 and 7901.1 preempted a local government from denying a permit for wireless service facilities on aesthetic grounds.  *Sprint PCS Assets, L.L.C. v. City of Palos Verdes*, 487 F.3d 694, 696 (9th Cir. 2007).[17]  However, a California Court of Appeal decision disagreed with the Ninth Circuit on this very issue, and the California Supreme Court granted a petition to review that decision. *See Sprint Telephony PCS v. County of San Diego*, 44 Cal. Rptr. 3d 754, *review granted and opinion superseded by*, 49 Cal. Rptr. 3d 653 (2006), *review dismissed by*, 71 Cal. Rptr. 3d 251 (2008).  Accordingly, the Ninth Circuit referred the issue to the California Supreme Court. *See City of Palos Verdes*, 487 F.3d at 696.  Unfortunately, the Supreme Court dismissed its grant of review, apparently because the Court found that the appeal was moot in light of the Ninth Circuit's decision in *Sprint*, 490 F.3d at 700.  *See S*print *Telephony*, 71 Cal. Rptr. 3d at 251.  As a result, the same issue presented by NextG's second claim remains unresolved under state law.

Faced with this uncertainty over the construction of a state statute that is over 100 years old, the district courts generally have declined to exercise supplemental jurisdiction over claims under

---

[17]    The Ninth Circuit first addressed § 7901 in *Sprint PCS Assets, L.L.C. v. City of La Cañada Flintridge*, 435 F.3d 993, *opinion amended and superseded on denial of rehearing by*, 448 F.3d 1067 (9th Cir. 2006).  But the court subsequently de-published that part of its decision. *See*, 448 F.3d at 1068-69 and n.1.

§ 7901. *See, e.g.*, *Pacific Bell Tel. Co. v. City of Walnut Creek*, 428 F. Supp. 2d 1037, 1049 (2006); *Qwest Communications Corp. v. City of Berkeley*, 146 F. Supp. 2d 1081, 1101 (N.D. Cal. 2001); *Cox Communications v. City of San Marcos*, 204 F. Supp. 2d 1272, 1284-85 (S.D. Cal. 2002); *but see GTE Mobilnet of California. L.P. v. City and County of San Francisco,* 440 F. Supp. 2d 1097, 1102-06 (N.D. Cal. 2006) ("*GTE II*").  This Court should follow suit.

### 2.     Public Utilities Code § 7901 Does Not Preempt the City's Regulations

Should this Court decide to hear NextG's § 7901 claim, this Court should grant the City summary judgment.  In enacting California Public Utilities Code § 7901, and its precursor Civil Code § 536, the Legislature intended to preempt certain types of local regulation of telephone corporations.  That does not mean that § 7901 preempts *all* local regulations related to the operation of telephone corporations.  Under well-settled principles of state law, this Court must determine whether state law conflicts with the City's requirement that NextG obtain Wireless Permits.

Under the California constitution, a "county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws."  Cal. Const., Art. XI, § 7.  An otherwise valid local law is preempted by state law, therefore, only when it "conflicts with state law."  *Sherwin-Williams Co. v. City of Los Angeles*, 4 Cal. 4th 893, 897 (1993) (internal quotation marks omitted); *see generally GTE II*, 440 F. Supp. 2d at 1103-06.  Such a conflict between state and local law exists only where the local law at issue: (i) is duplicative of state law because it is "coextensive therewith;" (ii) is "contradictory" to state law because the local law is "inimical thereto;" or (iii) invades an area that is "fully occupied" by state law.  *Sherwin-Williams*, 4 Cal. 4th at 897-98 (internal quotation marks omitted).  Under California law, there is a presumption against preemption "when local government regulates in an area over which it traditionally has exercised control."  *Big Creek Lumber Co. v. County of Santa Cruz*, 38 Cal. 4th 1139, 1149 (2006).  When this Court applies these principles to the state and local laws at issue here, it becomes clear that § 7901 does not preempt the City's requirements for Wireless Permits.  *But see GTE II*, 440 F. Supp. 2d at 1105-06 (finding a material issue of fact on the issue of whether § 7901 preempted the City's more onerous MEP ordinance).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

In 1905, the Legislature amended California Civil Code § 536 to grant to "telephone corporations" the right to construct "telephone lines along and upon any public road or highway" provided that such use does not "incommode the public use of the road or highway." That section, which was repealed and then reenacted as § 7901 in 1951 (*see generally Pacific Tel. & Tel. Co. v. City and County of San Francisco*, 51 Cal. 2d 766, 769-71 (1959)), has long been construed as a:

> continuing offer extended to telephone . . . companies . . . which offer when accepted by the construction and maintenance of telephone lines gives a franchise from the state to use the public highways for the prescribed purposes without the necessity for any grant by a subordinate legislative body.

*Id*. at 771 (internal quotation marks and citation omitted).

As the California Supreme Court has held, because of the interest the people of the state have in the "existence of telephone lines in the streets" the "right and obligation to construct and maintain telephone lines has become a matter of state concern. For this reason, the city cannot today exclude telephone lines from the streets upon the theory that 'it is a municipal affair.'" *Id*. at 774. It has long been held, however, that any such "vested right" to use the public rights-of-way is "subject only to the proper exercise of the police power." *Western Union Tel. Co. v. Hopkins*, 160 Cal. 106, 121 (1911).

By requiring NextG to obtain Wireless Permits, the City is not trying to control NextG's right "to do a telephone business" in San Francisco. *See Pacific Tel. & Tel. v. City of Los Angeles*, 44 Cal. 2d 272, 280 (1955). The City has not required NextG to obtain a franchise or to pay a franchise fee for the privilege of providing telecommunications services. As a result, the City's requirement that NextG obtain Wireless Permits does not conflict with state law because such requirement is not duplicative of § 7901, does not contradict § 7901, and does not invade an area that is exclusively a matter of state concern. Instead, that requirement is consistent with state law.

State courts have recognized local government authority to require permits for use of the public rights-of-way, even where those permits are based on concerns over aesthetics. In an early case construing the authority of a telegraph corporation under Civil Code § 536, the California Supreme Court recognized that the state had not prohibited local regulation over the construction of facilities in the public rights-of-way by a telegraph corporation. *See Western Union Tel. Co. v. City*

1    *of Visalia*, 149 Cal. 744 (1906).  In that case, after finding that the plaintiff had a right under § 536 to

2    a statewide franchise as a telegraph corporation, the court went on to find that § 536 did not preempt

3    a city ordinance limiting the height and location of certain poles that plaintiff intended to construct in

4    the public rights-of-way to provide telegraph service.  *Id.* at 750-51 ("the city had the authority, under

5    its police power, to so regulate the manner of plaintiff's placing and maintaining its poles and wires as

6    to prevent unreasonable obstruction of travel").  Indeed, the court of appeal in *Pacific Tel. & Tel. v.*

7    *City and County of San Francisco*, 197 Cal. App. 2d 133 (1961), succinctly described the difference

8    between the statewide concern (allowing a telephone corporation to provide services without

9    obtaining a franchise from local jurisdictions) and a permissible police power regulation (local

10   regulation of a telephone corporation's use of the public rights-of-way):

11           Where a corporation has a state franchise to use a city's streets, the city derives its
             rights to regulate the particular location and manner of installation of the franchise
12           holder's facilities from the narrower sense of the police power.  Thus, because of
             the state concern in communications, the state has retained to itself the broader
13           police power of granting franchises, leaving to the municipalities the narrower
             police power of controlling location and manner of installation.

14   *Id.* at 152.  In a recent case that is directly point, the court held that "local governments may regulate

15   the location and appearance of telephone equipment without transgressing the franchise conferred by

16   the state on telephone companies by section 7901."  *County of San Diego*, 44 Cal. Rptr. 3d at 764;[18]

17   *see Pacific Tel. & Tel. Co. v. City & County of San Francisco*, 51 Cal. 2d 766, 773-74 (1959)

18   (plaintiff "concede[d] the existence of power in the city" to "control[ ] the particular location of and

19   manner in which all public utility facilities, including telephone lines, are constructed in the streets").

20           Indeed, as previously noted, the Legislature has clearly stated its intention to vest in

21   "municipal corporations" the authority to regulate public utilities (including telephone corporations)

22   with respect to "matters such as the use and repair of public streets by a public utility [and] the

23   location of poles, wires, mains, or conduits of any public utility, on, under, or above any public

24   streets."  Cal. Pub. Util. Code § 2902.  That statute alone shows that the Legislature intended to make

25   a distinction between authorizing telephone corporations to provide service (preempted by state law)

----

[18]   Under California law, this case may not be cited in the state courts.  *See* Cal. Rule of Court
8.1115.  That rule, however, does not apply to the federal courts.

1    and regulating the manner in which said entities construct their facilities in the public rights-of-way

2    (reserved to local government).

3          Other recent state laws provide further support for the City's argument.  In enacting Public

4    Utilities Code § 7901.1 (in 1995) and Government Code § 50030 (in 1996), the Legislature

5    essentially codified the distinction the City is making here between the franchise authority that is a

6    matter of statewide concern and the police power regulation over use of the public rights-of-way that

7    is reserved for local governments.  As the Legislature noted when it enacted § 50030, "cities can still

8    control the location of telephone lines [and] requir[e] companies to obtain local permits."  Ass.

9    Comm. on Local Government, Hearing on Sen. Bill No. 1896 (1995-96 Reg. Sess.)  (June 19, 1996).

10   Similarly, the Legislature enacted § 7901.1 to "bolster the cities' abilities with regard to construction

11   management and to send a message to telephone corporations that cities have authority to manage

12   their construction, without jeopardizing the telephone corporations' statewide franchise."  Sen. Rules

13   Com., Office of Sen. Floor Analyses, Analysis of Sen. Bill 621 (1995-96 Reg. Sess.) (Aug. 31, 1995).

14         The City has imposed reasonable restrictions on NextG's use of the public rights-of-way that

15   are not preempted by § 7901.  This Court should grant the City's motion for summary judgment as to

16   NextG's state law claim.

17   **V.     CONCLUSION**

18         For the reasons set forth above, the Court should grant summary judgment to defendants on

19   the first and second claims of NextG's Complaint.

20   Dated: April 28, 2008                    DENNIS J. HERRERA
                                              City Attorney
21                                            THERESA L. MUELLER
                                              Chief Energy and Telecommunications Deputy
22                                            WILLIAM K. SANDERS
                                              THOMAS J. LONG
23                                            Deputy City Attorneys

24                                      By:_____/s/_____
25                                            THOMAS J. LONG

26                                            Attorneys for Defendants

27

28

# APPENDIX OF STATUTORY AUTHORITIES

47 U.S.C. § 253.  Removal of barriers to entry

(a) In general. No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

(b) State regulatory authority. Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

(c) State and local government authority. Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

(d) Preemption. If, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b), the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.

(e) Commercial mobile service providers. Nothing in this section shall affect the application of section 332(c)(3) to commercial mobile service providers.

(f) Rural Markets. It shall not be a violation of this section for a State to require a telecommunications carrier that seeks to provide telephone exchange service or exchange access in a service area served by a rural telephone company to meet the requirements in section 214(e)(1) for designation as an eligible telecommunications carrier for that area before being permitted to provide such service. This subsection shall not apply--
    (1) to a service area served by a rural telephone company that has obtained an exemption, suspension, or modification of section 251(c)(4) that effectively prevents a competitor from meeting the requirements of section 214(e)(1); and
    (2) to a provider of commercial mobile services.

47 U.S.C. § 332.  Mobile services

(c) Regulatory treatment of mobile services.
      .     .     .

    (7) Preservation of local zoning authority.

    (A) General authority. Except as provided in this paragraph, nothing in this Act shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

    (B) Limitations.

      (i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof--

        (I) shall not unreasonably discriminate among providers of functionally equivalent services; and

        (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

      (ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.

      (iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

      (iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

      (v) Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis. Any person adversely affected by an act or failure to act by a State or local government or any instrumentality thereof that is inconsistent with clause (iv) may petition the Commission for relief.

    (C) Definitions. For purposes of this paragraph--

      (i) the term "personal wireless services" means commercial mobile services, unlicensed wireless services, and common carrier wireless exchange access services;

      (ii) the term "personal wireless service facilities" means facilities for the provision of personal wireless services; and

      (iii) the term "unlicensed wireless service" means the offering of telecommunications services using duly authorized devices which do not require individual licenses, but does not mean the provision of direct-to-home satellite services (as defined in section 303(v)).

28 U.S.C. § 1367.  Supplemental jurisdiction

(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

(b) In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title, the district courts shall not have supplemental jurisdiction under subsection (a) over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure, or over claims by persons proposed to be joined as plaintiffs under Rule 19 of such rules, or seeking to intervene as plaintiffs under Rule 24 of such rules, when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332.

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if--
    (1) the claim raises a novel or complex issue of State law,
    (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
    (3) the district court has dismissed all claims over which it has original jurisdiction, or
    (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

(d) The period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.

(e) As used in this section, the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

1

2

California Public Utilities Code § 7901.  Right of way along roads, waters, and highways

Telegraph or telephone corporations may construct lines of telegraph or telephone lines along and upon any public road or highway, along or across any of the waters or lands within this State, and may erect poles, posts, piers, or abutments for supporting the insulators, wires, and other necessary fixtures of their lines, in such manner and at such points as not to incommode the public use of the road or highway or interrupt the navigation of the waters.

3

4

5

6

California Public Utilities Code § 7901.1.  Legislative intent

7

8

(a) It is the intent of the Legislature, consistent with Section 7901, that municipalities shall have the right to exercise reasonable control as to the time, place, and manner in which roads, highways, and waterways are accessed.

9

10

(b) The control, to be reasonable, shall, at a minimum, be applied to all entities in an equivalent manner.

11

12

(c) Nothing in this section shall add to or subtract from any existing authority with respect to the imposition of fees by municipalities.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28