DENNIS J. HERRERA, State Bar #139669
City Attorney
THERESA L. MUELLER, State Bar #172681
Chief Energy and Telecommunications Deputy
WILLIAM K. SANDERS, State Bar #154156
THOMAS J. LONG, State Bar #124776
Deputy City Attorneys
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4682
Telephone:    (415) 554-6548
Facsimile:    (415) 554-4757
E-Mail:    thomas.long@sfgov.org

Attorneys for Defendants
THE CITY AND COUNTY OF SAN FRANCISCO and
THE DEPARTMENT OF PUBLIC WORKS OF THE
CITY AND COUNTY OF SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NEXTG NETWORKS OF CALIFORNIA, INC., a Delaware corporation, <br><br> Plaintiff. <br><br> vs. <br><br> THE CITY AND COUNTY OF SAN FRANCISCO and THE DEPARTMENT OF PUBLIC WORKS OF THE CITY OF SAN FRANCISCO, <br><br> Defendants. | Case No. CV-08-0985-MHP <br><br> **DECLARATION OF WILLIAM K. SANDERS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> Hearing Date:    June 9, 2008 <br> Time:    2:00 p.m. <br> Place:    Courtroom 15 |

I, William K. Sanders, being duly sworn, declare:

1. I am employed by the City and County of San Francisco as a Deputy City Attorney in the Office of City Attorney Dennis J. Herrera, attorneys for the defendants in this action. I submit this declaration in support of motion for summary judgment filed by defendants the City and County of San Francisco and the Department of Public Works of the City and County of San Francisco

1   (hereinafter "City"). I have personal knowledge of the matters stated herein, and if called as a

2   witness could testify competently thereto.

3       2.  On November 16, 2007, I took photographs of certain wireless facilities installed in

4   the public rights-of-way in San Francisco, including one site at 40th and Cabrillo Streets. A true and

5   correct copy of some of those photographs is attached hereto as Exhibit A. I am informed and believe

6   that these facilities were installed by plaintiff NextG Networks of California, Inc. ("NextG"). My

7   belief is based on the fact that NextG informed the California Public Utilities Commission ("CPUC")

8   that it intended to install a facility at this location. My belief is further based on the fact that the City

9   introduced these same photographs into the record of *NextG Networks of California, Inc. v. City of*

10  *San Francisco*, Case No. 05-0658 (MHP) ("*NextG I*"), and NextG did not deny that these were

11  photographs of its facilities.

12      3.  NextG's facilities on these poles include the two antennas attached to the utility pole

13  by the crossbeam (in red circles), and the other facilities attached to the opposite side of the utility

14  pole below the antennas (in blue circles). It is my understanding that these additional facilities

15  include an optical repeater, a battery back up and an electric meter.

16      4.  The CPUC regulates the installation and maintenance of utility poles throughout the

17  State of California. To do so, the CPUC adopted, and amends from time to time, General Order

18  ("G.O.") 95. In August 2007, the CPUC amended G.O 95 to add Rule 94 establishing requirements

19  for attaching antennas to utility poles. A true and correct copy of Rule 94 of G.O. 95 is attached

20  hereto as Exhibit B. As depicted in the schematic drawings contained in Rules 94.4-A-C, antennas

21  must be installed six feet from the top of the utility pole. They also must be attached to a crossbeam

22  so that the center of the antenna is at least two feet from the center of the utility pole. I am informed

23  and believe that telecommunications carriers using utility poles in San Francisco to attach wireless

24  antennas must comply with the requirements of Rule 94.

25      5.  On October 18, 2006, one of NextG's competitors ExteNet Systems, Inc. ("ExteNet")

26  filed a complaint against the City in a matter entitled *ExteNet Systems, Inc. v. City and County of San*

27  *Francisco, et ano.* (Case No. C-06-06536-MHP). I am one of the attorneys responsible for

28

1    representing the City in the ExteNet matter.  In that capacity, I attended two hearings before this

2    Court on ExteNet's motion for a temporary restraining order ("TRO")/preliminary injunction ("PI").

3         6.    After this Court's decision in *NextG I*, the City abandoned requiring major

4    encroachment permits for wireless facilities.  Instead, the City offered ExteNet a utility conditions

5    permit ("UCP") that required review by the City's Planning or Recreation and Park Departments for

6    applications to construct wireless facilities in certain protected locations.

7         7.    In its motion, ExteNet asked this Court to order the City to grant ExteNet a UCP in a

8    form that was similar to the UCP this Court had required the City to issue to NextG in *NextG I*.  This

9    Court held a lengthy hearing in that matter on November 9, 2006.  A true and correct copy of the

10   Transcript of Proceedings is attached hereto as Exhibit C.

11        I declare under penalty of perjury under the laws of the United States that the foregoing is true

12   and correct, executed this 28th day of April, 2008 at San Francisco, California.

13

14                                          

15                                          WILLIAM K. SANDERS

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT A





EXHIBIT B

# STATE OF CALIFORNIA

---

# **RULES**

FOR

# Overhead Electric Line Construction



Prescribed by the

# PUBLIC UTILITIES COMMISSION

OF THE

# **STATE OF CALIFORNIA**

# GENERAL ORDER No. 95

**August 2007**

Rule 92.4-D2

> Grounding of exposed messengers near supply electric substations may be constrained by technical requirements with cooperation between supply and communication companies.

Note:    Added October 9, 1996 by Resolution SU–40.

## 93    Climbing Space

Climbing space shall be provided on all jointly used poles which support conductors and the provisions of Rules 54.7 and 84.7 are directly applicable to such poles. Climbing space on jointly used poles shall be so correlated between conductor levels that its position in relation to the pole is not changed by more than 90 degrees in a vertical distance of less than 8 feet. Climbing space shall be maintained from the ground level.

Note:    Revised May 22, 1990 by Resolution No. SU–5.

## 94    Antennas

### 94.1    Definition (See Rule 20.0)

### 94.2    Maintenance and Inspection (See Rules 31.1 and 31.2)

### 94.3    General Requirements

On joint use poles supporting Class T, C, L or H Circuits (up to 50 kV), the following shall apply:

**A.** Antennas shall meet the requirements of Class C equipment, unless otherwise specified in this rule.

**B.** All associated elements of the antenna (e.g. associated cables, messengers, and pole line hardware) shall meet the requirements of Class C circuits.

### 94.4    Clearances

**A.** Antennas and supporting elements (e.g. crossarms, brackets) shall maintain a vertical clearance of 6 feet from Supply Conductors operating at 0 – 50kV.  (See Figure 94-1)

Rule 94.4-D

**B.** Antennas and supporting elements (e.g. crossarms, brackets) shall maintain a 2 ft. vertical separation from communication conductors and equipment. (See Figure 94-2)

**C.** Antennas shall maintain a 2 ft. horizontal clearance from centerline of pole. (See Figures 94-1 and 94-2)

**D.** Antennas shall have a vertical clearance above ground as specified in Table 1, Column B, Cases 1 to 6a.

IX-17

August 2007

Rules 94.4-A & C



Figure 94-1



Figure 94-2

IX-19

Rule 94.5

## 94.5  Marking

**A.** No antenna owner or operator shall install an antenna on a joint use pole unless such installation is subject to an agreement with the pole owner(s) that includes marking requirements that are substantially similar to and achieve at least the same safety standards as those set forth in Appendix H to GO 95.

**B.** Joint use poles shall be marked with a sign for each antenna installation as follows:

**(1)**  Identification of the antenna operator

**(2)**  A 24-hour contact number of antenna operator for Emergency or Information

**(3)**  Unique identifier of the antenna installation.

## 94.6  De-energizing

No antenna owner or operator shall install an antenna on a joint use pole unless such installation is subject to an agreement with the pole owner(s) that includes de-energizing protocols that are substantially similar to and achieve at least the same safety standards as those set forth in Appendix H to GO 95.

**Exceptions:**

Antennas utilized by utilities for the sole purpose of operating and monitoring their supply system are exempt from this rule and shall only meet the construction and clearance requirements of supply equipment.

Antennas embedded in or attached to communication cables and messengers are exempt from this rule and shall only meet the construction requirements for Class C circuits.

EXHIBIT C

Pages 1 - 46

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MARILYN HALL PATEL

EXTENET SYSTEMS, INC., A DELAWARE )
CORPORATION, )
 )
          Plaintiff, )
 )
  VS. )  NO. C 06-6536 MHP
 )
THE CITY OF SAN FRANCISCO AND THE )
DEPARTMENT OF PUBLIC WORKS OF THE )
CITY OF SAN FRANCISCO, )
 )  San Francisco, California
          Defendant. )  Thursday
 )  November 9, 2006
 )  3:00 p.m.
_____ )

COPY

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**          BOWEN LAW GROUP
                             235 Montgomery Street
                             Suite 912
                             San Francisco, California 94104
                 **BY:   STEPHEN P. BOWEN, ESQ.**


**For Defendant:**           DENNIS J. HERRERA, CITY ATTORNEY
                             Office of the City Attorney
                             City Hall, Room 234
                             1 Dr. Carlton B. Goodlett Place
                             San Francisco, California 94102
                 **BY:   WILLIAM K. SANDERS, ESQ.**


*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                 *Official Reporter - US District Court*
                 *Computerized Transcription By Eclipse*

```
 1                    P R O C E E D I N G S

 2   NOVEMBER 9, 2007                          3:28 p.m.

 3

 4          THE CLERK:  Calling Civil 06-6536, ExteNet Systems,

 5   Incorporated versus City of San Francisco, et al.

 6          MR. BOWEN:  For plaintiff, Stephen B. Bowen, 235

 7   Montgomery Street, Suite 912, San Francisco 94104.

 8          MR. SANDERS:  William K. Sanders, Deputy City

 9   Attorney for the defendants.

10          THE COURT:  Here we are again.

11          MR. SANDERS:  Yes, Judge.

12          THE COURT:  Same problems, huh?  Some of the same

13   problems?

14          Let me get a little more understanding of your client

15   and what your client does, et cetera.  Essentially do the same

16   thing as this NextG company?

17          MR. BOWEN:  That's right, your Honor.  We are both

18   what's known as Distribute Antenna System, or DAS providers.

19          As your opinions have laid out in the NextG versus

20   City of San Francisco case, both of us use a hub location

21   that's connected via fiber optic cable to these remote antennas

22   and nodes on poles.  So there are some slight differences in

23   the equipment manufacturers, but, in essence, the network

24   deployments are identical.

25          THE COURT:  What does this mean in terms of the
```

1    actual kinds of construction attachments, et cetera, that the

2    city seems so concerned about?  Some of this involves fiber

3    optic cable underground?

4            MR. BOWEN:  Some does.  If I could just sketch out a

5    common installation?

6            THE COURT:  Sure.

7            MR. BOWEN:  Always have this hub location.  In a city

8    it could be in a building, so it's basically irrelevant to what

9    we are talking about here in terms of being the public

10   rights-of-way.

11           This is the interface between the fiber optics that

12   go out into the field on the one hand and networks that go back

13   to their switches, the wireless carrier switches on the other

14   hand.

15           The hub aside, though, what you have is fiber optic

16   cable that can get to these remote nodes a couple of ways.  One

17   is aerial fiber.  You just hang the fiber on utility poles.

18   That's probably the most common way to do this when there is --

19   when there are poles and telephone wires and so forth that are

20   already up there.

21           We have all seen the poles with telephone,

22   electricity, cable company.  This is one more fiber going along

23   a pole line to get to these node locations.

24           THE COURT:  Just more clutter up there, right?

25           MR. BOWEN:  Frankly, you could call it clutter,

1    though it's just one more little cable that's frankly even

2    smaller than a coaxial cable for a cable company.  These are

3    little tiny cables at the other end or ends.

4              There tends to be more than one of these node

5    locations because what you are doing is filling in dead spots

6    for cellular coverage.  So these are much lower power than a

7    regular cellular array.

8              We have all seen those around.  They are much smaller

9    physically and I -- actually, I have a picture if you would

10   like to see it.  I brought a picture with me.

11             **THE COURT:**  Why not?  Adults learn verbally, I think,

12   anyway.

13             **MR. SANDERS:**  By node location he's talking about the

14   antennas put on the pole.

15             **THE COURT:**  Does more than one company such as yours

16   use the same cable or does this mean that every company that

17   may be in the business doing what you do would have its own

18   cable?

19             **MR. BOWEN:**  That's an excellent question.  The answer

20   is, it doesn't have to be that way, and I will tell you why.

21             If I could describe what I handed you there.  This is

22   with a node location, a photo sim, photo simulation.  You will

23   see up that pole about two-thirds of the way there is an arm

24   that sticks out, an antenna.  On the bottom of it, below on the

25   pole with a circle around it on a little box that contains the

1  fiber, goes into that box and gets converted and goes into a

2  radial.  The radial drive is the antenna.  So that has drives

3  in it.  Both these things in the same pole, as you can see in

4  this example.

5          Each of these installations will cover a certain

6  area.  Basically will cover the desired target area with a

7  series of these remote nodes.  All of them are fed by the same

8  linear fiber going out from the hub.

9          Basically, it's like, start at the hub, take the

10  fiber out, hit the first pole.  Put this node on from with the

11  antenna.  Go to the next one down the line.  Do the same thing

12  again.

13          So you will have anywhere from two to -- well, it can

14  be a lot.  It can be 15, 20 nodes, but we are all connected by

15  this fiber.  Usually aerial, but it can be underground, okay,

16  it doesn't have to be aerial.

17          Some parts of the city, as you know, are underground

18  so in that situation what you do is you have two choices.  You

19  can either use existing conduit.  These are round plastic

20  conduits basically.  You can pull fiber through those if they

21  exist.  If they don't, you have to install new underground

22  conduits and for that you need the excavation permits that the

23  city --

24          MR. SANDERS:  I don't think he answered your

25  question.

1    **THE COURT:**  He's working on it.  Believe me, if he

2  doesn't answer my question, I won't have any problem honing in

3  on it.

4    **MR. BOWEN:**  I am getting to it.  I want you to

5  understand the entire network configuration.

6    The fiber either goes above ground or below ground.

7  When you deploy these networks, ClearLinx to ExteNet can link

8  one of these boxes, four separate carriers, with two of the

9  box's eight carriers.

10    **THE COURT:**  You mean, these boxes here?

11    **MR. BOWEN:**  Right.  That single antenna box that you

12  see on that page there will support four different carriers at

13  that location and all ride the fiber back to the same hub

14  location.

15    **THE COURT:**  How do you agree that's what you are

16  going to do as opposed to well, gee, that's NextG's box and we

17  don't want to use their box.  We want to have our own box.  Do

18  you negotiate these things?

19    **MR. BOWEN:**  What tends to happen is most of the

20  carriers, wireless carriers, want a turnkey operation.  They

21  want you to fill in this hole in your network.  It's your job

22  to figure out how to do that.  And they want you to broadcast

23  on three frequencies.

24    The problem is, as we said in our pleadings, the

25  first one in then can offer that same infrastructure to three

1  more carriers.  So they already have a leg up once they get in

2  there the first time.  They can offer the same infrastructure

3  to three more carriers, which is efficient visually,

4  economically and so forth is efficient, but, really, unless you

5  can compete for that first advantage, you are really behind the

6  eight ball, and that's what's happened already with the bid we

7  lost because we didn't have a UCP.

8          THE COURT:  I'm not asking you about that now, but

9  getting back to what the equipment is.

10         First of all, how many companies are in this mix

11  besides -- providing the same kind of services you are and

12  NextG is?  How many such companies are there?  What are we

13  looking at in terms of -- how many of these boxes does one have

14  to see on a pole?

15         MR. BOWEN:  Well, you would hope you would only see

16  on a particular pole one box because whoever gets that box up

17  there can serve four or more carriers.

18         As far as number of companies in the DAS business,

19  I'm aware of, I believe, four.  There is obviously NextG.

20  There is obviously ExteNet.  There is a company called New Path

21  and Crown Castle.  All of those companies to varying degrees

22  are in the same telecommunications niche, although it's very

23  clear to me having worked with ExteNet in detail that ExteNet

24  and NextG are exactly the same in terms of how they approach

25  their business and customer base.

1          THE COURT:  Every one of these companies wants to be

2    first out of the box, so to speak, or first in the box, but

3    they want to be the first, right?

4          MR. BOWEN:  There is an advantage to that, yes.

5          THE COURT:  There is that advantage.  But that means

6    if, in fact, everyone were given the same right, privilege,

7    whatever you want to call it, you could end up with four boxes

8    on this pole because everyone would believe that they had the

9    right to, you know, have -- opportunity to then use their box

10   for other carriers or other telecommunications companies to use

11   it, right?

12         MR. BOWEN:  I think it's unlikely for this reason.

13         MR. SANDERS:  Can I just say --

14         MR. BOWEN:  There are only a few carriers, about five

15   or six wireless companies, as we all know.  We know who the ads

16   are four:  Sprint, Verizon, Cingular and so forth.  They like

17   to multi-source this kind of infrastructure, not a single

18   carrier.  They like to spread their business around if they

19   can.

20         But within a particular area, once they have a dead

21   spot and they get a solution like it's already been deployed by

22   NextG and the business we lost, then whoever else has that same

23   problem will probably come to that carrier and say me too,

24   simply because what happens is once you have the infrastructure

25   deployed, then that carrier who is there already can offer

1   faster time to market and lower prices, more efficient service

2   because they already have the infrastructure built.

3           So the issue there is I don't think you are going to

4   see one pole with one of these boxes and antenna on it.  You

5   might see coverage on an area that on the edges overlaps, and

6   you might see this kind of antenna on a box, pole close to that

7   if they had a problem.  It's trying to solve coverage issues

8   for individual carriers and each of those carriers tends to

9   have different antenna locations themselves.

10          **THE COURT:**  Wouldn't the city, municipality, whatever

11  location that's going to have these poles, have some concern

12  about the jumble of boxes and other things attached to the

13  poles and this -- I suppose there are other concerns besides

14  this.  A lot of people are -- citizens are going to start

15  complaining when they see these poles that are just, you know,

16  filled up with boxes and with these contraptions at the top and

17  so on and so forth.

18          **MR. BOWEN:**  I would suggest to you that on balancing,

19  that probably will not be the outcome for this reason.

20          First of all, let's not forget that the citizens of

21  San Francisco, like every place else, want cellular coverage.

22  It's a very popular means to make telephone calls.  So I think

23  you have to be careful in thinking about these issues not to

24  forget about the public interest benefit of better cellular

25  coverage across the city.

1          In fact, some of the areas where there is not good

2    coverage are areas where you can't get a cell tower sited.

3          Secondly, there is not going to be a proliferation of

4    these antennaes simply because -- the carriers will tend to go

5    on one sent of equipment once it's out there compared to a

6    cellular array.  These are much, much smaller visually

7    impacting than those big cell towers, those so-called macro

8    cell sites.

9          So, yes, you will see this kind of installation on

10   poles, but, frankly it's -- yes, you can see it, but the

11   antenna is much, much smaller and the box is almost invisible.

12   There are boxes that have almost the profile of the pole

13   itself, and you can do things like paint them the color of the

14   pole so there are lots of ways to mitigate any visual impacts.

15          **THE COURT:**  Who is going to do that and try to

16   minimize that visual -- those visual impediments and so forth

17   and satisfy the public if it isn't the people who are elected

18   by the public to do the public's will?

19          **MR. BOWEN:**  We don't have any --

20          **THE COURT:**  Don't tell me the marketplace is going to

21   shake that all out.

22          **MR. BOWEN:**  I wouldn't suggest that to you, your

23   Honor.  I would think that the city certainly has a legitimate

24   interest in the points you were raising, however, as you know

25   under dispositive and relevant law must treat everybody the

1  same.  So if they want to do something in terms of visual

2  minimization of whatever happens to be, I think the right way

3  to do that is pass an ordinance, if they can get an ordinance

4  that they like, and get it passed that applies to everybody.

5        What is not okay is to issue a UCP to, say, NextG or

6  anybody else that doesn't have these conditions and say to

7  ExteNet, I know I did that.  In one case I did it voluntarily

8  for SBC.  One case I was forced for NextG, but for you, you

9  have to go through all these other conditions because that's

10 what I want, that's just not right under law and that's not the

11 way to accomplish what you are talking about, which is a very

12 legitimate interest.  The way to do that is pass an ordinance

13 that applies to everybody.

14        **THE COURT:**  Now, I'm sorry, but I was -- there were a

15 number of questions I wanted to get answered.

16        **MR. SANDERS:**  Your Honor, obviously, the NextG case

17 you ordered us to issue a UCP.  To say we are discriminating

18 against this company by issuing them a different UCP is just

19 unfair.  We followed your Honor's order and issued the exact

20 UCP that you ordered us to issue without any other conditions.

21        In the decision in the NextG case, your Honor

22 expressly noted that you have a legitimate interest in

23 regulating where these things are placed and what they look

24 like in the public rights-of-way.

25        In this case we did this a different way.  We didn't

1    require a major encroachment permit.  We don't require board

2    approval.

3            THE COURT:  We have gone away from the board approval

4    after everybody has done anything else and the board could say

5    "yes" or "no" or maybe.

6            MR. SANDERS:  There is none of that any more.  If you

7    look at the conditions we impose, first of all, they don't

8    exclude any street anywhere or any pole anywhere from being

9    used for wireless facility.  They just say --

10           THE COURT:  Except the historical --

11           MR. SANDERS:  They don't exclude those.  They say if

12   you want to use those, you have to go to the Planning

13   Department and explain why you need to use that pole and what

14   you can do to eliminate the negative aesthetic effects of that

15   particular installation.

16           THE COURT:  How long would this take?

17           MR. SANDERS:  Your Honor, he makes the point that we

18   don't have it implemented, but we are not implementing a system

19   until we have someone who is complying with it and we don't

20   have it yet.  So we have just started to implement this.

21           And, first of all, there is the issue of aesthetic

22   design around some of these things.  They don't necessarily

23   have to go in areas where they have to get Planning Department

24   approval.  And if they can't, then they will have to go get

25   Planning Department approval, but this is consistent with your

1  Honor's decision.

2       There is nothing in the *NextG* decision that's

3  applicable here.  It's a totally different system where your

4  Honor's decision in that case focused totally on the major

5  encroachment permit process, particularly on the board

6  approval, the public hearings.  And we will have none of that

7  here, Judge.

8       This is a very different system and it's the only way

9  we have at this point of having some modicum of control of

10 where these things are placed, which your Honor has indicated

11 both in her decision and in your questioning today that you

12 think we have a legitimate interest in that.

13      **THE COURT:**  Is this pursuant now to newly adopted

14 regulations, policies or practices?  What is it?

15      **MR. SANDERS:**  As we said in our papers, the

16 department's authority to issue UCP's is contained in the

17 administrative code.  The administrative code gives the

18 department broad authority to establish the terms and

19 conditions of a UCP.

20      So there has been no new ordinances or regulations

21 adopted since your Honor's decision, other than the department

22 is exercising its authority in a different way.

23      **THE COURT:**  And is there some way that a company such

24 as plaintiff could determine whether -- let me see if I can get

25 the list correct.  And I think this is maybe in your

1  declaration.

2          MR. SANDERS:  What areas are precluded?

3          THE COURT:  Yes, what areas are historic, decorative.

4          MR. SANDERS:  Yes.

5          MR. BOWEN:  Important to the City of San Francisco.

6          THE COURT:  Certain streets designated under the

7  general -- as important under the general plan.

8          MR. SANDERS:  I actually gave Mr. Bowen a map showing

9  all of those streets.

10          THE COURT:  How many streets are left that don't fall

11  under this category?

12          MR. SANDERS:  There's quite a few in the last

13  category I have to admit, Judge.

14          THE COURT:  In the last category, city, recreation

15  park?

16          MR. SANDERS:  No, no.  Important to the perception of

17  the city.  There's quite a few in that.  There is less in the

18  historic district.

19          THE COURT:  Give me a clue.  What are some of the

20  important ones?

21          MR. SANDERS:  I can give you an example.  I know that

22  in the build that they wanted to do for Metro PCS, they wanted

23  to go down California Street.

24          MR. BOWEN:  That's a no-no.

25          MR. SANDERS:  California Street happened to be

1  important to the perception of the city.

2      **MR. BOWEN:**  In fact, your Honor, Mr. Sanders is

3  right.  We talked about are there lists and maps of these kinds

4  of things and we had used those to bounce those against -- we

5  had three planned builds:  One in the Marina, one in the Sunset

6  and one in the Richmond in the bid that we lost because we

7  didn't have a UCP.

8      I can tell you that our field engineer estimated with

9  the risks from these design and location standards 50 percent

10  of that build couldn't have been accomplished simply because --

11  let me be careful here, if we didn't get permission from the

12  Planning Department and/or Rec and Parks Department to do this.

13      The issue there is it's an extra hurdle for us to get

14  across, obviously, that NextG doesn't have.  It has the same

15  effect as a no in this sense.  There is -- not only is there no

16  program in place, no staff for the program, it's never been

17  done for anybody before, any other carrier before.

18      The problem, I guess the biggest problem is there is

19  no timing for the review.  There is no -- there is no

20  indication of what standards they will apply to a "yes" or

21  "no."  The way it's drafted, it says you can't build in these

22  areas unless you get approval of the Planning Department or Rec

23  and Parks.  I simply can't do it.  There is no indication of

24  how fast that happens, how it happens or anything else.  No

25  program in place.

1        So it's basically a bureaucratic black hole that we

2 get dumped into for large proportions of our network again and

3 that's not something anybody else has to do.

4        If they want to do it, I think the right way is to

5 get an ordinance based that applies to everybody, not to single

6 out us and say you must comply with these even though nobody

7 else does.

8        **THE COURT:**  Well, you are not necessarily being

9 singled out.  You are the second or third applicant.  SBC

10 already has --

11        **MR. SANDERS:**  SBC doesn't put up any wireless

12 antennaes.  UCPs have been issued to a bunch of other carriers.

13 They put up fiber.

14        NextG was the first company that came to us that

15 wanted to put wireless facilities.  ExteNet was the second --

16 let me take that back, step back.

17        There have been wireless carriers who asked us to put

18 up antennaes.  We have been sued by one of those of two.  So

19 far we are beginning that case and next month.  Judge Illston

20 is going to hear a motion under the same statute that your

21 Honor ruled against us.

22        In the NextG case we won the first round of summary

23 judgment on a different federal statute in that case.  So with

24 the wireless carriers we basically have refused to issue them

25 UCPs for reasons that aren't relevant here.

 1           THE COURT:  Have any other companies applied?

 2           MR. SANDERS:  No.

 3           THE COURT:  So we are dealing only with NextG and

 4  what happened there?

 5           MR. SANDERS:  Correct.

 6           THE COURT:  ExteNet, as I understand it, was

 7  previously at a different name.  What was the name?

 8           MR. BOWEN:  ClearLinx.

 9           THE COURT:  Same company?

10           MR. BOWEN:  Just changed its name, yes.

11           THE COURT:  But, indeed, is it -- is it fair to talk

12  about how NextG was treated given the fact that that was a

13  subject of a Court order?  Does that mean everybody has to be

14  treated the same way as NextG was treated because it was under

15  a Court order?

16           MR. BOWEN:  We could do this a couple ways.  We could

17  come in individually and file complaints and motions for TRO's

18  and preliminary injunctions and have you --

19           THE COURT:  That may well happen, I'm beginning to

20  think.

21           MR. BOWEN:  Or the city could say, okay, I get the

22  message.  You know, the Court has told me I have to grant these

23  UCPs and I have to administer them equally under 7901.1 of the

24  PU Code that requires to treat everybody equally.  That was

25  part of our complaint as a matter of fact.

1          **THE COURT:**  Does it have to be equally, though, with

2    a company that's been the beneficiary, at least for the time

3    being, of an order of the Court?  I mean, the Court's job is

4    not to fashion a permit process.

5          The only thing the Court can do is say whether or not

6    that process was preempted and whether the company should come

7    up with a different one, but in the meantime this is what you

8    have got to do.

9          **MR. BOWEN:**  Understood, and I take your point.  I

10   think if the city persists in its refusals to grant equal UCPs,

11   you will probably see multiple lawsuits being filed in federal

12   court on the same grounds.  That's either a good idea or it's

13   not, that will be the outcome; but I have to say I guess we

14   felt poorly used because we actually had the thing that the

15   city used as the chief -- the lack of the chief lever against

16   NextG, which was full facilities-based authority.

17          Mr. Sanders' chief argument, as your Honor will

18   recall in writing your judgment was, well, they only happened

19   if it was based authority.  We don't have to give them a UCP,

20   full facilities based authorized.

21          We took the trouble to ask for it and get it and now

22   we say please give us a UCP.  They say you can have one, but

23   not the standard one and not the one that NextG was.  You can

24   have this other one other here, is what they are saying you can

25   have.  One where you go through the Planning Commission or

1  these other commissions with respect to any of these areas that

2  they say do require prior approval.

3         There are two differences, two chief differences

4  between the UCP that NextG got and the one that we are being

5  offered.  One is a suite of provisions that preserves and tries

6  to apply the outcome from the appeal that's now pending in the

7  Ninth Circuit.

8         THE COURT:  I understand you are not really going to

9  fight about that.

10         MR. BOWEN:  We offered it up actually, your Honor, in

11  negotiations.  I must say there is no stay in place, as your

12  Honor knows, against your mandamus.  So that's why the issue,

13  the order was -- the UCP was granted, but the problem area is

14  the design location conditions because they are substantially

15  different.

16         We think they will affect us as our declarant

17  Mr. Manire (phonetic spelling) says, in a very negative way.

18  They affect us in terms of not being able to design a network

19  to supply the desired coverage for the customers, but they also

20  put us in a horrible spot vis-a-vis NextG itself because I can

21  tell you they are out there saying we are the only carrier that

22  can install DAS networks in San Francisco.

23         In Marin NextG is making these representations saying

24  we, in effect, are the only guys out there that can do this.

25  So whether you go to Metro PCS or Cingular or Verizon or Sprint

1   or anybody else, they are going to say, well, can you get it

2   built just as fast as NextG can?  And we are going to say, you

3   know, I can't guarantee this because they have the design

4   conditions, location conditions, Planning Department, no staff

5   in the Planning Department to do this, no standards, no timing,

6   anything.

7         **THE WITNESS:**  Your Honor, I think you made a very

8   good point.  What happened to NextG really not relevant.  This

9   case has to stand on its own merits.  This plaintiff has to

10   prove the requirements in this UCP are preempted by Section

11   253(a) and not saved by 253(b) or 253(c).  They can't say, look

12   how you treated NextG.  How can you treat us differently?  They

13   can't do that.

14         That order has been appealed.  Even if we said to

15   this company, you need a major encroachment permit just like

16   NextG, we have appealed that order.  We can take the very same

17   position with this company that we took with NextG and,

18   unfortunately, forced them to sue us and get the same order.

19   We have appealed the NextG decision.  We don't know the outcome

20   of this case.  They will probably affirm you, Judge.  They

21   affirm you all the time --

22         **THE COURT:**  They don't affirm me all the time.

23         **MR. SANDERS:**  We don't know what is going to happen

24   in this case.  We have an obligation to protect the public and

25   protect the rights-of-way and I think what happens is NextG

1  is -- they have to prove that these particular requirements are

2  preempted by Section 253(a), and nothing in your Honor's

3  decision really helps them with that case.

4          And to come here and say, oh, well, this is just like

5  the NextG decision and you have no choice but to issue the same

6  acts decision and the same acts relief is simply wrong.  And to

7  now come here and say they are going to prevail on the merits

8  and say why they are going to prevail on the merits of this

9  case and not some other case that happens to have a plaintiff

10  in a similar position to them, that they are competitors, it's

11  just wrong and there is absolutely no evidence here, Judge,

12  that they are going to prevail on the merits of this case.

13          **THE COURT:**  How long has this company, ClearLinx, its

14  predecessor, been in business?

15          **MR. BOWEN:**  Well, they began business in the midwest.

16  They came to California and, unlike NextG, we actually first

17  applied to the California PUC for the kind of authority I just

18  described, the full facilities based.  This was a whole new

19  process we went through to get this.

20          It was unique to them at the time and that was in --

21  it was in the spring of last year, the first application, and

22  then working with the CPCU staff, it look them until,

23  throughout 2005 the fall and I believe that they were granted

24  full authority at the end of April 2006.

25          **THE COURT:**  Have they, in fact, had contracts,

1   performed these kinds of locations or set up these locations in

2   other cities, areas in California?

3           **MR. BOWEN:**  They have not deployed any networks in

4   California, yet they have deployed networks in other states.

5           **THE COURT:**  So it becomes sort of a slippery slope,

6   doesn't it?  Somebody takes a look and says NextG, look what

7   they have got.  Why don't we set up a company, go in and do the

8   same thing and ride on their coattails and so forth?  What's to

9   stop this sort of flood of companies just coming in from

10  somewhere else and doing that?

11          **MR. BOWEN:**  Well, your Honor, actually, I think you

12  are aware from looking at the pleadings in the NextG case,

13  there is a very, very strong federal and state statutory law

14  and case precedent in favor of competition.  In fact, in favor

15  of facilities based commission, which is why we have Section 53

16  of the Telecom Act in the first place.

17          And Mr. Sanders is frankly just wrong that our facts

18  aren't the same, but even if you want to try and distinguish a

19  major encroachment period from a UCP which are unspecified in

20  terms of how they are administered, let's not forget our

21  complaint also alleges protection under the state Public

22  Utility Code which requires cities to treat all carriers the

23  same, period.

24          So when I call it preemption under a federal act or

25  equal treatment and non-discrimination under a state Public

1  Utility Code statute, the city is required to treat everybody

2  the same.

3            THE COURT:  Are we in the situation where there is

4  sort of a gap?  Maybe the gap needed to be closed more quickly

5  than it has been, but the process that the city was using in

6  the NextG case was found to have essentially been preempted.

7  Doesn't mean they can't have some kind of limited regulations

8  and a system for requiring permits and for the issuance of

9  those permits or denial of permits, right?

10            MR. BOWEN:  I think it is right --

11            THE COURT:  You don't want some fly-by-night company

12  coming in, doesn't have any money, just got started on the fly

13  and all of a sudden they have got the authority to put up

14  boxes, whatever else and then they -- you know, they go

15  bankrupt and disappear and you have got all this stuff hanging

16  around.

17            MR. BOWEN:  That couldn't happen.

18            THE COURT:  Why?

19            MR. BOWEN:  Because to get to the first, even be able

20  to walk in and say, "Please give me a UCP," you have to go to

21  the California Public Utilities Commission and one of the

22  standards that they apply is the financial ability to serve,

23  and they have requirements about cash reserves and so forth.

24  They look at managerial, financial and technical ability to

25  serve and you can't get a so-called CPCN unless you prove to

24

1  them, the expert agency, that you are going to be around and

2  can do the job.   This notion of fly-by-night companies isn't

3  going to happen.

4         THE COURT:  Maybe that's not a good example, but

5  there is still -- as a result of what happened in the NextG

6  case, there is now this gap of -- not maybe as explicit and

7  carefully drafted regulation, or whatever you want to call it,

8  an ordinance or whatever that would apply to everyone.

9         Now, I am assuming that the requirement about these

10  location and design standards does apply to everyone, but you

11  are saying that they are not explicit enough so that you can

12  tell what they are.  Is that the gist of your argument?

13         MR. BOWEN:  Actually, it doesn't apply to anyone

14  except for us if they succeed; that is, is there any other

15  carrier period.

16         THE COURT:  The next carrier down the road that

17  applies would presumably have to follow these as well.  They

18  don't change them after they had either granted or denied yours

19  and then say hah-hah to the next one that comes in.  We have

20  changed the rules now.

21         MR. BOWEN:  They couldn't do so with any kind of fair

22  basis to do so, that's true.

23         MR. SANDERS:  Your Honor, on this issue of

24  irreparable harm, I think you hit on a good point, which is

25  this TRO really concerns San Francisco.  There is some 450

1   cities in California, 50 some-odd counties, and this company

2   can go and compete with NextG on equal footing, different

3   footing.

4           THE COURT:  Are you telling them to go somewhere

5   else?

6           MR. SANDERS:  You are looking -- you are talking

7   about irreparable harm, Judge, and it's really just impacting

8   their ability in San Francisco.

9           I don't think they have met the standard of

10  irreparable harm based on the limited scope of this situation

11  and the fact that they can't prove that they were likely to

12  succeed really, just totally, I think gets them out.

13          THE COURT:  What, in fact -- are there any written

14  standards, regulations or whatever that now apply so the ones

15  that are articulated in paragraph six on page three of, I think

16  it's your declaration, right?

17          MR. SANDERS:  Uh-huh.

18          THE COURT:  Are those the standards that apply now?

19          MR. SANDERS:  They are the standards that the

20  department put in.  They are not -- they are not put anywhere

21  else in any city code or any city regulation.

22          THE COURT:  They could change from day-to-day, right?

23          MR. SANDERS:  Well, once they are issued, the UCP, we

24  are not going to change them, but as I said, the city law gives

25  the department broad authority to fashion the terms and

1   conditions of an UCP and in this case they said if you want to

2   put up wireless antennaes, these are the terms and conditions.

3   Otherwise it's the standard UCP that SBC gets.  SBC doesn't

4   seek to put up wireless antennaes.  If they came to us tomorrow

5   and said that, we would say the same thing to them.

6          THE COURT:  And among the things they have to do is

7   get the approval of the Planning Department.

8          MR. SANDERS:  Correct.

9          THE COURT:  Is there a specific application for that

10  purpose?

11         MR. SANDERS:  No, there's not, Judge.

12         THE COURT:  And is there anything that tells them how

13  that process works, who in the Planning Department makes that

14  decision, what appeal rights, if any, there may be or what

15  review there may be?  Anything that describes decorative light

16  poles?

17         MR. SANDERS:  No, Judge.

18         THE COURT:  What is a decorative light pole?

19         MR. SANDERS:  If you go to some of the neighborhoods,

20  like Telegraph Hill area where there are ungrounded, the city

21  has built some very fancy light poles as opposed to your

22  standard wire metal pole, gun metal gray.

23         THE COURT:  The wiring was underground?

24         MR. SANDERS:  These would be in underground areas.

25  All of the decorative poles would be underground areas.

1          What this company wants to do now and what NextG is

2     doing now is just building in areas where there are your wooden

3     utility poles with your AT&T wires and your PG&E wires.

4     Because most of the decorative poles are owned by the city and

5     at this point the city has not agreed to let anybody put

6     antennaes on their poles.  That's not a right-of-way

7     regulation.  That's in our proprietary capacity.  We own the

8     poles and we can decide what people will do with them.

9          So NextG at this point only is going to be using the

10    PG&E poles and that's what this company wants to do.  So the

11    decorative pole issue doesn't apply here.

12         THE COURT:  Okay.  Now, but when some of those poles,

13    more ugly poles, non-decorative poles are in historic

14    districts.

15         MR. SANDERS:  Probably.  I think a lot of historic

16    districts are underground.  I think it's the streets with the

17    perception of the good views and perception of the city where

18    they are more likely to find those.

19         THE COURT:  There are some unsightly streets in this

20    city, such a beautiful city and it's thanks to all those

21    overhead wires and so on and so forth.  I can't believe that,

22    you know, one more box on one of those poles is going to make a

23    lot of difference, right?

24         But the problem, it says, "In historic districts."

25         MR. SANDERS:  And they are identified.

1          **THE COURT:**  And they are identified on maps.  But

2   what does, "Near historic or architecturally significant

3   buildings" mean?

4          **MR. SANDERS:**  In the UPC itself we use the word

5   "adjacent" and adjacent was defined.  I used the word "near" in

6   my declaration, and there is a definition of the word

7   "adjacent."

8          **THE COURT:**  So, for example, adjacent to City Hall

9   would be a no-no, right?

10         **MR. SANDERS:**  Yes.

11         **THE COURT:**  Adjacent to Bank of America?

12         **MR. SANDERS:**  Bank of America if -- might be

13  designated an architecturally significant building.  I don't

14  know.  Probably is.

15         **THE COURT:**  And on certain streets designated as

16  important.

17         Now, are those already designated as important on the

18  general --

19         **MR. SANDERS:**  There is a map.

20         **THE COURT:**  So you can look and see what is

21  designated?

22         **MR. SANDERS:**  Correct.

23         **THE COURT:**  And you would know you couldn't put them

24  there without approval of the Planning Commission?

25         **MR. BOWEN:**  Here is an example, your Honor.  Geary

1  Street is underground.  So we did a design that used California

2  because it parallels Geary by a block north.  The only problem

3  is these location conditions have California as one of those

4  visually important streets.

5         So, A, you can't get on Geary because it's

6  underground; and, B, under these you couldn't necessarily get

7  on California because it's important.

8         THE COURT:  What about Sutter and Post?

9         MR. SANDERS:  The thing is you have limited -- you

10  can move the pieces on the board around a little bit in terms

11  of the coverages, but only so far because, obviously, you have

12  to have kind of complete radio coverage in the area you are

13  trying to cover and you can't push things too far one way or

14  the other before you get gaps in the coverage.  So there are

15  streets you have to be on.

16         THE COURT:  That may be just too bad.  You know,

17  maybe there's some streets that you shouldn't be on.

18         MR. BOWEN:  Well, maybe so, but it should be too bad

19  for everybody then.

20         THE COURT:  Well, but it would be then.

21         MR. BOWEN:  But NextG doesn't have --

22         THE COURT:  I think NextG is a different case because

23  that was pursuant to Court order.

24         Now, maybe if at some point down the road there has

25  to be a renewal of something like that, but I don't think that

1   that opens the door to everybody having carte blanche.

2           Anyway, but you can determine what are the important

3   streets by virtue of the city plan, right?

4           MR. BOWEN:  There are lists and, as I said --

5           THE COURT:  Then you would have to apply to the

6   Planning Department to get an exception.

7           MR. BOWEN:  In ways we have no idea how to do and

8   what timing we are not clear on, yes.

9           THE COURT:  And then it says the city's Recreation

10  and Park Commission.  I didn't understand this one at all.  It

11  says:  "And the city's Recreation and Park Commission to

12  install wireless facilities adjacent to city parks."

13          In other words, that's who you would have to apply to

14  if they are adjacent to city parks?

15          MR. BOWEN:  The Planning Department for the others,

16  and the Rec Group Park Commission for ones that are near parks.

17          THE COURT:  And that's it?

18          MR. SANDERS:  That's it.

19          THE COURT:  But there would need to be a process to

20  do that, and there isn't a process.

21          MR. SANDERS:  There isn't, Judge, because, you know,

22  the Department of Public Works is handling the UCP, and no one

23  has agreed to these terms and conditions.  So the Department of

24  Public Works would have to go to the plant -- it could be

25  worked out, Judge, but the Department of Public Works doesn't

1  control the Planning Department, doesn't control the Rec and

2  Park Commission, but these are entities that constantly deal

3  with things like this.  There is nothing unusual about it.

4        **THE COURT:**  Who do you apply to and how does the

5  Department of Public Works kick in here?  As I understand it,

6  you would have to apply to the Planning Department for some of

7  these and for others you would have to apply to the Rec and

8  Park Commission?

9        **MR. SANDERS:**  Right.  The Department of Public Works

10 would have to -- if they designed around those systems, around

11 those requirements, the Department of Public Works would say,

12 okay, go build.

13        If they didn't, the Department of Public Works would

14 work would the -- with ExteNet in this case and go to the

15 Planning Department and Rec and Park Commission and get the

16 permission.

17        I mean, part of it could be move to this pole or that

18 pole, use this type of antenna as opposed to that type.  They

19 have many different types of antennaes.  So it's really -- so

20 the Planning Department is the entity which exercise what the

21 city looks like.  They are the logical city department to deal

22 with the aesthetic design concerns of these and these streets

23 were developed by the Planning Department.  The Department of

24 Public Works didn't make them up.  It doesn't have the

25 expertise.

1    We are sending this to the agency that has the

2 expertise and, similarly, the Rec and Park Commission has the

3 expertise to know when they think their parks are being unduly

4 affected by some ugly antenna.

5    THE COURT:  But I assume that if, in fact, there was

6 a situation where the fiber optic cable, they wanted to put it

7 under the street, there would have to be excavation then.  Does

8 that then go through the Public Works?

9    MR. SANDERS:  Public Works has an excavation -- NextG

10 doesn't have the authority to excavate, but AT&T and PG&E are

11 probably the biggest excavators in the city, other than the

12 city itself.

13    THE COURT:  I know.  I know.  They never seem to

14 stop.  So, yes, we do.

15    Needless to say, whether I was in network, Con Ed

16 motto was "Dig we must for a greater New York."

17    I don't know what they are doing here.  I swear to

18 God they finished doing -- finished doing whatever, resurfaced

19 the road and next week they are back there digging again.  I

20 don't know what they are doing.  It must be easy -- it must be

21 easy to get one of those permits if you are PG&E.

22    MR. SANDERS:  Excavation permits are not difficult.

23    MR. BOWEN:  That's always a last resort.

24    THE COURT:  Why don't you excavate then?

25    MR. BOWEN:  You always want to use aerial or existing

1  underground conduit because the reasons you mentioned, it's

2  expensive, tears up the street, disturbs traffic and so forth.

3      THE COURT: Let me ask you this. Is this too

4  practical? Is there any kind of a sit down and work out a

5  system where plaintiff's needs and interests can be

6  accommodated in a speedy and reasonable manner and to get a

7  result short of some order of the Court?

8      MR. SANDERS: Unless they are willing to do that.

9  Unless they are willing to say, show us how we can implement

10 this and we will try and implement that.

11     THE COURT: I'm asking both of you the question.

12     MR. SANDERS: That's for him then.

13     MR. BOWEN: Your Honor, we actually have already

14 taken a run, as it were, at design location conditions. We

15 have been through each one of them. We have taken the

16 information that Mr. Sanders had shared with us, these various

17 maps of the important streets and historical districts.

18     THE COURT: I would like to see that.

19     MR. BOWEN: I should have brought it. That was a

20 first for me. How it got there, I don't know, but there is a

21 map that shows what streets are important. We took that

22 information and we bounced that against the expressions of

23 interest from some of the wireless carriers that are out there.

24     We are happy to agree to conditions that we actually

25 have a means by which they can be implemented, understood and

1    not just be a black hole.  The problem is there is this

2    complete lack of infrastructure of administration of these

3    things, as we have already established here, but the conditions

4    themselves, as I said, look to us like -- it would simply make

5    it almost impossible to build networks in the areas that the

6    wireless carriers seem to want them.

7              It's going to be difficult for my client to agree to

8    something which it knows on the way in is going to hamstring it

9    in terms of being able to compete with NextG.  Frankly, in the

10   large perspective, it doesn't matter how NextG got their UCP,

11   whether you ordered it or the city agreed to it voluntarily,

12   whatever.  The fact is they have it and they can use that to

13   their benefit and our detriment in the marketplace and that is

14   prohibited by 7901.1 of Public Utilities Code and, we suggest,

15   also by Section 253 of the Communications Act.

16             You know, there has been a lot of litigation, as your

17   Honor is aware, to make sure the playing field is level --

18   state, federal -- for years.  Congress has aided this.  This is

19   not a new issue.  They are always down-sized to competition.

20             Maybe having a couple of antennaes up on poles is the

21   price of good cellular coverage.  That, frankly, is a decision

22   that most cities have made in a positive direction from our

23   standpoint, meaning go ahead and put them up, but, frankly, I

24   don't think the city has the legal right to say for whatever

25   reason no to us if they had to say yes to somebody else.

1          **THE COURT:**  They didn't have to say yes to somebody

2     else under compulsion.

3          **MR. BOWEN:**  I understand, but he did not seek a stay.

4          **THE COURT:**  Well, maybe some modification of that

5     Court order so there -- it levels the playing field a little

6     more is a possibility.  We have a party that's not here that

7     might not be happy to hear that, but what I'm concerned about

8     is whether or not you come up with some resolution, okay, if we

9     get the applications for this.  This, okay.  You don't need

10    applications for certain places, right?

11         **MR. SANDERS:**  Correct.

12         **THE COURT:**  Okay.  So first tack is, you know, target

13    those places.  In the meantime, those places, those streets or

14    areas where you do -- you are going to need some approval

15    either by the Planning Commission or Park and Rec, work out a

16    system by which a timely response and not a whole series of

17    appeal after appeal after appeal is going to be required, but a

18    timely response can be made.  And with regard to the places

19    where permits are going to be required, or whatever you are

20    calling it, whatever you are calling it, meeting the location

21    and design standards and see if you can't work around that.

22         There are going to be times when you are not going to

23    be able to put the equipment on certain poles and certain

24    locations, just because there are issues that the city has to

25    be concerned about.

1          You know, I don't want to create a free-for-all by

2   virtue of an order.  I would like to see if you can't really

3   work it out to the extent that I'm either left with a decision

4   where I have to make a determination as opposed to, perhaps,

5   you are able to work out some accommodation.

6              **MR. BOWEN:**  Your Honor, I guess --

7              **THE COURT:**  I don't know what your time frame is.

8              **MR. BOWEN:**  That's the issue.

9              **THE COURT:**  But, you know, that's -- you know, are we

10  going to let Metro PC do the dictating?

11             **MR. BOWEN:**  Well, I don't think it would actually be

12  that.  The reality is they tried to put up their own so-called

13  macro cell sites, the big towers and so forth, and the city, as

14  Mr. Sanders said, denied that, and they have lost that in court

15  as well.

16          So they turned to an alternate solution, these DAS

17  providers, and they are trying to fill in dead coverage spots.

18             **THE COURT:**  Who lost that?

19             **MR. BOWEN:**  Metro PCS.  They wanted to put up a

20  standard cell array in various spots in the city and

21  Mr. Sanders and company said no --

22             **MR. SANDERS:**  I didn't say no.  The Board of

23  Supervisors said no, Judge.  I defended the Board of

24  Supervisors.

25             **THE COURT:**  These are big ugly poles.

1          MR. BOWEN:  These are the big towers that have all

2    the cellular antennaes.  The big arrays of cellular.

3          THE COURT:  Those, okay.  Okay.

4          MR. BOWEN:  That's what they wanted to put up.  They

5    were told no.

6          THE COURT:  Where were you when they put up that ugly

7    thing on Twin Peaks?

8          MR. SANDERS:  I wasn't quite born yet.  It's been

9    there for a long time.

10         MR. BOWEN:  The tower of all towers.

11         THE COURT:  Can't you hook everything up to that?

12         MR. BOWEN:  That would be good.  Not quite enough

13   range for these antennaes to do that, but that would be a good

14   outcome.

15         The reality is Metro PCS put these areas up for bid

16   and we lost without a UCP.  As we said in our papers, how can

17   you write back and say okay we are not going to give you a bid

18   on a bet.  You have to have a UPC in hand or else you are not

19   in the running here and they are now bidding out or about to

20   bid out, as I said in the papers, another area in San

21   Francisco.

22         THE COURT:  The only person that can bid is NextG,

23   right?

24         MR. BOWEN:  The problem is, if we all started out of

25   the gate at the same time and Mr. Sanders and company wanted to

1  impose these conditions and had some kind of program to

2  administer them and all sat down to work it out so it was a

3  level playing field, that would be a different story, but NextG

4  is out there saying to the world, only we can bid and build for

5  DAS networks.

6          **MR. SANDERS:**  NextG came to the city back in 2003.

7  We spent two years negotiating, trying to negotiate an

8  agreement with NextG.  They sued us, as your Honor well knows.

9          We then filed the complaint with them at the CPUC.  I

10  don't know, it was probably, what, a year, year and a half

11  between them filing the complaint and the CPUC making -- you

12  know, getting done with its decision and coming back here and

13  you ordering against us.  They wanted to be in the same

14  position as NextG when they came to us on August 30th and said,

15  give us the same exact UCP that NextG took three years to get

16  after litigating with us.  And you are discriminating against

17  us because you are not giving us the same exact UCP that NextG

18  took three years to get and the Court ordered us to give.

19          And, I mean, your Honor said it about three or four

20  times and Mr. Bowen just keeps saying, well, it's

21  discriminatory.  It's not.  And we have haven't even imposed

22  the same exact conditions on NextG that we are trying to impose

23  on ExteNet.

24          We tried to comply with this Court's order and impose

25  reasonable regulations related to where they are going to put

1   their equipment.  That's all we did.

2           So they are not in the same position as NextG.  It's

3   not the same case as NextG.  Whether or not they are going to

4   prevail has nothing to do with NextG.  It has to stand on its

5   own right.

6           THE COURT:  In this bidding, what Metro PCS -- and I

7   suppose there are other companies as well, right?

8           MR. BOWEN:  Uh-huh.

9           THE COURT:  Why don't you negotiate with them that it

10  will be some kind of a condition -- the bid will be essentially

11  a conditional bid and it would be granted conditionally

12  depending on your ability to get the necessary permits,

13  et cetera?

14          MR. BOWEN:  We have already done that.  We did that.

15  We gave them --

16          THE COURT:  Well, it's not my job to make the

17  marketplace fairer just because people want to play easy to

18  get, so to speak.

19          MR. BOWEN:  I understand.  We did give Metro PCS a

20  bid for the areas we lost and, as we said, our declarant says

21  we would have gotten some of these areas but for the fact that

22  we lacked a UCP.  They were not going to make a conditional

23  award conditioned on us getting a UPC for San Francisco.

24          Mr. Sanders thinks we should go through three years

25  litigation and come back in front of your Honor and then we can

1   do what they are doing now.

2          THE COURT:  I'm not even suggesting you have to do

3   that.  The requirements now are less onerous.

4          What I'm suggesting is that you sit down and

5   negotiate how you can come up with a UCP, and maybe the city

6   can accommodate this to some extent, that would allow for

7   placement depending upon certain factors where you would have

8   to have a permit and that if you meet those factors, that you

9   could install facilities.

10         MR. BOWEN:  I guess --

11         THE COURT:  It seems to me you could be a little more

12  creative.  Perhaps I'm not the best person to figure out how to

13  be creative in this respect, but it seems to me there are ways

14  you can accomplish that.

15         MR. BOWEN:  I think Mr. Sanders' words revealed more

16  than he intended.  They sat down with NextG and for two years

17  tried to negotiate this and it was not successful.

18         MR. SANDERS:  That doesn't -- I did say that, but he

19  doesn't understand what happened with NextG, so it's a total

20  different situation.

21         THE COURT:  But he now knows that the hammer of the

22  Court may be wielded and may be better off to negotiate his own

23  deal rather than have the Court impose one.

24         MR. BOWEN:  I guess the object lesson there is -- and

25  I actually inquired to see what it was the city wanted NextG to

1    agree with through NextG and it appeared as though to me it was

2    some of the same things that we are seeing right now.

3         MR. SANDERS:  I will be happy to tell you what

4    happened, your Honor.  They agreed to these conditions in an

5    agreement we had.

6         THE COURT:  Who did, NextG?

7         MR. SANDERS:  NextG.

8         MR. BOWEN:  Unfortunately, it had to be approved by

9    the Planning Commission and Board of Supervisors and for

10    reasons that have nothing to do with those conditions, the

11    Planning Commission did not like the agreement and it was never

12    approved.

13         THE COURT:  Can you get the Planning Commission to

14    agree to essentially what's here?

15         MR. SANDERS:  It's the Planning Department.  That was

16    the Planning Commission.  This is the Planning Department.

17         And, actually, the Planning Department approved these

18    conditions and recommended that the Planning Commission approve

19    the NextG agreement and the Planning Commission did not agree.

20         THE COURT:  Does the Planning Commission have to

21    agree to anything now?

22         MR. SANDERS:  No, just the Planning Department.

23         THE COURT:  Just the Planning Department?

24         MR. SANDERS:  Correct.

25         THE COURT:  But with respect to the parks, it would

1    have to be the Rec and Park Commission?

2        **MR. SANDERS:**  Correct.

3        **THE COURT:**  Why don't you -- if you are only having

4    to work it out with the Planning Department and not these

5    finicky Planning Commission members, you ought to be able to

6    work out something that you could take to the table to

7    negotiate.

8        **MR. BOWEN:**  Here is the issue, your Honor.  We have

9    to be able to go to the Metro PCS's of the world and say, "We

10   have the same thing, the same UCP that NextG has.  We can move

11   just as fast as they can.  There is no more uncertainty with us

12   as them."  It's an important thing to these carriers.

13       **THE COURT:**  It may be, but you just got here, right?

14   It would be nice if everybody could -- essentially that puts

15   the city in the position that they pretty much have to give you

16   what you want right now because otherwise you are going to miss

17   out on a bid, right?

18           That's not the way it works.  At least they have to

19   have the -- you know, some ability to control some things that

20   are reasonable.

21           To me, this is not unreasonable what they have.  You

22   know what's required here.  If they can do it within a

23   reasonable period of time -- and maybe what we can do is work

24   out something where there is a -- in fact, a time limit on it,

25   but I think just because you want to be in as good a bargaining

1   position as NextG or some other company that's been out there

2   doing this for awhile, let's say they have been out there doing

3   it for awhile without the benefit of a Court order, but the

4   benefit of a contract, and they went through all those hurdles

5   and ultimately, you know, they got what they asked for, then

6   everybody else comes in and says that we want the same thing

7   without having to make the applications for the permits,

8   without having to jump through some of the hoops, and these are

9   not the hoops that they originally had to jump through, nor

10  which they came in here and that they challenged.

11          And I'm not sure that these would not stand up to a

12  preemption challenge, at least at this stage.  Maybe because

13  they are loose, whatever, but I think they can be tightened up.

14  I think you ought to try and negotiate it.

15          MR. BOWEN:  We are happy to do that, your Honor.  I

16  guess it occurs to me that the state law issue should not be

17  ignored here, the prohibition against treating different

18  carriers differently for whatever reason.

19          MR. SANDERS:  It's not even been briefed or discussed

20  until right now.

21          THE COURT:  This is a TRO.  And you are not being

22  treated differently.  The Court made a determination with

23  respect to preemption and the system that was being imposed

24  upon them.  You are in a more advantageous position at this

25  point than they were.  They have just got the benefit of a

1  Court decision.

2          MR. BOWEN:  Would your Honor have a time frame in

3  mind for what you are suggesting?

4          THE COURT:  I think you ought to talk -- I have no

5  idea how quickly it will take.

6          First of all, I guess it depends on how many of these

7  placements trigger any of these Park and Rec or City Planning

8  Department permits, but I would think if you want in with a

9  plan, Mr. Sanders, I instruct you to work out a time table that

10 would be expeditious and then come back here with it and if

11 they don't do it in that period of time, then I might take some

12 action.

13         MR. BOWEN:  Part of the issue here is whether you

14 look at those conditions even with maps, the maps of the

15 various important streets and historical districts and so

16 forth, you don't know which areas your customers are going to

17 be asking you to provide coverage in until they ask you.

18         So you can say in concept this condition might be

19 okay.  In reality, it may not be okay at all if it's in an area

20 where you have to put an antenna up to be able to serve a

21 wireless carrier.

22         THE COURT:  I don't have an easy answer to that.

23         MR. SANDERS:  There might not be -- there is no

24 prohibition in using that area.  There is no absolutely

25 prohibition.  They have to go to the Planning Department and

1   explain why they need it, what they can do, what it's going to

2   look like, why they can't put it someplace else.

3        MR. BOWEN:  There is no process.  Absolutely no

4   infrastructure to support administering these kinds of

5   conditions in place right now.

6        MR. SANDERS:  The judge is suggesting to see if we

7   can work that out.

8        THE COURT:  You are the only applicant in the playing

9   field now other than NextG.  Why don't you see if you can't

10  work something out?  Work out a system that's going to work

11  both in terms of timeliness and in terms of procedure.

12       MR. BOWEN:  We can certainly make the attempt, your

13  Honor.

14       THE COURT:  Give it a whirl, a quick whirl.

15       MR. BOWEN:  It will have to be quick because what I

16  have already mentioned in our papers.

17       THE COURT:  You know, and I -- you can certainly come

18  back here and try to modify the order with respect to NextG so

19  that they, at least, would have to jump through a few of these

20  hoops.

21       MR. SANDERS:  There has been an appeal filed.  Can I

22  do that now?

23       THE COURT:  What you would have to do is go to the

24  Court of Appeals and ask for leave to have a modification of

25  the order.  I'm sure NextG will be screaming.

1           MR. BOWEN:  I would expect so.

2           MR. SANDERS:  Although your Honor still has part of

3     the case.  The whole case is not gone, but the judgment has

4     been appealed.

5           So since they would be seeking to modify that

6     judgment, I guess I would have to go to the Ninth Circuit

7     first.

8           THE COURT:  I hadn't thought about what's left, if

9     anything, in that case.

10          MR. SANDERS:  There are other claims that are left.

11          MR. BOWEN:  Your Honor, just a quick question.  If we

12    don't succeed in a pretty quick fashion in trying to reach the

13    accommodations you are suggesting here, would your Honor

14    suggest we come back in for a -- another TRO, preliminary

15    injunction?  What would be your preference on that?

16          THE COURT:  It's going to have to be fully briefed on

17    both sides.  Might as well be a preliminary injunction.

18          MR. BOWEN:  Can we do it on a shorter notice than

19    five weeks?

20          THE COURT:  Yes, but I'm going to be away for about a

21    week.  So it's going to take you that long to get it

22    straightened out anyway.  But I will be back on the 20th.  What

23    is it, the 28th?

24          Okay.  See what you can work out.  You might be

25    surprised.

1          **MR. BOWEN:**  Okay.

2          **MR. SANDERS:**  Thank you, Judge.

3          **THE COURT:**  And be amenable.  Be helpful.  Okay?

4    Don't -- none of those city's feet in the concrete, okay?

5          **MR. SANDERS:**  Thank you, Judge.

6          **MR. BOWEN:**  Thank you, your Honor.

7          **THE COURT:**  Okay.  Thank you.

8          (Whereupon, further proceedings in the

9          above matter were adjourned.)

11                        --oo--

## CERTIFICATE OF REPORTER

I, DEBRA L. PAS, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C 06-6536 MHP, EXTENET SYSTEMS, INC. versus THE CITY OF SAN FRANCISCO, et al, were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

*Debra L. Pas*

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Tuesday, May 29, 2007