MARTIN L. FINEMAN, State Bar No. 104413
SUZANNE TOLLER, State Bar No. 129903
DAVIS WRIGHT TREMAINE LLP
505 Montgomery St., Suite 800
San Francisco, California 94111-6533
Telephone: (415) 276-6500
Facsimile: (415) 276-6599
Email: martinfineman@dwt.com

T. SCOTT THOMPSON, *pro hac vice*
JOHN R. EASTBURG, State Bar No. 247380
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, N.W., Suite 200
Washington, D.C. 20006
Telephone 202-973-4200
Facsimile: 202-973-4499
Email: scottthompson@dwt.com

ROBERT L. DELSMAN, State Bar No. 142376
NEXTG NETWORKS, INC.
2216 O'Toole Avenue
San José, California 95131

Attorneys for Plaintiff
NextG Networks of California, Inc.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NEXTG NETWORKS OF CALIFORNIA, INC., a Delaware corporation, | No. CV 08 0985 MHP |
| Plaintiff, | **PLAINTIFF NEXTG'S OPPOSITION TO DEFENDANT CITY'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| THE CITY AND COUNTY OF SAN FRANCISCO AND THE DEPARTMENT OF PUBLIC WORKS OF THE CITY OF SAN FRANCISCO, | Date: June 9, 2008 Time: 2:00 p.m. Courtroom 15, 18th Floor Before the Honorable Marilyn Hall Patel |
| Defendants. | Action Filed: February 15, 2008 |

# TABLE OF CONTENTS

**Page**

I.     SUMMARY OF ARGUMENT ................................................................................. 1

II.    FACTUAL SUMMARY ........................................................................................ 2

    A.     The City's Allegations Of Fact ................................................................ 2

    B.     Summary Of Additional Undisputed Facts .............................................. 3

III.   ARGUMENT ........................................................................................................ 7

    A.     Summary Judgment Standards ................................................................. 7

    B.     The City's Ordinance Is Preempted By Section 253 ................................ 8

    C.     The New Ordinance Is Preempted By Section 253(a) ............................ 10

        1.     The City's Standards For "Protected Locations" Are
            Equivalent To Those Struck Down By The Ninth Circuit,
            This Court, And Many Other Courts ....................................... 10

        2.     The Standards For "Protected Locations" Will Functionally
            Govern NextG's Construction ................................................ 16

    D.     The City's Requirements Are Not Saved By Section 253(b), 253(c),
        or Section 332(c)(7) ............................................................................... 18

        1.     The City's Requirements Do Not Fall within the Authority
            Reserved by Section 253(c) ................................................... 18

    E.     Section 332(c)(7) Is Not A Safe Harbor From Preemption And It Is
        Irrelevant To This Section 253(a) Challenge. ........................................ 21

    F.     The New Ordinance Violates Unambiguous State Law, And The
        Court Should Not Refrain From So Ruling ............................................. 23

IV.    CONCLUSION ................................................................................................... 24

# TABLE OF AUTHORITIES

Page(s)

CASES

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242, 248 (1986) ...................................................................................... 7

*Bellsouth Telecomms, Inc. v. City of Coral Springs*,
    42 F. Supp. 2d 1304 (S.D. Fla. 1999) ................................................................. 20

*Cablevision of Boston, Inc. v. Public Improvement Comm'n*,
    184 F.3d 88, 103 (1st Cir. 1999) ......................................................................... 20

*Cellular Tel. Co. v. Oyster Bay*,
    166 F.3d 490, 492-93 (2d Cir. 1999 ..................................................................... 9

*City of Auburn v. Qwest Corp.*,
    260 F.3d 1160, 1176 (9th Cir. 2001) ........................................................... passim

*City of Rancho Palos Verdes v. Abrams*,
    544 U.S. 113 (2005) ............................................................................................ 22

*Cox Communications PCS, LP v. City of San Marcos*,
    204 F. Supp.2d 1260 (S.D. Cal. 2002) ...................................................... 9, 20, 21

*GTE Mobilnet v. City of San Francisco*,
    2007 WL 420089 (N.D. Cal. Feb. 6, 2007) ..................................................... 9, 11

*Guebara v. Allstate Ins. Co.*,
    237 F.3d 987, 992 (9th Cir. 2001) ......................................................................... 8

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497, 507 (9th Cir. 1992) ......................................................................... 9

*Luxor Cab Co. v. Thomas Cahill*,
    21 Cal. App. 3d 551, 556 (1971) ..................................................................... 7, 16

*NextG Networks of Cal., Inc. v. Los Angeles County*,
    522 F. Supp. 2d 1240 (C.D. Cal. 2007) ................................................. 9, 11, 13, 19

*NextG Networks of Cal., Inc. v. City of Huntington Beach*,
    SACV 07-1471 ABC (C.D. Cal. Feb. 7, 2008) ..................................................... 9

*NextG Networks of Cal., Inc v. City of San Francisco*
    2006 U.S. Dist. LEXIS 36101 ..................................................................... passim

*Newpath Network, LLC v. City of Irvine*,
    SACV 06-550-JVS (C.D. Cal. Mar. 10, 2008) ................................................ 9, 10

*Pac. Tel. & Tel. Co. v. City & County of San Francisco,*
   197 Cal. App. 2d 133, 17 Cal. Rptr. 687 (1961) ................................................................. 24

*Qwest Communications v. City of Berkeley,*
   433 F.3d 1253 (9th Cir. 2006) ................................................................... 9, 18, 19

*Qwest Corp. v. City of Portland,*
   385 F.3d 1236 (9th Cir. 2004) ................................................................. 9, 17, 19

*Salerno v. United States,*
   481 U.S. 739 (1987) ................................................................................. 10

*Southwestern Bell Wireless, Inc. v. Johnson County Bd. of County Comm'rs,*
   199 F.3d 1185 (10th Cir. 1999), *cert. denied,* 530 U.S. 1204 (2000) ...................................... 20

*Sprint PCS Assets, LLC v. City of La Cañada Flintridge,*
   448 F.3d 1067 (9th Cir. 2006) ................................................................... 23

*Sprint Telephony PCS, L.P. v. County of San Diego,*
   377 F. Supp.2d 886, 899 (S.D. Cal. 2005) ............................................... 9, 11, 19, 22

*T-Mobile USA, Inc. v. City of Anacortes,*
   2008 U.S. Dist. LEXIS 37481 at *8-11 (W.D. Wa. May 6, 2008) ........................ 9, 11,12, 22

*TC Sys. Inc. v. Town of Colonie,* 263 F. Supp. 2d 471, 484-85 (N.D.N.Y. 2003) ....................... 18

*TCG New York, Inc. v. City of White Plains,*
   305 F.3d 67 (2d Cir. 2002), *cert. denied,* 538 U.S. 923 (2003) ............................................ 5, 18

*Verizon Wireless (VAW), LLC v. City of Rio Rancho,*
   476 F. Supp. 2d 1325 (D.N.M. 2007) ........................................................ 17, 21


STATUTES

47 U.S.C. § 253 ....................................................................................... passim

Cal. Pub. Util. Code § 233 ........................................................................ 24

Cal. Pub. Util. Code § 234 ........................................................................ 24

Cal. Pub. Util. Code § 7901 ............................................................... 3, 23, 24

Communications Act of 1934 ................................................................... 22

47 U.S.C. § 332 ....................................................................................... passim

Fed. R. Civ. P.12 .................................................................................. 2, 8

**OTHER AUTHORITIES**

*12th Annual Wireless Competition Report,*
    23 F.C.C.R. 2241, 2008 FCC LEXIS 1045 (2008) ............................................................... 23

NEXTG'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
NextG v. City of San Francisco, No.  CV-08-0985 MHP
WDC 738782v4 0058588-000003

1    Plaintiff NextG Networks of California, Inc. ("NextG") respectfully submits the following

2  Opposition to the Defendants' Motion For Partial Summary Judgment filed April 28, 2008 (hereinafter

3  "City Motion" or "Mot.").[1]

4                       I.    **SUMMARY OF ARGUMENT**

5    NextG's Complaint challenges the portions of the City of San Francisco's ("City") Code

6  governing the deployment of wireless telecommunications facilities, in particular, Ordinance No. 214-07

7  (as codified in Section 11.9 of the City's Administrative Code) and the City's and its Department of

8  Public Works' ("DPW") regulations implementing Ordinance No. 214-07 (collectively, the "New

9  Ordinance").  In its Complaint and its Motion for Judgment on the Pleadings,[2] NextG demonstrated that

10  the challenged Code provisions, on their face, are preempted by Section 253 of the Federal

11  Communications Act, 47 U.S.C. § 253, as interpreted and applied by the Ninth Circuit in a well-

12  established line of cases.  In addition, NextG demonstrated that the New Ordinance was not saved by

13  Section 253(c) or 47 U.S.C. 332(c)(7), and that the New Ordinance also violates California state law.

14    The City's Motion downplays the facial Section 253 challenge, which would render its Code

15  unenforceable, instead claiming that it is entitled to summary judgment because NextG has not proved

16  that it will be subject to the most onerous requirements of the New Ordinance.  The Ninth Circuit has

17  firmly established that facial challenges need not depend on the factual showings that the City asserts are

18  necessary.  Moreover, the City fails to present a meaningful, section-by-section analysis comparing its

19  New Ordinance to the municipal codes preempted by the courts – because if it did, the inescapable

20  conclusion is that its New Ordinance is preempted.  The City's conclusory assertions to the contrary, and

21  its attempt to reduce the New Ordinance to its *least restrictive* portions, are inadequate and unavailing.

22    Recognizing perhaps that its Ordinance is squarely preempted by Section 253(a), the City argues

23  that it is nonetheless "saved" by Section 253(b), as a "public safety and welfare" measure.  But Section

24  253(b) was explicitly limited by Congress to actions by the State.  Even if Section 253(b) were available

25  to the City, it still would not "save" the challenged provisions because they are not designed, much less

26  ───────────────

27  [1] The City moved for summary judgment only as to NextG's first and second claims and is therefore a
   motion for *partial* summary judgment.  (Mot. at vii).

28  [2] Though not styled as an opposition, the City's Motion clearly was, on some level, in response to
   NextG's Motion.

"necessary," to protect the public safety and welfare. The City's assertion would gut Section 253(a). The City's arguments under Section 253(c) suffers from similar defects, and its Section 332(c)(7) argument ignores the fact that Section 332 is not a safe harbor to Section 253 preemption. The challenged New Ordinance is preempted by Section 253, and is unenforceable. The City's Motion should be denied, and NextG's Motion for Judgment on the Pleadings should be granted.[3]

## II.     FACTUAL SUMMARY

### A.     The City's Allegations Of Fact

In response to NextG's facial challenge, the City submits various new facts primarily addressing the adoption and interpretation of the City's New Ordinance and the associated DPW regulations. While NextG does not dispute the terms of the New Ordinance, NextG does dispute many of the City's allegations of fact. In particular, NextG disputes the following: (1) contrary to the City's assertions, the City's maps are not "easy to use" or free from DPW discretion. As the accompanying declaration of Mr. Alford explains, the City's maps still leave significant ambiguity regarding whether a particular location will fall within the "protected" area, and the maps will require interpretation and discretion by DPW to determine whether any particular location is within a "protected" area. (Declaration of Robert A. Alford ("Alford Decl.") ¶¶ 5-7); (2) while these facts are not relevant, NextG disputes the City's repeated assertion that its planners are "experts" and that the designations of "protected" locations were created by "national, state, or local experts." (Mot. at 5). The City has not attempted to qualify any of its witnesses as experts or produced an export report; (3) NextG disputes the City's assertion as a "fact" that the New Ordinance does not allow or require any public hearing by the Planning Department or Recreation and Parks Department. (Mot. at 7). As discussed in NextG's simultaneously filed evidentiary objections, the City's "facts" are actually inadmissible and incorrect legal conclusions by lay witnesses purporting to interpret the City's New Ordinance; (4) as set forth in the Declaration of Mr.

---

[3] NextG maintains that the Court need not look beyond the face of the Ordinance, the existence of which was admitted in the City's Answer, in order to grant NextG judgment. However, if the Court deems it necessary, it may declare NextG's Motion for Judgment on the Pleadings to be a Motion for Summary Judgment, and may thus grant NextG's Motion relying, in part, on the declarations and other evidence related to the City's Motion. *See* Fed.R.Civ.P.12(d) ("[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56").

Alford and Mr. Cutrer, the City's allegations regarding the number of NextG installations that would be referred to Planning is inaccurate and impossible to test due to the incomplete information provided by the City.  Moreover, as Mr. Cutrer testifies, the City's argument about the impact on NextG is inaccurate.

While NextG believes that the "facts" the City seeks to introduce in order to derail NextG's claims are legally irrelevant, if the Court concludes that the facts are relevant, then summary judgment must be denied the City on the grounds that the facts upon which it relies are in dispute.

### B.    Summary Of Additional Undisputed Facts

This Court is familiar with NextG's technology and services, which are also discussed in *NextG Networks of Cal., Inc. v. City of San Francisco* ("*NextG San Francisco*"), 2006 U.S. Dist. LEXIS 36101 (N.D. Cal. June 2, 2006) (Patel, J.).  NextG will briefly summarize facts relating to the City's New Ordinance for the Court's convenience.

NextG's status as a telephone corporation under state law and its status as a telecommunications carrier under federal law provide it with legal authority to install, operate, and maintain its telecommunications networks along or upon the public rights-of-way without discretionary permits or other requirements not imposed a non-discriminatory basis on other telecommunications carrier and telephone corporations operating in the City's public ways.  47 U.S.C. § 253; Cal. Pub. Util. Code §§ 7901, 7901.1.  In 2003, the CPUC issued NextG a certificate of public convenience and necessity ("CPCN") to provide limited facilities-based and resold local exchange, access and interexchange telecommunications services in California as a telephone corporation.  (Complaint, Ex. A.)  Later, over the City's challenge, the CPUC affirmed the scope of NextG's CPCN and its applicability to NextG's Nodes (wireless facilities).  On July 20, 2006, the CPUC modified its January 12, 2006 Order and denied the City's request for rehearing of the decision as modified.  (*Id.*, Ex. C).  And, on April 12, 2007, the CPUC granted NextG's application for expanded full facilities-based authority and modified its CPCN to permit construction of facilities that are exempt from the California Environmental Quality Act ("CEQA").  This authority was granted to NextG subject to the requirement that the CPUC's Energy Division staff confirm that the construction is exempt from CEQA and issue a "Notice to Proceed" before NextG may commence construction requiring full facilities-based authority.  (*Id.*, Ex. D).

1    After this Court enjoined the City's previous permitting regime, *see NextG San Francisco*, 2006

2  U.S. Dist. LEXIS 36101, the City adopted Ordinance No. 214-07 on September 11, 2007.  NextG and

3  other affected carriers were allowed to weigh in on the proposed ordinance only once, at a public

4  hearing before the Land Use and Economic Development Committee of the City's Board of Supervisors

5  held on August 6, 2007.[4]  (Declaration of Nicole Mason ("Mason Decl.") ¶ 6).  After approval before the

6  Committee, the Ordinance was given final approval by a vote of the Board of Supervisors in a meeting

7  without a public hearing or opportunity for public comment before the Supervisors.[5]

8    On January 7, 2008, the City sent NextG a letter informing NextG of the New Ordinance and

9  ordering NextG to refrain from "installing any new Wireless Facilities in the public rights-of-way

10  without first obtaining Wireless Permits."  Complaint Exh. F; Answer ¶ 43 (admitting Exhibit F).

11    Ordinance No. 214-07 and regulations adopted pursuant to Ordinance No. 214-07 impose a new

12  discretionary, multi-layered process.  Under the New Ordinance, NextG is required to obtain not only a

13  Utilities Condition Permit ("UCP"), but also a "Wireless Permit."  Ordinance No. 214-07 §§ 11.9(a) &

14  (b); Department of Public Works Order 177,163.  In the vast majority of the City, in order to receive a

15  Wireless Permit, NextG would also be subject to additional processes and review before the Planning

16  Department, the Recreation and Park Department, the Department of Public Health, and in some cases,

17  all of them.  (Alford Decl. ¶ 7); *see also* Ord. No. 214-07 § 11.9(b)(2); transcript of August 6, 2007

18  Committee meeting, *available at* http://sanfrancisco.granicus.com/ViewPublisher.php?view_id=12, at

19  00:00:15-00:00:25 (City staff describing how applications are referred to other agencies).  The

20  Ordinance does not define a route for appeals of permit denials; however, the City asserts that DPW

21  denial (or approval) of a permit application would be appealable to the City's Board of Permit Appeals.

22  (Mot. at 5, 12-13).

23    Under Section 11.9(a) of the City's New Ordinance, all providers of "Telecommunications

24  Service" or "Personal Wireless Service" must obtain a UCP from DPW.  However, the City will require

25

26  [4] A video transcript of the August 6, 2007 meeting is available at
http://sanfrancisco.granicus.com/ViewPublisher.php?view_id=12.

27  [5] *See* Meeting Minutes of the Board of Supervisors, September 11, 2007, *available at*

28  http://www.sfgov.org/site/bdsupvrs_page.asp?id=68825 (reflecting that ordinance was approved on
consent agenda before public comment period).

NextG to obtain a different form of UCP than the City requires from other telecommunications utilities, such as the incumbent telephone company, a form that will incorporate the requirements of the Ordinance and Regulations that are at issue here.  (Mason Decl. ¶ 4).  Still, the City's New Ordinance provides that DPW "shall include in a UCP such conditions, in addition to those already set forth in Applicable Law, as may be required to … protect and benefit the public health, safety and welfare."  Ord. No. 214-07 § 11.9(a)(1).  Just as in the past, there is no limit to DPW's discretion to determine what will benefit the public welfare.  *See, e.g., TCG New York, Inc. v. City of White Plains*, 305 F.3d 67, 76 (2d Cir. 2002) (ability to deny based on "public interest factors" violates Section 253(a)), *cert. denied*, 538 U.S. 923 (2003)); *City of Auburn v. Qwest Corp.*, 260 F.3d 1160, 1176 (9th Cir. 2001) (limitless discretion is the "ultimate cudgel").

In addition to a UCP, entities that need to use "Personal Wireless Service Facilities" to provide their telecommunications service must also now obtain a "Personal Wireless Service Facilities Site Permit" ("Wireless Permit").  Ord. No. 214-07 § 11.9(b).  The Wireless Permit process is multi-layered and subjects the provider to a wholly discretionary review process before various City agencies, including the process of the Planning Department.  *Compare id. with NextG San Francisco*, 2006 U.S. Dist. LEXIS 36101 at *14-16.

While some number of applications will be reviewed only by DPW, the City has an additional set of hoops for what it terms "protected locations."  (City Mot. at 1).  As amended by Ordinance No. 214-07, Section 11.9(b)(2)(A) of the City's Administrative Code requires that any Wireless Permit application proposing to install facilities "(i) on historic, historically or architecturally significant, decorative, or specially designed utility poles; (ii) in a historic or locally significant district; (iii) adjacent to a historic, architecturally significant or locally significant building; or (iv) on a street where the City and County of San Francisco General Plan has identified the presence of valued scenic resources that should be protected and conserved" must be submitted to the Planning Department.  Ord. No. 214-07 § 11.9(b)(2)(A).  Section 11.9(b)(2)(A) leaves the City open-ended discretion even to define what will trigger referral to the Planning Department.  There is no objective standard defining what constitutes a "locally significant" or "architecturally significant" district or building, or what a "valued scenic resource" is.  Indeed, the City's testimony makes clear that it simply adopted a series of in-house and

1   third-party lists from organizations such as the Junior League, but it does not even attempt to explain or

2   justify the criteria used besides referring to them as "experts."  (Declaration of Mark Luellen ("Luellen

3   Decl.") ¶ 3-17).  Similarly, Section 11.9(b)(2)(B) requires review by the Recreation and Park

4   Department for any Wireless Permit application to install a Wireless Service Facility in locations

5   "adjacent to a City park or open space."  The "standards" to be applied by the Recreation and Park

6   Department are similarly discretionary and subjective.  *See* Ord. No. 214-07 § 11.9(b)(2)(B).

7          Contrary to the City's assertions, the issue of whether an application will be referred to the

8   Planning Department or Recreation and Park Department will require exercise of discretion by DPW.

9   Following adoption of DPW Order No. 177,163, DPW created maps that purportedly enable a

10  telecommunications provider, such as NextG, to know what locations would have to go to other

11  departments for review.  (*See* Mot. at 4-6; Declaration of Daniel McKenna ("McKenna Decl.") ¶ 16-17).

12  In its Motion, the City has put forward new maps which are at least readable, but as NextG's Project

13  Manager, Mr. Alford, testifies, they still do not make clear in all cases whether a particular location will

14  be considered "protected" and referred out of DPW.  (Alford Decl. ¶¶ 6-7).  Thus, whether a particular

15  application will require discretionary approval by the Planning Department or Recreation and Park

16  Department is unpredictable and lies in the discretion of DPW.

17         For those applications that trigger Planning Department and/or Recreation and Park Department

18  review, the City once again has broad discretion to deny applications.  Under the Ordinance, if an

19  application is referred to the Planning Department and/or the Recreation and Park Department, DPW is

20  prohibited from granting the application unless the relevant Department(s) recommends approval.  (Ord.

21  No. 214-07 §§ 11.9(b)(2)(A) & (B)).

22         The face of the Ordinance reveals that the "standards" to be applied by Planning and Recreation

23  & Parks are wholly arbitrary and discretionary.  For example, in the case of applications referred to the

24  Planning Department, the Department "shall not recommend approval … unless [it] determines that a

25  Personal Wireless Service Facility in the proposed location is consistent with the public health, safety,

26  convenience and general welfare and will not unreasonably affect, intrude upon or diminish any of the

27  identified City resources."  (Ord. No. 214-07 § 11.9(b)(2)(A)).  Similarly, if referred to the Recreation

28  and Park Department, the Department "shall not recommend approval . . . unless [it] determines that a

6

1  Personal Wireless Service Facility in the proposed location will not unreasonably affect, intrude upon or

2  diminish a City park or open space." (Ord. No. 214-07 § 11.9(b)(2)(B); Order No. 177,163 § III D 4 and

3  5.) These are wholly subjective, undefined, and discretionary "standards." Whether a proposed

4  installation will "unreasonably, affect, intrude upon or diminish" the "resources" is impossible to predict

5  and lies completely in the subjective, aesthetic discretion of the Planning Department.

6      Moreover, there is no defined process for how the applications will be treated by either

7  Department. Contrary to the inadmissible evidence of the City's lay witnesses interpreting the

8  Ordinance, nothing in the Ordinance prohibits hearings or requirement of additional submissions. Ord.

9  No. 214-07 § 11.9. Moreover, after grant or denial by DPW, the applicant faces an appeal process that

10 is even more burdensome and discretionary, including public hearings at which any "interested party"

11 can testify on any issue. Rules of the Board of Permit Appeals ("BPA"), Art. 1, § 5; *Luxor Cab Co. v.*

12 *Thomas Cahill*, 21 Cal. App. 3d 551, 556 (1971).

13     Finally, in addition to being discretionary and burdensome, the New Ordinance is discriminatory.

14 Telecommunications providers that provide service using technology other than what the City defines as

15 "wireless" are given a regulatory advantage and favored access to the right of way, as they are not

16 subject to the burden, costs, uncertainty, and delay inherent in the Wireless Permit requirement.

17 Furthermore, by its own definitions and scope, the New Ordinance does not impose a Wireless Permit

18 requirement on all antennas but, rather, only "commercial mobile services provided under a license

19 issued by the FCC." (Ord. No. 214-07 § 11.1(aa)-(bb), 11.9(b)(1)). Thus, the New Ordinance does not

20 impose the same obligations on all wireless facilities or services, such as other types of wireless

21 telecommunications services or unlicensed wireless services, including utility monitoring systems and

22 antennae for Wi-Fi.

23                     **III.    ARGUMENT**

24     **A.    Summary Judgment Standards**

25     In order for the City to prevail on summary judgment, it must establish, through admissible

26 evidence, that "there is no genuine issue as to any material fact" and that it is "entitled to a judgment as a

27 matter of law." Fed.R.Civ.P. 56(c). A genuine dispute of fact arises "if the evidence is such that a

28 reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477

7

1    U.S. 242, 248 (1986).  The court ruling on a motion for summary judgment must view all of the

2    "evidence in the light most favorable to the nonmoving party."  *Guebara v. Allstate Ins. Co.*, 237 F.3d

3    987, 992 (9th Cir. 2001); Fed.R.Civ.P. 56(c).  The Court must assume the truth of direct evidence set

4    forth by the opposing party.  *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992).

5         NextG moved for judgment on the pleadings on the grounds that the New Ordinance is

6    impermissible on its face.  The City's Motion counters by offering testimony regarding, *inter alia*, the

7    history and creation of the regulations, their enforcement, and whether the City thinks NextG's

8    construction might be subject to the most onerous regulatory regime that applies to "protected

9    locations."  (See, *e.g.*, City Motion at 6-7).  NextG disputes this evidence in the accompanying

10   declarations, and the Court must view NextG's declarations regarding events of which the declarants

11   have first-hand knowledge as true.  *Hanon*, 976 F.2d at 507.  Since, unlike NextG's facial challenge, the

12   City's Motion relies on evidence that raises a genuine dispute of a material fact, summary judgment *for*

13   *the City* is not proper in this case.  Fed.R.Civ.P. 56(c).

14        The issue before this Court on NextG's Rule 12(c) Motion is whether the City's New Ordinance

15   is, *on its face*, preempted by state and federal law.  The facts submitted by the City are not relevant or

16   material to the question of whether the New Ordinance is preempted on its face.  Nonetheless, even if

17   the Court concludes that the facts are relevant, the issue before the Court on the *City's* Motion then is

18   whether there is a triable issue of material fact as to the City's testimony regarding the justifications and

19   operation of its regime.  As explained in detail below, the evidence presented by NextG, if credited as it

20   must be, would allow a reasonable trier of fact to conclude that the City's New Ordinance may have the

21   effect of prohibiting the provision of telecommunications services, making it is impermissible under

22   binding precedent.  *See, e.g., City of Auburn*, 260 F.3d at 1175.  Indeed, even if the City's facts are

23   accepted as true, the City's Motion still must be denied because the Ordinance still would be preempted

24   as a matter of law.

25   **B.    The City's Ordinance Is Preempted By Section 253**

26        The City's Motion ignores controlling Ninth Circuit precedent, relies on inapplicable standards,

27   and seeks to "save" the City's requirements through a "semantic two-step" that the Ninth Circuit has

28   rejected.  As demonstrated below, the New Ordinance is preempted by Section 253(a) under well-

8

NEXTG'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
NextG v. City of San Francisco, No.  CV-08-0985 MHP
WDC 738782v4 0058588-000003

1   established Ninth Circuit precedent, and it is not "saved" under Section 253(b), Section 253(c), or

2   Section 332(c)(7), as the City asserts.

3        The Telecommunications Act of 1996 was intended to "'provide for a pro-competitive, de-

4   regulatory national policy framework designed to accelerate rapidly private sector deployment of

5   advanced technologies and services . . . by opening all telecommunications markets open to

6   competition.'" *Cox Commc'ns PCS, L.P. v. City of San Marcos, 204 F. Supp. 2d 1260*, 1264 (S.D. Cal.

7   2002) (quoting *Cellular Tel. Co. v. Oyster Bay*, 166 F.3d 490, 492-93 (2d Cir. 1999)).  The City cannot

8   dispute that Section 253(a) preempts even regulations that *may* have the *effect* of prohibiting the

9   provision of telecommunications services.  (City Motion at 11 n.8); s*ee also NextG San Francisco*, 2006

10  U.S. Dist. LEXIS 36101 at * 12; *Auburn*, 260 F.3d at 1175; *Qwest Corp. v. City of Portland*, 385 F.3d

11  1236, 1239 (9th Cir. 2004); *Qwest Communications v. City of Berkeley*, 433 F.3d 1253, 1258 (9th Cir.

12  2006).  Yet, the City does not meaningfully articulate why the Ninth Circuit's analyses and holdings in

13  *Auburn* and the other cases do not preempt the City's challenged provisions.  Nor could it, because the

14  New Ordinance's provisions are directly on point with those struck down in *Auburn*, as well as other

15  cases, such as *GTE Mobilnet, LP. v. City of San Francisco*, 2007 U.S. Dist. LEXIS 8801 (N.D. Cal. Feb.

16  6, 2007); *NextG Networks of Cal., Inc. v. Los Angeles County*, 522 F. Supp. 2d 1240 (C.D. Cal. 2007);

17  *Sprint Telephony PCS, L.P. v. County of San Diego*, 377 F. Supp.2d 886, 899 (S.D. Cal. 2005), *petition*

18  *for rehearing en banc granted*, --- F.3d ----, 2008 WL 2051371 (9th Cir. May 14, 2008); *T-Mobile USA,*

19  *Inc. v. City of Anacortes*, 2008 U.S. Dist. LEXIS 37481 at *8-11 (W.D. Wa. May 6, 2008); *NextG*

20  *Networks of Cal., Inc. v. City of Huntington Beach*, SACV 07-1471 ABC (C.D. Cal. Feb. 7, 2008); and

21  *Newpath Network, LLC v. City of Irvine*, SACV 06-550-JVS (C.D. Cal. Mar. 10, 2008).  Indeed, in

22  substance and effect they are not materially different from the San Francisco regulations already struck

23  down by this Court.  *NextG San Francisco*, 2006 U.S. Dist. LEXIS 36101.

24       The City focuses its argument on disputing whether NextG's network will be affected by the

25  regulations that govern "protected areas," and on trying to "save" the requirements under Section 253(b)

26  and (c) and Section 332(c)(7).  As demonstrated below, the City's defense is unavailing, and summary

27  judgment is inappropriate.

28

The "heavy burden" standard that the City asserts NextG must meet is inaccurate. While called a "facial" challenge, this case is not the same as a First Amendment "facial" challenge. Here, the standard of review of the City's Ordinance has been established by Congress in Section 253(a). As the Ninth Circuit has repeatedly held, that standard is whether the City's requirements "may" have the effect of prohibiting any entity's ability to provide any telecommunications service. *See, e.g., Auburn*, 260 F.3d at 1175. Thus, the argument that the plaintiff must demonstrate that there is no set of circumstances in which the local requirement could be lawful is inconsistent with the standard created by Congress. The City's argument would reverse Section 253(a), eliminating the "may … have the effect" portion of Section 253(a) and creating a very limited preemption applicable only in cases where the provider could demonstrate that there was no way it would ever be able to provide service under the city's requirements. The court in *Newpath Networks, LLC v. City of Irvine*, SACV 06-550-JVS at 3 n.2 (C.D. Cal. Mar. 10, 2008), recently rejected the standard advanced by the City.[6]

### C.    The New Ordinance Is Preempted By Section 253(a)

As demonstrated in NextG's Rule 12(c) Motion, on its face, the New Ordinance is preempted by Section 253(a) because it leaves applicants to the discretion of the City and it imposes a burdensome and uncertain process. The City does not rebut those established points.

#### 1.    The City's Standards For "Protected Locations" Are Equivalent To Those Struck Down By The Ninth Circuit, This Court, And Many Other Courts.

In *Auburn*, the Ninth Circuit identified various features of a municipal ordinance that, in combination, had the effect of prohibiting a telecommunications carrier's provision of services. *Auburn*, 260 F.3d at 1176. These features included: (1) a lengthy application provision that required submission of maps, corporate policies, and other information requested by the city; (2) a public hearing requirement; (3) discretionary factors that have nothing to do with management of the right of way, (4) fees in excess of the cost of maintaining the right of way; and (5) unfettered city discretion to grant,

---

[6] The City's reliance on *Salerno v. United States*, 481 U.S. 739 (1987), is misplaced for the same reasons. *Salerno* involved a constitutional challenge to an act of Congress. Unlike in *Salerno*, here the standard by which the City's legislative act is judged is defined by Congress, and it explicitly prohibits City requirements that "may . . . have the effect" of prohibiting NextG's ability to provide telecommunications service. 47 U.S.C. § 253(a).

1  deny or revoke an applicant's rights to deploy its facilities. *Id.* The court deemed the last feature to be
2  the most important, referring to it as the "ultimate cudgel." *Id.*

3        In *Los Angeles County*, analyzing a zoning ordinance that required NextG to obtain a
4  Conditional Use Permit, the court had "little trouble concluding that this process is so burdensome and
5  Byzantine as to erect a barrier to providing telecommunications services" because the county "impose[d]
6  a lengthy, detailed, and expensive application process riddled with administrative hoops…." *Los*
7  *Angeles County*, 522 F. Supp. 2d at 1250; *see also NextG San Francisco*, 2006 U.S. Dist. LEXIS 36101
8  at * 16 (previous San Francisco requirements preempted in part because it allowed "absolute discretion
9  as to whether any given telecommunications carrier will be able to install its facilities in the public
10 rights-of-way"); *GTE Mobilnet v. City of San Francisco*, 2007 WL 420089 (N.D. Cal. Feb. 6, 2007)
11 (holding that San Francisco's process violated § 253(a)); *Sprint Telephony*, 377 F. Supp.2d at 895;
12 *Anacortes*, 2008 U.S. Dist. LEXIS 37481 at *8-12.

13       Applying these well-established standards to this case leads to the conclusion that the City's
14 process is impermissibly subjective and burdensome, especially as it governs the "protected locations"
15 that make up a significant portion of the City.

16                      **a.    The New Ordinance Vests The City With Unlimited Discretion**

17       As a threshold matter, contrary to the City's assertions, there is significant uncertainty and
18 discretion in the issue of what locations will be referred out of DPW. NextG's Project Manager, Mr.
19 Alford, who has over 15 years of telecommunications deployment experience in the Bay Area, testifies
20 that the shading on the City's maps still leaves ambiguity regarding whether a specific utility pole will
21 fall within a "protected" zone. (Alford Decl. ¶ 6). For example, if the pole is several feet off the corner
22 where a "protected" street and "unprotected" street meet, whether it will be deemed to be on the
23 protected or unprotected street is ambiguous and will require DPW's subjective determination on a case-
24 by-case basis. One cannot determine the status of many locations based on the maps, and thus,
25 confirming that DPW will have to exercise some level of discretion that may conflict with what the
26 provider understood to be the applicable level of review.[7]

27  ─────────────────
28  [7]  *See* Fed. R. Civ. P. 56(c) (summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law").

The City spends significant time and effort in an attempt to bolster the *bona fides* of its classification of locations as historical or "significant."  While NextG has had no opportunity for discovery of those assertions and objects to them,[8] at bottom, the City's arguments are not relevant. Fundamentally, under the Ordinance, for many locations in the City, an application will be referred to Planning Department and the Department will subject the application to entirely discretionary review to determine whether the City "likes" the proposal or not based on a Planning Department staff member's view of what is important or cluttered.  This is precisely what has been preempted by the Ninth Circuit and numerous other courts.

The City argues that the discretion is somehow permissible because it is "vested in City experts." (City Motion at 9).  But this simply identifies *who* will be exercising this discretion.  The fact that the staff members are self-styled "experts" – a designation that NextG denies – does not alter the discretionary nature of the situation or the fact that the standards that will be applied by the City's "experts" are precisely the same as those that have been preempted by the Ninth Circuit and other courts.  For example, in the case of applications referred to the Planning Department, the Planning Department "shall not recommend approval … unless [it] determines that a Personal Wireless Service Facility in the proposed location is *consistent with the public health, safety, convenience and general welfare* and will *not unreasonably affect, intrude upon or diminish any of the identified City resources*." (Ord. No. 214-07 § 11.9(b)(2)(A) (emphasis added)); *see Auburn*, 260 F.3d at 1179.  Similarly, if referred to the Recreation and Park Department, the Department "shall not recommend approval . . . unless [it] determines that a Personal Wireless Service Facility in the proposed location will not unreasonably affect, intrude upon or diminish a City park or open space."  (Ord. No. 214-07 § 11.9(b)(2)(B)).  These are precisely the type of open-ended, arbitrary, subjective, discretionary standards that were preempted by this Court in *NextG San Francisco* as well as other cases in the Ninth Circuit. *See, e.g.*, *NextG San Francisco*, 2006 U.S. Dist. LEXIS 36101 at *11-21; *Auburn*, 260 F.3d at 1179; *Anacortes*, 2008 U.S. Dist. LEXIS 37481 at *13.

_____

[8] The City offered testimony about where its "protected" lists came from, but not how they were compiled, what standards were used, or even whether these standards were consistent from list to list. (*See* Luellen Decl. ¶¶ 5-18).

1    The Planning Department's evaluation of whether a proposed facility will "unreasonably affect,

2    intrude upon or diminish any of the identified City resources" is a purely subjective, discretionary

3    matter, pursuant to which the City can deny an application for *any* reason as long as it is stated in the

4    cryptic and vague black hole of the "general welfare" or "unreasonable intrusion" upon an alleged view

5    or resource deemed valuable, good, or significant in the standardless taste of unnamed City staff, who

6    are under no obligation to explain or justify their aesthetic preferences.

7    Indeed, the City's own witnesses describe the discretionary nature of the process. For example,

8    Amit Ghosh conceded that "[b]ecause of the diverse nature of the locations that require Planning

9    Department approval under Ordinance 2 14-07, ***the Planning Department will need to consider***

10   ***different factors for different applications***."  (Declaration of Amit Ghosh ("Ghosh Decl.") ¶ 18

11   (emphasis added)).[9] He also noted that "*[s]ome of the factors* that the Planning Department *may*

12   *consider*, depending on the specific application, include the extent of other 'visual clutter' in the area,

13   the compatibility of the proposed facilities with neighboring structures, the quality and importance of

14   any view or historic resource that may be affected, the extent to which vegetation may mask the

15   facilities, and the size, shape, color and location on the pole of the proposed equipment."  (Ghosh Decl.

16   ¶ 19 (emphasis added)).  Thus, Mr. Ghosh concedes that deployments in the public rights-of-way, on

17   existing utility poles, will be tested against "visual clutter" in the area (what constitutes "visual clutter"

18   being entirely up to the Planner), the "compatibility" with neighboring structures, and the "quality and

19   importance" of a view or resource (thus, even among "protected" locations, apparently some will be

20   more important than others, but only the City Planner knows which).  These are precisely the type of

21   vague standards that violate Section 253(a) – whether or not applied by an alleged "expert."  *See, e.g.*,

22   *Auburn*, 260 F.3d at 1179

23   In addition to the subjective "standards," there is no apparent process for how the applications

24   will be treated by either Department, and public hearings and additional submissions of information may

25   be required.  *See Auburn*, 260 F.3d at 1176; *Los Angeles County*, 522 F. Supp. 2d at 1251 ("These public

26   hearing requirements further complicate the already burdensome application process, as courts have

27
28   [9] NextG has objected to portions of the Ghosh, McKenna, and LaForte declarations on the ground that
     the only purpose of the challenged sections is to assert the legal interpretation of Ordinance 214-07 as
     meaning that the review would be at the staff level without any hearings.

nearly universally held.").  The City's lay witnesses offer the legal conclusion that the Ordinance does not require hearings, (*e.g.*, Declaration of Daniel LaForte ("LaForte Decl.") ¶ 3), but there is nothing in the Ordinance that explicitly supports that otherwise inadmissible testimony, to which NextG objects.  In any event, even if there were no hearing before the Planning Commission, that alone would not save the fact that the City will still be exercising unfettered discretion based on standards that have been preempted by the Ninth Circuit.  As discussed below, if DPW (*e.g.* based on a recommendation from Planning) denies an application, there will be public hearings without standards as part of the necessary administrative appeal process.

The City has adopted new labels and has redesignated its planning staff as "experts," but it has not altered its fundamental requirements that position the City as the final arbiter of telecommunications market entry.  The New Ordinance provides no certainty regarding the process and no objective standards that NextG can satisfy to ensure its applications will be granted.  NextG's ability to provide telecommunications service can be denied or delayed at any one of multiple steps based on purely subjective and arbitrary grounds.  As such, as a matter of law, the Ordinance violates Section 253(a), on its face.

### b.    The New Ordinance Is Impermissibly Burdensome

The City argues that it has eliminated the burden associated with its prior process despite the fact that NextG would be subject to that same process every time its applications are referred to Planning or Parks and Recreation.  While the City may have done away with some of the prior burdens, nonetheless the New Ordinance requires NextG and others to overcome multiple levels of burden.  First, NextG must obtain a Utilities Condition Permit ("UCP") – an issue glossed over and ignored by the City.  Ord. No. 214-07 § 11.9(a).  The application requirements are vague, but include the requirement that applicants must "prove their legal right to occupy and use the Public Rights-of-Way."  (Ord. No. 214-07 § 11.9(a)(1)).  And DPW must "include in a UCP such conditions, in addition to those already set forth in Applicable Law, as may be required to … protect and benefit the public health, safety and welfare." *Id.* Applicants must pay for the privilege of navigating this arbitrary and discretionary process, in the form of "a non-refundable application fee of two thousand dollars."  (Ord. No. 214-07 § 11.9(a)(2)).

1    While the requirements for its competitors who do not incorporate wireless elements stops there,

2    NextG must, second, obtain a Wireless Permit.  The Wireless Permit involves submission to DPW, then,

3    in the vast majority of cases, review by the Planning or Recreation & Park Departments.  If DPW denies

4    the permit, NextG must appeal to the Board of Permit Appeals, and there face briefings, submission of

5    additional evidence, and open public hearings without standards.  (Mot. at 5); *see* DPW Order No.

6    177,163; Rules of the BPA, Arts.1, 5, 6.  Indeed, even if DPW *approves* the permit, apparently,

7    disgruntled members of the public can appeal, thus delaying and placing at risk NextG's deployment.

8    DPW Order No. 177,163 § V ("The Department's approval or denial of a [Wireless Permit] may be

9    appeal. . . .").

10    Moreover, while the City asserts that it has lowered the related fees, it is clear that the ordinance

11    requires payment of several fees for each "Wireless Service Facility."  (Ord. No. 214-07 §

12    11.9(b)(3)(A), (B)).  In addition, the New Ordinance requires that applicants "compensate the applicable

13    City department for all costs related to reviewing an application for a Personal Wireless Service

14    Facilities Site Permit."  (Ord. No. 214-07 § 11.9(b)(3)(B)).  It also provides open-ended discretion to

15    "require a Person filing an application for a Personal Wireless Service Facilities Site Permit to pay a

16    sum in excess of the amount charged pursuant to this section."  (Ord. No. 214-07 § 11.9(b)(3)(D)).

17    Thus, the City has left itself an opening to charge unlimited fees.

18    As discussed above, while the initial paperwork required for an "unprotected" location may have

19    been decreased some amount, in reality, the vast majority of locations will require NextG to overcome

20    multiple layers of City review and will be subject to the same burdensome, discretionary process this

21    Court properly struck down.

22        **c.**  **The "Appeal" Process Adds Another Burdensome And Discretionary**
23            **Procedure**

  The City claims that the New Ordinance is permissible in part because "DPW's *approval or*

24    *denial* of a Wireless Permit may be appealed under San Francisco Charter § 4.106(b) to the City's Board

25    of Permit Appeals."  (City Motion at 5 (emphasis added); DPW Order No. 177,163 § V).  It argues that

26    "this discretion under the new Regulations is not 'unfettered discretion to reject a permit application

27    altogether, for whatever reasons [the Board of Supervisors and DPW] choose,'" because "the Ordinance

28

prescribes standards that could serve as the basis for a review on appeal." (*Id.* at 12 (internal citations omitted)).

Rather than helping the City, the Board of Permit Appeals procedure amplifies the problem by adding another burdensome and discretionary stage to the permitting process – and according to DPW Order No. 177,163, NextG may have to undergo this process even if DPW approves a permit application. (DPW Order No. 177,163 § V). For example, if Planning denies a permit and an appeal is taken to the Board of Permit Appeals, a hearing, open to the public, is required. Business & Tax Regulations Code, Art. 1, §§ 8, 14; Rules of the BPA, Art. 1, §§ 1, 2. Other "interested parties" may speak at the hearing, *Rules of the BPA*, Art. 1, § 5, and the BPA may also designate experts "as it deems necessary" to report on and make recommendations concerning technical matters in appeals. *Id.*, Art. 5, § 3. In addition, four out of five votes are required to overrule a decision by DPW. City Charter § 4.106(d). Review is limited, and "[t]he only question before [the] court . . . is whether there was an affirmative showing that the Board abused its discretion or acted arbitrarily." *Luxor Cab Co. v. Thomas Cahill*, 21 Cal. App. 3d 551, 556 (1971). Nor is the timeline for these appeals definite – the BPA's action on the appeal will be taken no later than 60 days after the filing of the Notice of Appeal "or a reasonable time thereafter." Business & Tax Regulations Code, Art. 1, § 8. Judicial review is available only via a writ of mandate under Cal. Code Civ. Proc. Section 1094.5.

In addition, it appears that the "appeal" would be of the DPW denial. Yet, DPW must deny if the Planning Department or Recreation Department recommends denial. Thus, the question remains whether there can be any meaningful review of the decision of the Planning or Recreation Departments. Their unfettered discretion is insulated by declaring DPW the decision making body.

In sum, the City's "appeal" process furthers the burden, discretion, and uncertainty imposed by the Ordinance and confirms that the Ordinance must be preempted.

## 2. The Standards For "Protected Locations" Will Functionally Govern NextG's Construction

The City clearly knows what a permissible permitting scheme would look like, because it has created what appears to be a permissible scheme to govern "unprotected" locations. The City attempts to use this partial revision of its zoning regulations in order to salvage the *entire* ordinance. Noting that

NextG has previously estimated that approximately 90% of NextG's anticipated new facility installations will be subject to review by the Planning Department and/or Recreation and Park Department, the City claims that "[a]fter the judgment in *NextG I*, NextG could install equipment on poles anywhere in the City without any City review; thus, NextG had no reason to locate its facilities in unprotected locations. Nevertheless, 20 of the 30 locations that the Department could locate on the Department Map were in unprotected locations and would have been subject to the new streamlined process." (City Motion at 7.) Apparently, the City believes that so long as NextG's entire network is not subject to the additional layers of review, the Ordinance is not preempted. That argument is incorrect.

As a threshold issue, NextG need not *prove* that it will be subject to the more onerous requirements inherent in "protected locations" – rather, it need only allege that it *may* be subject to them. *See Portland*, 385 F.3d at 1241 (plaintiff not "required to make an actual showing of 'a single telecommunications service that it . . . is effectively prohibited from providing,'" because "regulations that may have the effect of prohibiting the provision of telecommunications services are preempted"); *Verizon Wireless (VAW) LLC v. City of Rio Rancho*, 476 F. Supp. 2d 1325, 1331 (D.N.M. 2007) (allegations of plans to construct sufficient to establish standing for 253(a) claim). And at the summary judgment stage, it need only show that a material issue of fact exist as to whether it may be subject to the requirements. Fed.R.Civ.P. 56(c).

Moreover, the City's claims based on NextG's *previous* construction does not even purport to refute NextG's allegation that the vast majority of its *new* Nodes would fall within "protected locations." (Alford Decl. ¶ 7). Moreover, the City trumpets the fact that "only" one-third of NextG's previously-built Nodes would have been subject to the more onerous requirements of the New Ordinance.

NextG has been unable to confirm the City's assertion based on its limited description of its analysis. However, even if the City's claim is taken at face value as applied to the new Nodes, NextG's network as a whole will, for all intents and purposes, depend on the outcome of that portion of the Nodes. This is because NextG's service and networks are highly sophisticated, interrelated, and require detailed and careful planning by expert engineers working closely with NextG's customers. The Nodes cannot simply be placed "anywhere." (Declaration of David Cutrer ¶¶ 6-14). Indeed, even apparently

1    "slight" changes may require changes throughout the network in a domino-like effect.  (*Id.*).

2    Accordingly, it is irrelevant whether thirty percent or ninety percent of NextG's network will be subject

3    to "protected" location review.  Because of the extensive nature of the City's designations, some portion

4    of NextG's networks will be located in "protected" locations.  The delay, risk, or inability to install even

5    a fraction of its network will frustrate the purposes of the network as a whole.[10]

### D. The City's Requirements Are Not Saved By Section 253(b), 253(c), or Section 332(c)(7)

7        The City's primary defense is that its Code provisions are "saved" by Section 253(b) and (c).

8    The City's assertions fail on multiple grounds.

#### 1. The City's Requirements Do Not Fall within the Authority Reserved by Section 253(c).

11        The City has not satisfied its obligation to establish that the challenged provisions are within its

12    authority under Section 253(c).  The thrust of the City's argument is that it is not regulating the

13    company, but rather exercising discretion over what facilities are located in the public rights-of-way.

14    (Mot. at 14).  The City's position fails because it is inherently discretionary and inherently

15    discriminatory.

16        Under Section 253(c), the City may "manage" use of the public rights-of-way and require fair

17    and reasonable compensation for use of the public rights-of-way.  However, such management and

18    compensation must be competitively neutral and nondiscriminatory.  47 U.S.C. § 253(c); *see, e.g.,*

19    *Auburn*, 260 F.3d at 1177; *NextG San Francisco*, 2006 U.S. Dist. LEXIS 36101 at *24.  Moreover, the

20    Ninth Circuit has definitively held that Section 253(c) "saves" only those municipal requirements that

21    are "directly related" to management of the public rights of way.  *Auburn*, 260 F.3d at 1177-78; *see also*

22    *White Plains*, 305 F.3d at 81-82; *TC Sys. Inc. v. Town of Colonie*, 263 F. Supp. 2d 471, 484-85

23    (N.D.N.Y. 2003).  In *Berkeley*, the Ninth Circuit explained that proper "management" activities include

24    "coordination of construction schedules, determination of insurance, bonding and indemnity

25    requirements, establishment and enforcement of building codes, and keeping track of the various

---

[10] The City claims that "Verizon Wireless recently located all 14 of its proposed sites in unprotected areas." (McKenna Dec., ¶ 27, Ex. G).  However, based on the declaration, it is unclear whether these facilities were even built, and it is clear it was part of a settlement.  (*Id.*)

1   systems using the rights-of-way to prevent interference between them."  433 F.3d. at 1258.  This can be

2   contrasted with demands for "information on the nature of the requested use, the uses of adjacent

3   buildings and structures, [and] the location and dimensions of all structures, yards, walls, fences, parking

4   and loading facilities," which have "little to do with managing the physical integrity of the rights-of-way

5   … and cannot be viewed as management of the rights-of-way preserved by section 253(c)."  *Los*

6   *Angeles County*, 522 F. Supp. 2d at 1254-55.

7          The City's requirements do not fall within the City's limited Section 253(c) authority.  The

8   City's procedures encompass concerns and criteria unrelated to the management of the rights-of-way.

9   For example, the City's procedures permit the City to deny or condition a permit approval on the basis

10  of location, aesthetics, and harmony with adjacent uses.  (Ord. No. 214-07 § 11.9(b)(2)(A)).  Those

11  requirements are not "coordination of construction," or the other right-of-way management activities

12  authorized by Section 253(c).  Likewise, the Ordinance allows the City to deny a permit because the

13  City thinks it will "unreasonably affect, intrude upon or diminish,"  in some undefined way, "any of the

14  identified City resources."  *Id.*  In *Auburn*, and *Berkeley*, the Ninth Circuit struck down the requirements

15  at on just this type of unfettered discretion.  *Auburn*, 260 F.3d at 1179; *Berkeley*, 433 F.3d at 1258; *see*

16  *also Portland*, 385 F.3d at 1242; *Los Angeles County*, 522 F. Supp. 2d at 1254; *Sprint Telephony*, 377 F.

17  Supp.2d at 895-96.

18         In addition, the City's requirements are not saved by Section 253(c) because they are not

19  competitively neutral and nondiscriminatory.  Indeed, the thrust of the City's position is that it must be

20  permitted to discriminate against certain providers who choose to provide telecommunications service

21  using wireless facilities.  (Mot. at 14-15).  The City's assertion is without support.  Section 253 does not

22  differentiate between wireless and wireline telecommunications; it applies to "any interstate or intrastate

23  telecommunications service."  47 U.S.C. § 253(a); *see, e.g.*, *Auburn*, 260 F.3d at 1175 (applying Section

24  253 to "wireless" portion of ordinance).  Yet, the City insists that wireless facilities are somehow

25  inherently more intrusive than other telecommunications equipment.  There is no evidence on the record

26  to support the City's assertion.  Rather, the City's assertion reveals a general bias against wireless

27  facilities – even in the face of evidence that wires and equipment installed by "non-wireless" providers

28  may be larger than or more visually intrusive than NextG's equipment.  Photographs introduced by the

City and by NextG reveal that electric utilities install cross arms on poles, and that cable companies and other telecommunications companies install equipment boxes similar to those installed by NextG. (Mason Decl. Exhs. C-H).  Yet, they are not subject to the City's subjective, aesthetic review.  The City's targeted regulation of certain telecommunications providers is not "distinctions on valid considerations." (Mot. at 15 (citing *Cablevision of Boston, Inc. v. Public Improvement Comm'n*, 184 F.3d 88, 103 (1st Cir. 1999).  It is naked discrimination against an entire segment of the telecommunications market that is not competitively neutral and cannot be permitted to stand in light of the plain language and goals of Section 253.

### a.    The New Ordinance Is Not "Saved" By Section 253(b)

The City argues that the Ordinance is also saved, to some extent, by Section 253(b). Specifically, the City asserts that Section 253(b) allows it to ensure compliance with FCC RF emissions requirements and to protect health and safety by keeping the public rights-of-way from being unduly cluttered with utility facilities.  (Mot. at 16-17).  The City's reliance on Section 253(b) is misplaced.

First, Section 253(b) is not applicable to the City.  While Section 253(c) applies to State or "local government," 47 U.S.C. § 253(c), Section 253(b), by its plain terms, reserves authority only for the State.  47 U.S.C. § 253(b).  If Congress had intended to reserve to cities the authority reserved in Section 253(b), it would not have drawn the distinction.  *Southwestern Bell Wireless, Inc. v. Johnson County Bd. of County Comm'rs*, 199 F.3d 1185, 1192 (10th Cir. 1999), *cert. denied*, 530 U.S. 1204 (2000). Nonetheless, some courts have held that a city may use Section 253(b) as a defense where the State has "specifically delegated" authority to regulate telecommunications providers to protect public safety, *see, e.g.*, *Cox Communications PCS, LP v. City of San Marcos*, 204 F. Supp. 2d 1260, 1264 (S.D. Cal. 2002) (quoting *Bellsouth Telecomms, Inc. v. City of Coral Springs,* 42 F. Supp. 2d 1304 (S.D. Fla. 1999)). While NextG disputes that Section 253(b) can be delegated to the City and that the state has done so, even if it had, the City's challenged Ordinance is not saved by Section 253(b).

The City's argument that Section 253(b) allows it to keep the public right-of-way uncluttered as a health and safety matter is unavailing.  Section 253(c) is clearly the provision that governs the City's "management" of the public rights-of-way.  And despite the City's alleged concern about the right-of-way being "unduly cluttered with utility facilities," it does not impose the Wireless Permit obligations of

the Ordinance on "non-wireless" telecommunications providers or other "utilities," thus destroying the credibility of the City's asserted concern.[11]  The City is not assuring "resources are protected and conserved" (Mot. at 17), it is regulating and controlling market entry for an unfavored segment of competitors.  It is not competitively neutral and nondiscriminatory, and therefore, it is not "saved" by Section 253(b).

## E.   Section 332(c)(7) Is Not A Safe Harbor From Preemption And It Is Irrelevant To This Section 253(a) Challenge.

In its Motion, the City claims that the New Ordinance is protected from preemption under Section 253(a) by Section 332(c)(7) of the Communications Act.  The City claims that "Section 332(c)(7) is an overriding safe harbor provision for the exercise of local land use authority over wireless facilities. It applies to the entire Communications Act, including § 253."  (City Motion at 17).

Had Congress harbored a concern that Section 253(a) could negate the protections allegedly extended by Section 332(c)(7), it could have included a similar exemption, but it did not do so.  Because the series of exclusions in Section 253 demonstrates Congress's awareness that Section 253 could affect Section 332, and because the existing exclusions address traditionally local provinces such as the management of rights-of-way, under the principle of *expressio unius est exclusio alterius*, Congress's failure to omit Section 332(c)(7) from the reach of Section 253(a) must be interpreted as an affirmation of Section 253(a)'s applicability to state and local wireless zoning ordinances.

The courts in *Verizon Wireless (VAW), LLC v. City of Rio Rancho*, 476 F. Supp. 2d 1325, 1336 (D.N.M. 2007), and *City of San Marcos*, 204 F. Supp. 2d at 1268, confirmed that wireless providers are not limited to Section 332(c)(7) as the sole mechanism for challenges to local zoning requirements.  The court in *Rio Rancho* reasoned that Section 332(c)(7) provides a remedy for specific "decisions" on individual zoning applications.  However, before ever reaching a denial of a specific zoning application, wireless providers, like any other telecommunications provider, can challenge a municipal ordinance under Section 253 on the grounds that the ordinance may prohibit or have the effect of prohibiting the

---

[11] The City's citation on this point to cases decided under Section 332(c)(7), (Mot. at 17), emphasizes that its real argument does not lie with Section 253(b).  As discussed below, Section 332(c)(7) cases are not applicable in this case.

1  provision of telecommunications services.  *See Rio Rancho*, 476 F. Supp. 2d at 1336-39; *see also*, *Sprint*

2  *Telephony*, 377 F. Supp.2d at 891-92, 899.

3       The court in *Anacortes* similarly made clear that Section 332(c)(7) is not a "safe harbor":

4  "although the City appears to argue that the court should look to Section 332(c)(7) … Section 332(c)(7)

5  is not a third safe harbor from preemption.  Instead, Section 332(c)(7) places restrictions on the local

6  government's decisions regarding the placement, construction, and modification of personal wireless

7  service facilities."  *Anacortes*, 2008 U.S. Dist. LEXIS 37481 at *21.  The *Anacortes* court's rejection of

8  this argument is consistent with the policy of the Act.  Congress' intention in adopting Section 253 and

9  Section 332(c)(7) was to limit the ability of cities to hamper deployment of telecommunications services

10  and technologies.  As the Supreme Court recognized in the context of Section 332(c)(7),

11           *[o]ne of the means* by which [Congress] sought to accomplish these goals
            was reduction of the impediments imposed by local governments upon the
12           installation of facilities for wireless communications, such as antenna
            towers.  To this end, the [1996 Act] amended the Communications Act of
13           1934 to include *§ 332(c)(7), which imposes specific limitations on the
            traditional authority* of state and local governments to regulate the
14           location, construction and modification of such facilities.

15  *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 115 (2005) (emphasis added) (internal citations

16  omitted).  Indeed, Justice Breyer went farther, stating that "Congress saw a national problem, namely an

17  'inconsistent and, at times, conflicting patchwork' of state and local siting requirements, which

18  threatened 'the deployment' of a national wireless communications system."  *Id.* at 127-28 (Breyer, J.,

19  concurring) (quoting H.R. Rep. No. 104-204, pt. 1, p.94).  Thus, contrary to the City's assertions,

20  Section 332(c)(7) is not a grant of authority to cities, and it is not a defense to preemption under Section

21  253(a).  It is one piece of a multi-part design to limit cities' discretion.

22       Relying further on Section 332(c)(7), the City argues that Congress intended to allow it to

23  discriminate between wireless and wireline providers.  (Mot. at 19).  Again, the City's argument is

24  meritless.  As a threshold matter, Section 253(c) does not include the "unreasonably discriminate among

25  providers of functionally equivalent services" language of Section 332(c)(7)(B)(1).  Thus, all of the

26  Section 332 cases cited by the City are inapplicable.

27       Moreover, the City's argument is based on a factual premise that is unsupported and wrong.  The

28  FCC has recognized that wireless service is functionally equivalent to wireline services, particularly

given the increasing percentage of Americans who have given up having a "wired" home phone and switched to exclusively wireless communications.  *See, e.g.*, *12th Annual Wireless Competition Report*, 23 F.C.C.R. 2241, 2249, 2008 FCC LEXIS 1045 (2008) ("During the second half of 2006, 11.8 percent of U.S. adults lived in households with only wireless phones, up from 7.8 percent in the second half of 2005, and triple the percentage (3.5 percent) in the second half of 2003") ("*Wireless Competition Report*").  Moreover, NextG competes directly with traditional "wireline" providers, such AT&T. (Declaration of Larry Doherty ¶ 3).  Finally, as discussed above, the visual evidence introduced by NextG (Mason Decl. Exhs. C-H ) demonstrates that "wireless" facilities installed in the public right-of-way do not "create different visual, aesthetic, or safety concerns."  (Mot. at 19 (quoting H.R. Conf. Rep. No. 104-458 at 208)).

### F.    The New Ordinance Violates Unambiguous State Law, And The Court Should Not Refrain From So Ruling

Finally, the City claims that "[t]his Court should decline supplemental jurisdiction over NextG's state law claim under 28 U.S.C. § 1367(c)(1) because it concerns a novel and complex issue of state law – whether California Public Utilities Code § 7901 permits local governments to regulate the placement of telephone equipment in public rights-of-way on aesthetic grounds."  (City Motion at 21).  The City's assertion is incorrect.  There is clear precedent governing the application of Section 7901.  But even in the absence of extensive case law on point, the plain language of Section 7901 clearly prohibits the City's New Ordinance and this Court can rule in NextG's favor on that basis.

Section 7901 grants telephone corporations broad authority to install necessary wires and fixtures, so long as they do not interfere with public use of the roads.  Cal. Pub. Util. Code § 7901 ("Telegraph or telephone corporations may construct lines of telegraph or telephone lines along and upon any public road or highway … and may erect … necessary fixtures of their lines, in such manner and at such points as not to incommode the public use of the road or highway or interrupt the navigation of the waters"); *see Sprint PCS Assets, LLC v. City of La Cañada Flintridge*, 448 F.3d 1067, 1069 n.2 (9th Cir. 2006) (noting its decision that Section 7901 preempted a city ordinance regulating wireless telecommunications facilities).  The sole power reserved to municipalities under California law is the reasonable control of the time, place and manner in which roads, highways, and waterways may be

1    accessed.  Cal. Pub. Util. Code § 7901.1; *see Pac. Tel. & Tel. Co. v. City & County of San Francisco*,

2    197 Cal. App. 2d 133, 152, 17 Cal. Rptr. 687 (1961) ("*Pac. Tel. II*").

3            NextG is a telephone corporation under California law and clearly falls within the purview of

4    Section 7901.  Under Public Utility Code Section 234(a), NextG is a telephone corporation because it

5    owns, controls, operates, and manages its own instruments and appliances used to facilitate

6    communications by telephone for compensation within California.  *See* Complaint, Exhibit A; Cal. Pub.

7    Util. Code § 234(a).  The wireless elements incorporated into NextG's network fall squarely under

8    Section 7901, as a telephone line is defined broadly to include "all conduits, ducts, poles, wires, cables,

9    instruments, and appliances, and all other real estate, fixtures, and personal property owned, controlled,

10   operated, or managed in connection with or to facilitate communication by telephone, *whether such*

11   *communication is had with or without the use of transmission wire*."  Cal. Pub. Util. Code § 233

12   (emphasis added).  Moreover, the CPUC regulates NextG as a telephone corporation, recently

13   reaffirming the scope and grant of NextG's CPCN as including antennas.  Complaint, Exhibit D.

14           As a telephone corporation, NextG is entitled by Section 7901 to deploy its facilities in public

15   rights-of-way subject only to the requirement that the equipment does not "obstruct and interfere with

16   ordinary travel" in the right-of-way.  *Pac. Tel. II*, 197 Cal. App. 2d at 146.

17           The City has interfered with NextG's rights under Section 7901 in a manner that exceeds its

18   authority under Section 7901.1.  As discussed *supra*, the City's process requires NextG to make various

19   showings that are unrelated to time, place, and manner regulation of the right-of-way.  *See, e.g.*, Ord.

20   No. 214-07 § 11.9(b)(2)(A).  The City's extensive requirements largely address aesthetic concerns and

21   purport to expand the City's authority well beyond the power granted in Cal. Pub. Util. Code § 7901.1.

22   Section 7901.1 only gives cities the authority to regulate the manner in which roads are accessed, not to

23   regulate the manner in which telephone companies affect the road's appearance.  Moreover, as discussed

24   above, the City's requirements are not applied to all users in an equivalent manner, as required by

25   Section 7901.1.  Thus, the City's ordinances contravene state law and public policy.

26                                    **IV.    CONCLUSION**

27           With its New Ordinance, the City again is establishing itself as the subjective arbiter over market

28   entry by a segment of the telecommunications market.  As such, its requirements, on the face of the

Ordinance, are the same as those stuck down in *NextG San Francisco*, *Auburn*, and a growing body of decisions.  The City's discriminatory requirements are not legitimate right-of-way management and are not competitively neutral and nondiscriminatory.  Accordingly, the City's Ordinance is preempted by Section 253.  In addition, while NextG believes the various facts raised by the City are irrelevant to its facial challenge, nonetheless, they are disputed and central to the City's factual argument and, therefore, cannot be the basis for summary judgment for the City.  Plaintiff NextG Networks of California, Inc. respectfully requests that the City's Motion for Summary Judgment be denied.


Dated:  May 16, 2008.

Respectfully Submitted,

**DAVIS WRIGHT TREMAINE LLP**


By: /s/_____
        T. Scott Thompson
Attorneys for Plaintiff
NextG Networks of California, Inc.