1  DENNIS J. HERRERA, State Bar #139669
   City Attorney
2  THERESA L. MUELLER, State Bar #172681
   Chief Energy and Telecommunications Deputy
3  WILLIAM K. SANDERS, State Bar #154156
   THOMAS J. LONG, State Bar #124776
4  Deputy City Attorneys
   City Hall, Room 234
5  1 Dr. Carlton B. Goodlett Place
   San Francisco, California 94102-4682
6  Telephone:      (415) 554-6548
   Facsimile:      (415) 554-4757
7  E-Mail:         thomas.long@sfgov.org

8  Attorneys for Defendants
   THE CITY AND COUNTY OF SAN FRANCISCO and
9  THE DEPARTMENT OF PUBLIC WORKS OF THE
   CITY AND COUNTY OF SAN FRANCISCO

10

11              UNITED STATES DISTRICT COURT

12             NORTHERN DISTRICT OF CALIFORNIA

13               SAN FRANCISCO DIVISION

14

15  NEXTG NETWORKS OF CALIFORNIA,        Case No. CV-08-0985-MHP
    INC., a Delaware corporation,

16              Plaintiff,               **DEFENDANTS' OPPOSITION TO
                                         PLAINTIFF'S MOTION FOR
17        vs.                            JUDGMENT ON THE PLEADINGS**

18  THE CITY AND COUNTY OF SAN           Hearing Date: June 9, 2008
    FRANCISCO and THE DEPARTMENT         Time:         2:00 p.m.
19  OF PUBLIC WORKS OF THE CITY OF       Place:        Courtroom 15
    SAN FRANCISCO,

20              Defendants.

21

22

23

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................... iii

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ...................................1

II.     PROCEDURAL HISTORY.................................................................................3

III.    STATEMENT OF FACTS ..................................................................................3

      A.      *NextG I* ..................................................................................................4

      B.      ExteNet Systems Litigation ...................................................................4

      C.      The City's New Ordinance and Implementing Regulations......................5

            1.      Overview....................................................................................5

            2.      The Department Maps Are Easy to Use and Involve No DPW
                  Discretion......................................................................................6

            3.      The Wireless Permit Review Process .............................................7

                  a.      The Regulations Create a New, Streamlined Process for
                          Approving Applications in Unprotected Locations .............7

                  b.      The Process for Reviewing Applications in Protected
                          Areas Is Neither Time Consuming nor Cumbersome and
                          Is Tailored to the City's Legitimate Need to Protect Its
                          Identified Historic and Scenic Resources .........................8

            4.      Types of Equipment Constituting Wireless Facilities ...................10

IV.     NEXTG'S MOTION RELIES ON FACTUAL ALLEGATIONS THAT
      CANNOT SUPPORT THE RELIEF IT SEEKS. ................................................10

      A.      Legal Standard for a Rule 12(c) Motion .................................................10

      B.      NextG's Factual Summary Relies on Many Allegations That Are Not
            Established by the Pleadings or Otherwise Supported by Admissible
            Evidence.....................................................................................11

V.      LEGAL STANDARDS APPLICABLE TO NEXTG'S PREEMPTION
      CLAIMS .............................................................................................................14

      A.      NextG Must Overcome a Strong Presumption In Order to Preempt the
            City's Traditional Authority Over Land Use Matters..............................14

      B.      NextG Must Overcome a Heavy Burden in Its Facial Challenge of the
            City's Wireless Permit Regulations. .......................................................14

VI.     ARGUMENT.....................................................................................................15

      A.      NextG Has Not Met Its Burden of Demonstrating that Federal Law
            Preempts the Wireless Permit Regulations .............................................15

             1.      Section 253(a) Does Not Preempt the Wireless Permit
                  Regulations .................................................................................15

             2.      The Regulations Are Saved by the § 253(b) and § 253(c) Safe
                  Harbors.......................................................................................18

a.    The Regulations Properly Exercise the City's Authority to Manage the Public Rights of Way in a Non-Discriminatory Manner ....................................................18

3.    Section 332(c)(7) Shows That Congress Did Not Intend to Preempt the City's Regulations Managing the Placement of Wireless Facilities .........................................................21

a.    Section 253 Must Be Interpreted to Harmonize with § 332(c)(7) ...........................................................22

b.    Congress Expressly Preserved the City's Discretion to Deny Wireless Permits in Protected Locations.................22

B.    NextG Has Not Met Its Burden of Demonstrating that Public Utilities Code § 7901 Preempts the City's Regulations ...........................................24

VII.    CONCLUSION.....................................................................................25

APPENDIX OF STATUTORY AUTHORITIES ....................................................App.

## TABLE OF AUTHORITIES

**Federal Cases**

*American Bankers Assoc. v. Gould*
    412 F.3d 1081 (9th Cir. 2005) ........................................................................14

*Auburn Housing Auth. v. Martinez*
    277 F.3d 138 (2d Cir. 2002) ...........................................................................23

*Boise Cascade Corp. v. EPA*
    942 F.2d 1432 (9th Cir. 1991) ........................................................................22

*Cablevision of Boston, Inc. v. Public Improvement Commission*
    184 F.3d 88 (1st Cir. 1999)...........................................................................21

*City of Auburn v. Qwest Corp.,*
    260 F.3d 1160, 1175-76 (9th Cir. 2001)................................................16, 17, 19

*City of Rancho Palos Verdes v. Abrams*
    544 U.S. 113 (2005)........................................................................................24

*Communications Telesystems International v. California Pub. Util. Comm*
    196 F.3d 1011 (9th Cir. 1999) ..................................................................14, 18

*Cox v. State of Louisiana*
    379 U.S. 536 (1965)........................................................................................14

*Cox Communications v. City of San Marcos*
    204 F. Supp. 2d 1260 (S.D. Cal. 2002) ......................................................22, 24

*General Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregational Church*
    887 F. 2d 228 (9th Cir. 1989)........................................................................11

*GTE Mobilnet of California v.San Francisco*
    2007 U.S. Dist LEXIS 8801 (N.D. Cal. 2007).............................................17

*MetroPCS v. San Francisco*
    400 F.3d  715 (9th Cir. 2005) ........................................................................15

*NextG Networks of California, Inc. v. City of San Francisco*
    2006 U.S. Dist. LEXIS 36101 (N.D. Cal. 2006) .......................1, 17, 20, 21

*NextG Networks of California, Inc. v. County of Los Angeles*
    522 F. Supp. 2d 1240 (C.D. Cal 2007) .....................................................16, 17

*Omnipoint Corp. v. Zoning Hearing Bd.*
    181 F. 3d 403 (3d Cir. 1999) ........................................................................23

*Qwest Communications Inc. v. City of Berkeley*
    433 F.3d 1253 (9th Cir. 2006) ..............................................16, 17, 18, 19

*Qwest Corp. v. City of Portland*
    385 F.3d 1236 (9th Cir. 2004) ...................................................................16

*Salerno v. United States*
    481 U.S. 739 (1987)...................................................................................14

*Sprint Telephony PCS v. County of San Diego*, Nos. 05-56076, 05-56435
    (9th Cir. May 14, 2008) .........................................................................2, 15

*TCG Detroit v. City of Dearborn*
    16 F. Supp. 2d 785 (E.D. Mich. 1998) *affirmed*, 206 F.3d 618 (6th Cir. 2000) .......................21

*TCG New York, Inc. v. City of White Plains*
    305 F.3d 67 (2d Cir. 2002) .......................................................................21


**Federal Statutes**

28 United States Code
    Section 1367(c)(1) ...................................................................................25

47 United States Code
    Section 151 ...............................................................................................22

47 United States Code
    Section 253 ........................................................................................ passim
    Section 253(a) .................................................................................... passim
    Section 253(b).......................................................................2, 4, 15, 18
    Section 253(c) .................................................................................... passim
    Section 332(c)(7) ............................................................................... passim
    Section 332(c)(7)(A).................................................................................22
    Section 332(c)(7)(B).................................................................................22
    Section 332(c)(7)(B)(i) ............................................................................23
    Section 615b ............................................................................................22


Federal Rules of Civil Procedure
    12(c)................................................................................................... passim
    12(d)..........................................................................................................11
    56 ....................................................................................................... passim


**State Statutes & Codes**

California Public Resources Code
    Section 21000 ...........................................................................................7

California Public Utilities Code
    Section 7901 ....................................................................................1, 2, 24
    Section 7901.1 .................................................................................1, 2, 24

1

2

**San Francisco Codes & Charter**

San Francisco Administrative Code

Section 11.9 .................................................................................5
Section 11.9 (a) ............................................................................5
Section 11.9 (a), (b)(1) .................................................................5
Section 11.9(a)(2) .........................................................................6
Section 11.9(b)(2)(A) ................................................................6, 9
Section 11.9(b)(2)(B) ..........................................................6, 9, 18
Section 11.9(b)(2)(C) ....................................................................7
Section 11.1(bb) ..........................................................................20
Section 11.9(b)(2) ........................................................................12
Section 11.9(b)(2)(A), (B) ............................................................5
Section 11.9(b)(3) .........................................................................6
Section 11.9(b)(3)(A) ....................................................................6
Section 11.9(b)(3)(B) ....................................................................6

San Francisco Charter

Section 4.106(b)..........................................................................13

**Other Authorities**

Manual of Federal Practice 5th

Section 4.31 ................................................................................10

**Other References**

H.R. Conference Report No. 104-458 (1996)..................................14, 23, 24

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I.    **INTRODUCTION AND SUMMARY OF ARGUMENT**

In its Motion for Judgment on the Pleadings ("NextG Motion"), plaintiff NextG Networks of California, Inc. ("NextG") contends that the new wireless permit regulations adopted by defendants the City and County of San Francisco and the Department of Public Works (collectively "the City") "re-impose[] essentially the same burdensome and wholly discretionary requirements" that this Court invalidated in *NextG Networks of California, Inc. v. City of San Francisco*, 2006 U.S. Dist. LEXIS 36101 (N.D. Cal. 2006) ("*NextG I*").  NextG Motion, p.1.  However, NextG has never submitted an application under the City's new regulations, and NextG seriously misunderstands the basic facts about how the regulations work.  Contrary to NextG's allegations, the new regulations are nothing like the major encroachment permit ("MEP") process that this Court in *NextG I* found to be preempted by 47 U.S.C. § 253.[1]

In summary, the regulations establish two alternative processes for obtaining wireless permits, depending on where the applicant wishes to construct its facilities.  If the proposed site is not in a location that the City has identified as having an important scenic, historic or architectural resource (an "unprotected location"), the regulations provide a quick, easy and inexpensive path to obtain a permit.  In the usual case, applicants will be able to obtain a permit to construct facilities in unprotected locations within seven business days of submitting a complete application.  If the proposed site is in a location where important scenic, historic or architectural resources are present (a "protected location"), the application will undergo review by expert City staff.  Unlike the MEP process, this review will be free of any hearings, will not involve the City's Board of Supervisors, and is targeted to be completed within fifteen business days.  The purpose of the review will be to allow City experts to protect San Francisco's celebrated views, architecture, history and open spaces.

NextG's claims that the City's regulations are preempted by § 253 and California Public Utilities Code §§ 7901 and 7901.1 rest on factual allegations about the City's regulations that are not established by the pleadings and therefore cannot support NextG's motion under Federal Rule of

---

[1]  Relevant portions of federal and state statutes discussed in this memorandum are reproduced in the attached Appendix of Statutory Authorities.

1    Civil Procedure 12(c).  For example, NextG contends that the regulations fail to provide any clear

2    information showing the protected locations and that, instead, the Department of Public Works

3    ("DPW") will exercise broad discretion in deciding which applications trigger review by City experts.

4    Because the City denied these factual allegations in its Answer to NextG's Complaint, this Court

5    must deem these allegations to be false.   In any event, NextG will never be able to prove these and

6    other key allegations because they are directly at odds with the regulations and implementing

7    documents.  As the City showed in its Motion for Summary Judgment on the First and Second Claims

8    of the Complaint[2], the City's new regulations are a valid exercise of local authority that Congress and

9    the California legislature intended to safeguard from preemption.

10        The facts that the Court can consider in this motion for judgment on the pleadings show that

11   NextG has not met its burden of proving preemption under § 253 for three reasons, any one of which

12   defeats NextG's federal claim.  First, the City's regulations lack the combination of features that the

13   Ninth Circuit has found to justify preemption under § 253(a).  Second, the regulations carry out the

14   City's legally protected authority under § 47 U.S.C. 253(b) and § 253(c) to protect the public safety

15   and welfare and to manage the public rights-of-way.  Third, 47 U.S.C. § 332(c)(7) expressly forbids

16   preemption of the particular means by which the City manages the placement of wireless facilities in

17   its streets.

18        With respect to NextG's § 7901 and § 7901.1 claim, the Court should not even reach the

19   merits because the very issue raised by NextG is a novel and unresolved issue of state law.  Should

20   the Court decide to hear this claim, it should find that the City's regulations exercise authority that is

21   fully consistent with state law.

23        [2] On May 14, 2008, the Ninth Circuit issued an order to rehear *en banc* the three-judge panel
24   opinion in *Sprint Telephony PCS v. County of San Diego*, an opinion NextG cited frequently in its
     motion for judgment on the pleadings.  The order specifies that the three-judge panel opinion may not
25   be cited as precedent.  *Sprint Telephony PCS v. County of San Diego*, Nos. 05-56076, 05-56435 (9th
     Cir. May 14, 2008).  Because the City filed its summary judgment motion prior to this order and
26   because of the centrality of the three-judge panel opinion to NextG's case, the City cited to and
     discussed that opinion in its summary judgment motion.  In the Argument Section of this brief, the
27   City restates the § 253 arguments by removing citations to and discussions of the *Sprint* decision on
     which NextG relied.

28

DEFS.' OPP. TO MOT.  FOR JUDG. ON PLEADINGS        2
CASE NO. CV-08-0985-MHP

1   The City has completely revamped its regulations and NextG has not even given them a try.

2   As a result, NextG has premised its facial challenge on significant misstatements regarding how the

3   City's regulations operate.  The Court should deny NextG's motion and grant the City's motion for

4   summary judgment.

5   **II.    PROCEDURAL HISTORY**

6   NextG filed its Complaint on February 15, 2008.  On March 11, 2008, the City filed its

7   Answer, in which it denied all of the significant factual allegations of the Complaint. On April 3,

8   2008, NextG filed the present motion for judgment on the pleadings under FRCP 12(c).  Shortly

9   thereafter, the City notified NextG that, in response to the NextG Motion, the City intended to file a

10  motion for summary judgment.  The parties stipulated to a revised briefing and hearing schedule,

11  which this Court signed.  Stipulation Regarding Motion Schedule and Order Continuing Case

12  Management Conference ("Stipulation"), Doc. No. 12, April 25, 2008.  In accordance with the

13  Stipulation, the City filed its summary judgment motion on April 28, 2008.  Under the Stipulation,

14  NextG had the option to file a cross-motion for summary judgment on May 2, 2008, an option that

15  NextG declined, thereby foregoing the opportunity to present evidence to supplement its Complaint

16  in support of an affirmative motion for relief.

17  Under the Stipulation, this opposition to the NextG Motion and NextG's opposition to the

18  City's summary judgment motion are to be filed on May 16, 2008.  The parties' respective reply

19  papers are due on May 23, 2008, and the hearing is set for June 9, 2008.

20  **III.    STATEMENT OF FACTS**[3]

21  This Section presents a detailed explanation of how the City's new regulations actually work,

22  based primarily on the ordinance enacting the regulations and other implementing documents.  To

23  establish the context for the new regulations, the City begins by discussing *NextG I* and related

24  litigation.

25

26

27  [3] For the benefit of the reader who has read the City's motion for summary judgment, this Section is substantively the same as Section II of the City's summary judgment motion.

28

DEFS.' OPP. TO MOT.  FOR JUDG. ON PLEADINGS          3
CASE NO. CV-08-0985-MHP

**A.    *NextG I***

In *NextG I*, this Court found that § 253(a) preempted the City's MEP ordinance, *id*. at *11-21, and rejected the City's defenses that the safe harbor provisions (§ 253(b), § 253(c)) saved the MEP ordinance from preemption by § 253(a), *id*. at *21-27.  This Court determined that the process for obtaining major encroachment permits, which involved multiple public hearings: (i) is "time-consuming and expensive;" and (ii) affords the City's Board of Supervisors "unfettered discretion" to reject a permit "for whatever reasons they choose."  *Id*.  at *16, *22.

While finding for NextG, this Court acknowledged the City's legitimate "concern that *absent regulation*, wireless antennas will proliferate without regard for public convenience, the negative views of residents, or *aesthetic guidelines*."  *Id*.  at *27 (emphasis added).  This Court noted that § 253 did "not foreclose[ ] [the City] from regulating wireless carriers through neutral, explicit conditions for access which permit carriers to install their antennas and are limited to what is necessary to promote effective management of the City's rights-of-way."  *Id.*

**B.    ExteNet Systems Litigation**

On October 18, 2006, one of NextG's competitors, ExteNet Systems Inc. ("ExteNet"), filed a complaint against the City, asserting claims similar to NextG's.  (*See* Declaration of William K. Sanders in Support of Defendants' Motion for Summary Judgment ("Sanders Dec."), ¶ 5.)  After the judgment in *NextG I,* the City had stopped using MEPs for siting wireless facilities and instead offered ExteNet a utility conditions permit ("UCP") that required review by the City's Planning or Recreation and Park ("Rec/Park") Departments for applications to construct wireless facilities in certain protected locations.  (*Id.*, ¶ 6.)

At a November 9, 2006 hearing on ExteNet's motion for a temporary restraining order, this Court stated to ExteNet:  "There are going to be times when you are not going to be able to put the equipment on certain poles and certain locations, just because there are issues that the city has to be concerned about."  (*Id.,* ¶ 7 and Ex. C, p. 35, lines 22-25).  This Court also stated that, for the locations for which Planning or Rec/Park Department approval would be required, the City should develop a process by which "not a whole series of appeal after appeal after appeal is going to be required, but a timely response can be made."  (*Id.,* Ex. C, p.35, lines 16-18.)

**C.    The City's New Ordinance and Implementing Regulations**

   **1.    Overview**

To address the problems and concerns identified by this Court in *NextG I* and the ExteNet litigation, the City has enacted new regulations (collectively "the Wireless Permit Regulations" or "Regulations"). The Regulations consist of three parts:  (1) "the Ordinance" (Complaint, Ex. E), which is now codified at San Francisco Administrative Code § 11.9 (Declaration of Daniel McKenna in Support of Defendants' Motion for Summary Judgment ("McKenna Dec."), ¶ 3 and Ex. A); (2) DPW Order No. 177,163 ("the Order") (McKenna Dec., ¶ 4 and Ex. B); and (3) certain maps prepared by the City referred to in the Order (the "Department Maps" or "Maps") (McKenna Dec., ¶¶ 12-23 and Exhs.C, D).

Under the San Francisco Administrative Code, all telecommunications services carriers are required to obtain UCPs in order to use the public rights-of-way. S.F. Admin. Code § 11.9(a). The Ordinance amends the Administrative Code to require any entity that is entitled to a UCP, and that seeks to install personal wireless services facilities ("Wireless Facilities") in the public rights-of-way, to also obtain a personal wireless service facilities site permit ("Wireless Permit"). S.F. Admin. Code § 11.9 (a), (b)(1). NextG does not dispute that its antennas and related equipment are subject to the Ordinance. *See* NextG Motion, p. 1. The Order implements the Ordinance by establishing a procedure for DPW to issue Wireless Permits. The Department Maps facilitate the application and DPW review process.

A key feature of the Regulations is that they establish two alternative processes for obtaining Wireless Permits, depending on where the applicant wishes to locate its wireless facilities. If an applicant seeks to place facilities in one of the enumerated locations in the City in which there are protected historic, architectural, locally significant, or scenic resources, the Regulations require the Planning Department to review the application; if the applicant wishes to locate facilities adjacent to a public park, the Rec/Park Department must review the application. S.F. Admin.Code § 11.9(b)(2)(A), (B); Order, § III.D.4, 5. For any location outside of these protected locations, DPW may issue the Wireless Permit without any review related to protected City resources. Order, § III.D.

1    The Regulations sharply reduce the fees that the City had required under the MEP process at

2    issue in *NextG I*.  All fees are based on the costs of processing and reviewing applications.  S.F.

3    Admin. Code § 11.9(b)(3).  Fees to cover DPW costs will not exceed $225 per application.  *Id.,* §

4    11.9(b)(3)(A).  If review by other departments is required, additional fees apply, ranging from $105

5    to $135, plus time and materials.  *Id.,* §11.9(b)(3)(B).  The new fee structure is dramatically less than

6    the $4,800 in MEP fees identified in *NextG I*, 2006 U.S. Dist. LEXIS, *15.[4]

7         **2.**     **The Department Maps Are Easy to Use and Involve No DPW Discretion.**

8    There are two types of Department Maps.  *See* Order, § II.L.  The Planning Department Maps

9    show the locations that would require the approval of the Planning Department before DPW could

10   issue a Wireless Permit.  S.F. Admin. Code § 11.9(b)(2)(A); Order § III.D.4.  The Rec/Park

11   Department Map shows the City parks and open spaces that require Rec/Park Department approval

12   before DPW may issue a Permit for an adjacent location.  S.F. Admin. Code § 11.9(b)(2)(B).

13   (McKenna Dec., Ex. D (Planning Department Map) and Ex. C (Rec/Park Department Map).)

14   The Planning Department Maps are available in two formats, PDF and MapView.  (McKenna

15   Dec., ¶¶ 17-21.)  In either format, a user may enlarge the Map on a computer screen so that individual

16   street segments or buildings can be easily viewed.  (*Id.,* ¶¶ 20, 23.)  Examples of enlargements of a

17   segment of the Maps, in both formats, are attached to the McKenna Declaration.  (*Id.,* Exhs. E, F.)

18   The MapView format is linked to a searchable database that can be used to determine if a particular

19   pole location is a protected location requiring additional review.  (*Id.,* ¶ 12.)  This is the same Map

20   and database that DPW will consult when it makes its completely non-discretionary determination of

21   the applicable process.  (*Id.,* ¶ 22.)  The Rec/Park Department Map is in PDF format and may also be

22   enlarged to show individual street segments.  (*Id., ¶* 12.)

23   The Department Maps reflect the protected resources identified by the Planning and Rec/Park

24   Departments and do not involve any discretion by DPW.  The historic, architectural, and locally

25   significant resources shown on the Planning Department Map reflect determinations – based on

---

26   [4]  To obtain a UCP, which generally authorizes telecommunications carriers to use the public
27   rights-of-way, carriers must pay DPW a one-time fee of $2,000 to cover the City's costs.  S.F.
      Admin. Code § 11.9(a)(2).

28

1  rigorous evaluations by national, state, or local experts – of the historic, architecturally and locally

2  significant districts and buildings that merit special consideration before they or their surroundings

3  could be altered by new construction.  (Declaration of Mark Luellen in Support of Defendants'

4  Motion for Summary Judgment ("Luellen Dec."), ¶¶ 3-17.)  Among other reasons, the Planning

5  Department must identify historic resources in order to meet its obligations under the California

6  Environmental Quality Act ("CEQA").  Calif. Pub. Resources Code § 21000, *et seq.*  (Luellen Dec.,

7  ¶¶ 4-8.)  Similarly, the categories of scenic streets enumerated in the Regulations and the streets that

8  fall within those categories have been determined by expert City planners in fulfillment of the

9  principles and requirements of the City's state-mandated General Plan.  (Declaration of Amit K.

10  Ghosh in Support of Defendants' Motion for Summary Judgment ("Ghosh Dec."), ¶¶ 6-17. )

3.    **The Wireless Permit Review Process**

a.    **The Regulations Create a New, Streamlined Process for Approving Applications in Unprotected Locations**

14        For applications to construct Wireless Facilities in unprotected locations, the Regulations

15  create a new process that is streamlined both in the amount of required information and the time for

16  approval of the Permit.  Applicants need only provide the following information:  a description of the

17  facilities to be installed; a drawing of the location of the proposed pole and existing and proposed

18  facilities on the pole; applicant contact information; proof that the applicant has permission of the

19  pole owner to install facilities; a statement that requirements under CEQA have been or will be

20  satisfied; and a verified statement of compliance with the Federal Communications Commission's

21  (FCC) regulations regarding exposure to RF emissions.  Order, § III.C.1-5.  The verified RF

22  statement need only be furnished to the City once for each particular type of RF transmission

23  equipment.  Order, § III.C.4.

24        Upon receipt of a completed application, DPW will refer the verified RF statement (if one is

25  required) to the Department of Public Health ("DPH") for confirmation of compliance with FCC

26  requirements.  S.F. Admin. Code § 11.9(b)(2)(C); Order, § III.C.8.  DPW will request that DPH make

27  this determination within ten days of the referral and will make good faith efforts to ensure

28  compliance with this request.  Order, § III.C.8.  DPW will approve the application within five

1   business days of receipt of DPH's determination of FCC compliance. Order, § III.C.7. In the more

2   common situation in which the applicant has already obtained a DPH finding of FCC compliance for

3   its equipment, the Department shall approve the application within seven business days of receipt of

4   the completed application. *Id.*. The Department will not hold any hearing on the application.

5   (McKenna Dec., ¶ 28.)   In sum, applications to install equipment in unprotected locations require

6   minimal information and will, in most instances, be approved within seven business days.

7           NextG attempts to minimize the importance of this new, streamlined process by alleging that

8   "at least 90% of NextG's anticipated new facility installations will be subject to review by the

9   Planning Department and/or Recreation and Park Department." Complaint, ¶ 49. Similarly, in its

10  motion, NextG claims that, "[i]n the vast majority of the City," NextG would be subject to review by

11  these departments and/or DPH.[5] NextG Motion, pp. 6-7.

12          NextG's own experience refutes its claims. After the judgment in *NextG I*, NextG could

13  install equipment on poles anywhere in the City without any City review; thus, NextG had no reason

14  to locate its facilities in unprotected locations. Nevertheless, 20 of the 30 locations that DPW could

15  locate on the Department Map were in unprotected locations and would have been subject to the new

16  streamlined process. (McKenna Dec., ¶¶ 24 - 26.) Similarly, Verizon Wireless recently located all

17  14 of its proposed sites in unprotected areas. (*Id.,* ¶ 27, Ex. G).

18                          **b.    The Process for Reviewing Applications in Protected Areas Is
19                                  Neither Time Consuming nor Cumbersome and Is Tailored to the
                                    City's Legitimate Need to Protect Its Identified Historic and Scenic
20                                  Resources**

21          For applications to construct Wireless Facilities in protected locations, the Regulations require

22  the minimum amount of information and review necessary to prevent harm to the City's identified

23  historic and scenic resources. The only additional information that applicants must furnish for

24  protected locations is a photo-simulation of the Wireless Facilities at the proposed location and a

25  photo and site drawing showing any Wireless Facilities within a 150-foot radius of the proposed

26  _____

27          [5]  As shown above, DPH review is not triggered by the proposed location, but rather by
    whether the equipment has previously been reviewed for conformity with FCC regulations.

28

location.  Order, § III.C.6.  DPW will request that the Planning or Rec/Park Departments complete its review within fifteen business days of the referral from DPW, and DPW will make good faith efforts to ensure compliance with this request.  Order, § III. D.9.  DPW must issue an approval or denial of the Wireless Permit within five business days of receiving the determination from the Planning or Rec/Park Departments.  *Id*., § III.D.10.  Neither the Ordinance nor the Order allow for the Planning or Rec/Park Departments to hold any hearings, and therefore – contrary to NextG's supposition - no hearings will be held before granting or denying the Permit.  (*See* Ghosh Dec., ¶ 25; Declaration of Daniel LaForte in Support of Defendants' Motion for Summary Judgment, ¶ 3).

The Ordinance specifies the standards that the Planning and Rec/Park Departments are to apply to their review of proposed facilities in protected locations.  The Planning Department must determine that the proposal is "consistent with the public health, safety, convenience and general welfare and will not unreasonably affect, intrude upon or diminish any of the identified City resources."  S.F. Admin. Code § 11.9(b)(2)(A).[6]  Similar standards guide the Planning Department's responsibilities in many areas.  (Ghosh Dec., ¶¶ 20-24.)  The standards are necessarily flexible because of the diversity of historic and scenic locations that trigger Planning Department review, and the resulting diversity of factors that will need to be considered.  (*Id*., ¶ 18.)  Some of the many potential factors include the extent of other "visual clutter" in the area, the compatibility of the proposed facilities with neighboring structures, the quality and importance of any view or historic resource that may be affected, the extent to which vegetation may mask the facilities, and the size, shape, color, and location on the pole of the proposed equipment.  (*Id***.,** ¶ 19**.**)  For example, review of facilities proposed to be located on a street with a "good" view could involve different considerations from those that would apply to facilities proposed to be placed in front of City Hall.  (*Id.*, ¶ 18.)

For these reasons, the process for reviewing applications to construct Wireless Facilities in protected locations is nothing like the MEP process this Court invalidated in *NextG I.*  It is not burdensome, time-consuming, or expensive to obtain a Wireless Permit.  Among the many critical

---

[6]  For proposed locations adjacent to a City park or open space, the Rec/Park Department must find that the proposal "will not unreasonably affect, intrude upon or diminish a City park or open space."  *Id*., § 11.9(b)(2)(B).

1    differences from the process that this Court reviewed in *NextG I*, 2006 U.S. Dist. LEXIS, *14-16, are

2    the following: (1) no explanation of the purpose of the facilities is required; (2) photo-simulations are

3    only required for protected locations; (3) permit fees are much lower and cost-based; (4) applicants

4    are not required to provide notice to numerous other City agencies; (5) reports from other City

5    agencies are not required; (6) no City department will hold a public hearing; (7) DPW will not submit

6    a recommendation to the Board of Supervisors ("Board"); (8) the Department, not the Board, will

7    decide whether to grant or deny the Permit; and (9) where discretion is exercised with respect to

8    protected locations, it is guided by explicit standards and vested in City experts.

9    ### 4.    Types of Equipment Constituting Wireless Facilities

10   There is a variety of equipment and equipment configurations that providers such as NextG

11   may wish to install on poles.  The most visually prominent piece of equipment is the wireless antenna

12   and the supporting crossarm.  The California Public Utilities Commission ("CPUC") requires that

13   wireless antennas on utility poles extend out at least two feet from the center of the pole, which

14   requires the use of crossarms and brackets to support the antennas.  See CPUC General Order (GO)

15   95, Rule 94.4.C ; (Sanders Dec., Ex.B).  Despite these requirements, not all antennas look the same.

16   Some of NextG's installations in the City have included an antenna comprised of two gray box-

17   shaped elements.  (*See* Sanders Dec., ¶¶ 2-3, Ex. A.)  NextG also has used canister-shaped antennas.[7]

18   Some of NextG's installations have included the following additional above-ground equipment: (1) a

19   repeater; (2) a box containing battery back-up equipment; and (3) an electric meter.  (*See id.*)

20   ## IV.    NEXTG'S MOTION RELIES ON FACTUAL ALLEGATIONS THAT CANNOT SUPPORT THE RELIEF IT SEEKS.[8]

21   
22   ### A.    Legal Standard for a Rule 12(c) Motion

23   For purposes of a Rule 12(c) motion, all controverted allegations in the pleadings of the

24   moving party are treated as false.  Richard A. Givens, *Manual of Federal Practice 5th,* § 4.31.  A

25   [7]  *See* Supplemental Declaration of Nicole Mason in Support of Plaintiff's Opposition to Defendants' Motion to Clarify the Scope of the Injunctive Relief Granted to Plaintiff and/or to

26   Modify the Judgment, No. CV 05-0658 (MHP), Document 83, Filed 12/12/07, Ex. C.

27   [8]  This Section directly responds to NextG's motion for judgment on the pleadings and its contents were not part of the City's summary judgment motion.

28

plaintiff is not entitled to judgment on the pleadings if the answer raises issues of fact or an affirmative defense which, if proved, would defeat plaintiff's recovery. *General Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregational Church,* 887 F. 2d 228, 230 (9th Cir. 1989). If matters outside the pleadings are presented to and not excluded by the court, the motion for judgment on the pleadings is converted into a Rule 56 summary judgment motion. FRCP 12(d).

As shown above, NextG's motion relies on several factual allegations that are controverted and therefore cannot support a Rule 12(c) motion. Even if the motion is converted to a Rule 56 summary judgment motion, these allegations are not supported by declarations and do not otherwise constitute admissible evidence.

**B.    NextG's Factual Summary Relies on Many Allegations That Are Not Established by the Pleadings or Otherwise Supported by Admissible Evidence**

The foundation of NextG's motion is an eight-page "Factual Summary" containing "facts" that NextG asserts are either established through the Complaint and Answer or are subject to judicial notice. However, NextG interposes a revealing caveat: if some of its purported facts are not established on the pleadings, "they are not ultimately necessary to the outcome of the motion." NextG Motion, p.2. NextG is right to be tentative. Several of NextG's key allegations are not established by the pleadings, because the City denied the paragraphs in the Complaint containing those allegations. In fact, these allegations are demonstrably false, as the City has shown herein and in its related summary judgment motion. Some of these unestablished facts are central to NextG's theme that the City's new regulations are "essentially the same" as the MEP process. NextG Motion, p. 1. NextG's inability to support this theme defeats its motion.

 NextG factual allegations that are not established on the pleadings include the following:

(1) *The issue of whether an application will be referred to the Planning Department or Rec/Park Departments is "fraught with discretion" because maps showing the protected locations are "nearly illegible and will require interpretation by DPW."* NextG Motion, p. 8. NextG supports this argument by citing to some maps that the City submitted to the Court in its post-judgment motion in *NextG I* on October 26, 2007. *Id.* However, in a December 3, 2007 submission in *NextG I,* the

City explained that it was preparing new maps that would clearly identify whether a particular location required Planning Department review.  (*See* Reply Declaration of Daniel McKenna in Support of Defendants' Motion to Clarify the Scope of the Injunctive Relief Granted to Plaintiff and/or To Modify the Judgment (Case No. 05-00658-MHP), ¶ 8.)  As promised, no later than January 11, 2008, the City shared with NextG a much clearer map of the protected locations requiring Planning Department review.  (*See* McKenna Dec., ¶¶ 16-18.)  NextG ignored this new map in its February 15, 2008 Complaint (¶ 50) (as well as in its April 3, 2008 motion).  Accordingly, the City denied NextG's allegations in its Answer (¶ 50).  In sum, NextG's allegations regarding the illegibility of the maps and purported DPW discretion are controverted and therefore false for purposes of Rule 12(c).  Because the maps on which NextG relies are clearly obsolete, they are irrelevant under Rule 56.  In any event, as the City has shown above in Section III.C.2 and in its motion for summary judgment (§ II.C.2), the undisputed evidence is that the Department Maps are clear, easy to use, and contain information provided to DPW from the Planning Department.

(2)  *Some of the protected locations are "based entirely on DPW's discretionary, subjective notions of what is 'significant' or 'an important street view or orientation' or 'good view'."*  NextG Motion, p. 8.  NextG does not offer a citation to its Complaint or to any other admissible evidence for this allegation.  Consequently, it must be deemed false under both Rule 12(c) and Rule 56.  In any event, as the City has shown above in Section III.C.2 and in its motion for summary judgment (§ II.C.2), these allegations are demonstrably false.

(3)  *"In the vast majority of the City" the new regulations would require review of NextG's permit applications by the Planning Department, Rec/Park Department, Department of Public Health "and in some cases, all of them."*  NextG Motion, pp. 6-7.  NextG cites § 11.9(b)(2) of the Ordinance to attempt to support this allegation.  However, nothing in subsection (b)(2) speaks to the geographic scope of the protected locations triggering Planning or Rec/Park Department review.[9]  As previously

---

[9]  NextG also cites to a hearing before the Board of Supervisors Land Use Committee in which a DPW staff person stated that DPW would refer the applications to these departments.  NextG Motion, p. 7.  Whether or not that statement accurately described the Ordinance is irrelevant.  The Ordinance itself and the Order clearly state when such references are required.

1   noted, NextG's Complaint (¶ 49) similarly alleged that "at least 90%" of NextG's new wireless

2   installations would require Planning or Rec/Park Department review, an allegation the City denied.

3   Answer, ¶ 49.  Consequently, NextG has not presented any legally cognizable facts regarding the

4   extent to which it will be required to obtain Planning or Rec/Park Department approval.  Moreover,

5   as shown in Section III.C.3.a. above and in the City's summary judgment motion (§ II.C.3.a),

6   evidence from NextG's previous construction and planned construction by Verizon Wireless refutes

7   NextG's unsupported allegation.

8        (4)  *The Ordinance does not define a pathway for appeals.*  NextG Motion, pp. 7, 9.  As noted

9   above, the Order specifically states that DPW's approval or denial of a Wireless Permit may be

10  appealed under San Francisco Charter § 4.106(b) to the City's Board of Permit Appeals.  Order, § VI,

11  McKenna Dec., Ex. B.

12       (5)  *Hearings before the Planning and Rec/Park Departments are possible.*  NextG Motion, p.

13  9.  NextG made the same allegation in its Complaint, which the City denied. *Compare* Complaint, ¶

14  52 *with* Answer, ¶ 52.  As this allegation is controverted and not supported by any admissible

15  evidence, it must be treated as false under both Rule 12(c) and Rule 56.  In any event, as the City has

16  shown in Section III.C.3.b above and in its motion for summary judgment (§ II.C.3.b), the undisputed

17  evidence is that no such hearings will be held.

18       (6)  *"In order to construct, operate and maintain its facilities, NextG requires access to utility*

19  *poles located in the public rights-of-way."*  NextG Motion, p. 4.  NextG does not offer a citation to its

20  Complaint or to any other admissible evidence for this allegation.  Consequently, it must be deemed

21  false under both Rule 12(c) and Rule 56. [10]

22       (7)  *NextG's wireless antennas are "small."*  NextG Motion, p. 3.  This is a matter of opinion

23  for which NextG offers no support (there are no allegations regarding dimensions of the antennas or

24  photographs attached to the Complaint), and which the City would have denied had it been alleged in

25  the Complaint.  As this allegation is controverted and not supported by any admissible evidence, it

26  ────────────

27      [10] If NextG were to attempt to support this allegation, NextG would need to demonstrate with admissible evidence that it is unable to place its facilities in locations other than the public rights-of-way, such as on the tops of buildings or other structures.

28

DEFS.' OPP. TO MOT.  FOR JUDG. ON PLEADINGS     13
CASE NO. CV-08-0985-MHP

must be treated as false under both Rule 12(c) and Rule 56.  To provide some evidence to assist the Court on this issue, the City's summary judgment motion includes pictures of certain NextG antennas in San Francisco.  (Sanders Dec., Ex. A.)

NextG's inability to establish these key facts renders unsupportable NextG's arguments that the City's new regulations are burdensome, allow the City unfettered discretion at "nearly every stage" (NextG Motion, p. 14), and would "drive[] NextG back into the same discretionary process already struck down by this Court" (*id*., p. 6).  To the contrary, the new regulations afford NextG and other providers ample opportunity to provide telecommunications services in the City.

## V.    LEGAL STANDARDS APPLICABLE TO NEXTG'S PREEMPTION CLAIMS

### A.    NextG Must Overcome a Strong Presumption In Order to Preempt the City's Traditional Authority Over Land Use Matters

It is presumed that the historic police powers of state and local governments are not superseded by federal law, unless it is the "clear and manifest purpose of Congress" to do so. *American Bankers Assoc. v. Gould*, 412 F.3d 1081, 1086 (9th Cir. 2005).  State and local regulation over the provision of telecommunications services is one of those areas.  *Communications Telesystems International v. California Pub. Util. Comm. ("CTI")*, 196 F.3d 1011, 1017 (9th Cir. 1999) ("federal preemption of state regulation in the area of telecommunications must be clear and occurs only in limited circumstances").  Land use and management of the public rights of way are also areas traditionally reserved to local government.  *Cox v. State of Louisiana*, 379 U.S. 536, 554 (1965).  Indeed, Congress recognized this fact when it enacted the TCA.  *See* H.R. Conf. Rep. No. 104-458, at 207-08 (1996) (expressing Congress' intent to "preserve" authority of state and local governments over zoning and land use matters, except in the "limited circumstances" set forth in the TCA).  Accordingly, the TCA should be presumed not to preempt the City's Wireless Permit Ordinance unless there is strong evidence to support Congressional intent to do so.

### B.    NextG Must Overcome a Heavy Burden in Its Facial Challenge of the City's Wireless Permit Regulations.

To prevail on its facial challenge to the Regulations, NextG must show that there is no set of circumstances under which the Regulations would be valid.  *Salerno v. United States,* 481 U.S. 739, 745 (1987).  Because this case concerns Wireless Facilities, the logic in *MetroPCS, Inc. v. City and*

*County of San Francisco*, 400 F.3d 715 (9th Cir. 2005) (addressing claims under 47 U.S.C. § 332(c)(7)), is applicable:

> Zoning rules – such as those that allow local authorities to reject an application based on 'necessity' – may not suggest on their face that they will . . . have the effect of prohibiting wireless services. Thus, in most cases, only when a locality applies the regulation to a particular permit application and reaches a decision . . . can a court determine the TCA has been violated.

*Id*. at 724. Likewise, because the City's Wireless Permit Regulations on their face afford ample opportunity for NextG and others to provide telecommunications services in neighborhoods throughout the City, NextG's facial challenge offers no basis for the Court to find preemption.

## VI.    ARGUMENT[11]

### A.    NextG Has Not Met Its Burden of Demonstrating that Federal Law Preempts the Wireless Permit Regulations

NextG argues that it is entitled to judgment on the pleadings on its claim that § 253 preempts the City's Wireless Permit Regulations because the City's Wireless Permit process is "burdensome and subjects [NextG] to a standardless, undefined, and discretionary review process." NextG Motion, p. 13. NextG's motion must fail for each of three reasons: (1) the City's Regulations do not fall under the scope of regulations preempted by § 253(a); (2) the City's Regulations are saved by § 253(b) and § 253(c); and (3) § 332(c)(7) shows that Congress did not intend for any provision of the TCA, including § 253(a), to preempt local regulations like the City's that manage the placement of wireless facilities based on impact on protected resources. The City needs to prevail on only one of these arguments for NextG's § 253 motion to fail.

### 1.    Section 253(a) Does Not Preempt the Wireless Permit Regulations

NextG has not met its burden under § 253(a) of showing that the City's Wireless Permit Regulations may effectively deny it the opportunity to provide telecommunications services in San

---

[11] Although this Section is substantively similar to Section IV of the City's summary judgment motion, it differs in that it (1) responds specifically to NextG's arguments in its motion for judgment on the pleadings and (2) removes citations to and discussions of the *Sprint* decision on which NextG relied, in light of the Ninth Circuit's determination to rehear that decision *en banc*. *Sprint Telephony PCS v. County of San Diego*, Nos. 05-56076, 05-56435 (9th Cir. May 14, 2008).

1   Francisco.[12]  NextG's arguments for preemption are founded on its incorrect and unsupported views

2   about how the Regulations work.  In particular, Next G wrongly asserts that whether a particular

3   application will require discretionary approval by the Planning or Rec/Park Departments "is subject

4   to the unfettered discretion of DPW."  NextG Motion, p. 15.  As shown in Section III..C.2 above, the

5   Maps simply reflect the previous determinations by the Planning and Rec/Park Departments of the

6   protected locations.  DPW's determination of whether an applicant's proposed location is protected or

7   unprotected is not discretionary and is based on information equally available to DPW and the

8   applicants.

9          Apparently because of this fundamental error, NextG's preemption argument ignores the new,

10  streamlined process – with minimal information and fee requirements – that freely allows applicants

11  to place Wireless Facilities on utility poles in unprotected locations.  *See* § III.C.3, *supra.*  The

12  information required for such applications constitutes the bare minimum necessary to address health,

13  safety, and legal concerns and to be able to respond to public inquiries about equipment on poles.

14  The Regulations offer ample opportunity to take advantage of this streamlined process.  The

15  Department Maps and associated databases are fully available to applicants and clearly show the

16  protected and unprotected locations.  *See* § III.C.2, *supra.*  Visual inspection of the Maps shows that

17  there are many parts of the City where there are no protected locations and other parts of San

18  Francisco where unprotected locations are closely interspersed with protected locations.

19         This opportunity to readily obtain a Permit in unprotected locations readily distinguishes this

20  case from *NextG I* and the other decisions cited by NextG finding preemption under § 253(a).  *See,*

21  *e.g.*, *Qwest Communications Inc. v. City of Berkeley*, 433 F.3d 1253, 1256-68 (9th Cir. 2006)

22  ("*Berkeley*"); *City of Auburn v. Qwest Corp.*, 260 F.3d 1160, 1175-76 (9th Cir. 2001) ("*Auburn*");

23  *NextG Networks of California, Inc. v. County of Los Angeles*, 522 F. Supp. 2d 1240 (C.D. Cal 2007).

24  None of the factors justifying preemption of the local laws at issue in those cases (many of which

25  required franchises for the privilege of providing telecommunications services) are present for

26  _____

27  [12]  The Ninth Circuit has interpreted § 253(a) to apply to regulations that may have the effect
    of prohibiting telecommunications services.  *Qwest Corp. v. City of Portland*, 385 F.3d 1236, 1239
    (9th Cir. 2004).

28

1   applications to install Wireless Facilities in unprotected locations.  Instead, with respect to

2   applications to place antennas in unprotected locations:  (1) the submission requirements are minimal;

3   (2) the fees are minimal and cost-based; (3) there are no criminal penalties for violations; (4) no

4   hearings are required to obtain the Permit; and (5) no open-ended discretion is exercised.

5          NextG also has not met its burden of showing that the Permit process for *protected* locations

6   may have the effect of prohibiting telecommunications.  First, NextG has not yet submitted any

7   applications for Wireless Permits and thus is only able to make a facial challenge.  As a result, there

8   is no evidence that NextG will need to include equipment in many, or even any, protected locations.

9          Second, when the Ninth Circuit and other courts have found preemption under § 253(a), they

10  have done so based on a combination of features.  *Berkeley*, 433 F.3d at 1257-58 (non cost-based

11  fees, "very exhaustive" submission requirements, significant discretion, civil and criminal penalties);

12  *Auburn*, 260 F.3d at 1176 ("lengthy and detailed application form", public hearings, discretion

13  unrelated to right of way management, non cost-based fees, civil and criminal penalties); *County of*

14  *Los Angeles*, 522 F. Supp. 2d at 1250-52 ("lengthy, detailed and expensive application process",

15  public hearings, criminal and civil sanctions, "unfettered discretion" at multiple points).  The Permit

16  process with respect to protected locations presents only one of the features the Ninth Circuit has

17  found to justify preemption – that the Wireless Permits in protected areas are discretionary.

18  However, this discretion under the new Regulations is not "unfettered discretion to reject a permit

19  application altogether, for whatever reasons [the Board of Supervisors and DPW] choose."  *NextG I*,

20  2006 U.S. Dist. LEXIS at *22; *see also GTE Mobilnet of California v. San Francisco*, 2007 U.S. Dist

21  LEXIS 8801, *13-14 (N.D. Cal. 2007) (criticizing the City's MEP process for allowing the Board of

22  Supervisors to make decisions without "any governing or limiting standards").  Instead, the

23  Ordinance prescribes standards that could serve as the basis for a review on appeal:  the Planning

24  Department must determine that the proposed siting is consistent with the health, safety, convenience

25  and general welfare and will not unreasonably affect, intrude upon or diminish any of the identified

26

27

28

City resources.[13]  Furthermore, expert City planners, not members of the Board of Supervisors, will exercise this discretion.  The aesthetic judgments the City planners will make will be akin to the types of judgments they are called upon to make regularly under a variety of City ordinances in order to implement the City's land use policies.  (*See* Ghosh Dec., ¶¶ 20-24.)   In addition, the discretion is not exercised after a hearing in which members of the public will express their views on these issues. Thus, the fact that some Wireless Permits are discretionary is not sufficient, in and of itself, to establish preemption based on a facial challenge.

In sum, the mere possibility that NextG might submit applications to site equipment in protected locations, with the consequence that City experts could on occasion exercise reviewable discretion under explicit standards to deny those applications is not sufficient to justify preemption under § 253(a) based on a facial challenge.[14]

### 2.    The Regulations Are Saved by the § 253(b) and § 253(c) Safe Harbors

Even if the City's Regulations fall within the preemptive language of § 253(a), they are not preempted if they meet the safe harbor requirements of either § 253(b) or § 253(c).  *Berkeley*, 433 F.3d  at 1258; *CTI*, 196 F.3d at 1016-17 (upholding state regulatory actions under subsection (b)). Both safe harbors apply.[15]

### a.    The Regulations Properly Exercise the City's Authority to Manage the Public Rights of Way in a Non-Discriminatory Manner

NextG argues that the City's Regulations are not saved by § 253(c) because "the City's procedures encompass concerns and criteria unrelated to the management of the rights-of-way, including authorizing the City to deny applications for Wireless Permits "on the basis of location, aesthetics, and harmony with adjacent uses."  NextG Motion, pp. 17-18.  NextG's argument fails

---

[13]   Similarly, the Rec/Park Department must determine whether a proposed site adjacent to a park or open space would unreasonably affect, intrude upon or diminish a City park or open space. S.F. Administrative Code § 11.9(b)(2)(B).

[14]   While in its Complaint NextG asserts an "as applied" challenge, there are no facts alleged therein to support such a challenge, nor can there be because NextG has not applied for any Wireless Permits.

[15]   In its motion, NextG does not discuss § 253(b).  For this reason, the City refers the Court to the City's argument in its motion for summary judgment (§ IV.A.2.b.) that § 253(b) saves the City's Regulations.

because it is based on an unduly narrow interpretation of the scope of permissible management of the rights-of-way.

The phrase "manage the public rights-of-way" in § 253(c) means "control over the right-of-way itself, not control over companies with facilities in the right-of-way." *Auburn*, 260 F. 3d at 1177. Examples of regulations that attempt to control companies, rather than manage the rights-of-way, are ones that: (1) require applicants to demonstrate their technical and legal qualifications to provide telecommunications services, *Berkeley*, 433 F.3d at 1259; (2) require a description of telecommunications services to be provided, *Auburn*, 260 F.3d at 1178; (3) regulate ownership of the franchised telecommunications carriers, *id.*; (4) require applicants to offer best available rates and terms of service, *id*; or (5) require applicants to offer excess capacity for city use, *id*. Unlike the ordinances in those cases that the courts found were not saved by § 253(c), the Regulations do not impose such requirements -- or any others that can be construed as attempting to control the companies providing telecommunications services in San Francisco. For this reason, they are saved by § 253(c).

In addition, the legislative history of the TCA shows that Congress intended local governments to retain authority to regulate where facilities are placed in the public rights-of-way in accordance with local land use policies. For assistance in interpreting the phrase "manage the public rights-of-way," the Ninth Circuit has looked to examples of right-of-way management offered by Senator Dianne Feinstein during the floor debate on § 253(c). *Id*. at 1177-78. Senator Feinstein's nonexclusive list included "requir[ing] a company to place its facilities underground, rather than overhead, consistent with the requirements imposed on other utility companies," and "enforc[ing] local zoning regulations." *Id*. at 1177 (internal quotation marks omitted). Under the Regulations, the City exercises authority of the type identified by Senator Feinstein to regulate the placement of telecommunications facilities. In locations where there are no protected resources, applicants will find an easy path to construction of their Wireless Facilities. If and when applicants propose to site those facilities in protected locations, City experts will review the proposals to determine whether the Wireless Facilities will adversely affect the City's protected resources. Implicit in the Planning and Rec/Park Department review processes is the opportunity for the City and the applicant to work

1    together to reduce the impact on a protected resource by either avoiding installing Wireless Facilities

2    in those areas in the first place or, where feasible, by using a less intrusive style of antenna or by

3    locating some equipment underground.

4          Management of the public rights-of-way must include the discretion to deny a permit in

5    certain locations.  Just as one example, no reasonable person would dispute that allowing a Wireless

6    Facility on a pole in front of San Francisco's famous Victorian "Painted Ladies" would do violence to

7    an internationally famous view.[16]  Not all protected resources are as prized as those buildings and

8    view, but the Regulations reasonably allow the City to regulate the placement of potentially obtrusive

9    Wireless Facilities based on informed judgments about the impact the installation of such facilities

10   would have on the historic and scenic resources that are central to San Francisco's celebrated

11   character.  In sum, the Regulations address the City's reasonable concern, as aptly described by this

12   Court, that "wireless antennas will proliferate without regard for public convenience, the negative

13   views of residents, or aesthetic guidelines."  *NextG I*, 2006 U.S. Dist. LEXIS 36101 at *27.

14         Nor do the Regulations discriminate among telecommunications carriers.  Instead, they treat

15   all telecommunications carriers the same by requiring *all* carriers that have UCPs to obtain Wireless

16   Permits if they seek to install Wireless Facilities in the public rights-of-way.   The Ordinance defines

17   Wireless Facilities as "antennas and related Facilities used to provide or facilitate the provision of

18   Personal Wireless Service."  S.F. Admin. Code § 11.1(bb).  As a result, the Ordinance applies both to

19   personal wireless service carriers (like AT&T, Verizon and Sprint) and to entities like NextG that

20   install facilities to be used by personal wireless service carriers to service their customers.  The fact

21   that the City does not require similar permits for other types of telecommunications equipment does

22   not constitute discrimination among carriers.  In fact, NextG is a beneficiary of that policy.  Like

23   AT&T and other carriers, NextG does not need a permit, other than a UCP, to install its fiber optic

24   lines on utility poles.

25

26   _____

   [16]  This view can be seen at http://members.virtualtourist.com/m/p/m/328068/.

27

28

1    Even if this Court finds that the City is somehow subjecting NextG to differential treatment, it

2  is well settled that the City may take into account the differences between providers in regulating

3  telecommunications providers.  See *TCG New York, Inc. v. City of White Plains*, 305 F.3d 67, 80 (2d

4  Cir. 2002) ("The statute does not require precise parity of treatment."); *Cablevision of Boston, Inc. v.*

5  *Public Improvement Commission*, 184 F.3d 88, 103 (1st Cir. 1999) (as long as the City "makes

6  distinctions on valid considerations, it cannot be said to have discriminated" against a

7  telecommunications services provider); *TCG Detroit v. City of Dearborn*, 16 F. Supp. 2d 785, 792

8  (E.D. Mich. 1998), *affirmed*, 206 F.3d 618 (6th Cir. 2000) ("the explicit language of the statute does

9  not require . . . strict equality").  The City has a reasonable basis for treating Wireless Facilities

10  differently.  Carriers like NextG install large and obtrusive equipment on utility poles.  (*See* Sanders

11  Dec. at ¶¶ 2-3 and Ex. A.)   Furthermore, unlike their wireline counterparts, wireless carriers have

12  been able to provide wireless services for years without using the public rights-of-way.  See *GTE I*,

13  2007 U.S. Dist. LEXIS, at *2.

14    *NextG I* does not support NextG's discrimination argument.  In *NextG I,* this Court found,

15  based on a CPUC decision, that the City could not justify its differential treatment of limited and full

16  facilities-based carriers.  *NextG I*, 2006 U.S. Dist. LEXIS 36101, *25-26.  Here, in contrast, different

17  types of telecommunications service providers are treated the same – any telecommunications carrier

18  that seeks to install Wireless Facilities must obtain a Wireless Permit.  For example, if the incumbent

19  carrier, AT&T, were to seek to construct Wireless Facilities in the public rights-of-way, it would need

20  to obtain the same Wireless Permit as NextG.

### 3.    Section 332(c)(7) Shows That Congress Did Not Intend to Preempt the City's Regulations Managing the Placement of Wireless Facilities

    The same act of Congress that enacted § 253 also added § 332(c)(7),[17] which speaks directly

to the issue in this case – the extent of local governmental authority over the placement of wireless

facilities.  The City will show that:  (1) Congress plainly intended for § 253 to be read in harmony

with § 332(c)(7); and (2) Congress could not have been clearer that it intended to preserve precisely

---

[17]  Section 704 of the TCA added 47 U.S.C. § 332(c)(7) to the Communications Act.

the authority to regulate the placement of Wireless Facilities that the City asserts in the Wireless Permit Regulations.

### a. Section 253 Must Be Interpreted to Harmonize with § 332(c)(7)

Section 332(c)(7) is an overriding safe harbor provision for the exercise of local land use authority over wireless facilities. It applies to the entire Communications Act, including § 253. Section 332(c)(7)(A) states that "*nothing in this chapter* [*i.e*, the entire Communications Act[18]] shall limit or affect the authority" of local governments "over decisions regarding the placement, construction, and modification of personal wireless service facilities," subject only to the limitations in subsection (B) (emphasis added). Section 332(c)(7) clearly applies to the City's Wireless Permit Regulations because the Regulations govern City decisions regarding the placement and construction of Wireless Facilities in the City landscape. Section 332(c)(7) explicitly forbids the courts from preempting under § 253 regulation of Wireless Facilities that is permissible under § 332(c)(7).

Courts must make "every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous." *Boise Cascade Corp. v. EPA*, 942 F.2d 1427, 1432 (9th Cir. 1991). In *Cox Communications v. City of San Marcos*, 204 F. Supp. 2d 1260 (S.D. Cal. 2002)*,* the court recognized that the phrase "nothing in this chapter" in § 332(c)(7)(A) compelled the conclusion that Section 253 must be interpreted in light of § 332(c)(7). *Id.* at 1267. Accordingly, the court determined that, because § 332(c)(7)(B) contemplates public hearings regarding placement of wireless facilities, construing § 253 to preempt public hearings would "frustrate the purposes of [§] 332(c)(7)(B)." *Id.* at 1267-68. For this same reason, this Court may not interpret § 253 to preempt the City's Regulations based on requirements that are permissible under § 332(c)(7).

### b. Congress Expressly Preserved the City's Discretion to Deny Wireless Permits in Protected Locations

The unusually clear legislative history of the TCA shows that Congress intended to safeguard precisely the type of regulation exercised in the Wireless Permit Regulations. The addition of §

---

[18] 47 U.S.C. Chapter 5 comprises 47 U.S.C. § 151 through § 615b and thus includes §253.

1    332(c)(7) to the TCA represented a conscious choice by Congress to maintain a measure of state and

2    local control over the placement of wireless facilities.  *See Omnipoint Corp. v. Zoning Hearing Bd.,*

3    181 F. 3d 403, 407 (3d Cir. 1999).  The rejected House version of the legislation would have

4    displaced local land use authority and required the FCC to regulate the placement of wireless

5    facilities.  However, the Conference Report[19] shows that the adopted legislation, § 332(c)(7),

6    "*prevents Commission preemption of local and State land use decisions and preserves the authority*

7    *of State and local governments over zoning and land use matters* except in the limited circumstances

8    set forth in the conference agreement."  H.R. Conf. Rep. No. 104-458, at 207-08 (1996) (emphasis

9    added).

10    The two "limited circumstances" that are exceptions to the preservation of local authority are

11    found in § 332(c)(7)(B)(i).  First, local governments may not "unreasonably discriminate among

12    providers of functionally equivalent services."  The Conference Report's explanation of this

13    restriction only underscores the validity of the City's Regulations:

> The intent of the conferees is to ensure that a State or local government does
> not . . . unreasonably favor one competitor over another.  The conferees also
> intend that the phrase 'unreasonably discriminate among providers of
> functionally equivalent services' will provide localities with the flexibility to
> treat facilities that create different *visual, aesthetic, or safety concerns*
> differently to the extent permitted under generally applicable zoning
> requirements even if those facilities provide functionally equivalent services.
> For example, *the conferees do not intend that if a State or local government
> grants a permit in a commercial district, it must also grant a permit for a
> competitor's 50-foot tower in a residential district.*

20    *Id.* at 208 (1996) (emphasis added).  Notably, Congress expressly stated that local governments retain

21    the discretion to deny permits in certain areas based on "visual, aesthetic or safety concerns."

22    The second limitation is that local regulations may not "prohibit or have the effect of

23    prohibiting personal wireless services."  Again, the Conference Report speaks directly in support of

24    the Regulations:  "[i]t is the intent of this section that bans or policies that have the effect of banning

---

[19]   The conference report is considered the most reliable evidence of legislative intent because
it represents the final statement of the terms agreed to by both houses.  *Auburn Housing Auth. v.
Martinez*, 277 F.3d 138, 147 (2d Cir. 2002).

personal wireless services or facilities not be allowed *and that decisions be made on a case-by-case basis*." *Id.* at 208 (1996) (emphasis added).

The Regulations mirror Congress' example of permissible regulatory discretion. For proposed installations outside of protected locations – equivalent to the "commercial district" in Congress' example – the Ordinance allows virtually unrestricted access to the City's public rights of way. However, in the protected locations – akin to the "residential district" cited by Congress – the City will make case-by-case decisions about where the facilities may be located in order to avoid unreasonable intrusions on the City's historic or scenic resources. Because the Regulations impose requirements that Congress consciously and explicitly reserved for local governments in § 332(c)(7), it would impermissibly "frustrate the purpose" of § 332(c)(7) to preempt the Regulations under § 253. *City of San Marcos*, 204 F. Supp. 2d at 1268.

NextG argues that § 332(c)(7) is not a defense to preemption under § 253(a). NextG Motion, pp. 18-19. NextG's principal basis for this position is the *Sprint* decision that the Ninth Circuit has agreed to rehear *en banc* and may no longer be cited as precedent. NextG's only other argument is the general and uncontroversial statement that Section 332(c)(7) imposes some limitations on the traditional authority of state and local governments to regulate wireless facilities, citing *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 115 (2005). However, NextG fails to address any of the specific provisions of Section 332(c)(7) discussed above – and their explicit legislative history – which demonstrate that, whatever limitations Congress intended, it did not intend to prevent local governments from making case-by-case decisions regarding the placement of Wireless Facilities based on visual, aesthetic or safety concerns. Because the City's Regulations manage the placement of Wireless Facilities in ways that Congress expressly preserved under § 332(c)(7), the Regulations may not be preempted under § 253.

### B.    NextG Has Not Met Its Burden of Demonstrating that Public Utilities Code § 7901 Preempts the City's Regulations

NextG also argues that Public Utilities Code §§ 7901 and 7901.1 preempt the Regulations. In Section IV.B. of its motion for summary judgment, the City has explained that the Regulations impose reasonable restrictions on NextG's use of the rights-of-way under state law. The City also

points out that the issues raised by NextG are unresolved under state law and that, under 28 U.S.C. § 1367(c)(1), the Court should therefore decline supplemental jurisdiction over NextG's state law claims.  The City incorporates Section IV.B. of its summary judgment motion herein by reference.

**VII.    CONCLUSION**

Having never submitted an application under the City's Regulations, Next has based its motion on a misunderstanding of how the Regulations actually work.  As the foregoing has demonstrated, the Regulations afford NextG ample opportunity to deploy its Wireless Facilities in San Francisco with a minimum of burden.  The Court should deny NextG's motion for judgment on the pleadings and grant the City's motion for summary judgment.

Dated: May 16, 2008                             DENNIS J. HERRERA
                                                City Attorney
                                                THERESA L. MUELLER
                                                Chief Energy and Telecommunications Deputy
                                                WILLIAM K. SANDERS
                                                THOMAS J. LONG
                                                Deputy City Attorneys



                                    By:_____/s/_____
                                                THOMAS J. LONG

                                                Attorneys for Defendants
                                                THE CITY AND COUNTY OF SAN FRANCISCO and
                                                THE DEPARTMENT OF PUBLIC WORKS OF THE
                                                CITY AND COUNTY OF SAN FRANCISCO

# APPENDIX OF STATUTORY AUTHORITIES

47 U.S.C. § 253.  Removal of barriers to entry

(a) In general. No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

(b) State regulatory authority. Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

(c) State and local government authority. Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

(d) Preemption. If, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b), the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.

(e) Commercial mobile service providers. Nothing in this section shall affect the application of section 332(c)(3) to commercial mobile service providers.

(f) Rural Markets. It shall not be a violation of this section for a State to require a telecommunications carrier that seeks to provide telephone exchange service or exchange access in a service area served by a rural telephone company to meet the requirements in section 214(e)(1) for designation as an eligible telecommunications carrier for that area before being permitted to provide such service. This subsection shall not apply--
   (1) to a service area served by a rural telephone company that has obtained an exemption, suspension, or modification of section 251(c)(4) that effectively prevents a competitor from meeting the requirements of section 214(e)(1); and
   (2) to a provider of commercial mobile services.

47 U.S.C. § 332.  Mobile services

(c) Regulatory treatment of mobile services.
 .       .       .
    (7) Preservation of local zoning authority.
    (A) General authority. Except as provided in this paragraph, nothing in this Act shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.
    (B) Limitations.
        (i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof--
            (I) shall not unreasonably discriminate among providers of functionally equivalent services; and
            (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.
        (ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.
        (iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.
        (iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.
        (v) Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis. Any person adversely affected by an act or failure to act by a State or local government or any instrumentality thereof that is inconsistent with clause (iv) may petition the Commission for relief.
    (C) Definitions. For purposes of this paragraph--
        (i) the term "personal wireless services" means commercial mobile services, unlicensed wireless services, and common carrier wireless exchange access services;
        (ii) the term "personal wireless service facilities" means facilities for the provision of personal wireless services; and
        (iii) the term "unlicensed wireless service" means the offering of telecommunications services using duly authorized devices which do not require individual licenses, but does not mean the provision of direct-to-home satellite services (as defined in section 303(v)).

28 U.S.C. § 1367.  Supplemental jurisdiction

(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

(b) In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title, the district courts shall not have supplemental jurisdiction under subsection (a) over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure, or over claims by persons proposed to be joined as plaintiffs under Rule 19 of such rules, or seeking to intervene as plaintiffs under Rule 24 of such rules, when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332.

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if--
    (1) the claim raises a novel or complex issue of State law,
    (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
    (3) the district court has dismissed all claims over which it has original jurisdiction, or
    (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

(d) The period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.

(e) As used in this section, the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

California Public Utilities Code § 7901.  Right of way along roads, waters, and highways

Telegraph or telephone corporations may construct lines of telegraph or telephone lines along and upon any public road or highway, along or across any of the waters or lands within this State, and may erect poles, posts, piers, or abutments for supporting the insulators, wires, and other necessary fixtures of their lines, in such manner and at such points as not to incommode the public use of the road or highway or interrupt the navigation of the waters.

California Public Utilities Code § 7901.1.  Legislative intent

(a) It is the intent of the Legislature, consistent with Section 7901, that municipalities shall have the right to exercise reasonable control as to the time, place, and manner in which roads, highways, and waterways are accessed.

(b) The control, to be reasonable, shall, at a minimum, be applied to all entities in an equivalent manner.

(c) Nothing in this section shall add to or subtract from any existing authority with respect to the imposition of fees by municipalities.