United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

NEXTG NETWORKS OF CALIFORNIA, INC., a Delaware Corporation,

Plaintiff,

v.

THE CITY AND COUNTY OF SAN FRANCISCO, and THE DEPARTMENT OF PUBLIC WORKS OF THE CITY OF SAN FRANCISCO,

Defendants.
_______________________________________/

No. C 08-00985 MHP

**MEMORANDUM & ORDER**

**Re: Cross-Motions for Summary Judgment**

Plaintiff NextG Networks of California, Inc. ("NextG"), a telecommunications company, has filed this action against the City of San Francisco (the "City") and the Department of Public Works of the City of San Francisco ("DPW"), alleging that the City has enacted an ordinance that interferes with NextG's right to install, operate, and maintain its facilities along or upon the public rights-of-way. NextG asserts that the City's ordinance (1) is preempted by section 253 of the Telecommunications Act of 1996, 47 U.S.C. section 253, (2) violates sections 7901 and 7901.1 of the California Public Utilities Code, and (3) violates Article I, Section 10, Clause 1 of the U.S. Constitution forbidding a state from passing laws that impair the obligation of contracts. Now before the court are the parties' cross-motions for summary judgment.[1] Having considered the parties' arguments and submissions, the court enters the following memorandum and order.

BACKGROUND

There is no dispute that plaintiff NextG is a "telecommunications carrier" that provides "telecommunications service," as those terms are defined and used in the federal Communications Act of 1934, 47 U.S.C. sections 153 (44) & (46), as recently amended by the Telecommunications Act of 1996. There is also no dispute that NextG is a "telephone corporation" operating a

United States District Court
For the Northern District of California

"telephone line" as those terms are defined under California Public Utility Code sections 234(a) and 233.

NextG does not operate a complete end-to-end communications network or offer services directly to customers or businesses. Rather, NextG's network consists of discrete, localized extensions to other wireless carriers' networks which transport the carriers' signals to areas that lack complete coverage. NextG's network comprises two types of physical components: fiber optic cable, which is deployed through underground conduits; and radio frequency transmitter and receiver units, which are located aboveground on structures such as buildings or utility poles.

This is the second round of litigation between NextG and the City concerning the City's attempted regulation of NextG's telecommunications facilities. In the first action numbered C 05-00658 and filed before this court on February 11, 2005, at issue was the City's then-existing regulations requiring NextG to obtain a major encroachment permit. The permit applications required an explanation of the purpose of the facilities, maps showing the location of the facilities, pictures of the proposed locations, drawings and specifications for the equipment to be installed, and contact information for the party requesting the permit. The party requesting the permit was required to pay an $800 processing fee as well as $4,000 to cover the City's administrative costs and attorneys' fees. Notice to seven different city agencies including the Planning, Fire, and Police Departments was necessary and thereafter, each separate agency was required to provide a report to the Director of Public Works. Following a public hearing on the permit, the Department of Public Works would then submit a recommendation to the Board of Supervisors which retained plenary power to accept or reject the recommendation of the Department of Public Works..

In NextG Networks of California, Inc. v. City and County of San Francisco, 2006 WL 1529990 at *5 (N.D. Cal. June 2, 2006) (hereinafter "NextG I"), this court found the then-existing major encroachment permitting process to be time-consuming, expensive and subject to the absolute and unfettered discretion of the Board of Supervisors. The court ruled that the City's permitting process may prohibit or have the effect of prohibiting NextG from providing telecommunications services and therefore, was preempted under 47 U.S.C. section 253(a). Id. The court also found that the City's permitting process was not saved by the safe harbor provisions of 47 U.S.C. section

253(c) because the process did more than regulate NextG's use of the public rights-of-way. Id. at *9. Assuming without deciding that section 253(b) was applicable not only to states but also to local governments, the court also found that the City's permitting process was not saved by the safe harbor provisions of 47 U.S.C. section 253(b) because the process did not further the public safety and welfare. Id. The court enjoined the City from requiring NextG to obtain a major encroachment permit and ordered the City to issue NextG such lawful permits as NextG required to install, operate, and maintain NextG's telecommunications facilities in the public rights-of-way. The city appealed the court's judgment.

Following NextG I, the City returned to the drawing board and adopted an ordinance imposing a new set of regulations upon telecommunications providers such as NextG. On September 11, 2007, the City adopted Ordinance No. 214-07 and the mayor signed the Ordinance into law on September 21, 2007. Administrative Code section 11.9(a) already required telecommunications services carriers such as NextG to obtain a Utility Conditions Permit ("UCP") to use the public rights-of-way. McKenna Dec., Exh. A (hereinafter "Admin. Code"). Ordinance No. 214-07 amended the Administrative Code by adding section 11.9(b), which requires any entity that is entitled to a UCP and that seeks to install personal wireless service facilities in the public rights-of-way to obtain an additional Wireless Permit. Id. In December 2007, the Department of Public Works ("DPW") issued final regulations implementing the new Ordinance. The implementing regulations are found in DPW Order No. 177,163. McKenna Dec., Exh. B (hereinafter "DPW Order"). NextG does not dispute that its aboveground radio frequency antennas and associated equipment are subject to the new Wireless Permit requirements.

Unlike the major encroachment permitting process at issue in NextG I, the wireless permitting process at issue here does not require a public hearing[2] and is not subject to the plenary discretionary power of the Board of Supervisors.

Under the new Ordinance and DPW Order (collectively, the "regulations"), telecommunications carriers requiring a Wireless Permit must submit an application to the Department of Public Works. The DPW "shall" approve the application unless review by any one of three different city departments is required. DPW Order § III.D.3. The three additional city

departments include the Planning Department, the Recreation and Park Department, and the Public Health Department. Id. Where review by any of these three additional City departments is required, the Department of Public Works "shall not" issue a Wireless Permit unless the sister department has recommended approval. Admin. Code § 11.9(b)(2)(A)–(C). The DPW Order reiterates that the determination of the three sister City departments to approve or deny is binding upon the DPW. DPW Order § III.C.5 ("If the Department of Public Health determines that human exposure to radio frequency emissions exceeds FCC limits, the [DPW] *will* deny the application") (emphasis added); Id. § III.C.6 ("The determination of the Planning Department and/or the Recreation and Park Department *shall be binding* on the [DPW]") (emphasis added).

Review by the Planning Department is required if the proposed location of the wireless facility is:

> (a) On a historic, historically or architecturally significant, decorative, or specially designed Utility Pole;
>
> (b) In a: (i) National Historic Landmark District; (ii) listed or eligible National Register Historic District; (iii) listed or eligible California Register Historic District; (iv) San Francisco Landmark District; (v) local Historic or Conservation District; or (vi) locally significant district;
>
> (c) Adjacent to a: (i) National Historic Landmark; (ii) California Landmark; (iii) San Francisco Landmark; (iv) Structure of Merit; (v) building that the City has designated as architecturally significant; or (vi) locally significant building; or
>
> (d) On a street identified in the City and County of San Francisco General Plan as one that: (i) is most significant to City pattern; (ii) defines City form; (iii) has an important street view for orientation; or (iv) has street views that are rated "excellent" or "good."

DPW Order § III.D.4; see also Admin. Code § 11.9(b)(2)(A). Review by the Recreation and Park Department is required if the proposed location is "Adjacent to a City park or open space." DPW Order III.D.5; see also Admin. Code § 11.9(b)(2)(B). Finally, the Department of Public Health must determine that human exposure to radio frequency emissions from the proposed wireless facility does not exceed limits set by the Federal Communications Commission ("FCC"). DPW Order § III.8; see also Admin. Code § 11.9(b)(2)(C). For purposes of review by the Planning Department, the term "Adjacent" is defined in the DPW Order as "on the same side of the street and in front of the building or the next building on either side." DPW Order § II.A(i). For purposes of review by

the Recreation and Parks Department, the term "Adjacent" is defined in the DPW Order as "on the same side of the street." Id. § II.A(ii).

The Administrative Code sets forth standards by which the various sister departments will conduct their own review. The Planning Department "shall" recommend approval of a Wireless Permit if it determines that the proposed location of the wireless facility is "consistent with the public health, safety, convenience, and general welfare and will not unreasonably affect, intrude upon or diminish any of the identified City resources." Admin. Code § 11.9(b)(2)(A). The Recreation and Park Department "shall" recommend approval of a Wireless Permit if it determines that the proposed location "will not unreasonably affect, intrude upon or diminish a City park or open space." Id. § 11.9(b)(2)(B). Finally, the Department of Public Health "shall" recommend approval of a permit if it determines that human exposure to radio frequency emissions from the proposed wireless facility is within limits established by the FCC. Id. § 11.9(b)(2)(C).

DPW makes the determination as to whether an application must be forwarded to the Planning and/or Recreation and Parks Department for review and approval. DPW Order § III.D.3. Referral to the Planning Department is based on a DPW map that identifies historic buildings and districts as well as streets with scenic views. As discussed below, the identification of historic areas and scenic views is pre-determined by the Planning Department pursuant to federal, state and local law and does not allow for discretion by the DPW. Similarly, identification of City parks and open spaces is determined by the Recreation and Parks Department and does not allow for discretion by the DPW. A separate map identifying parks and open spaces is used by the DPW to determine if referral to the Recreation and Parks Department is required. Both maps are available in formats that allow a user to zoom into individual streets or buildings. McKenna Dec. ¶¶ 17–21, Exhs. E, F.

The Administrative Code does not define what makes a utility pole, building or district "historic," "architecturally significant," or "locally significant" such that the DPW must refer an a Wireless Permit application to the Planning Department. Admin. Code § 11.9(b)(2)(A). Pursuant to various federal, state and local historic preservation laws, however, the Planning Department has identified significant City resources that merit special consideration before they or their surroundings may be altered by new construction. See Luellen Dec. For example, the California

United States District Court
For the Northern District of California

Environmental Quality Act ("CEQA") provides that "historical resources" may include any "object, building, structure, site, area [or] place" that is "historically significant or significant in the architectural, engineering, scientific, economic, agricultural, educational, social, political, military, or cultural annals of California." Title 14 Cal. Code of Reg., Chapter 3, § 15064.5(a)(3). Pursuant to the CEQA, the Planning Department maintains a detailed listing of all the City's historic resources which is summarized in San Francisco Preservation Bulletin No. 16. Luellen Dec., Exh. A. City resources identified pursuant to federal, state, or local laws as historic and otherwise significant have been incorporated into maps the DPW has developed and published for purposes of determining whether review by the Planning Department is triggered under the Wireless Permit process. McKenna Dec., Exh. D. Moreover, the DPW Order itself references local, state and federal historic preservation laws, referring specifically to districts and buildings that have been designated, for example, National Historic Landmarks. DPW Order III.D.4.

Similarly, the Administrative Code does not define when a particular street contains "valued scenic resources that should be protected and conserved." Admin. Code § 11.9(b)(2)(A). As stated in the Administrative Code itself, however, such streets have been identified pursuant to the City's General Plan. Id. Under California Government Code §§ 65350 *et seq.*, all local governments are required to prepare general plans that address seven issues including land use, circulation, housing, conservation, open space, noise and safety. Ghosh Dec. ¶ 9. The "Urban Design Element," which has been part of the City's General Plan since 1972, contains two maps, one entitled "Street Areas Important to Urban Design and Views" and a second entitled "Quality of Street View." Ghosh Dec., Exhs. A, B. Together, these two maps identify (1) streets with views of important buildings, (2) streets that define city form, (3) streets that extend the effect of public open space, (4) streets forming the forty-nine mile scenic drive, (5) streets with important street views for orientation, and (6) streets where views are features that are important in attracting business firms and residents to the City. Ghosh Dec. ¶¶ 15–17. The DPW Order also references the General Plan when discussing streets that trigger review by the Planning Department. DPW Order § III.D.4. Just as historic buildings and districts have been incorporated into published DPW maps used to determine whether review by the Planning Department is required under the Wireless Permit process, streets identified

United States District Court
For the Northern District of California

as having important scenic views by the General Plan have also been incorporated into the DPW maps. McKenna Dec., Exh. D.

A Wireless Permit application must identify, describe, and depict through drawings and a photographic simulation the proposed wireless facilities and their proposed locations. DPW Order § III.C. The application must also provide proof, if necessary, that permission to install the wireless facility has been obtained from the owners of any existing utility pole, a statement that any required California Environmental Quality Act ("CEQA") approvals for installation of the wireless facilities have been obtained from the CPUC or the Planning Department, and a verified statement from a qualified engineer that human exposure to radio frequency emissions from the facilities is within the limits established by the FCC. Id. No other information, certifications, or statements are required.

Application and other fees for obtaining a Wireless Permit are set forth in Administrative Code section 11.9(b)(3). The initial application fee to the DPW consists of a per facility fee of $75 to cover costs related to reviewing the application and a per facility fee of $150 to cover costs related to inspecting the wireless facility to ensure compliance with the terms of the permit. Admin. Code § 11.9(b)(3)(A). If review is required by the Planning, Recreation and Parks, or the Public Health Departments, additional fees ranging from $105 to $135 per wireless facility are imposed for the purpose of compensating the applicable City department for costs related to reviewing an application. Id. § 11.9(b)(3)(B). Finally, in certain instances where the review of an application "is or will be unusually costly to the [DPW or to other City departments], the Director of Public Works, in his or her discretion, may require [an applicant] to pay a sum in excess of the [standard] fees." Id. § 11.9(b)(3)(D). These additional fees "shall be sufficient to recover actual costs, . . . shall be charged on a time and materials basis, . . . [and] upon request, shall be [documented] in writing." Id.

The projected timeline for review is relatively short. Upon receipt of the application the DPW makes an initial determination as to whether the application is complete. DPW Order III.D.1. If the application is incomplete, DPW shall notify the applicant within three business days and shall return the application along with a statement of what additional information is required. Id. at III.D.2. If additional review by the Planning, Recreation and Parks, and/or Public Health Departments is required, the DPW "will request" that those departments "will make a good faith

United States District Court
For the Northern District of California

effort" to make a decision, within at most, fifteen business days of receiving the referred application. Id. at III..D.8, III.D.9. After receiving a recommendation from the other departments, the DPW "shall issue a determination granting or denying the application" within five business days. Id. at III.D.10.

The final step of the application process involves an appeal process. The regulations provide that the DPW's approval or denial of a Wireless Permit may be appealed to the Board of Permit Appeals. Id. at VI. Under the appeals process, a public hearing is required and members of the public must given an opportunity to be heard.

LEGAL STANDARD

Summary judgment is proper when the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id. The party moving for summary judgment bears the burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986). On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Id.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Mere allegations or denials do not defeat a moving party's allegations. Id.; Gasaway v. Nw. Mut. Life Ins. Co., 26 F.3d 957, 960 (9th Cir. 1994). The court may not make credibility determinations, and inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the motion. Masson v. New Yorker Magazine, 501 U.S. 496, 520 (1991); Anderson, 477 U.S. at 249. The moving party may "move with or without supporting affidavits for a summary judgment in the party's favor upon all or any

United States District Court
For the Northern District of California

part thereof." Fed. R. Civ. P. 56(a). "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e).

DISCUSSION

NextG and the City bring cross-motions for summary judgment regarding whether the City's Ordinance No. 214-07 and DPW Order No. 177,163 (collectively, the "regulations") setting forth a process for obtaining a Wireless Permit is preempted, on its face,[3] by section 253(a) of the Telecommunications Act of 1996, 47 U.S.C. § 253(a). The parties also bring cross-motions for summary judgment as to whether the City's regulations violate California Public Utilities Code sections 7901 and 7901.1.

I. Federal Telecommunications Act of 1996

In 1996, Congress passed the Federal Telecommunications Act. PL 104–104, 110 Stat 56. The full title of the Act is "An act to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunication technologies." Qwest Communications v. City of Berkeley, 433 F.3d 1253, 1255 (9th Cir. 2006) (quoting H.R.Rep. No.104-458 (1996) (Conf. Rep.)).

Section 253(a) of the Act furthers this regulatory purpose by precluding states and municipalities from passing laws that "may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." 47 U.S.C. § 253(a). In order to show that a local regulation is preempted, the telecommunications provider need not show that the local regulation *actually* prohibits its ability to provide telecommunications services. Rather, it is sufficient if the regulation *may* have the effect of prohibiting the provision of services. NextG I, 2006 WL 1529990 at *4 (citing Qwest Corp. v. City of Portland, 385 F.3d 1236, 1241 (9th Cir. 2004), cert. denied, 544 U.S. 1049 (2005)). The Ninth Circuit has interpreted section 253(a) as an express preemption of state regulation that is "'virtually absolute' in restricting municipalities to

a 'very limited and proscribed role in the regulation of telecommunications.'" Id. at 1256 (quoting City of Auburn v. Qwest Corp., 260 F.3d 1160, 1175 (9th Cir. 2001)). The narrowly circumscribed role is set forth in sections 253(c) and 253(b).

Section 253(c) preserves the authority of state and local governments "to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis." 47 U.S.C. § 253(c). The Telecommunications Act does not define "manage[ment of] the public rights-of-way," but the Ninth Circuit has looked for guidance from other sources including the Act's legislative history and the FCC, the agency charged with interpreting and enforcing the Act. City of Auburn, 260 F.3d at 1177. Based on these sources, the Ninth Circuit has noted that management of the public rights-of-way includes the authority to preserve the physical integrity of streets and highways; control the orderly flow of vehicles and pedestrians; manage gas, water, cable, and telephone facilities that crisscross the streets and public rights-of way; coordinate schedules; determine insurance, bonding and indemnity requirements; establish and enforce building codes and local zoning regulations; keep track of various systems using rights-of-way to prevent interference between them; require a company to pay fees to recover an appropriate share of increased street repair and paving costs that result from excavation; and require a company to place its facilities underground, rather than overhead, consistent with the requirements imposed on other utility companies. Id.

Additionally, section 253(b) provides an additional "safe harbor" preserving the authority of a state "to impose, on a competitively neutral basis . . . requirements necessary . . . to protect the public safety and welfare." 47 U.S.C. § 253(b). Unlike section 253(c), section 253(b) refers to the reserved authority of a *state only* and does not also refer to local governments. Section 253(b), however, may apply to local governments to the extent that a state has delegated to a municipality its authority to protect the public safety and welfare. See Cox Commc'ns PCS v. City of San Marcos, 204 F. Supp. 2d 1206, 1268–69 (S.D. Cal. 2002); GTE Mobilnet of California Limited Partnership v. City and County of San Francisco, 2007 WL 420089 at *5 (N.D. Cal. February 6, 2007) (Illston, J.). California has delegated such authority to the City through the California Constitution[4] and the

United States District Court
For the Northern District of California

California Public Utilities Code,[5] and accordingly, section 253(b) allows a municipality to regulate telecommunications carriers to protect the public safety and welfare.[6]

A steady stream of litigation since the year 2000 has resulted in some guidance on what types of municipal regulations are preempted under section 253(a). As one district court has summarized, the "common features" of ordinances that have been preempted include: (1) a complicated application process (including reporting of financial and other information related to the fitness of a provider to provide services); (2) a public hearing on the application; (3) imposition of criminal or civil sanctions for violations; and (4) unfettered discretion to approve or deny the application, or revoke a permit once issued. NextG Networks of California, Inc. v. County of Los Angeles, 522 F. Supp. 2d 1240, 1249 (C.D. Cal. 2007) (summarizing Ninth Circuit cases in City of Berkeley and City of Auburn together with district court cases including GTE Mobilnet of California L.P. v. City and County of San Francisco, 2007 WL 420089 at *4–5 (N.D. Cal. Feb. 6, 2007); NextG Networks of California, Inc. v. City and County of San Francisco, 2006 WL 1529990 at *5 (N.D. Cal. June 2, 2006); Cox Commc'ncs PCS, L.P. v. City of San Marcos, 204 F. Supp. 2d 1260, 1265–66 (S.D. Cal. 2002)).

Since NextG v. County of Los Angeles, district courts in the Ninth Circuit have continued to find municipal regulations to be preempted by section 253(a). See T-Mobile USA, Inc. v. City of Anacortes, 2008 U.S. Dist. LEXIS 37481 (W.D. Wa.. May 6, 2008); New Path Networks v. City of Irvine, 2008 WL 2199689 at *3–4 (C.D. Cal. Mar. 10, 2008); NextG Networks of California, Inc. v. City of Huntington Beach, SACV 07-1471 ABC (RNBx), Docket No. 30, (C.D. Cal. February 7, 2008). These cases, like their predecessors, struck down municipal regulations that involved burdensome application requirements, public hearings, criminal or civil sanctions, unfettered discretion, or some combination thereof.

The municipal regulations at issue here are distinguishable in a variety of aspects from the preempted regulations at issue in these prior cases. First, telecommunications providers are not subject to any civil or criminal penalties for failure to comply with the regulations. Second, no public hearings are required for the initial application process.

Third, the application process is relatively basic, streamlined, and inexpensive. The information required for the application is limited to the information necessary to identify the proposed locations of the wireless facilities; information related to whether or not the applicant has permission to use a particular utility pole; a certification that the applicant has obtained approvals required under the California Environmental Quality Act; and a certification that radio frequency emissions are within FCC limits. No other information concerning the applicant's financial condition, qualifications, corporate policies, licenses, and rates, terms and conditions of service are required. Moreover, the list of required information is a closed list that does not allow the City to request additional unspecified information. The regulations also specify a time frame within which the City is to process the application. Although not a binding deadline, the regulations require the City to use good faith efforts to approve an application within a few weeks of it being submitted. Finally, the application process imposes reasonable fees that are directly related to the costs of processing an application. The court concludes that these aspects of the application process, either individually or in combination are not so onerous, complicated, time-consuming or expensive as to prohibit or have the effect of prohibiting the provision of telecommunications service.

Although many individual aspects of the City's regulation are not preempted under section 253(a), some aspects are. First, if an application is either denied or approved, that decision may be appealed to the Board of Permit Appeals. The rules governing the Board of Permit Appeals call for public hearings and no standard is set forth to guide the Board's decision-making. All of the prior cases striking down municipal regulations have found this type of unfettered discretion to be especially problematic. Accordingly, because the appeals process set forth in DPW Order section VI allows for public hearings and unfettered discretion, it is preempted under section 253(a) and not saved by the safe harbor provisions of sections 253(b) and (c).

Second, as mentioned above, the application fees are generally reasonable and directly related to the City's costs in processing an application. However, one aspect of the fee structure allows the DPW to impose excess fees above the standard enumerated fees if the cost of reviewing an application is "unusually costly." Although any excess fee imposed must be "sufficient to cover actual costs, . . . shall be charged on a time and materials basis," and "shall be [documented] in

writing" upon request, the court is troubled by the absence of any limitation on the amount of excess fees that may be imposed as well as the fact that the Director of the DPW retains discretion to determine when the cost of reviewing an application is "unusually costly." Again, this type of unfettered discretion has been found to be especially problematic. The court concludes that Administrative Code section 11.9(b)(3)(D) allowing for unlimited excess fees imposed at the discretion of the DPW is preempted under section 253(a) and not saved by the safe harbor provisions of sections 253(b) and (c).

Having identified some components which are preempted and some which are not, the court now addresses the remaining component which lies at the heart of the regulations. This component calls for review by the Planning, Recreation and Parks, and Public Health Departments. Review by the Public Health Department is required for a single limited purpose—to determine whether radio frequency emissions are within FCC limits. Although denial of an application because emissions are not within FCC limits may have the effect of prohibiting telecommunications service, the regulation is saved by section 253(c) because it is directly related to protecting the public health and safety.

Similarly, denial of an application by the Planning and Recreation and Parks Departments may also have the effect of prohibiting service, but the regulation is directly related to the City's authority to manage the public rights-of-way under section 253(c). In NextG I, this court "acknowledge[d] the City's concern that absent regulation, wireless antennas will proliferate without regard for public convenience, the negative views of residents, or aesthetic guidelines." NextG I, 2006 WL 1529990 at *9. In regulating the placement of wireless antennas and taking into account such concerns as aesthetic values, scenic views, and visual clutter, the City is exercising a legitimate interest in regulating the public rights-of-way. Management of the public rights-of-way has been recognized to include requiring equipment to be placed underground, maintaining the physical integrity of the rights-of-way, and preventing a tangled mass of criss-crossing wires and equipment. See City of Auburn, 260 F.3d at 1177. If each of these regulations constitutes permissible management of the rights-of-way, then regulation to control the placement of wireless facilities on utility poles and other locations, even if driven primarily by aesthetic concerns, is also permissible.

The court concludes that the component of the regulations requiring review by the Planning and Recreation and Parks Department falls within the safe harbor of section 253(c).

The regulations here are not as broad as those in City of Auburn where the city had discretion to grant, deny or revoke a franchise based on whether a franchise would "use the public ways [to] serve the community interest" or whether granting a license agreement would be "deemed in the best interest of the City." City of Auburn, 260 F.3d at 1179 n.18. The standards here are not "unnamed" as they were in the City of Auburn. Id. To the contrary, in this case the City does not assert any possible "unnamed" and unspecified interest it may have in regulating wireless facilities. Instead, the City's interest is limited to protecting the integrity of its historic and cultural resources as well as its parks and open spaces. Whether this interest is grounded in concerns for aesthetics, convenience, property values, tourism, or business development is not the issue. Whatever the underlying concern, the City may assert an interest in protecting its valuable resources and it is permissible to regulate telecommunications on the basis of that interest.

The court's analysis, however, does not end here. The problem with the City's regulation is not that it takes into account, among other concerns, subjective aesthetic values. The problem is that this value is not articulated with specificity and detail and leaves too much room for discretion. The Planning Department reviews an application according to whether the wireless facility is "consistent with the public health, safety, convenience, and general welfare and will not unreasonably affect, intrude upon or diminish any of the identified City resources." Similarly, the Recreation and Parks Department reviews an application to determine if the wireless facility will "unreasonably affect, intrude upon or diminish a City park or open space." These standards are too vague and too broad to fall within the safe harbor of section 253(c). The court acknowledges that aesthetic values are inherently subjective and discretionary. But this does not mean that more specific criteria cannot be enumerated so as to give applicants appropriate notice and City decision-makers proper guidance.

In sum, the court concludes that although many aspects of the City's regulation are not preempted, particular provisions are. These include the appeals process under DPW Order section VI, the discretionary imposition of excess fees under Administrative Code section 11.9(3)(D), and the standards by which the Planning and Recreation and Parks Departments review an application

pursuant to Administrative Code sections 11.9(2)(A) and (B). To be clear, the court finds that *review* by the Planning and Recreation and Parks Departments, even if driven primarily by aesthetic concerns, is a permissible form of management of the public rights-of-way. Nevertheless, the current *standards* by which those Departments review a wireless permit application are not sufficiently specific and detailed to fall within the safe harbor of section 253(c).

The City has informed the court that Administrative Code Chapter 11, the chapter which contains the wireless permit requirements, contains a severability provision that states, "If any part of this Chapter . . . is held invalid, the remainder of this Chapter . . . shall not be affected thereby and shall continue in full force and effect. To this end, provisions of this Chapter are severable." Admin. Code § 11.72. Pursuant to this express severability provision, the court need not invalidate the entire regulatory scheme. Rather, only those portions identified above that are preempted and not otherwise saved by the safe harbors of sections 253(b)and 253(c) are invalid and severed from the remaining provisions.

II. California Public Utilities Code Section 7901

Pursuant to 28 U.S.C. section 1367(c)(1), the City urges the court to decline supplemental jurisdiction over NextG's state law claim because the issue presented—whether California Public Utilities Code section 7901 permits local governments to regulate the placement of telephone equipment in public rights-of-way on aesthetic grounds—is a novel and complex issue of state law.

Two courts have addressed this issue. The Ninth Circuit concluded that section 7901 preempted local ordinances. Sprint PCS Assets L.L.C. v. City of La Canada Flintridge, 435 F.3d 993, 997–98, amended, 448 F.3d 1067 (9th Cir. 2006). The California Court of Appeal reached the opposite conclusion, expressly disagreeing with the Ninth Circuit. Sprint Telephony v. County of San Diego, 140 Cal. App. 4th 748, 768 n.13, 44 Cal. Rptr. 3d 754 (2006). In light of the disagreement, the Ninth Circuit amended its prior opinion in City of La Canada Flintridge, placing its discussion of section 7901 into an unpublished memorandum disposition. See 2006 WL 1457785.

United States District Court
For the Northern District of California

The Ninth Circuit also requested the California Supreme Court to decide the issue. Sprint PCS Assets, LLC v. City of Palos Verdes, 487 F.3d 694 (9th Cir. 2007). The California Supreme Court granted review of the California Court of Appeal decision in Sprint Telephony v. County of San Diego, see 143 P.3d 654, 49 Cal. Rptr. 3d 653, but later dismissed the appeal, see 175 P.3d 1, 71 Cal. Rptr. 3d 251. In dismissing the appeal of Sprint Telephony v. County of San Diego, the California Supreme Court cited to the Ninth Circuit's decision in Sprint Telephony v. County of San Diego, 490 F.3d 700 (9th Cir. 2007), which the Ninth Circuit has recently granted a petition to rehear en banc, 2008 WL 2051371 (9th Cir. 2008).

Faced with uncertainty over the construction of a state statute that is over 100 years old, district courts have generally declined to exercise supplemental jurisdiction over claims under section 7901. See e.g., Pacific Bell Tel. Co. v. City of Walnut Creek, 428 F. Supp. 2d 1037, 1049 (2006); Qwest Communications Corp. v. City of Berkeley, 146 F. Supp. 2d 1081, 1101 (N.D. Cal. 2001); Cox Communications v. City of San Marcos, 204 F. Supp. 2d 1272, 1284–85 (S.D. Cal. 2002); but see, GTE Mobilnet of California L.P. v. City and County of San Francisco, 440 F. Supp. 2d 1097, 1102–06 (N.D. Ca. 2006).

This court agrees with the City that NextG's state law claim raises novel and complex issues of state law. Accordingly, the court declines supplemental jurisdiction over plaintiff's claims under California Public Utilities Code sections 7901 and 7901.1.

CONCLUSION

Plaintiff's and defendant's motions are each GRANTED IN PART and DENIED IN PART. Plaintiff's second cause of action for violation of California Utilities Code sections 7901 and 7901.1 is DISMISSED.

IT IS SO ORDERED.

Dated: June 20, 2008

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

United States District Court
For the Northern District of California

ENDNOTES

1. Pursuant to Federal Rule of Civil Procedure Rule 12(d), the court has deemed NextG's motion, styled as a motion for judgment on the pleadings, as a motion for summary judgment.

2. NextG insists that if an application is referred to the Planning or Recreation and Park Departments, a public hearing will be required. This allegation finds no support in the record, and the face of the regulations is clear—they call for "review" of an application by the relevant department and nowhere do the regulations call for public hearings. Admin. Code § 11.9(b)(2)(A)–(C).

3. NextG has not submitted any applications to the DPW to obtain a Wireless Permit. Therefore, NextG's challenge to the permitting regulations is a facial, not an "as applied," challenge.

4. California Constitution article XII, section 8 reserves to municipalities the "power over public utilities relating to the making and enforcement of . . . regulations concerning municipal affairs."

5. California Public Utilities Code section 2902 protects a municipality's powers to regulate "matters affecting the health, convenience, and safety of the general public, including matters such as the use and repair of public streets by any public utility [and] the location of the poles, wires, mains, and conduits of any public utility, on under, or above any public streets."

6. In NextG I, this court assumed without deciding that section 253(b) was applicable to not just states, but local governments as well. NextG I, 2006 WL 1529990 at *9. In now holding that section 253(b) does in fact apply, the court joins its colleagues in Cox and GTE Mobilnet.